**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>v.<br><br>ANTON PERAIRE-BUENO, and JAMES PERAIRE-BUENO,<br><br>      Defendants. | Case No.: 1:24-cr-00293-JGLC |

**DEFENDANTS' REPLY IN SUPPORT OF JOINT
MOTION TO SUPPRESS OR, ALTERNATIVELY, FOR *FRANKS* HEARING**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.    THE GOVERNMENT MISSTATES THE APPLICABLE LEGAL PRINCIPLES........... 2

    A.    The government cannot hide behind the "good-faith exception," because that limited qualification to the exclusionary rule does not apply here. ........................ 2

    B.    "Selectivity" in "storytelling" is a red herring, because in his warrant affidavits, Dias did not only omit facts, he affirmatively misrepresented them. .................... 3

    C.    An evidentiary hearing is needed to determine if Dias intentionally misled the court or acted in reckless disregard of the truth. .............................................................. 4

II.   THE GOVERNMENT ADMITS CERTAIN MISREPRESENTATIONS IN THE WARRANT AFFIDAVITS AND MAKES WEAK EXCUSES FOR OTHERS................ 6

    A.    The government re-writes Dias's false statement that the Peraire-Buenos proposed "trades" that they had "no intention of executing" to refer to "bundles" that the alleged victims later created, not the trades themselves. ........................................ 8

    B.    The government implausibly argues that Dias's false statement that the alleged "Exploit" targeted "more obscure" tokens was technically true, because the common tokens at issue, which have market values in the billions, are still "more obscure" than Bitcoin............................................................................................. 9

    C.    The government erroneously dismisses Dias's false claim that the alleged victims, all predatory "sandwich attackers," were engaged in typical "arbitrage trading" as a "hyper-technical error."...................................................................................... 10

    D.    The government unconvincingly insists Dias's false claim that the Peraire-Buenos "altered transactions" did not mean that they actually "changed" any transactions. ..................................................................................................... 12

    E.    The government erroneously argues that if Dias had not manipulated his diagram of the MEV-Boost application, his affidavits would have been even more misleading........................................................................................................... 13

    F.    The government re-writes the false allegation that the Peraire-Buenos "tampered" with the blockchain itself, falsely claiming that Dias only accused them of undermining the "infrastructure" of the Ethereum Network. ................................ 14

III.  VIEWED IN THEIR TOTALITY, THE MISREPRESENTATIONS IN THE WARRANT AFFIDAVITS WERE PLAINLY MATERIAL TO THE FINDING OF PROBABLE CAUSE. ..................................................................................................................... 15

CONCLUSION................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Dist. of Columbia v. Wesby*, 583 U.S. 48 (2018) ........................................................15

*Franks v. Delaware*, 438 U.S. 154 (1978) ........................................................ *passim*

*Illinois v. Gates*, 462 U.S. 213 (1983) ........................................................3, 12

*Johnson v. United States*, 333 U.S. 10 (1948) ........................................................3

*Jones v. Town of Waldoboro*, 943 F.3d 532 (1st Cir. 2019) ........................................16

*Maryland v. Pringle*, 540 U.S. 366 (2003) ........................................................15

*Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991) ........................................5

*United States v. Anderson*, 2020 WL 249479 (W.D. Va. Jan. 16, 2020) ........................16

*United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) ........................................14, 16

*United States v. Boles*, 914 F.3d 95 (2d Cir. 2019) ........................................2

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000) ........................................17

*United States v. Clark*, 935 F.3d 558 (7th Cir. 2019) ........................................5, 7

*United States v. Esparza*, 546 F.2d 841 (9th Cir. 1976) ........................................7, 16

*United States v. Fama*, 758 F.2d 834 (2d Cir. 1985) ........................................6

*United States v. Glover*, 755 F.3d 811 (7th Cir. 2014) ........................................5, 6

*United States v. Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) ........................................3, 4, 5

*United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023) ........................................6, 14, 16, 17

*United States v. Leon*, 468 U.S. 897 (1984) ........................................2, 3, 6

*United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013) ........................................5

*United States v. Menendez*, 2024 WL 912210 (S.D.N.Y. Mar. 4, 2024) ........................16

*United States v. Rajarantam*, 719 F.3d 139 (2d Cir. 2013) ........................................5

*United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) ........................................3

*United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) .......................................................................2

*United States v. Simmons*, 771 F. Supp. 2d 908 (N.D. Ill. 2011) ...................................................16

*Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024) .........................................................................15

## OTHER AUTHORITIES

Mike Atolin, "What Are Liqudity Pools," Coindesk (Apr. 9. 2024),
    https://www.coindesk.com/learn/what-are-liquidity-pools......................................................10

