

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 13, 2025

**BY ECF**
The Honorable Jessica G. L. Clarke
United States District Judge
500 Pearl Street
Southern District of New York
New York, New York 10007

     Re:    *United States v. Peraire-Bueno*, S1 24 Cr. 293 (JGLC)

Dear Judge Clarke:

     The Government respectfully submits this letter to set forth its position regarding the Rule 17(c) subpoena served by defendants Anton Peraire-Bueno and James Peraire-Bueno on Nonparty-1 (the "Subpoena"), after reviewing Nonparty-1's motion to quash the Subpoena, filed on May 23, 2025 (the "Nonparty-1 Motion") and the defendants' opposition to the Nonparty-1 Motion, filed on June 6, 2025. (*See* Dkts. 92-93, 95).

     For the reasons set forth below, the Government joins in the arguments made in the Nonparty-1 Motion as to why Requests 4-9 of the Subpoena should be quashed. For the additional reasons that follow, the Court should quash Requests No. 4-7 of the Subpoena, which seek communications between Nonparty-1 and other entities that are irrelevant to the defendants' state of mind, inadmissible hearsay, and, at best, arguable impeachment evidence that may not be obtained by Rule 17 subpoena before trial under well-established Second Circuit law. In addition, the Court should quash Requests 8 and 9 of the Subpoena, which seek evidence of Nonparty-1's general trading activities that, too, are irrelevant to the issues in this case, inadmissible because they are unfairly prejudicial and likely to mislead and confuse the jury about the issues in the case, and, at best, constitute arguable impeachment material that is not properly sought through a Rule 17(c) subpoena at this stage.[1]

---

[1] The Government takes no position with respect to Nonparty-1's motion to quash Requests 1-3. However, it bears noting that the defense mischaracterizes the charges in the Indictment in their effort to advance their arguments with respect to Requests 1-3. For example, it is not accurate that "the government is relying on a theory of tacit expectations and alleged norms, and not on the alleged violations of written laws or regulations or on any other express directives to users of the Ethereum Network" to prove the defendants' fraud. (*See* Dkt. 95 at 10). The Indictment describes that the bundles proposed by the victim traders, using the same MEV Boost software that the defendants used, included coded conditions that their trades be executed in the precise order in which those transactions appeared, or not at all. (*See* Indictment, Dkt. 70 ¶¶ 13, 24). That was an

## I. Background

On May 8, 2024, a grand jury in this District returned Indictment 24 Cr. 293, charging the defendants with conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. Superseding Indictment S1 24 Cr. 293 was subsequently returned on March 27, 2025, (the "Indictment").[2] In brief, the Indictment alleges that the defendants meticulously planned a fraud scheme for months, which culminated in the theft of approximately $25 million in cryptocurrency from victim cryptocurrency traders, including Nonparty-1, in mere seconds on April 2, 2023 (the "Exploit"). Among other things, the Indictment alleges that the defendants identified and targeted the victim traders through deceitful trades intended to, in the defendants' own words, "bait" the victims (*see, e.g.*, Indictment ¶¶ 21-22), exploited a coding vulnerability by using a false statement to prematurely gain access to the victims' private trading information (*see, e.g.*, Indictment ¶¶ 24-26), and fraudulently altered the private trading information to steal more than $25 million (*see, e.g.*, Indictment ¶¶ 26-27). After the defendants stole the funds, they laundered the proceeds through a series of shell companies and multiple cryptocurrency and bank accounts. (Indictment ¶¶ 30-32.) While the defendants now attempt to recast their conduct as an innocent "novel trading strategy," Dkt. 95 at 2, the evidence—including the defendants' own search activity following the Exploit, along with their actions prior to the Exploit—show that at the time, the defendants knew what they were doing was wrong. (Indictment ¶¶ 18-22 (alleging

---

express directive, which the Government anticipates witness testimony and other evidence will establish. Moreover, the defendants are obviously charged with having intentionally violated "written laws"—the wire fraud and money laundering statutes—by engaging in a scheme to defraud others, here, Nonparty-1, of money or property.

