# EXHIBIT 3

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

I.     **Background and Qualifications**

Dr. S. Matthew Weinberg is an associate professor of computer science at Princeton University, where he has taught since 2017. He is also the co-director of Princeton University's Center on the Decentralization of Power through Blockchain Technology (DeCenter) and is affiliated with Princeton's Center for Information and Technology Policy (CITP), Program in Applied and Computational Mathematics (PACM), and Bendheim Center for Finance. He received his B.A. in Mathematics from Cornell University in 2010, and his Ph.D. in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology in 2014.

Dr. Weinberg's field of expertise is Algorithmic Mechanism Design, which is the study of algorithms (such as blockchain protocols) that involve economic incentives (such as those of validators, users, searchers, etc.). He has published 87 papers across venues within both computer science and economics. His works have received the top dissertation award and the best full paper award from ACM SIGecom, the interdisciplinary research community studying Economics and Computation, and a test of time award from IEEE Foundations of Computer Science, the research community studying Theoretical Computer Science. For his research and teaching, he has also received a Sloan Foundation Fellowship, an NSF CAREER Award, Princeton's President's Award for Distinguished Teaching, a Phi Beta Kappa Teaching Award, and an Engineering Council Lifetime Achievement Award.

Much of Dr. Weinberg's work within Algorithmic Mechanism Design directly concerns blockchains. For example, he is the co-Director of Princeton's DeCenter (Center for the Decentralization of Power through Blockchain Technology), was the General Chair and co-Program Committee Chair for Advances in Financial Technologies (AFT, the top academic

1

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

conference for blockchain research), and taught a course titled "Algorithmic Mechanism Design for cryptocurrencies and DeFi". Since 2016, he has also published 12 papers specifically on incentives in blockchain ecosystems and regularly presents this work at both academic and practitioner venues.

A list of all publications he has authored in the previous 10 years, and a list of all other cases in which, during the previous 4 years, he has testified as an expert at trial or by deposition are contained in his CV appended to this disclosure.

II.     **Opinions and Bases and Reasons**

If called at trial, Dr. Weinberg may testify to the following opinions. These opinions are based on Dr. Weinberg's education and training as set forth above and in his CV, and on review of the materials listed in the Appendix to this disclosure.

1. *Explain the Ethereum protocol and key features of its design*. Dr. Weinberg will explain that Ethereum is an open-source, decentralized blockchain platform that operates solely through its protocol. The Ethereum protocol does not function like prescriptive rules of conduct for Ethereum users. The Ethereum protocol is open-source and fully transparent. The protocol is experimental and subject to change. Ethereum has processes by which users can propose changes to the protocol called "Ethereum Improvement Proposals" or EIPs. Members of the community can review and comment on an EIP, but unless and until the EIP is adopted, any proposed change remains outside of the current Ethereum protocol.

2. *Explain that the Ethereum blockchain is a decentralized, trust-minimizing, and permissionless platform that encourages behavior through economic incentives*. Dr. Weinberg will explain

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

that "decentralized" means that anyone can place transactions to be added to the blockchain. There is no central authority or single entity with control over Ethereum. There is no centralized point of decision-making, access, or rulemaking. Dr. Weinberg may contrast these decentralized features with centralized structures underpinning other currency systems, where a centralized authority sets monetary policy and makes legal guarantees, or with technologies facilitating currency exchanges, which rely on a central authority (often a corporate entity, like Venmo) to orchestrate and guarantee transactions. The Ethereum blockchain is trust-minimizing in that users do not need to know or place trust in the other users or in any central authority. Rather, Ethereum users place their transactions knowing that economic incentives are in place to encourage the transaction to be added to a future block and, in effect, executed. The Ethereum blockchain is permissionless in that anyone in the world can access it to propose to add a transaction to the blockchain and any user who has 32 ETH can stake that ETH to become a validator. These features of the Ethereum blockchain—decentralization, trust-minimization, permissionlessness—reflect the principle that anonymous users on the blockchain will behave rationally and according to their economic incentives. This principle underpins the function of Ethereum. The blockchain does not rely on the honesty or virtue of its users but instead is designed to function without any such reliance.

3. *Explain the role of validator under the Ethereum protocol*. Dr. Weinberg will explain the role of the validator under the current proof-of-stake (PoS) consensus mechanism. Anyone who stakes 32 ETH can become a validator. A single user can operate more than one validator. The PoS consensus mechanism works by randomly selecting a single validator per dedicated timeslot and allowing them to earn ETH by adding a new block to the chain. The Ethereum

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

protocol assigns that randomly selected validator an absolute monopoly over selecting and ordering transactions to include in the block. The validator's absolute monopoly over the block is critical to the functioning of the Ethereum blockchain. A validator, like all users on the Ethereum blockchain, is expected to act rationally and in its economic self-interest and thus to propose whatever block will maximize its payoff.