## INTRODUCTION

Considered in their totality, the numerous, interrelated misrepresentations in Special Agent Marco Dias's warrant affidavits painted the following misleading picture for the court: the Peraire-Buenos, two "hackers" [*false*], orchestrated an alleged "Exploit" that targeted "more obscure cryptocurrency tokens" [*false*] to steal from individuals (or entities) engaged in "cryptocurrency arbitrage trading" [*false*] by proposing transactions that the Peraire-Buenos "had no intention of executing" [*false*] and obtaining private trading information that the "relay" should never have provided to the Peraire-Buenos, as "validators," under the Ethereum Network's protocols [*false*] and, in doing so, they "tampered" with the Ethereum blockchain itself, the "previously believed tamper-proof ledger system" [*false*]. Given the cumulative effect of these material, false statements, the basis for this *Franks* motion is not, as the government erroneously suggests, that pulling any single thread from Dias's affidavits would cause the court's findings of probable cause to unravel, rather it is that Dias's entire presentation was cut from whole cloth.

In its Opposition (ECF 61), the government largely concedes that many of Dias's statements in the warrant affidavits were inaccurate, incomplete, or otherwise misleading. It nevertheless attempts to avoid the consequences of these inaccuracies by ignoring the plain meaning of his representations, re-writing the affidavits, or ignoring the misleading over-arching narrative that the affidavits presented. At a minimum, this Court should hold a *Franks* hearing to develop a complete record and determine whether Dias acted deliberately or with reckless disregard for the truth when he included numerous material, false statements in the warrant affidavits. If he did, it would be no excuse, as the government contends, that officers relied in good faith on the Google Warrants. The law is clear that good faith is not a defense to suppression when an officer obtains a search warrant by misleading the neutral and detached magistrate who issues it.

## I.     THE GOVERNMENT MISSTATES THE APPLICABLE LEGAL PRINCIPLES.

### A.     The government cannot hide behind the "good-faith exception," because that limited qualification to the exclusionary rule does not apply here.

Predictably, the government asserts that government agents relied in good faith on the Google Warrants. *See* Opp'n 61-63. But even if that were true, the claim could not save the tainted evidence in this case from suppression. *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) ("Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble."). As a legal matter, the good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984), does not apply to a warrant challenge under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

The Supreme Court explicitly established that limitation in *Leon*, as the Second Circuit has repeatedly recognized. In *Leon*, the Supreme Court held:

> Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.

468 U.S. at 923 (citing *Franks*, 438 U.S. at 154). In *Reilly*, the Second Circuit confirmed:

> It bears emphasis . . . that the good-faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts. Good faith is not a blanket excuse for any police behavior. A warrant is not a general hunting license, nor it is a mantle of omnipotence, which cloaks its holders in the King's power to "do no wrong." And *perhaps most important, [good faith] is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant – proceedings that are typically* ex parte.

76 F.3d at 1273 (citing *Franks*, 438 U.S. at 155-56) (emphasis added); *see also, e.g.*, *United States v. Boles*, 914 F.3d 95, 103 (2d Cir. 2019) ("When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is

strong and tends to outweigh the resulting costs of suppression.") (citing *Davis v. United States*, 564 U.S. 229, 238 (2011)).

Similarly, in *United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015), on which the government relies (at 62), the Second Circuit held, "the good faith exception cannot shield even an officer who relies on a duly issued warrant . . . where the issuing magistrate has been knowingly misled." *Id.* at 118 (citing *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)). The court further emphasized that this limitation applies "not merely in cases of deliberate police misconduct, but also in situations where an officer is 'reckless' or 'grossly negligent' in seeking or executing a warrant." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)); *accord United States v. Lahey*, 967 F. Supp. 2d 698, 712 n.16 (S.D.N.Y. 2013) ("[T]he *Leon* exception normally does not apply where the underlying search warrant affidavit contains false statement or omissions that are intentional or reckless and material.").

**B.    "Selectivity" in "storytelling" is a red herring, because in his warrant affidavits, Dias did not only omit facts, he affirmatively misrepresented them.**

The warrant requirement of the Fourth Amendment ensures that an independent magistrate has an adequate opportunity to evaluate accurate information and to decide whether it establishes probable cause that a crime has occurred and, thus, that a search for evidence is justified. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983). "Its protection consists in requiring that . . . inferences [about probable cause] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). Yet the government recasts this constitutional exercise in truth-telling and neutral decision-making as the art of "storytelling" by law enforcement officials, arguing that "[a]ll storytelling involves an element of selectivity." Opp'n 60 (quoting *Lahey*, 967 F. Supp. 2d at 708).