Finally, there is no basis—and the defendants point to none whatsoever—for the drastic and completely unwarranted remedy of precluding the Government from presenting any arguments or evidence at trial pertaining to Nonparty-1's coded instructions regarding their trades if Request Nos. 1-3 are quashed. (*See* Def. Opp. to Nonparty-1 Mot., at 13). Evidence of a crime comes in many forms—percipient testimony, documents, tangible objects, and recordings, to name a few—the ultimate weight of which is to be determined by the jury. Likewise, there are a multitude of reasons why a Rule 17(c) subpoena may be quashed: for seeking evidence that is irrelevant, inadmissible, insufficiently specific, privileged, impeachment material, unduly burdensome to collect, or which simply does not exist. Taken to its logical conclusion, the defendants' argument is tantamount to saying that assault victims should be precluded from testifying about their recollection of the assault merely because they no longer have the clothes they wore the night of the crime and those items cannot be subpoenaed, or that an accountant should be precluded from testifying regarding accounting practices simply because the spreadsheet in question is no longer in existence and cannot be subpoenaed. Should the Court quash Request Nos. 1-3, the Government respectfully seeks a full opportunity to be heard on any such preclusion motion, in the event that the defendants adhere to this position.

[2] The Indictment included the same crimes as initially charged, with an additional count of conspiring to receive stolen property. By letter dated May 12, 2025, the Government advised the Court of its intent not to proceed on Count Four of the Superseding Indictment (*i.e.* conspiracy to receive stolen property).

actions designed to conceal their participation in the Exploit), 29 (alleging online searches by Anton Peraire-Bueno in the weeks following the exploit for, among other things, "how long is us statue of limitations," "wire fraud statue / wire fraud statue of limitations," and "money laundering statue of limitations"), 32 (alleging online searches by James Peraire-Bueno in October and November 2023 for, among other things, "money laundering," "exploit," "computer fraud abuse act," and "does the united states extradite to [foreign country]").

On March 27, 2025, defendants filed a motion for issuance of a Rule 17(c) subpoena on Nonparty-1, which seeks the production of nine categories of documents by July 1, 2025, months in advance of the trial scheduled in this matter (the "Rule 17 Motion"). (*See* Dkts. 73-74). These categories include (i) documents relating to the source code for Nonparty-1's MEV Bot relating to the Exploit, the computer code for the smart contracts relating to the Exploit, and instructions by Nonparty-1 relating to the Exploit (Requests No. 1-3); (ii) Nonparty-1's communications with other victims, witnesses, and entities relating to the Exploit (Requests No. 4-7); and (iii) documents relating to Nonparty-1's other cryptocurrency trading activities (Requests 8-9). On April 17, 2025, the Court granted the defendants' leave to serve the Subpoena on Nonparty-1. (Dkt. 82). Nonparty-1 moved to quash the defendants' Subpoena on May 23, 2025. On June 6, 2025, the defendants opposed Nonparty-1's motion to quash.

## II. Legal Standard

Under Rule 17(c), a subpoena may order a witness to produce any books, papers, documents, data or other designated objects. Fed. R. Crim. P. 17(c)(1). But Rule 17(c) "was not intended to provide a means of discovery for criminal cases," and a Rule 17(c) subpoena may not be used to conduct a "general 'fishing expedition.'" *United States v. Nixon*, 418 U.S. 683, 700 (1974); *see also Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) (same). Instead, because the rule's "purpose is trial-focused," a Rule 17(c) subpoena "may be used only to obtain materials admissible as evidence at trial." *United States v. Louis*, 04 Cr. 203 (LTS), 2005 WL 180885, at *3 (S.D.N.Y. Jan. 27, 2005); *see also United States v. Murray*, 297 F.2d 812, 821 (2d Cir. 1962) (Rule 17 subpoena is "solely for the obtaining of *evidence* for the use of the moving party" (emphasis added)). In other words, Rule 17(c) may not be used "to obtain leads as to the existence of additional documentary evidence or to seek information relating to the defendant's case" because "[t]his type of discovery, permissible under the Federal Rules of Civil Procedure, has not been authorized for criminal trials." *United States v. Gross*, 24 F.R.D. 138, 141 (S.D.N.Y. 1959).