4. *Explain the function of economic incentives in encouraging Ethereum user behavior*. Dr. Weinberg will explain that Ethereum relies upon numerous economic incentives to encourage certain behavior. Because Ethereum is decentralized, trust-minimizing, and permissionless, Ethereum users understand that other users may deviate from expected behavior where the economic incentives are insufficient to discourage or encourage certain actions. For example, the Ethereum protocol includes slashing penalties for validators. Validators are slashed 1 ETH for equivocating—i.e., signing more than one block during a given timeslot when the validator has been randomly chosen to propose a block. Ethereum incentivizes users to slash validators by offering them a reward for successful slashings. Dr. Weinberg will explain the concept of maximal-extractible value (or "MEV"). Under the Ethereum protocol, the block-proposing validator has a complete right to the MEV to be gained from adding a new block to the chain. In circumstances where the validator can earn more MEV than the slashing penalty for equivocating, a validator would act rationally and according to economic incentives to equivocate and propose a second block to capture the MEV. Nothing in the protocol prevents or prohibits such equivocating from occurring. Rather, the foreseeable consequence of such action is application of the slashing penalty. In this way, slashing functions like a tax or fee and unlike a rule or law. Slashing is not a moral judgment or reflective of the Ethereum user

4

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

community's views on the legality of the behavior that led to the slashing. If the Ethereum user community had the view that the current slashing penalties were insufficient to discourage actions like equivocating, it would be possible to modify the protocol including by increasing the slashing penalties. Since the alleged "Exploit" described in the Indictment, there have been no such changes to increase the slashing penalties.

5. *Explain the MEV-Boost program and its relationship to the Ethereum protocol*. Dr. Weinberg will explain that the MEV-Boost software is not part of the Ethereum blockchain or incorporated into its protocol. Rather, it is a sidecar that is optional for Ethereum users. MEV-Boost was developed by Flashbots. MEV-Boost's system reflects an experimental form of proposer-builder-separation (or "PBS") that seeks to break apart the validator's dual role as both block-builder and block-proposer under the Ethereum protocol. Although forms of PBS have been proposed for addition to the Ethereum protocol, those proposals have not been adopted. The MEV-Boost system is experimental and subject to frequent revision and update.

Dr. Weinberg will define and explain the roles of searchers, builders, relays, and validators under MEV-Boost. Searchers are sophisticated users that aim to profit by operating trading strategies that depend on the ordering of transactions. There are some searchers who operate independently, but many searchers are institutional entities like hedge funds. Searchers have the ability, but no obligation, to engage in sandwich attacks. That remains true for searchers using MEV-Boost. Searchers, like all Ethereum users, are presumed to be rational economic actors and are expected to act in accordance with their economic incentives. Dr. Weinberg will explain that, through a sandwich attack, a searcher selects a pending transaction in the

5

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

mempool and then proposes a frontrun and backrun trade around it. These transactions are constructed by the searcher's pre-programmed MEV Bots; the sandwich attacker thus authorizes the frontrun trade when it submits its bundle to the builder(s). A sandwich attack manipulates the value of the subject currencies within a given liquidity pool to extract a trading profit. That profit comes at the expense of the user who proposed the pending transaction around which the searcher constructed the sandwich attack by taking advantage of the pending transaction's slippage rate. Although sandwich attacks are considered by many in the Ethereum user community to be unfair or exploitative, the Ethereum and MEV-Boost protocol permits them. Attempts to thwart sandwich attacks have occurred and have been the subject of public discussion in the Ethereum user community. As an example, Dr. Weinberg may discuss the Salmonella token strategy. Dr. Weinberg would explain that an environment that permits sandwich attacks is one in which it would be expected that users would attempt to thwart the practice. Public discussion of the Salmonella token strategy demonstrates that expectation. The fact that sandwich attacks and attempts to thwart them are both permitted under the MEV-Boost and Ethereum protocols, and openly discussed, is a further example of the principle that rational users on Ethereum will seek to maximize their economic rewards consistent with their economic incentives.

Regarding the role of the validator, Dr. Weinberg will explain that, when using MEV-Boost, a validator retains the ability to use its own execution client to order transactions and propose a block. Nothing in the MEV-Boost protocol prevents a validator from submitting an authentic signature to obtain the relay's block and subsequently equivocating by signing and proposing a block of its own construction. A validator is not required to agree not to equivocate as a