To be clear, the Peraire-Buenos do not argue, as the government mistakenly suggests, that a warrant affiant must "summarize every piece of information or cite every statement with perfect precision." *Id.* Rather, they contend only that an affiant must tell the truth so that the judicial officer can perform his or her constitutional function. In this case, Dias did not do that.

Regardless, any argument about "selectivity" in the "story" that Dias told to the court is a red herring. In his affidavits, Dias not only omitted material facts but affirmatively misrepresented them. *See Lahey*, 967 F. Supp. 2d at 708-09 (citing *United States v. Vilar*, 2007 WL 1075041, at *87 (S.D.N.Y. Apr. 4, 2007) (distinguishing *Franks* claims based on omissions from those based on misrepresentations)). In short, the problem is not simply what Dias left out, but what he actually put in.

As discussed below, Dias repeatedly misled the court by including numerous material, false statements in his warrant affidavits. These included that (1) the Peraire-Buenos proposed trades that they had "no intention" of executing, (2) their alleged "Exploit" targeted "more obscure" cryptocurrency tokens, (3) the alleged victims were engaged in traditional "arbitrage" trading, (4) the Peraire-Buenos "altered" the transactions that their alleged victims proposed, and (5) they also "tampered" with the blockchain itself, thereby compromising the integrity of the "previously believed tamper-proof ledger system."

### C. An evidentiary hearing is needed to determine if Dias intentionally misled the court or acted in reckless disregard of the truth.

Despite conceding that Dias made inaccurate statements, the government urges this Court not to hold an evidentiary hearing. *See* Opp'n 43, 44 n.13, 49. But in these circumstances, where the Peraire-Buenos have made a "substantial preliminary showing" that Dias made numerous, material misrepresentations in his warrant affidavits, "the Fourth Amendment *requires* that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56 (emphasis added); *see also*

*United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013) (holding "[the initial] showing does not necessarily entitle the defendant to a favorable finding on the merits, but it *entitles the defendant to a hearing* where he must prove falsity or recklessness (as well as materiality) by a preponderance of the evidence" (emphasis added)) (vacating the denial of a *Franks* motion and remanding for further proceedings).

"Merely to obtain a *Franks* hearing, . . . a defendant does not need to prove the *Franks* violation." *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019) (reversing the denial of a *Franks* motion and remanding for a *Franks* hearing). The "substantial preliminary showing" required for a *Franks* motion is only a "burden of production," and "[p]roof by a preponderance of the evidence is not required until the *Franks* hearing itself." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (reversing the denial of a *Franks* motion and remanding for a *Franks* hearing). In other words, at this early stage, the Peraire-Buenos "need not come forward with conclusive proof of deliberate or reckless falsity." *McMurtrey*, 704 F.3d at 511.

The government also insists the Peraire-Buenos "bear[] a 'heavy burden'" in challenging the warrant affidavits. Opp'n 48 (quoting *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)). In doing so, however, it relies on one case, *Rivera*, where the court applied the "substantial preliminary showing" test and only made that further comment in *dicta*, and several others, such as *Rajaratnam* and *Lahey*, in which *Franks* hearings were held because the defendants satisfied the "substantial preliminary showing" standard, as the Peraire-Buenos have in this case. *See, e.g.*, *United States v. Rajarantam*, 719 F.3d 139, 147 (2d Cir. 2013) (noting that the district court ordered a *Franks* hearing after finding that the defendant "had 'made a substantial preliminary showing' that the government recklessly omitted 'several key facts'" from a warrant application); *Lahey*, 967 F. Supp. 2d at 704 (same result regarding a challenge to false statements in an affidavit).

Meanwhile, on the merits of the *Franks* challenge, the government makes various assertions about what Dias really meant. As discussed below, many of these arguments are contrary to the plain text of his actual statements. Regardless, at this initial stage, "to obtain a *Franks* hearing," the Peraire-Buenos "need not overcome the court's speculation"—or the government's arguments—"regarding an innocent explanation for the falsity or omission." *Glover*, 755 F.3d at 820-21 ("While reasonable explanations for the [misstatement or] omission of the information might well exist, the defendant need not disprove them before the *Franks* hearing itself.").[1] The purpose of the evidentiary hearing is to develop a full record for the Court regarding the inaccuracies in the affidavits.