Accordingly, a defendant seeking documents pursuant to Rule 17(c) subpoena bears the burden of satisfying the "strict standard" set forth by the Supreme Court in *Nixon*, *see United States v. Brown*, No. 95 Cr. 168 (AGS), 1995 WL 387698, at *9 (S.D.N.Y. June 30, 1995), which requires the party seeking the pretrial production of documents to demonstrate:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay

>    the trial; and (4) that the application is made in good faith and is not
>    intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 699-700; *see also United States v. RW Pro. Leasing Servs. Corp.*, 228 F.R.D. 158, 162 (E.D.N.Y. 2005) (citing *Nixon*, 418 U.S. at 699-700); *Louis*, 2005 WL 180885, at *9 (party seeking documents pursuant to a Rule 17(c) subpoena must be able to "reasonably specify the information contained or believed to be contained in the documents sought" and establish both relevancy and admissibility (citation omitted)); *Brown*, 1995 WL 387698, at *9 (*Nixon* requires "specifically identifying the materials sought and showing that they are relevant and admissible").[3]

Precisely because of the risk of abuse and misuse of Rule 17 subpoenas against non-parties, including witnesses and crime victims, courts stringently hold those seeking to obtain documents under Rule 17(c) to their burden of demonstrating that the documents sought are (1) relevant, (2) admissible, and (3) specifically identified, and it is "insufficient" for a party to show only that the subpoenaed documents "are *potentially* relevant or *may* be admissible," *RW Pro. Leasing Servs.*, 228 F.R.D. at 162 (emphases added).[4]  Similarly, "[a] party's Rule 17(c) subpoena may not evade specificity in the hope 'that something useful will turn up' in its reach." *United States v. Bergstein*, 16 Cr. 746 (PKC), 2017 WL 6887596, at *5 (S.D.N.Y. Dec. 28, 2017).  Indeed, a court may quash a Rule 17(c) subpoena based on a failure to satisfy any one of these prongs. *Id.* at *3.  Moreover, "the Court has an independent duty to review the propriety of the subpoena," *Vasquez*, 258 F.R.D. at 72, and requests accurately characterized as fishing expeditions "deserve[] to be quashed" on that basis alone, *United States v. Chen De Yian*, No. 94 Cr. 719 (DLC), 1995 WL 614563, at *2 (S.D.N.Y. Oct. 19, 1995).

---

[3] The defendants imply that the Court should apply a more relaxed standard than *Nixon* to subpoenas issued by defendants to third parties for documents "material to the defense." (Rule 17 Mot., at 5 n.3, citing *United States v. Tucker*, 249 F.R.D. 58 (S.D.N.Y. 2008) (pronouncing *Nixon* to be "inappropriate" where production "is requested by (A) a criminal defendant; (B) on the eve of trial; (C) from a non-party; (D) where the defendant has an articulable suspicion that the documents may be material to his defense")). *Tucker* is inapplicable, and the Supreme Court's *Nixon* standard controls.  For one thing, *Tucker* applies (on its own terms) when production is requested on the eve of trial, which is plainly not the case here.  More fundamentally, however, the *Tucker* decision has no basis in *Nixon* or any Second Circuit authority, and various Judges in this District have declined to apply *Tucker*. *See, e.g.*, *United States v. Barnes*, 04 Cr. 186 (SCR), 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008) (explaining that *Tucker* "is not the prevailing law," and "all district courts within the Second Circuit, aside from the *Tucker* court, have applied the *Nixon* analysis to third-party subpoenas issued by the defense"); *United States v. Bergstein*, 16 Cr. 746 (PKC), 2017 WL 6887596, at *4 (S.D.N.Y. Dec. 28, 2017) ("The overwhelming majority of district courts in the Second Circuit have instead applied the *Nixon* analysis to such requests because the relaxed *Tucker* standard is not prevailing law of the Circuit.") (cleaned up).