6

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

condition of using the MEV-Boost software or otherwise interacting with the MEV-Boost relay. Nor does MEV-Boost involve the validator making any statement or promise to the MEV-Boost system or to any other user on this or any other topic. There are also no economic incentives in the MEV-Boost protocol itself to discourage a validator from equivocating in this manner. Rather, the MEV-Boost program relies exclusively on the slashing penalties in the Ethereum protocol to discourage this behavior by validators. As a result, there are circumstances where the potential MEV to be earned by the validator through equivocating will outweigh the economic disincentive of the slashing penalty. In that circumstance, a sophisticated validator using the MEV-Boost software would act rationally and according to its economic incentives to equivocate even if doing so means that it would incur the slashing penalty provided under the Ethereum protocol. Users of Ethereum, including searchers and others who use the MEV-Boost program, would understand that these economic incentives that pertain under the Ethereum protocol remain unchanged by MEV-Boost. For example, at the time of the alleged Exploit, a searcher would understand that, if the MEV opportunity available from interrupting a sandwich attack by including a transaction that arbitrages the manipulated market back to fair market prices was larger than the slashing penalty under the Ethereum protocol for equivocation, a sophisticated validator would be economically motivated to equivocate. The searcher would further understand there the MEV-Boost protocol does not prohibit that behavior by the validator.

Regarding the MEV-Boost relay code, Dr. Weinberg will explain that it is open-source and publicly available. As a result, it would be understood in the community of Ethereum users

7

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

that users would view the code and design strategies around it to maximize their own profit, including by interrupting a sandwich attack as described above.

6. *Explain the function and content of a digital signature in the context of MEV-Boost*. Dr. Weinberg will explain that a digital signature attached to a communication in the MEV-Boost program indicates only that the validator who sent the communication is the validator or, rather, had access to the validator's private key. In this sense, the validator's digital signature functions like handwriting that is publicly recognizable as that of the validator that is sending the message. The signature does not convey any other meaning. This is true of digital signatures as used on Ethereum and MEV-Boost. The signature is not a promise that the validator will not equivocate and incur the expected slashing penalty as a result.

7. *Explain how the alleged Exploit was consistent with the Ethereum and MEV-Boost protocols*. Dr. Weinberg will explain that the actions labeled the "Exploit" in the Superseding Indictment were made possible by an aspect of the MEV-Boost relay code that was publicly visible. As such, it was likely inevitable that some user would identify the aspect of the MEV-Boost relay code that made it possible to interrupt a sandwich attack in the manner alleged. In this instance, the validator allegedly equivocated by signing two blocks during the same time slot—the block released by the relay to the validator, and the one that the validator ultimately proposed. The foreseeable economic consequences for this equivocating—*i.e.*, slashing—occurred as provided under the Ethereum protocol. There were no economic consequences for the actions taken in the alleged Exploit under MEV-Boost because the MEV-Boost protocol itself includes no economic penalties for such behavior. In this instance, because the amount of MEV created

8

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

by the sandwich attackers' proposed bundles was large, the economic disincentive of the slashing penalty relied upon by MEV-Boost was insufficient to dissuade a rational validator from equivocating and capturing the MEV opportunity available in the relay's provided block. Nothing in the MEV-Boost or Ethereum protocols prohibited this equivocating by the validator. Here, the sandwich attackers' frontrun and backrun trades were particularly risky because they involved trades of millions of dollars' worth of cryptocurrency in bundles that had no guarantee of remaining intact. Indeed, sandwich attacks incentivize further reordering.

The alleged Lure Transactions did not and could not have conveyed any meaning to the searchers or any other Ethereum user because the Lure Transactions were simply transactions pending in the mempool. The Lure Transactions therefore did not and could not have conveyed any promise to not attempt to thwart a sandwich attack later involving the Lure Transactions. Transactions pending in the mempool are incapable of conveying any such meaning, and, moreover, that asserted meaning would not make sense in the context of the Ethereum blockchain where users are expected to act rationally and according to their economic interests. The alleged False Signature was not false, because digital signatures in MEV-Boost program convey no meaning other than identifying the particular validator. Here, the alleged False Signature fulfilled that role because it identified the validator and made it possible for the slashing penalties to be applied.

The alleged Exploit did not threaten or risk the integrity of the Ethereum blockchain. If both blocks signed by the validator were blocks that could have been added to the chain, the other validators (acting as attestors) would have to vote on which block to accept. But because the

9

**Expert Disclosure as to S. Matthew Weinberg, Ph.D.**

validator signed a blockheader for a block that ultimately could not be added to the blockchain, there was no risk of a fork in the chain. The Ethereum protocol was not subsequently revised to increase the slashing penalties for equivocating generally or equivocating in the manner alleged in the Superseding Indictment. The MEV-Boost relay code was revised to check that the signed header is valid, and to give the relay an advantage in having its block accepted in the case of an equivocation by the validator. MEV-Boost, however, still contains no economic disincentives that would discourage efforts to thwart sandwich attacks. MEV-Boost continues to rely on the slashing penalties in the Ethereum protocol. It should be expected that efforts to thwart sandwich attacks will continue where the economic incentives make doing so rewarding.

I acknowledge and approve of the above disclosure of my qualifications and opinions.

_____