Here, the Peraire-Buenos have satisfied their initial burden of production, and accordingly, the Fourth Amendment requires an evidentiary hearing at which Dias can be cross-examined, his credibility can be assessed, and a full record can be developed. *See United States v. Lauria*, 70 F.4th 106, 131-32 (2d Cir. 2023) (remanding for *Franks* hearing and holding "whether an affiant acted negligently or with an intent to 'deceive' or 'mislead' or with a 'reckless disregard for the truth'" is a "factual question" to be addressed by the district court, which can "develop the factual record, observe the witnesses, and assess their credibility").

## II. THE GOVERNMENT ADMITS CERTAIN MISREPRESENTATIONS IN THE WARRANT AFFIDAVITS AND MAKES WEAK EXCUSES FOR OTHERS.

This *Franks* motion addresses the material, false statements in two affidavits that Dias submitted to obtain the Google Warrants in this highly technical, first-of-its-kind criminal

---

[1]    The government confuses this point when it cites *United States v. Fama*, 758 F.2d 834 (2d Cir. 1985), and argues that any "innocent explanations" for the Peraire-Buenos' conduct are irrelevant to the finding of probable cause. Opp'n 55, 60. *Fama* was not a *Franks* case, and its discussion of probable cause had nothing to do with the *Franks* analysis. *See* 758 F.2d at 837 (explaining that the good-faith exception does not apply "if the officers were dishonest or reckless" but holding that "*Leon* clearly controls this case," because the defendants had not claimed that the agent who obtained the search warrant had been "dishonest or reckless").

prosecution, and it raises serious constitutional concerns. Yet the government treats the motion with disdain, calling it "entirely unfounded," Opp'n 43; *see id.* at 51 ("entirely without basis"), *id.* at 58 ("totally nonsensical" and "absurd[]"), criticizing its arguments as "bordering on the frivolous," *id.* at 58; *see id.* at 56 ("far afield of fact and law"), and accusing the Peraire-Buenos of "quibbling over" the words that Dias wrote in his affidavits, *id.* at 52; *see id.* at 54 ("quibble of word-choice"); *id.* at 56 ("word-choice disagreement"), and applying "hyper-technical interpretations," *id.* at 54; *see id.* ("strained interpretation").

Putting that over-heated rhetoric aside, however, the government does not meaningfully dispute that, *as written*, many central statements in the warrant affidavits were untrue. Even if the government could now propose substantive fixes for the affidavits, either by adding more words or changing their meanings, the facts remain: Dias gave inaccurate information to the court, and "[t]he ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit." *Clark*, 935 F.3d at 563. By relying on "half-truths," "misrepresentations," and "conclusory allegations," Dias effectively "reduce[d] the function of [the] magistrate to that of a rubber stamp upon the law enforcement officer's personal determination of probable cause." *United States v. Esparza*, 546 F.2d 841, 843 (9th Cir. 1976).

Moreover, the government's atomized focus on each statement ignores the overall misleading picture that the affidavits painted. As discussed below, the affidavits' misstatements contributed to the same misimpression; they made this novel case, which does not fit within the wire fraud statute, sound like a more familiar manipulation or hacking scheme. For example, the misstatement about the asserted "obscurity" of the tokens sounds a familiar note to more traditional manipulation cases that target illiquid currencies. The false claim that the Peraire-Buenos never "intended" their proposed trades to "execute" plays on spoofing, a common technique of

manipulation in traditional markets that has no bearing here. The false altering claim and the false allegations about "private trading data" make this case sound like a "hacking" prosecution, which it is not. As the government concedes, the conduct alleged in the Indictment does not involve or even resemble manipulation or hacking; in fact, it has no precedent in any prosecution that the government has ever brought. *See* Defs.' Reply in Support of Mots. to the Dismiss the Indict. at 3-5 (filed today). In this complex, unprecedented case, a magistrate could be easily and understandably misled by inaccurate and misleading warrant affidavits. And that is what happened here.

   A.    **The government re-writes Dias's false statement that the Peraire-Buenos proposed "trades" that they had "no intention of executing" to refer to "bundles" that the alleged victims later created, not the trades themselves.**

Dias falsely told the court that the Peraire-Buenos "sent requests for trades that they had no intention of executing." ECF 56-8 ¶ 19; *see also id.* ¶ 17(b), (d). In fact, as the government concedes in its Opposition, all the trades at issue were executed, just as the Peraire-Buenos allegedly requested. And Dias knew or recklessly disregarded that critical fact when he submitted his inaccurate affidavits.

Nevertheless, the government chides the Peraire-Buenos for an "overly literal focus" on the actual words that Dias wrote in his warrant affidavits. Opp'n 50. It now argues that what Dias *really* meant was that the Peraire-Buenos sent requests for "trades" that they had no intention of executing in the proposed "bundles" that the alleged Victim Traders *later* created. *See id.* (describing "proposed bundles" that the alleged victims created after the Peraire-Buenos allegedly submitted their "requested trades"). That, however, is not what Dias actually told the court.