[4] In this regard, the defendants' argument that the admissibility inquiry "is simply whether the documents are *arguably* admissible" (*see* Def. Opp. to Nonparty-1 Mot., at 18) is squarely at odds with the law that district judges in this Circuit have applied.

## II.   Discussion

### A.  The Government Has Standing To Join the Motion to Quash

As an initial matter, the Government has standing to join in Nonparty-1's motion to quash, as it is settled law that "the government has standing to challenge a Rule 17(c) subpoena directed to a non-party when the subpoenaed party authorizes the government to assert his or her rights by request, by indicating its joinder a motion to quash, or by forwarding responsive material to the government." *Bergstein*, 2017 WL 6887596, at *3 (citing *United States v. Martoma*, 962 F. Supp. 2d 602, 605 n.4 (S.D.N.Y. 2013) (collecting cases)).  Here, the Government has advised Nonparty-1 of its intent to file a letter that raises additional arguments in support of quashing certain requests made in the Subpoena, and Nonparty-1 has authorized the Government to assert its rights.

In addition, courts in this District have found that the Government has "standing to move to quash subpoenas served on third parties, when the Government's purpose in so moving is to protect the judicial process; particularly in 'preventing the undue lengthening of the trial, undue harassment of its witnesses, and prejudicial over-emphasis on [the witness's] credibility." *United States v. Carton*, 17 Cr. 680, 2018 WL 5818107, at *2 (S.D.N.Y. Oct. 19, 2018) (citation omitted, emphasis in *Carton*); *see United States v. Giampa*, 92 Cr. 437 (PKL), 1992 WL 296440, at *1 (S.D.N.Y. Oct. 7, 1992) (same); *see also Bergstein*, 2017 WL 6887596, at *2-3 (explaining that "[p]reventing the undue harassment of a cooperating witness," preventing prejudicial overemphasis on a witness's credibility or undue lengthening of trial, and the Government's "interest in controlling the timing of disclosures as to a cooperating witness" to be "legitimate governmental interest[s] giving rise to standing" in the Rule 17 context).  These concerns—in particular, preventing undue harassment of Nonparty-1 and prejudicial over-emphasis on Nonparty-1's credibility based on defendants' focus on Nonparty-1's own trading activity—are front and center in this case.  And in any event, because this Court has an independent duty to ensure the propriety of Rule 17(c) subpoenas, "a number of courts within this Circuit have proceeded to consider the merits of a motion to quash irrespective of any determination on standing." *Bergstein*, 2017 WL 6887596, at *2 n.1.

### B.  Request Nos. 4-7 Do Not Satisfy the *Nixon* Standard

This Court should quash Request Nos. 4-7, which broadly seek to compel the production of Nonparty-1's communications with other victims, entities, and witnesses regarding the Exploit between September 2022 and May 2024.

Request No. 4 seeks the redacted portions of over 250 pages of communications between Nonparty-1 and other victims, consisting of more than 3,000 messages.  The Government already obtained and produced these messages—the majority of which are not redacted—to the defendants in discovery. Request No. 4 fails the *Nixon* standard for multiple reasons. As an initial matter, the Government obtained these materials from Nonparty-1, it produced them to the defendants out of an abundance of caution, despite the fact that communications among the victims *after* the Exploit regarding their understanding of what may have occurred and next steps arguably do not fall within the categories covered by Rule 16.  Moreover, to the extent that these after-the-fact assessments and discussions "may also be impeachment material" (*see, e.g.*, Rule 17 Mot., at 9 n.5; *see also*