It would make no sense, for example, to say that a person baked a cake that they had "no intention of eating," simply because the person ate the cake after finishing dinner, not immediately after taking it out of the oven. But the government wants this Court to read Dias's affidavit in that

unusual way, interpreting the straightforward, unequivocal phrase "no intention of executing" to incorporate absent concepts of timing and order, all under the guise of supposed "context." *Id.* By falsely asserting that the Peraire-Buenos had "no intention of executing" their requested trades, Dias encouraged the court to find probable cause that the Peraire-Buenos were involved in a common and familiar spoofing-type scheme in which they proposed trades but then cancelled or withdrew them. But as the government concedes, that did not happen here.

### B. The government implausibly argues that Dias's false statement that the alleged "Exploit" targeted "more obscure" tokens was technically true, because the common tokens at issue, which have market values in the billions, are still "more obscure" than Bitcoin.

Dias falsely described the alleged "Exploit" as targeting "more obscure cryptocurrency tokens." ECF 56-8, ¶ 17(b). Although Dias did not need to use the description "more obscure" in his affidavits, he deliberately chose to include it. And that decision misled the court about the alleged transactions.

According to the government, the contention that Dias misled the court about the cryptocurrency tokens at issue "borders on the frivolous." Opp'n 52. Tellingly, however, the government does not dispute that Aave ("AAVE") and Shiba Inu ("SHIB") are among the most commonly traded tokens in the world with market values in the billions. *See* Mot. 8-9 (citing public information about both coins). It would make no difference that these tokens are "more obscure" than Bitcoin or Ether, as the government gamely points out. Opp'n 53. That is like saying Pepsi is a "more obscure" brand than Coke. Rather, Dias gave a different, more incriminating impression to the court by falsely implying that these tokens were difficult to trade and that the Peraire-Buenos intentionally took advantage of their relative obscurity.

The government also tries to shift the focus away from Dias's false statement about "more obscure tokens" and toward his separate reference to "smaller liquidity pools." *Id.* (citing ECF 56-

8, ¶ 17(b)). That pivot only confuses the issue. On the Ethereum Network, each token (AAVE, SHIB, WBTC (wrapped Bitcoin), etc.) does not have its own single liquidity pool, big or small; they are available for users to buy or sell from various liquidity pools that others create.[2] Whether a person buys Coke at a massive Walmart or in a sleepy bodega, it is still Coke. The same is true for cryptocurrency tokens. It is beyond despite that the affidavits plainly—and falsely—alleged that the Peraire-Buenos targeted "more obscure *tokens*." If Dias really meant "smaller liquidity pools," as the government now contends, he should have said that.

### C. The government erroneously dismisses Dias's false claim that the alleged victims, all predatory "sandwich attackers," were engaged in typical "arbitrage trading" as a "hyper-technical error."

Dias falsely told the court that the alleged Victim Traders were engaged in "cryptocurrency arbitrage trading." ECF 56-8, ¶ 11. As Dias certainly knew and the government reluctantly concedes, the alleged victims in this case were "sandwich attackers," sophisticated predatory traders who sought to manipulate cryptocurrency markets to profit at the expense of their own unwitting victims.

The government tries to dismiss Dias's mischaracterization as a "hyper-technical error," accusing the Peraire-Buenos of "quib[bling] over word choice." Opp'n 54. But the misleading discussion of "arbitrage" in the warrant affidavits was no proverbial slip-of-the-tongue. Dias apparently wanted the court to think, incorrectly, that the alleged victims were engaged in common trading activity, not controversial market manipulation. Based on his inaccurate affidavit, the court had no reason to know that the suspected "crime" involved an alleged effort by the Peraire-Buenos to frustrate a manipulative scheme by their supposed victims. The fact that the Indictment includes

---

[2]     *See* Mike Atolin, "What Are Liquidity Pools," Coindesk (Apr. 9. 2024), https://www.coindesk.com/learn/what-are-liquidity-pools.

the allegations about "arbitrage" but *not* any use of the word "sandwich," *see* Indict. ¶ 13, only underscores the deliberateness of this choice.