Def. Opp. to Nonparty-1 Mot., at 17-18), "[c]ourts have repeatedly held that a Rule 17(c) subpoena should not be used to obtain materials, in advance of trial, which are to be used for impeachment purposes." *Giampa*, 1992 WL 296440, at *3 (collecting cases rejecting the use of Rule 17(c) subpoenas to obtain impeachment material before trial); *see also Nixon*, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Nektalov*, No. 03 Cr. 828 (PKL), 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004) ("documents sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena").

The Government received these communications from Nonparty-1 with certain redactions that relate to privilege assertions made by Nonparty-1, which are reflected in a privilege log that was provided by Nonparty-1 and produced to the defendants. The defendants are not entitled—whether Rule 17 or otherwise—to the privileged communications of a victim witness. The defendants do not point to any authority—nor is the Government aware of any—that enables a party to use Rule 17 subpoena to obtain privileged communications so that it can determine if it agrees with those privilege determinations, or to challenge what defendants believe to be an inadequate privilege log. *Accord United States v. Xu*, 13 Cr. 133 (JMF), 2024 WL 4504352, at *2 (S.D.N.Y. Oct. 16, 2024) (quashing Rule 17(c) subpoenas that, among other things, requested "materials protected by the attorney-client privilege," including "communications between Cravath and Polar that were 'undisclosed' to the Government").

In addition, the defendants also fall short of demonstrating that the redacted portions of Nonparty-1's communications with other victims are admissible. At trial, the relevant issue will be the defendants' *mens rea* at the time of the alleged crimes. There is no basis to conclude that communications, which clearly do not include the defendants—hence, their requests for such communications—have any relevancy to their state of mind. The defendants argue that other hypothesized communications between Nonparty-1 and other victims "may be admissible" to show the purported effect on the listener. (Rule 17 Mot., at 8-9). But that argument proves too much: *any* communication, almost by definition, has an effect on its listener, so the fact that the defendants can articulate theoretical reasons why those communications might not be hearsay does not satisfy *Nixon*'s requirement that the "document sought must *at that time* meet the tests of relevance and admissibility." *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) (citation omitted). What's more, the materials sought by a Rule 17(c) subpoena "must themselves be admissible evidence" at trial; it is not enough that they "contain information which could be admissible" precisely because "Rule 17(c) is not a method of discovery in criminal cases," *id.* at 552; *accord Xu*, 2024 WL 4504352, at *3 (quashing subpoena because, among other things defendant could not "argue that *all* of the communications he seeks in the two subpoenas would be admissible under the rules governing hearsay"), and so even if the materials requested by Request No. 4 could theoretically contain *some* information that could fall within a conceivable hearsay exception, that does not satisfy the defendant's burden.

Request Nos. 5-7, which broadly seek Nonparty-1's communications with other entities and witnesses, fare no better for many of the same reasons. *First*, Rule 17(h) prohibits the use of a subpoena to obtain a "statement of a witness or of a prospective witness under this rule." Fed. R. Crim. P. 17(h). Courts have recognized that such statements—"at least if possessed by the Government"—are "explicitly excluded from Rule 17(c)'s scope." *Xu*, 2024 WL 4504352, at *2

(collecting cases). Indeed, courts in this District have held that Rule 17(h) precludes the use of a Rule 17(c) subpoena to obtain any statements of a witness, consistent with the text of the rule. *See id.* (citing *United States v. Yudong Zhu*, No. 13 CR. 761, 2014 WL 5366107, at *3 (S.D.N.Y. Oct. 14, 2014) ( "Zhu argues without support that Rule 17(h) applies only to witness statements already in the Government's possession. This argument is without merit."); *see also United States v. Carton*, No. 17 CR 680 (CM), 2018 WL 5818107, at *4 (S.D.N.Y. Oct. 19, 2018) ("To the extent such documents exist, they would likely be hearsay and/or the statements of Government witnesses, which, again, are not discoverable under Rule 17(h)."). Regardless, the defendants cannot use a Rule 17(c) subpoena to circumvent the disclosure requirements for prior statements of a witness, which is already addressed as a matter of standard criminal procedure by the Jencks Act, *see* 18 U.S.C. § 3500.