The contrast between the tale that Dias told and the truth is stark. Arbitrage is a well-known trading strategy that takes advantage of price differences across markets to realize profits. It is lawful and, according to many experts, promotes the efficiency of markets. *See* Mot. to Compel Production of *Brady* Material (ECF 51) at 6-10 (citing sources). "Sandwich attacking," on the other hand, is an often-criticized trading scheme in which the "attacker" intentionally front-runs its victim to drive up the price that the victim pays for a token, causing the victim to trade at a temporarily worse price, and then back-runs the trade, effectively reversing the price increase. Unlike arbitrage trades, "sandwich attacks" aim to *cause* price differences for their own profit (rather than take advantage of differences that already exist), do not represent "investments" in any meaningful sense, and do not help markets to correctly price tokens.

The government incorrectly claims the true identity of the alleged victims as "sandwich attackers" is relevant only to an "everybody's doing it defense," not the determination of probable cause for the Google Warrants. Opp'n 66-67. As the Peraire-Buenos have made clear, however, that is *not* their defense in this case. *See* Reply in Support of Mot. to Compel Production of *Brady* Material at 2-3 (filed today). Further, as they have explained elsewhere, the undisputed fact that the alleged Victim Traders were "sandwich attackers" bears directly on whether there was probable cause to believe that the Peraire-Buenos committed wire fraud or intended to do so because it provides context to the adversarial, decentralized, trustless system in which the transactions occurred. *See* Mot. 9-10.

**D.    The government unconvincingly insists Dias's false claim that the Peraire-Buenos "altered transactions" did not mean that they actually "changed" any transactions.**

Dias falsely claimed that the Peraire-Buenos "altered transactions" that the Victim Traders had proposed. *E.g.*, ECF 56-8, ¶¶ 16(f), 17(c). Now, despite repeatedly (and unfairly) criticizing the Peraire-Buenos for playing word games, the government cites Webster's Dictionary in an effort to convince this Court that "alter" does not mean "change." Opp'n 56 (citing definition that "alter" means "to make different without changing into something else").

Consistent with the "commonsense, practical" approach to probable cause for search warrants, *Gates*, 462 U.S. at 230, a court must accept what the affiant writes and read those words with their ordinary meaning. A tailor can "alter" pants by cuffing the legs or letting out the waist, but the owner cannot "alter" those same pants by putting his or her socks on first. Here, the government concedes that the Peraire-Buenos did *not* alter any terms of the Victim Traders' proposed transactions; each transaction traded tokens, in defined quantities and specified pools, as coded by its smart contract. The only "change" that purportedly occurred was the order of transactions in certain bundles that the alleged victims later proposed to builders (not the relays or validators) on the Ethereum Network. But Dias did not say that the Peraire-Buenos "altered bundles" or "altered blocks." He falsely stated that they "altered transactions."

Nevertheless, the government asks this Court to read the damning accusation that the Peraire-Buenos "altered transactions" to mean that they changed the proposed sequence of transactions, not any of the actual terms of those transactions. If Dias meant, as the government now suggests, that the Peraire-Buenos "altered the *order* in proposed *bundles* of transactions," as opposed to the transactions themselves, he should have said that. The difference is critical. In falsely accusing the Peraire-Buenos of "altering transactions," he misled the court by framing the Peraire-Buenos' alleged behavior as tampering with the coded smart contracts. That did not

happen, and the Indictment alleges no such offense. In that way, Dias's inaccurate description of the alleged offense elided the more complex property rights arguments on which the government's theory of wire fraud (improperly) relies. *See* Mot. to Dismiss the Indict. for Failure to Allege Essential Elements (ECF 49) at 26-28.

**E.    The government erroneously argues that if Dias had not manipulated his diagram of the MEV-Boost application, his affidavits would have been even more misleading.**

In his affidavits, Dias altered a publicly available diagram of the MEV-Boost application on the Ethereum Network. *See* ECF 56-8, ¶ 15(c)(6). Rather than dispute that fact, the government disparages the Peraire-Buenos' arguments as "nonsensical" and "absurd[]." Opp'n 58. Yet the reality remains: the manipulated diagram falsely portrayed the flow of information within the MEV-Boost system. Dias's deliberate choice to use a modified image (which he did not disclose to the court) reflects his bad faith and reckless disregard for the truth of the information in his warrant affidavits. In defending that choice, the government argues that using the original, unaltered diagram would have been even less accurate and, thus, even more misleading. *See* Opp'n 57-58.