*Second*, to the extent that these requests, like Request No. 4, are designed to uncover any witness statements for use as impeachment material in advance of the witness's testimony, they are entirely improper. *See Giampa*, 1992 WL 296440, at *3; *Nixon*, 418 U.S. at 701; *Nektalov*, 2004 WL 1574721, at *2. It is unlikely that these requests, like Request No. 4, could yield admissible communications, because on their face, they seek hearsay—that is, the out-of-court "communications" by a witness. To the extent that Requests 5-7 could theoretically contain some admissible portions—which the defendants do not persuasively establish – they still do not satisfy the defendants' burden to show that the documents "at that time meet the tests of relevance and admissibility." *Cherry*, 876 F. Supp. at 552-53; *Xu*, 2024 WL 4504352, at *3. And the fact that Request Nos. 5-7 seek communications that, like Request No. 4, may be probative as to Nonparty-1's state of mind (or, for that matter, the state of mind of other Ethereum network participants) does not render them admissible because Nonparty-1's state of mind is of limited potential relevance, if any, to this case. The trial will focus on the defendants' state of mind. The material sought simply does not bear on the defendants' state of mind and whether they acted with the requisite intent to defraud.[5]

Ultimately, the defendants' description of Request Nos. 5-7 using speculative and conclusory terms such as "plainly relevant," "potentially relevant" (in the very next sentence), and "potentially admissible," and that they "likely shed light on those issues," and "may be admissible as business records, statements against interest, or then-existing mental or physical state, among

---

[5] Of course, the materials the defendants now seek were not and never have been in their possession or known to them, because the defendants were not on these communications that they are now seeking. But that is precisely the point: if the defendants had no idea these communications discussing the Exploit existed when they were planning and executing the Exploit, the communications that Nonparty-1 had with other parties about the Exploit could not possibly be probative as to the defendants' intent to defraud. The defendants attempt to surmount this obvious obstacle by asserting that the views of other individuals are somehow relevant to whether they, the defendants, "objectively could have expected that this alleged behavior may be considered criminal." (Def. Opp. to Nonparty-1 Mot., at 15). To be clear, however, whether the defendants specifically knew that they were committing a crime and intended to commit a particular crime is not an element of wire fraud, which simply requires proof that the defendants acted knowingly and with the specific intent to defraud. *See, e.g.*, *United States v. Middendorf*, 18 Cr. 36, 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019).

others," and "may also have non-hearsay uses" betrays another fundamental problem with those requests: that the true purpose of these requests is to "fish[] . . . to see what may turn up," and not to identify specific pieces of admissible evidence for trial as the controlling rule of *Nixon* requires. *Bowman Dairy*, 341 U.S. at 220-21; *Gross*, 24 F.R.D. at 141 (Rule 17(c) subpoenas may not be used to "obtain leads as to the existence of additional documentary evidence" or merely to "seek information relating to the defendant's case"); *United States v. Jenkins*, 02 Cr. 1384 (RCC), 2003 WL 1461477, at *5 (S.D.N.Y. Mar. 21, 2003) (a showing of potential relevance does not meet *Nixon* standard); *cf. United States v. Barnes*, No. S9 04 Cr. 186 (SCR), 2008 WL 9359654, at *4 (S.D.N.Y. Apr. 2, 2008) (subpoena that "blindly seeks 'all' documents and recordings that fall into several categories for an approximate 23-month period rather than identifiable pieces of evidence" indicates "that the subpoena was intended as a discovery device rather than as a mechanism for obtaining specific admissible evidence").[6] The defendants do not—and cannot—advance any specific or non-theoretical arguments as to relevance and admissibility because the requests do not themselves seek any specific documents that are themselves relevant and admissible. *Accord Xu*, 2024 WL 4504352, at *3; *Cherry*, 876 F. Supp. at 552-53; *accord United States v. Weissman*, 01 Cr. 529 (BSJ), 2002 WL 31875410, at *1 (S.D.N.Y. 2002) (mere hope that something will turn up in requested document does not meet specificity requirement).