The Peraire-Buenos do not contend that Dias should have used the complete, original diagram, which described a version of the MEV-Boost system that was never adopted, as the government mistakenly suggests. *See id.* at 58. That is a strawman. Instead, the obvious point is that if Dias wanted to use a diagram to help illustrate his point, he should have used a complete, accurate diagram of the MEV-Boost system *as it actually works*. And, if Dias had used an accurate diagram, the magistrate would have seen that the relay, by design, provides information to the validator—and that the Peraire-Buenos did not "hack" anything as Dias falsely claimed. Dias went with a diagram of an abandoned proposal, cropped it to fit his story, and never revealed those facts to the court. The other scattered references in the affidavits to information that flows from the relay

13

to the validator only, which the government highlights, do not fix this problem; to the contrary, they make the affidavits internally contradictory and compound the prejudicial confusion.[3]

### F. The government re-writes the false allegation that the Peraire-Buenos "tampered" with the blockchain itself, falsely claiming that Dias only accused them of undermining the "infrastructure" of the Ethereum Network.

Dias made the outrageous claim (which the former U.S. Attorney echoed in his headline-grabbing press release) that the Peraire-Buenos "tampered" with the Ethereum blockchain itself. *See* ECF 56-8, ¶ 13(d). In telling the court that the sky was falling, Dias accused the Peraire-Buenos of threatening "the integrity" of the entire blockchain. *Id.* Those inflammatory claims were false. Not only is it technologically impossible to tamper with transactions that have been included in the blockchain, the specific transactions at issue in this case have all included in that permanent, immutable, public ledger.

Now, rather than reckon with these misrepresentations, the government attempts to distract the court, pointing to other statements about "exploit[ing] the infrastructure of the blockchain." Opp'n 60 (citing ECF 56-8, ¶ 8). But the warrant affidavits speak for themselves. Dias sounded the alarm about the "ledger system"—that is, the blockchain—that was "previously believed [to

---

[3]    In defending Dias's use of his manipulated diagram and describing the complete image, the government, once again, misstates the applicable law. The government cites *Rajaratnam* for the proposition that "in the context of omissions, courts 'insert the omitted truths' into the hypothetical corrected affidavit to determine if probable cause exists." Opp'n 58 (quoting *Rajaratnam*, 719 F.3d at 146-47). But that is not what *Rajaratnam* held, and more recently, in *Lauria*, the Second Circuit clarified the issue: "in the context of a criminal case, a warrant affidavit may be corrected by supplementation"—that is, by the insertion of omitted information—"only when the supplemental information detracts from, rather than supports probable cause." *Lauria*, 70 F.4th at 126 (citing *Rajaratnam*, 719 F.3d at 146); *see also United States v. Awadallah*, 349 F.3d 42, 70 n.22 (2d Cir. 2003) (explaining "related facts which were also known [by law enforcement officers] at the time of the [warrant] application . . . lie outside the scope of a proper *Franks* inquiry because the relevant question is whether the *remaining portions* of the affidavit give rise to probable cause") (emphasis in original). Thus, at this stage, the government cannot insert or add any new information in an effort to fix its *Franks* problem.

be] tamper-proof." ECF 56-8, ¶ 13(d). In doing so, he gave the false impression that the Peraire-Buenos figured out how to do the impossible: to "tamper" with the blockchain itself.

Dias had no evidence that the Peraire-Buenos "tampered" with the Ethereum blockchain. Indeed, the Indictment makes no such allegation, and the government knows it is not true. As the Second Circuit has recognized, the blockchain remains "tamper-proof," meaning "any data recorded on the ledger cannot be altered." *Williams v. Binance*, 96 F.4th 129, 134 (2d Cir. 2024).

## III.   VIEWED IN THEIR TOTALITY, THE MISREPRESENTATIONS IN THE WARRANT AFFIDAVITS WERE PLAINLY MATERIAL TO THE FINDING OF PROBABLE CAUSE.

The government correctly notes that probable cause considers the "totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), and "requires courts to consider 'the whole picture,'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 60 (2018) (quoting *United States v. Cortez*, 429 U.S. 411, 417 (1981)). But the government turns that familiar principle on its head, asking this Court to assess *in isolation* each of the many misrepresentations in Dias's warrant affidavits rather than consider their cumulative effect on the finding of probable cause. *See, e.g.*, Opp'n 49 (arguing "the probable cause supporting the Google Warrant did not rest [on – *sic*] any of *these isolated statements*" (emphasis added)); *id.* at 53 (arguing that striking the misleading words "more obscure" would make no difference).

Almost 50 years ago, in a decision that foreshadowed *Franks*, the Ninth Circuit explained the obvious need to consider the cumulative effect of all the inaccuracies in a warrant affidavit.