At bottom, the Requests seek hearsay, in the hopes of impeachment, that is highly unlikely to be admissible in light of the issues at trial. The fact that defendants have "some reason to believe" that certain communications could exist (*see* Rule 17 Mot., at 9-10), and that they could possibly present some argument about the hearsay exceptions in the future, "does not excuse [defendants] from *Nixon*'s requirement that [they] must specifically identify the materials he is seeking to bear out [their] suspicions." *United States v. Pena*, 15 Cr. 551 (AJN), 2016 WL 8735699, at *3 (S.D.N.Y. Feb. 12, 2016). The defendants cannot satisfy their burden under *Nixon*. *United States v. Rich*, 83 Cr. 579, 1984 WL 845, at *3 (S.D.N.Y. Sept. 7, 1984) ("[A] mere hope that the documents, if produced, may contain evidence favorable to the defendant's case will not suffice. Rule 17(c) requires a showing that the materials sought are currently admissible in evidence; it cannot be used as a device to gain understanding or explanation."). This Court should quash Request Nos. 4-7.

### C. Request Nos. 8-9 Call for Irrelevant Material that Is, At Most, Arguable Impeachment Material

This Court should also quash Request Nos. 8-9. Request Nos. 8-9 fail to meet the *Nixon* standard because they are irrelevant, inadmissible, and lack any specificity properly tethered to the appropriate issues at trial. These requests, at bottom, seek to compel the production of documents regarding Nonparty-1's other trading activity, unrelated to the specific events of this case. The defendants contend that such materials will enable them to determine the extent to which

---

[6] The defendants' own motion makes abundantly clear that the purpose of the Subpoena is to obtain discovery. (*See* Rule 17 Mot., at 10 ("Because it is unclear whether [Nonparty-1] produced their complete communications with these individuals about the Indictment or the events alleged therein, the subpoena seeks the complete set of communications.")). It does not, of course, satisfy the *Nixon* standard for the defendants to use Rule 17(c) as a discovery device, and *then* attempt to articulate the hypothetical relevance and admissibility of those documents after the fact.

Nonparty-1 was engaged in so-called "sandwich trading." But Nonparty-1's other trading activity is not relevant to the question of the *defendants*' guilt or whether they acted with the requisite intent to defraud, regardless of whether sandwich trading could be atypical, undesirable, or even unlawful. *See United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (explaining that victim's attributes are irrelevant to defendant's criminal intent by reference to prior holding that a victim's "own criminal background is not relevant to the inquiry as to whether the defendants were properly convicted under" 18 U.S.C. § 2314); *United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) (finding "victim's later act" to be irrelevant to defendant's "earlier culpable mental state" and explaining that defendant's fraudulent intent "focuses on the violator, not the victim").[7]