> Although each misrepresentation [by the affiant] taken alone would not have been fatal to the warrant, the cumulative effect of the inaccuracies was substantial. Purged of these inaccuracies, the affidavit would not support a finding by the magistrate of probable cause. The misrepresentations made it impossible for the neutral magistrate to exercise his independent judgment. His role in the process by which Fourth Amendment rights are protected should not be subverted in this matter. This is precisely the danger that the Supreme Court in *Aguilar* and *Spinelli* sought to avoid. A letter-

15

> perfect affidavit is not essential. We cannot, however, sustain a warrant based on an affidavit as inaccurate as [the affiant's] "without diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry."

*Esparza*, 546 F.2d at 844 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

Since then, courts have consistently followed that same approach. *See, e.g.*, *Jones v. Town of Waldoboro*, 943 F.3d 532, 541 (1st Cir. 2019) (holding that, in conducting *Franks* analysis, courts must "'take into account the cumulative effect of the multiple omissions' and misstatements in the affidavit") (citing *United States v. Vigeant*, 176 F.3d 565, 572 n.8 (1st Cir. 1999)); *United States v. Menendez*, 2024 WL 912210, at *10 (S.D.N.Y. Mar. 4, 2024) (denying *Franks* challenge because "the combined, cumulative effect of the omissions . . . does not rise to the level of the substantial preliminary showing required for a *Franks* hearing"); *United States v. Anderson*, 2020 WL 249479, at *7 (W.D. Va. Jan. 16, 2020) ("Taken individually, some of the omissions in Detective Bridges' affidavit are merely innocent or negligent mistakes. However, the totality of the circumstances . . . indicate that Detective Bridges acted with reckless disregard of whether the omissions would make the affidavit misleading."); *United States v. Simmons*, 771 F. Supp. 2d 908, 918 (N.D. Ill. 2011) ("While the omission of each individual fact may not necessarily lead to the conclusion that [the warrant affiant] acted with reckless disregard for the truth, the cumulative effect of all of the omissions was to eliminate nearly every indicator detracting from the CI's reliability. There was nothing left to put the issuing judge on notice of the omitted facts."). Notably, the government cites no case in which a court declined to consider the cumulative effect of multiple misrepresentations in a warrant affidavit.

As a practical matter, it would be impossible to do otherwise. Under the *Franks* framework, "[t]o determine the materiality of alleged misstatements, the courts 'correct' the warrant affidavit," and this process "requires the deletion of misstatements." *Lauria*, 70 F.4th at 125; *see United States*

*v. Awadallah*, 349 F.3d 42, 70 n.22 (2d Cir. 2003) (holding "the relevant question is whether the *remaining portions* of the affidavit give rise to probable cause") (emphasis in original); *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (holding "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause'") (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). That means all misstatements must be removed from an affidavit. And as with all probable cause determinations, such corrections must be done with an eye to the "totality of the circumstances," not bit by bit.

Accordingly, a *Franks* hearing is required by the Fourth Amendment unless the affidavit has sufficient content to support a finding of probable cause after all the challenged material has been "set to one side." *Franks*, 438 U.S. at 171-72. Put another way, while every statement in a warrant affidavit does not necessarily have to be true, *see Canfield*, 212 F.3d at 718, the affidavit must establish probable cause without any false information. In the end, the critical question is whether "the remaining portions of the affidavit[s]" were adequate to obtain the search warrants. *Lauria*, 70 F.4th at 126 (quoting *Awadallah*, 349 F.3d at 70 n.22). In its Opposition, the government does not even discuss those "remaining portions," as the Peraire-Buenos have summarized them, *see* Mot. 16-17, much less convincingly explain how those scant facts, without more, would have established probable cause. For the reasons already stated, *see id.*, those remaining allegations could not support issuing the warrants.

## CONCLUSION

For the foregoing reasons, Defendants Anton Peraire-Bueno and James Peraire-Bueno move to suppress all evidence obtained from the search warrants to Google, LLC, and all fruits of those poisonous trees, or alternatively, at a minimum, hold a *Franks* hearing.

Date: January 31, 2025

Respectfully submitted,

By: */s/ Katherine Trefz*
Katherine Trefz (*pro hac vice*)
Daniel Shanahan (*pro hac vice*)
Patrick J. Looby (*pro hac vice* pending)
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
ktrefz@wc.com
dshanahan@wc.com
plooby@wc.com

Jonathan P. Bach
Shapiro Arato Bach
1140 Avenue of the Americas
17th Floor
New York, NY 10036
Tel: 212-257-4897
jbach@shapiroarato.com

*Counsel for Defendant*
*James Peraire-Bueno*

By: */s/ Daniel N. Marx*
Daniel N. Marx
William W. Fick (*pro hac vice*)
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Tel: 857-321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

*Counsel for Defendant*
*Anton Peraire-Bueno*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.


*/s/ Katherine Trefz*
Katherine Trefz