None of the defendants' arguments establish that such evidence would be relevant to this case, as *Nixon* requires. *Nixon*, 418 U.S. at 699-700. To start, while the defendants assert that documents responsive to Requests No. 8-9 will allow them to place the victims' trading strategies in the context of the strategies employed by other Ethereum users, it is not at all clear why this is so or why that would be admissible at trial—that is, documents that identify other MEV Bots that Nonparty-1 used and that quantify Nonparty-1's trading profits would not logically shed light on the trading strategies of *other* Ethereum users writ large.[8] (*See* Rule 17 Mot., at 11). Although the defendants claim in conclusory fashion that "it may be appropriate to inform the jury about the scale and nature of these trading strategies," (*id.*), the defendants' self-serving assertion falls well short of explaining why "these trading strategies" by the victims of their fraud are relevant to the issue at trial: the defendants' own conduct and state of mind. At its base, the purpose of these requests is evidently to determine the amount of profits Nonparty-1 may have obtained utilizing a particular trading strategy, ostensibly to suggest whether directly or indirectly at trial that such profitability justified the defendants' own actions. It is simply no defense for the defendants to claim that the victims were themselves engaged in some kind of misconduct (or profited even where there was no misconduct to be found) when the defendants took their money through fraud. But Request Nos. 8-9 sweep even more broadly, seeking to ascertain the victims' overall trading conduct with no bearing on the events of this case. The defendants fail to establish the relevance or admissibility of specific evidence to be introduced at trial and therefore fail to meet the *Nixon* standard.

---

[7] For example, evidence of a victim's prior prostitution is irrelevant to a defendant's guilt for coercing the victim to engage in sexual activity. *United States v. Rivera*, 799 F.3d 180, 185 (2d Cir. 2015). As another example, evidence of a victim's participation in making payday loans is irrelevant to a defendant's guilt for defrauding the victim. *United States v. Galanis*, 844 F. App'x 400, 403 (2d Cir. 2021). Here, too, information regarding Nonparty-1's other trading activity has little purpose other than to "cast the victims of the charged crime in an unfavorable light based on irrelevant matters," *id.*, and it is not relevant to the defendants' intent to defraud.

[8] Defendants cite to research publications that purport to provide statistics on sandwich attacks. Not only are these publications inadmissible hearsay statements, but again, whether Nonparty-1 and the defendants' other victims were engaged in sandwich attacks does not bear on the *defendants'* fraudulent intent, and is no defense to the charges.

As far as the Government can discern from the defendants' numerous pejorative descriptions of sandwich trading, the defendants believe that sandwich trading constitutes "market manipulation" that ranges somewhere between controversial, malicious, and illegal. (*See* Dkt. 53, at 9-11 (defendants' motion to suppress); Dkt. 49, at 16-19 (defendants' motion to dismiss); Dkt. 51, at 4-13 (defendants' motion to compel)). But even assuming for the sake of argument that Nonparty-1's sandwich trading activity could reflect arguable impeachment evidence—which the Government does not concede—"[c]ourts have repeatedly held that a Rule 17(c) subpoena should not be used to obtain materials, in advance of trial, which are to be used for impeachment purposes." *Giampa*, 1992 WL 296440, at *3; *see also Nixon*, 418 U.S. at 701; *United States v. Nektalov*, No. 03 Cr. 828 (PKL), 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004). Moreover, any such evidence would, at most, be extrinsic evidence of other allegedly bad acts, which is *also* not admissible under Federal Rules of Evidence 608(b) and 613(b). *Accord United States v. Purdy*, 144 F.3d 241, 245-46 (2d Cir. 1998) ("Extrinsic evidence offered for impeachment on a collateral issue is properly excluded."); *Whiting v. Old Brookville Bd. of Police Comm'rs*, 4 F. App'x 11, 13-14 (2d Cir. 2001). Simply put, documents that are sought solely for impeachment purposes, like the materials sought by Request Nos. 8-9, are not the proper subject of a Rule 17(c) subpoena. This Court should, in line with the established authority rejecting the use of Rule 17(c) subpoenas to obtain impeachment material before trial—and especially where such materials are wholly inadmissible—quash Requests No. 8-9.

### III. Conclusion

For the foregoing reasons and those stated in the Nonparty-1 Motion, the Court should quash Request Nos. 4-9 of the Subpoena.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: ___/s/_____
Rushmi Bhaskaran / Jerry Fang / Danielle Kudla
Assistant United States Attorneys
(212) 637-2439 / 2584 / 2304