UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                                      :
                                                      :
   UNITED STATES OF AMERICA                           :
                                                      :
            - v. -                                    :    S1 24 Cr. 293 (JGLC)
                                                      :
   ANTON PERAIRE-BUENO and                            :
   JAMES PERAIRE-BUENO,                                :
                                                      :
                Defendants.                           :
                                                      :
------------------------------------------------------x

## THE GOVERNMENT'S MOTIONS TO EXCLUDE THE TESTIMONY OF THE DEFENDANTS' PROPOSED EXPERT WITNESSES

JAY CLAYTON
United States Attorney

Jerry Fang
Danielle Kudla
Benjamin Levander
Ryan Nees
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

LEGAL STANDARD........................................................................................................ 4

ARGUMENT .................................................................................................................... 8

I. The Court Should Exclude the Proposed Testimony of Andrea Eisfeldt............................. 8

    A.   Professor Eisfeldt Is Not Qualified to Offer Her Proposed Opinions ......................... 8

    B.   Professor Eisfeldt's Testimony Impermissibly Usurps the Role of the Court and Jury
        11

    C.   Professor Eisfeldt's Testimony Fails the "Fit" Test of Rule 702, Is Irrelevant Under
        Rule 402, and Should Be Precluded Under Rule 403 ............................................... 16

II. The Court Should Exclude the Proposed Testimony of Brett Falk and S. Matthew Weinberg .... 19

    A.   Professors Falk and Weinberg Are Not Qualified to Offer Their Proposed Opinions,
        Which Lack Any Methodology and Are Not Reliable .............................................. 22

    B.   The Testimony of Professors Falk and Weinberg Impermissibly Usurps the Role of
        the Court and Jury ................................................................................................... 28

    C.   The Testimony of Professors Falk and Weinberg Is Irrelevant Under Rule 402 and
        Should Be Precluded Under Rule 403 ..................................................................... 31

III.   The Court Should Exclude the Proposed Testimony of Kevin Madura ................................ 33

    A.   Mr. Madura Is Not Qualified to Offer His Proposed Opinions, Which are
        Unsupported by Bases, Reasons, or Reliable Methodology....................................... 35

    B.   Mr. Madura's Testimony Impermissibly Usurps the Role of the Court and Jury ..... 38

    C.   Mr. Madura's Proffered Testimony Is Not Properly the Subject of Expert Opinion... 42

IV.   In the Alternative, the Court Should Conduct a Daubert Hearing ........................................ 43

CONCLUSION ............................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*,
  No. 08 Civ. 7508 (SAS), 2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013)................................. 13
*Amorgianos v. National R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)............................................................................................ 6, 25
*Bourjaily v. United States*,
  483 U.S. 171 (1987).............................................................................................................. 5
*Choi v. Tower Rsch. Cap. LLC*,
  2 F.4th 10 (2d Cir. 2021)................................................................................. 30, 31, 37, 40
*City of Provid. v. Bats Glob. Mkts.*,
  No. 14 Civ. 2811 (JMF), 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022).............................. 5, 16
*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993)...................................................................................................... passim
*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013)................................................................................ 35
*DiBella v. Hopkins*,
  403 F.3d 102 (2d Cir. 2005)......................................................................................... 18, 32
*Ellis v. YMCA Camp Mohawk, Inc.*,
  615 F. App'x 697 (2d Cir. 2015)......................................................................................... 35
*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)....................................................................................... 5, 6, 25, 40
*GST Telecomm., Inc. v. Irwin*,
  192 F.R.D. 109 (S.D.N.Y. 2000)......................................................................................... 14
*Highland Cap. Mgmt. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008).......................................................................... 16, 40
*Highland Cap. Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005)............................................................................ 7, 26
*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992)............................................................................................... 12
*In re AIG, Inc. 2008 Sec. Litig.*,
  No. 08 Civ. 4772 (LTS), 2015 WL 13648082 (S.D.N.Y. Mar. 19, 2015) .............................. 16
*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................................................ 16
*In re Initial Pub. Offering Sec. Litig.*,
  174 F. Supp. 2d 61 (S.D.N.Y. 2001)................................................................................... 12
*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018)................................................................................. 24
*In re Rezulin Prods. Liability Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................... passim
*Kleiman v. Wright*,
  No. 18 Cv. 80176, 2020 WL 6729362 (S.D. Fl. Nov. 16, 2020) ........................................... 36
*Kumho Tire v. Carmichael*,
  526 U.S. 137 (1999) .............................................................................................. 25, 26, 28

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
   2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ............................................................ 7
*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
   No. 19 Civ. 5263 (GHW), 2022 WL 671630 (S.D.N.Y. Mar. 7, 2022) .................................. 24
*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013) .................................................................................. 26
*Marx & Co. v. Diners' Club Inc.*,
   550 F.2d 505 (2d Cir. 1977) .................................................................................. 12
*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) .......................................................................... passim
*Querub v. Hong Kong*,
   649 F. App'x 55 (2d Cir. 2016) ...................................................................... passim
*Red Rock Commodities, Ltd. v. Standard Chartered Bank*,
   140 F.3d 420 (2d Cir. 1998) .................................................................................. 11
*S.E.C. v. Lek Sec. Corp.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019) ....................................................... 11, 24, 37
*S.E.C. v. Lyon*,
   No. 06 Civ. 14338 (SHS), 2009 WL 6325519 (S.D.N.Y. Mar. 18, 2009) ..................... 19, 32
*S.E.C. v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ............................................................. passim
*Shatkin v. McDonnell Douglas Corp.*,
   727 F.2d 202 (2d Cir. 1984) .................................................................................. 25
*Sparta Com. Servs. v. DZ Bank*,
   680 F. App'x 17 (2d Cir. 2017) ............................................................................. 14
*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016) .................................................................................. 41
*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .......................................................................... 11, 14
*United States v. Chanu*,
   40 F.4th 528 (7th Cir. 2022) ................................................................................. 41
*United States v. Chastain*,
   No. 22 Cr. 305 (JMF), 2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023) .............................. 17
*United States v. DiDomenico*,
   985 F.2d 1159 (2d Cir. 1993) ........................................................................... 6, 30
*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ............................................................................ 13, 27
*United States v. Gatto*,
   986 F.3d 104 (2d Cir. 2021) ............................................................................. 4, 5
*United States v. Haynes*,
   729 F.3d 178 (2d Cir. 2013) .................................................................................. 30
*United States v. Kaufman*,
   No. 19 Cr. 504 (LAK), 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021) ................... 4, 7, 16, 26
*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) ....................................................................... 6, 11, 16
*United States v. Mahaffy*,
   No. 05 Cr. 613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) ................................ 8

*United States v. Mejia*,
  545 F.3d 179 (2d. Cir. 2008)................................................................. 13, 27

*United States v. Mendlowitz*,
  No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .................. 15, 19, 32, 42

*United States v. Menendez*,
  No. 23 Cr. 490 (SHS), 2025 WL 547794 (S.D.N.Y. Feb. 19, 2025) ............................. passim

*United States v. Newkirk*,
  684 F. App'x 95 (2d Cir. 2017)...................................................................... passim

*United States v. Rosado*,
  728 F.2d 89 (2d Cir. 1984) ............................................................................ 31

*United States v. Sanders*,
  No. 12 Cr. 574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013)................... 15, 41

*United States v. Scop*,
  846 F.2d 135 (2d Cir. 1988) ....................................................................... 6, 12

*United States v. Tin Yat Chin,*
  371 F.3d 31 (2d Cir. 2004).......................................................................... 9, 42

*United States v. White*,
  No. 02 Cr. 1111 (KTD), 2003 WL 721567 (S.D.N.Y. Feb. 28, 2003) ....................... 31

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) ............................................................................ 27

**Rules**

Fed. R. Evid. 402 ................................................................................... 7, 22
Fed. R. Evid. 403 .............................................................................. 7, 17, 22
Fed. R. Evid. 702 .............................................................................. *passim*
Fed. R. Evid. 704 ........................................................................... 6, 29, 30
Fed. R. Crim. P. 16 ...................................................................... 7, 24, 26

## INTRODUCTION

The defendants have noticed their intention to call four expert witnesses at trial. The defense's proposed experts and accompanying disclosures suffer from an array of deficiencies that warrant preclusion of all four witnesses. The disclosed testimony of the defendants' proposed experts is impermissible because the proffered opinions outstrip the qualifications of the proposed experts, are inappropriate subjects for expert testimony, lack a reliable methodology or basis in facts and data, or are irrelevant, unfairly prejudicial, and confusing to the jury. Among other things, the proposed experts would offer legal conclusions that invade the purview of the Court and the jury, or serve no other purpose than to provide an expert patina to inadmissible hearsay testimony about the defendants' actions and supposed lack of criminal intent. More broadly, the proposed experts' disclosures make clear that the defendants seek to turn their criminal fraud and money laundering trial into a referendum on the merits of "sandwich trading" and the regulation of cryptocurrency—topics that have no bearing on any element of the charged offenses or any issue before the jury. The Court should exercise its gatekeeping authority and preclude such impermissible expert testimony.

## BACKGROUND

On May 8, 2024, a Grand Jury in this District returned Indictment 24 Cr. 293, charging the defendants with conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. Superseding Indictment S1 24 Cr. 293 was subsequently returned on March 17, 2025, (the "Indictment").[1] The charges arise out of the defendants' meticulously planned fraud scheme,

---

[1] The Indictment included the same crimes as initially charged, with an additional count of conspiring to receive stolen property. By letter dated May 12, 2025, the Government advised the Court of its intent not to proceed on Count Four of the Superseding Indictment (*i.e.* conspiracy to receive stolen property).

which culminated in the theft of approximately $25 million in cryptocurrency from victim cryptocurrency traders (the "Victim Traders") in mere seconds on April 2, 2023 (the "Exploit") and subsequent laundering of the proceeds.  *See* Dkt. No. 125 ("Gov't MILs") at 2-11 (describing in detail the defendants' scheme and the facts the Government expects to prove at trial).  Trial is set to begin on October 14, 2025.

On August 13, 2025, the defendants provided disclosures for four witnesses that the defendants may call as experts at trial.  *See* Exs. A-D (defendants' expert notices).  Those witnesses are: (1) Andrea Eisfeldt; (2) Brett Falk; (3) S. Matthew Weinberg; and (4) Kevin Madura.[2] According to the defendants' notice, if permitted by the Court, the witnesses would opine on the following topics:

- Professor Eisfeldt proposes to testify about "[d]ecentralized and [t]rustless [m]arkets," including her opinions that:  "[d]ecentralized crypto markets do not currently have the same established legal provisions" as "traditional financial markets"; "crypto markets operate under transparent code"; and "a [trading] strategy that consistently results in substantial profits generally requires extensive preparation."  Professor Eisfeldt further would testify regarding sandwich trading and the Exploit.  Specifically, she would opine that: sandwich trading—the strategy employed by the victims in this case—is a "form of market manipulation"; economic incentives "justif[ied] the costs" of the defendants' "unbundling and equivocating"; and "[s]andwich attacks . . . differ from price convergence arbitrage strategies."  Finally, Professor Eisfeldt would opine that "Ethereum is a dynamic, evolving system" and "the ex-post examination of disruptions [of such systems] . . . is a valuable and necessary process" for their development.  Ex. A. at 2-16.

---

[2] The expert notice of Andrea Eisfeldt is Exhibit A; the notice of Brett Falk is Exhibit B; the notice of S. Matthew Weinberg is Exhibit C; and the notice of Kevin Madura is Exhibit D.

- Although noticed as separate witnesses, Professor Falk and Professor Weinberg provided expert disclosures covering nearly identical sets of topics and opinions, described in detail below, including:  the role and economic incentives of Ethereum validators generally, including that "slashing penalties" imposed on validators "are not a moral judgment"; that sandwich trading is unfair and market manipulation; a description of the MEV-Boost system and code, including that the code is "publicly available"; a description of a 2021 attack, referred to as the "Salmonella attack," on sandwich traders unrelated to the victims in this case; a narration of the defendants' Exploit; that neither the defendants' bait transactions nor their False Signature were false; that the defendants, in sum and substance, did not violate rules or protocols by unblinding the block received from the relay to construct and propagate their own competing block; and that the defendants' Exploit was consistent with their economic incentives and was not a threat to Ethereum's integrity.  Professor Falk alone would further opine on "[n]orms and [p]seudonymity" of Ethereum users; that "[t]he number of tokens lost by the [victims in this case] was . . . decided solely by the [victims]"; and that "[t]he Defendants' trading strategy is best understood as a clash between two highly sophisticated adversarial entities"—the defendants versus their "parasitic" victims.  Ex. B at 2-26; Ex. C. at 2-10.

- Mr. Madura proposes to testify about general definitions concerning MEV-Boost and the Ethereum network; explain the "Program[] source code" (*i.e.*, the Exploit code), including "how it would have operated when executed"; and provide a definition of "digital signatures."  Mr. Madura would further opine that MEV-Boost is "not part of the core Ethereum protocol"; "validators are free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid"; the Trigger Transactions (referred to as the "Bait Transactions" in the Indictment) were "valid, signed transactions"; the Presigned Transactions ("Tampered Transactions" in the

Indictment) were "cryptographically signed and stored for later use," and therefore, "valid"; when the Program code constructed the "package of information" sent to the relay, the "Program did not change the default values used for certain fields, including the *parent root* and *state root*," which remained set to "zero, as specified by the author of the open-source programming library used by the Program (and not the Program itself)"; and once in possession of the transaction data from the relay, the Program code "follows the same methodology as all MEV-seeking entities do:  collect and order transactions in a certain way to optimize profit for the validator."  Ex. D at 3-24.

On August 29, 2025, the Government informed the defendants that their expert disclosures failed comply with Rule 16(b)(1)(C).  *See* Ex. E.  The Government identified several specific deficiencies and asked that the defendants' identify, among other things, (i) what education, experience, or training, if any, the four experts had related to sandwich trading or the MEV-Boost system prior to their engagement in this matter, (ii) the substance of any information given to any of the experts that was provided by the defendants (either directly or indirectly), and whether any expert had interviewed either or both of the defendants; and (iii) the bases for specific opinions, which are addressed in this motion.  *See id.*  On September 4, 2025, the defendants responded to the Government's request, providing supplemental information, discussed further below, and stating that the original expert disclosures "identify the documents on which the experts' disclosed opinions are based" and that "[n]one of the experts spoke with either of the Peraire-Buenos or each other."  Ex. F at 1.

## LEGAL STANDARD

An expert must be "qualified, reliable, and helpful" to be "permitted to testify."  *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The

inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliabl[y] appl[ied]" to the case. Fed. R. Evid. 702.

The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). District courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993), and their exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

The first requirement—that the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"— serves a dual purpose. First, "[i]n requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541, 546 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in

applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliabl[y] appl[ied] . . . to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court should not "admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Additionally, Rule 704(b) provides that "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." This rule prevents an expert from stating an "inference as to a defendant's actual mental state at the time of a crime," as "expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993). For the same reason, an expert cannot speculate as to the credibility, state of mind, or the motivations of others. *See, e.g., United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("[E]xpert witnesses

may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury."); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("Additionally, an expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses.").

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403. Because "[e]xpert evidence can be both powerful and quite misleading [due to] the difficulty in evaluating it," a court, "in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595; *see Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (explaining that Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation").

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) was amended in 2022 to require the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same).

## ARGUMENT

### I.    The Court Should Exclude the Proposed Testimony of Andrea Eisfeldt

The defendants intend to call Professor Andrea Eisfeldt, a finance professor at UCLA, as an expert to offer opinions on a variety of topics relating to, among other things:

(i)     "Decentralized crypto markets," including why various participants "may be drawn to crypto markets," that participation in such markets is "not without risk," that such markets "do not currently have the same established legal provisions" as "traditional financial markets," and that "crypto markets operate under transparent code," Ex. A at 2-4;

(ii)    A comparison of the victims' sandwich trading strategy, which Eisfeldt calls a "form of market manipulation," with other "price convergence arbitrage strategies," *id.* at 4-15;

(iii)   Whether economic incentives would "justify" conduct like the defendants' Exploit, *id.* at 14; and

(iv)    The evolution of emerging systems such as Ethereum, and how "the ex-post examination of disruptions [of such systems] . . . is a valuable and necessary process" for their development, *id.* at 16.

Professor Eisfeldt's testimony should be precluded in its entirety on several grounds.  First, she lacks sufficient experience or expertise in decentralized cryptocurrency markets, the MEV-Boost system, or sandwich trading to opine as an expert on these topics.  Second, Professor Eisfeldt's proposed testimony impermissibly attempts to usurp the role of the Court and the jury and to argue that the defendants lacked the requisite intent to commit the charged crimes.  Third, her testimony fails the "fit" test of Rule 702, is irrelevant under Rule 402, and should be precluded under Rule 403 because it is likely to confuse the issues and mislead the jury, among other issues.

### A.  Professor Eisfeldt Is Not Qualified to Offer Her Proposed Opinions

Much of Professor Eisfeldt's testimony should be excluded because she is not qualified to testify as an expert witness about decentralized cryptocurrency markets or, crucially, the sandwich trading strategies about which she intends to opine or the MEV-Boost system actually at issue in this case.

8

A threshold issue is whether the witness is "qualified as an expert" to render the proposed opinion. *See Nimely*, 414 F.3d at 396. A witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004). Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13; *see Querub v. Hong Kong*, 649 F. App'x 55, 56-57 (2d Cir. 2016) (affirming exclusion of expert familiar only with foreign accounting standards and explaining that because the expert "is not qualified to opine on [Public Company Accounting Oversight Board] standards, she has no basis for comparing them with other standards").

Professor Eisfeldt has no specific experience involving the MEV-Boost system or sandwich trading, and has, at best, limited experience related to the broad topic of decentralized finance. Notably, Professor Eisfeldt's curriculum vitae makes no reference whatsoever to cryptocurrency or blockchain technology, much less MEV-Boost or other topics relevant to this trial. *See* Ex. A at PDF pp. 21-26. Nor does she appear to have ever published or presented on these topics. *See id.* Neither her professional website nor her UCLA faculty page contains any mention of any blockchain- or crypto-related topics. *See* Ex. G.

Despite the silence of Professor Eisfeldt's regularly maintained CV, website, and faculty page on these topics, the defendants' expert disclosure for Professor Eisfeldt nonetheless cites supposedly relevant qualifications: (i) that Professor Eisfeldt "is a frequent panelist on topics in Financial Technology, including at the American Finance Association Annual Meeting in January 2024 and the Bitcoin Bruin Summit at UCLA Anderson in 2025"; and (ii) that Professor Eisfeldt

"teaches a popular MBA FinTech course." *See* Ex. A at 1.  As to the former, the cited experience

plainly does not even relate to the topics at issue in this trial or on which Professor Eisfeldt seeks

to opine.  At the January 2024 American Finance Association Annual Meeting, Professor Eisfeldt

spoke on a panel titled "AI and the Future of Finance" and specifically addressed the topic of

"Generative AI and Firm Values."[3]  At the Bitcoin Bruin Summit, she participated in a panel titled

"Beyond Banks: Bitcoin's Role in Reinventing Financial Freedom," which discussed "Bitcoin's

global potential to disrupt traditional finance, highlighting how Bitcoin Libre is empowering

individuals through innovative lending solutions."  Ex. H at 4.  As to the latter, the defendants'

expert notice appears to refer to a corporate finance course titled "Financial Technology: FinTech"

that Professor Eisfeldt previously has taught to business school students at UCLA.  *See* Ex. I at 7.

The course offers a survey of "opportunities (and challenges) at the intersection of finance and

technology," including "Artificial Intelligence, Big Data, Machine Learning," and "current topics

in DeFi."  While the course does broadly cover "crypto, tokens, [and] exchanges," it also focuses

on "banking and lending, payments, real estate, and asset management."  *Id.*  The defendants'

September 4, 2025 letter claims that this course "covered MEV and transaction-ordering, including

sandwich trading," Ex. E at 7, but fails to identify any prior education, experience, or training

Professor Eisfeldt has relating to the MEV-Boost system.  Nor does she have any peer-reviewed

publications involving these topics.

   Neither Professor Eisfeldt's participation in panels on artificial intelligence and Bitcoin—

a cryptocurrency with no bearing on the area of blockchain technology at issue in this case—nor

her inclusion of a broad module on decentralized finance in her business school FinTech class

---

[3] *See* The American Finance Association, "AI and the Future of Finance," https://www.youtube.com/watch?v=T-AyBUMcWeg at 22:58.

qualify her to be an expert to render the specific opinions noticed, including her claims that the defendants' actions were somehow "justified," that the victims were engaged in "market manipulation" (a legal term of art), and that there is a lack of "established legal provisions" for cryptocurrency. *See, e.g.*, *S.E.C. v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 407-13 (S.D.N.Y. 2019) (holding that expert's general experience in "finance and economics" did not qualify him to testify about the more narrow topic of "layering or Cross-Market Strategy"); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (expert's "expertise in the general area of structured finance" did not qualify him to present expert testimony on "synthetic CDOs, a very specific type of security"); *United States v. Menendez*, No. 23 Cr. 490 (SHS), 2025 WL 547794, at *5 (S.D.N.Y. Feb. 19, 2025) (anthropology professor with "impressive" credentials in area of Middle Eastern studies not qualified to opine on specific topic of "gift-giving among Middle Eastern cultures"); *see also supra* at 9 (quoting *Nimely*, 414 F.3d at 399 n.13; *Querub*, 649 F. App'x at 56-57).

Accordingly, Professor Eisfeldt should be precluded from offering her proposed cryptocurrency and blockchain-related opinions, including but not limited to the cited topics of sandwich trading, MEV-Boost, validator behavior, and the Ethereum network.

## B. Professor Eisfeldt's Testimony Impermissibly Usurps the Role of the Court and Jury

Professor Eisfeldt's proposed testimony should also be precluded because it would improperly usurp the role of the Court and the jury.

A fundamental principle underlying Rule 702 is that it is the court's job to instruct the jury on the law, and the jury's job to apply the facts to that law. *Lumpkin*, 192 F.3d at 289. For that reason, "[a]s a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). The Second Circuit has repeatedly held that such expert testimony should be excluded. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered*

*Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992);

*Scop*, 846 F.2d at 140; *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977).

Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-

established that it is often deemed a basic premise or assumption of evidence law—a kind of

axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001)

(citations omitted).  Accordingly, expert testimony that "usurp[s] either the role of the trial judge in

instructing the jury as to the applicable law or the role of the jury in applying that law to the facts

before it by definition does not aid the jury" and is thus inadmissible.  *Nimely*, 414 F.3d at 397.

For example, Professor Eisfeldt intends to opine that:

- "Decentralized crypto markets do not currently have the same established legal provisions" as "traditional financial markets," such as rules that "prohibit front-running and insider trading."  Ex. A at 3.

- During "the relevant time period, there was no US crypto-focused central authority."  Ex. A at 3.

- "By design, crypto markets operate under transparent code," which "allows certain market participants to invest in . . . developing strategies to profit from any nuances in [the code's] design or implementation."  Ex. A at 3.

- Sandwich trading is a "form of market manipulation" and a "type of front-running attack . . . where a malicious actor manipulates the order of transactions in a blockchain network," and that the "[a]ll of the five at-issue sandwich bots in this matter"—*i.e.*, the victims of the defendants' Exploit— "used such a strategy."  Ex. A at 6, 13.[4]

---

[4] Professor Eisfeldt quotes undated webpages from Coinbase and "Crypto Street" as the basis for these opinions.  In its August 29, 2025 letter, the Government asked the defendants to "clarify the meaning of 'market manipulation' in this opinion and whether Professor Eisfeldt would testify to this opinion as her own or whether she is merely conveying the contents of the cited Coinbase document."  Ex. D at 5.  The Government also asked the defendants to "provide the publication date of the Coinbase document."  *Id.*  The defendants responded in their September 4, 2025 letter

- Although validators receive a "slashing penalty" for "propos[ing] two blocks for the same slot (i.e. equivocating) . . . the profits [a validator could receive] for unbundling and equivocating may be large enough to economically justify the costs." Ex. A at 14.

- "Ethereum is a dynamic, evolving system" and "the ex-post examination of disruptions [of such systems] . . . is a valuable and necessary process" for their development. Ex. A at 16.

Professor Eisfeldt's proposed testimony plainly usurps the role of the Court and the jury and should be precluded on that basis. Her testimony regarding the "legal provisions" applicable to decentralized crypto markets and characterizing sandwich trading as a "type of front-running attack . . . where a malicious actor *manipulates* the order of transactions in a blockchain network" are naked attempts to instruct the jury on the law, and plainly inadmissible.[5]  So too is her proposed testimony about the purported absence of a "US crypto-focused central authority" during the relevant period. *See, e.g.*, *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about causes and origins of financial crisis and noting that court would not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis"); *Rezulin Prods.*, 309 F. Supp. 2d at 547 ("[T]he

---

by claiming semantically that, despite their notice, "Dr. Eisfeldt will not be asked to testify that sandwich trading is 'market manipulation,'" that she "may testify as to the economic incentives of sandwich trading and how it works," and that the "quotation of the Coinbase reference simply provides additional support for the undisputed way in which sandwich attacks work." Ex. E at 7-8. The defendants did not provide the date of the Coinbase document.

[5] The conclusory statement in the defendants' September 4, 2025 letter that "Dr. Eisfeldt will not be asked to testify that sandwich trading is 'market manipulation,'" Ex. E at 8, does not save this opinion. If Professor Eisfeldt is somehow *not* opining that sandwich trading is market manipulation, she is merely quoting undated webpages from Coinbase and "Crypto Street," and her opinion should be excluded for the separate reason that an expert may not serve as a vehicle for the transmission of hearsay. *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("The expert may not, however, simply transmit hearsay to the jury. . . . Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever.'"); *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003).

opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").

Professor Eisfeldt's proposed testimony that "crypto markets operate under transparent code," which "allows certain market participants to invest in . . . developing strategies to profit from any nuances in [the code's] design or implementation," Ex. A at 3, fares no better. At its heart, this testimony is an argument that "code is law" and anything permitted by "transparent" computer code in decentralized crypto markets is therefore legal. To begin, this testimony is, at best, a legal argument—that actions permitted by code are legal—thinly veiled as testimony regarding norms or standards of industry conduct. Such expert testimony is regularly precluded. *See, e.g.*, *Bilzerian*, 926 F.2d at 1295 (expert testimony encompassing "legal conclusion" is "not admissible, and may not be made so simply because it is presented in terms of industry practice"); *Rezulin Prods.*, 309 F. Supp. 2d at 558 (excluding proposed expert testimony regarding purported "standards of [industry] conduct" that were "at best thinly-disguised legal or quasi-legal principles" because such testimony "would encroach on the court's prerogative to instruct on the law"); *GST Telecomm., Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y. 2000) (excluding expert testimony because the "standards of conduct espoused by the experts [were] not specialized knowledge" but rather were "in effect . . . legal conclusions" about particular transactions); *Sparta Com. Servs. v. DZ Bank*, 680 F. App'x 17, 19-20 (2d Cir. 2017) (affirming exclusion of expert testimony regarding "banking industry standards and practices" as "replete with legal conclusions"); *Menendez*, 2025 WL 547794, at *5 (excluding proposed expert testimony that "a gift . . . does not necessarily connote a 'quid pro quo'" as "far beyond the bounds of proper expert testimony").

Indeed, even if allowing an expert to testify to the effect that "code is law" in crypto markets did not improperly instruct the jury regarding the law (and it certainly does), it should be

14

precluded under Rule 403. *See, e.g.*, *United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017) (affirming district court's exclusion of expert testimony concerning industry practice as irrelevant to "attorney obligations not to convey information they actually know, or consciously avoid knowing, is false"); *United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"); *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *5 (S.D.N.Y. Dec. 20, 2019) (precluding expert testimony on the "general industry practices in the payment processing industry" as not relevant to whether the defendant violated the wire fraud statute).

Professor Eisfeldt's proffered opinions that economic incentives would "economically justify" conduct like the defendants' Exploit (specifically "unbundling and equivocating"), Ex. A at 14, and that "ex-post examination of disruptions" of new systems like Ethereum "is a valuable and necessary process" for those systems' development, Ex. A at 16, are similarly inappropriate. To begin, these opinions are akin to an expert in a robbery trial testifying that the robbery was "economically justif[ied]" and that security upgrades made after the robbery were "a valuable and necessary process" to protect from future crimes. Moreover, "[i]nserting the word 'economically' . . . does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion." *Tourre*, 950 F. Supp. 2d at 678. Here, Professor Eisfeldt seeks to testify that the defendants' charged crimes were "justif[ied]" and "valuable" to the development of Ethereum. Aside from being irrelevant and likely to confuse the issues and mislead the jury, as discussed further below, such testimony impermissibly suggests a legal conclusion about the validity of the

15

defendants' conduct and about the expert's "belief about a party's state of mind"—*i.e.*, the defendants' reasoning and motivation for the Exploit—and thus "is an improper subject for expert testimony and cannot be saved by couching [her] opinion as 'industry custom and practice.'" *Highland Cap. Mgmt. v. Schneider*, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008); *see, e.g.*, *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (granting motion to exclude expert testimony regarding "knowledge, motivations, intent, state of mind, or purposes" of individuals or entities because "expertise does not give [an expert] the ability to read minds"); *Tourre*, 950 F. Supp. 2d at 681 ("[An individual's] state of mind is not a proper subject of expert testimony."); *In re AIG, Inc. 2008 Sec. Litig.*, No. 08 Civ. 4772 (LTS), 2015 WL 13648082, at *1 n.2 (S.D.N.Y. Mar. 19, 2015) (excluding expert testimony that consisted of "legal assertions" that were "disingenuously . . . proffered [as a] 'factual' demonstration").

### C. Professor Eisfeldt's Testimony Fails the "Fit" Test of Rule 702, Is Irrelevant Under Rule 402, and Should Be Precluded Under Rule 403

Professor Eisfeldt's proposed testimony also should be precluded because it is irrelevant to the issues actually in dispute before the jury at trial. Expert testimony must be directly pertinent to an issue that the jury has to resolve and "fit" the facts of the case. *Bats Glob. Mkts.*, 2022 WL 902402, at *8; *see Lumpkin*, 192 F.3d at 289.

Professor Eisfeldt's broad comparisons of decentralized crypto markets to traditional financial markets and of sandwich trading to "price convergence arbitrage," are irrelevant to, and, in any event, ill-fitted for, a case about the defendants' commission of fraud and money laundering offenses. A frolic and detour through the similarities and differences between traditional financial markets and decentralized crypto markets, or between price convergence arbitrage and sandwich trading, is not probative of any contested fact and will certainly confuse the issues and create a "danger of undue delay and wasting time." *Kaufman*, 2021 WL 4084523, at *19 (precluding expert

testimony that would have "educated the jury" about loans and illustrated "the similarities and differences" between types of loans); *see, e.g.*, *United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (precluding expert testimony about the academic definitions of certain finance terms and a comparison between those terms and the information in the case because such testimony had "limited or no bearing on the issues in this case" and any probative value was "substantially outweighed by the dangers of confusing or misleading the jury").  Professor Eisfeldt's descriptions of the "economic incentives" that supposedly "justify" conduct like the defendants' crime and her view that "disruptions" like the Exploit are actually "valuable and necessary" for the development of "evolving" systems like Ethereum are even further afield from any issue the jury actually has to resolve.  The lessons that Professor Eisfeldt purports to draw from these topics cannot be "reliabl[y] appl[ied] . . . to the facts of the case," Fed. R. Evid. 702, and are certain to confuse the issues and mislead the jury, *see* Fed. R. Evid. 403.[6]  Accordingly, this testimony should be precluded.

More broadly, each subject of Professor Eisfeldt's proposed testimony serves to advance inappropriate arguments that should be precluded in their entirety.  *See* Dkt. 125 ("Gov't MILs") at 43-54.  Her testimony regarding decentralized crypto markets—including the purported absence of established "legal provisions" or a dedicated regulator, and the existence of "transparent code"—are effectively suggestions that cryptocurrency is unregulated and that "code is law."  Her testimony on sandwich trading and price convergence arbitrage is effectively an exercise in victim-

---

[6] This testimony is also offered without any discernible methodology or basis, rendering it inherently unreliable under Rule 702, which requires "a sufficiently rigorous analytical connection between [an expert's] methodology and [her] conclusions."  *Nimely*, 414 F.3d at 396.  Here, there "is simply too great an analytical gap between the data and the opinion proffered," and the "*ipse dixit* of the expert" is not enough to bridge the gap.  *Id.*

blaming—seeking to tell the jury that the defendants' victims were *different* than other traders in the market and "malicious."  Ex. A at 6.  And her testimony on the economic incentives that would "justify" conduct like that of the defendants and on the "valuable" impact of a "disruption[]" like the Exploit on an "evolving" system like Ethereum similarly, at their core, are arguments that the defendants are somehow not guilty due to the novelty of cryptocurrency or the purportedly undesirable nature of the fraud victims' trading strategy.

As set forth in detail in the Government's motions *in limine*, the Court should preclude *any* argument or evidence that cryptocurrency is unregulated, that "code is law," or that the victims' trading strategy was somehow atypical, undesirable, or even unlawful.  *See* Gov't MILs at 43-54. That analysis applies *a fortiori* in the expert context, due to the "uniquely important role" of Rule 403 "in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."  *Nimely*, 414 F.3d at 397; *see Daubert*, 509 U.S. at 595 (under Rule 403, a court "exercises more control over experts than over lay witnesses" because "[e]xpert evidence can be both powerful and quite misleading [due to] the difficulty in evaluating it").

Here, Professor Eisfeldt's proposed testimony would confuse the issues by incorrectly suggesting that the relevant standard is whether the defendants' conduct was within the technological limits of "transparent" computer code or economically profitable or ultimately led to positive reforms in the Ethereum network, rather than whether the defendants intended to and did take the victim traders' money through false statements and whether the defendants' subsequent movement of the proceeds violated the money laundering statutes.  Such misleading expert testimony is regularly excluded under Rule 403.  *See, e.g.*, *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("[T]he district court correctly concluded that [the expert's] testimony would unnecessarily confuse the jury because the real issue in the case was not whether [a party]

acted ethically, but rather . . . whether the $50,000 was or was not a bribe, and whether [the party] did or did not believe it was a bribe."); *Rezulin Prods.*, 309 F. Supp. 2d at 545 (proposed testimony "would be likely unfairly to prejudice and confuse the trier by introducing the experts' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards"); *S.E.C.* v. *Lyon*, No. 06 Civ. 14338 (SHS), 2009 WL 6325519, at *1 (S.D.N.Y. Mar. 18, 2009) (excluding proffered experts who sought to testify to confidentiality best practices—and whether such practices were followed —as "irrelevant, prejudicial, and . . . far more likely to confuse or mislead a jury than to assist them" in a securities fraud and insider trading litigation).[7]  Accordingly, Professor Eisfeldt's testimony should be precluded.

## II.    The Court Should Exclude the Proposed Testimony of Brett Falk and S. Matthew Weinberg

The defendants intend to call Brett Falk and S. Matthew Weinberg, a professor and an associate professor of computer science, respectively, as experts to offer nearly identical sets of opinions parroting various litigation positions advanced by the defendants on a wide range of topics in this case.  Specifically, Professors Falk and Weinberg each would opine on the following topics:

(i)    General background on Ethereum and decentralized ledgers, including that Ethereum is "trustless," Ex. B at 4, and "does not rely on the honesty or virtue of its users but instead is designed to function without any such reliance," Ex. C at 3.  *See generally* Ex. B at 2-4; Ex. C at 2-3.

(ii)    The role and economic incentives of Ethereum validators, including that "a validator would act rationally and according to economic incentives to equivocate and propose a second block"—*i.e.*, to engage in conduct similar to that of the defendants—if doing so would yield more profit than the cost

---

[7] Moreover, expert testimony is not appropriate where, as here, a fact witness is capable of testifying as to relevant facts. *See Newkirk*, 684 F. App'x at 97; *Mendlowitz*, 2019 WL 6977120, at *7.  While the merits of sandwich trading and its relationship with price convergence arbitrage are not appropriate topics for *any* witness at trial, several witnesses—including Victim-1, the Flashbots Representative, and the defendants, should they choose to testify—would be able, and in fact better-positioned than Professor Eisfeldt, to testify to that issue if it had any relevance to the questions before the jury.

of the "slashing penalty" for engaging in the conduct, Ex. C at 4; *see* Ex. B at 5 (explaining that "slashing penalties set the economic incentives for validator behavior," and it would be "rational and consistent with [those] incentives for an entity to incur a slashing penalty if the expected profits outweigh the cost"). *See generally* Ex. B at 4-5; Ex. C at 3-5.

(iii)    That "[s]lashing is not a moral judgment or reflective of the Ethereum user community's views on the legality of the behavior that led to the slashing," Ex. C at 4-5; *see* Ex. B at 5 ("Slashing is not a moral judgement [sic] on the validator.").

(iv)    That the "Ethereum protocol has not remained static over time," Ex. B at 7; *see* Ex. C at 2 (Ethereum "protocol is experimental and subject to change").

(v)     That sandwich trading "manipulates the value of the subject currencies" and is "considered by many in the Ethereum user community to be unfair or exploitative," despite the fact that "the Ethereum and MEV-Boost protocol permits" such trading. Ex. C at 6; *see* Ex. B at 11-12 (opining that sandwich trading "makes a profit at the expense of" other traders, "is generally considered to be an undesirable side of effect of Ethereum's current design," "requires manipulating . . . the price of tokens," and is "detrimental.").

(vi)    Flashbots's MEV-Boost system and code, including "the roles of searchers, builders, relays, and validators under MEV-Boost," that MEV-Boost is "optional for Ethereum users" and has changed over time, and that participants are "expected to act in accordance with their economic incentives." Ex. C at 5; *see* Ex. B at 12-15 (discussing the MEV-Boost system and opining that MEV-Boost "does not speak for the whole Ethereum ecosystem," "has changed over time," is "adversarial and governed by economic incentives," and "is controversial because it does not mitigate . . . sandwiching," which is "harmful" and like "theft").

(vii)   A description of a 2021 attack, referred to as the "Salmonella attack," on sandwich traders unrelated to the victims in this case, concluding in the opinion that "[p]ublic discussion of the Salmonella token strategy demonstrates [the] expectation" that other users "would attempt to thwart [sandwich trading]." Ex. C at 6; *see* Ex. B at 16 (describing Salmonella attack and concluding that attack "is a known and publicly discussed strategy, highlighting the risks associated with sandwich [trading]" (citing a Reddit comment as its source[8])).

(viii)  That "the MEV-Boost relay code" is "open-source and publicly available," and "it would be understood in the community of Ethereum users that users

---

[8] Ex. B at 16 n. 36 (citing https://www.reddit.com/r/CryptoCurrency/comments/my295o/how_a_user_wrecked_sandwich_traders_for_fun_and/).

would view the code and design strategies around it to maximize their own profit." Ex. C at 7-8; *see* Ex. B at 18 (explaining that "the relay" the defendants exploited "behaved as predicted based on its publicly available source code").

(ix)    A narration of the defendants' Exploit. *See* Ex. B at 17-25; Ex. C at 8-10.

(x)    That the defendants' bait transactions did not convey any meaning or guarantee (and thus were not false). *See* Ex. B at 22; Ex. C at 9.

(xi)    That the defendants' False Signature was either "not false, because digital signatures in MEV-Boost program convey no meaning other than identifying the particular validator," Ex. C at 9, or "[n]ot [i]nvalid" because the defendants used a real signature that "identified them as the validator," even though "the signed block header lacked the state and parent root fields necessary for inclusion on the chain," Ex. B at 23.

(xii)    That the defendants' Exploit was consistent with their economic incentives. *See* Ex. C at 8-9; Ex. B at 21.

(xiii)    That the "Defendants' operation was not a threat to Ethereum's integrity," Ex. B at 25; *see* Ex. C at 9-10 ("The alleged Exploit did not threaten or risk the integrity of the Ethereum blockchain.").

(xiv)    Regarding the defendants' unblinding of the block received from the relay to construct and propagate their own competing block, Professor Weinberg would opine that "[n]othing in the MEV-Boost protocol prevents a validator from submitting an authentic signature to obtain the relay's block and subsequently equivocating by signing and proposing a block of its own construction," Ex. C at 6, and Professor Falk would opine that "according to the Ethereum protocol, the Defendants had the exclusive right to propose [a block]" at the time of the Exploit," Ex. B at 18.

Additionally, Professor Falk alone would opine:

(i)    Regarding the "[n]orms and [p]seudonymity" of Ethereum users, including that "the actions taken by the Defendants in this matter to move funds are not necessarily atypical of participants with large cryptocurrency holdings attempting to maintain privacy" and that the process of funding a validator "do[es] not provide meaningful privacy." Ex. B at 5-6, 9.

(ii)    That the victims in this case "exposed themselves to an especially high amount of risk" through their trading strategy and "[t]he number of tokens lost by the [victims] was solely by the [victims]." Ex. B at 19.

21

(iii)    That bundling of transactions—a key aspect of the sandwich trading strategy executed through the MEV-Boost system, including by the victims in this case—is not guaranteed "within the Ethereum protocol."  Ex. B at 21-22, 25-26.

(iv)    That "[t]he Defendants' trading strategy is best understood as a clash between two highly sophisticated adversarial entities" and that the "Defendants' trading strategy did not generate losses to other Ethereum traders" aside from the "parasitic" victims in this case.  Ex. B at 24.

Professors Falk and Weinberg's testimony should be precluded in their entirety on several grounds.  First, neither Professor Falk nor Professor Weinberg has disclosed sufficient expertise in the subjects of the MEV-Boost system and sandwich trading on which each seeks to opine or has offered a reliable methodology for his opinions.  Second, each of Professor Falk and Weinberg's proposed testimony impermissibly attempts to usurp the role of the Court and the jury and seeks to improperly argue that the defendants lacked the requisite intent to commit the charged crimes.  Third, each one's testimony is irrelevant under Rule 402 and should be precluded under Rule 403 because it is likely to confuse the issues and mislead the jury.  Their opinions address several improper topics, as described in the Government's motions *in limine*, and are appropriately precluded under Rule 403, particularly given that several percipient witnesses, including a cooperating witness, the Flashbots Representative, Victim-1, and the defendants, if they choose to testify, are unambiguously *better* positioned to testify to these issues than the purported experts.

### A.  Professors Falk and Weinberg Are Not Qualified to Offer Their Proposed Opinions, Which Lack Any Methodology and Are Not Reliable

Much of Professor Falk's proposed testimony should be excluded because he is not qualified to testify as an expert witness about core topics of his testimony—the MEV-Boost system, sandwich trading, and the defendants' Exploit, and absent further disclosures to demonstrate a basis for his qualifications, Professor Weinberg's testimony should be excluded on the same ground.  Moreover, both Professor Falk and Professor Weinberg's testimony are

inadmissible because their opinions are not reliable. To the contrary, each professor's testimony is replete with conclusory opinions provided without any stated basis or methodology. And, to the extent the professors do provide bases and reasons, the sources they rely on simply emphasize the impropriety of their proffered opinions. Accordingly, their testimony should be precluded.

Professor Falk has been offered as an expert once previously, *see* Ex. B at 39, in an arbitration in which his testimony was found to be "not persuasive, and moreover, lack[ing] foundation with regard to Falk's (a) credentials to render such opinion testimony, and (b) what basis he had for reaching the opinion conclusions he offered." Ex. J at 17.[9]

Professor Falk's proposed testimony suffers from the same defects here. While he has experience and publications broadly relating to blockchain technology, he does not appear to have specific experience or research involving the MEV-Boost system, sandwich trading, or other core topics of his proposed testimony. Indeed, in response to the Government's direct request that the defendants supplement Professor Falk's disclosure by "identify[ing] what education, experience, or training, if any, Professor Falk had related to sandwich trading or the MEV-Boost system," Ex. E at 2, the defendants pointed to Professor Falk's general experience involving cryptocurrency and blockchain technology and added that Falk "has become familiar with the Ethereum protocol and the concept of MEV, as well as the behavior of MEV-seeking entities, including sandwich attacks." Ex. F at 4. The defendants cite no publications, talks, or trading experience to support even this limited assertion, and their letter is notably silent as to expertise regarding *MEV-Boost*—the actual system at issue here. Professor Falk's expertise in various computer science topics—and even his publications broadly addressing cryptocurrency and blockchain technology—does not qualify him

---

[9] Professor Weinberg does not appear ever to have previously been qualified as an expert. He has been retained as a proposed expert in a pending antitrust case in which he does not appear to have yet been qualified as an expert or to have testified. Ex. C at PDF p. 30.

to testify about the more specific topics at issue in this case and in his expert disclosure. *See supra*
at 11 (citing *Lek Sec. Corp.*, 370 F. Supp. 3d at 407-13; *Tourre*, 950 F. Supp. 2d at 677-78; *Menendez*,
2025 WL 547794, at *5; *Nimely*, 414 F.3d at 399 n.13; *Querub*, 649 F. App'x at 56-57).

Similarly, although the defendants' supplemental disclosure states that Professor
Weinberg—unlike the defendants' other proposed experts—actually "has become familiar with
. . . Flashbots programs and protocols (including MEV-Boost)," Ex. F at 5, the defendants provide
little specificity about the basis for his qualifications in this regard. Indeed, even in their
supplemental disclosure, the defendants claim only generally that Professor Weinberg's
experience is derived from serving "as an advisor to research on these topics" (the details of which
are not disclosed) and that Professor Weinberg attended unspecified "conferences at which these
topics have been presented on and discussed." *Id.* This limited disclosure alone is insufficient to
establish Professor Weinberg's purported expertise. Indeed, while an expert's opinion may be
based on his or her knowledge and experience, an expert testifying based on his experience or
research must still "explain how that experience leads to the conclusion reached, why that
experience is a sufficient basis for the opinion, and how that experience is reliably applied to the
facts." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, No. 19 Civ. 5263 (GHW), 2022 WL 671630, at *17
(S.D.N.Y. Mar. 7, 2022) (quoting Fed. R. Evid. 702 advisory committee note); *see also* Rule
16(b)(1)(C)(iii) (requiring not only "a complete statement of all opinions" but also "the bases and
reasons for them" and "the witness's qualifications"). Professor Weinberg fails to do so here.

Moreover, neither Professor Falk nor Professor Weinberg's proposed testimony is "the
product of reliable methods reliably applied," *In re Mirena IUS Levonorgestrel-Related Prods.
Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 239-40 (S.D.N.Y. 2018), and thus each should be
precluded. "To warrant admissibility" under Rule 702, "it is critical that an expert's analysis be

reliable at every step." *Amorgianos*, 303 F.3d at 267.  "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [an expert's] methodology and [his] conclusions." *Nimely*, 414 F.3d at 396. Thus, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (quoting *Joiner*, 522 U.S. at 146); *see also Shatkin* v. *McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (rejecting expert methodology based on an "apples and oranges" comparison).  Further, "reliability" requires that courts ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Nimely*, 414 F.3d at 396 (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999)).

Here, neither Professor Weinberg nor Professor Falk appears to have employed *any* methodology whatsoever in reaching their proposed opinions, much less a methodology "reliable at every step," as required under Rule 702, *Amorgianos*, 303 F.3d at 267.  Their disclosures are replete with unsourced and seemingly baseless conclusions parroting the defendants' litigation positions—for example asserting that "[s]lashing is not a moral judgment," Ex. C at 4-5; Ex. B at 5, that, in sum and substance, the defendants did not violate rules by unblinding the relay's block and constructing and propagating their own competing block, *see* Ex. C at 6; Ex. B at 18; and that key elements of the defendants' fraudulent scheme (the bait transactions and False Signature) were not false, *see* Ex. C at 9; Ex. B at 22-23.[10]  In addition to being inappropriate topics for expert

---

[10] The Government identified these and other deficiencies in its August 29, 2025 letter to the defendants.  *See* Ex. E at 3-4.  In response, the defendants point, as the basis for this proposed testimony, to Professor Falk's "study of the Ethereum protocol and documentation," without specifying which documentation, Ex. F at 4-5, and to Professor Weinberg's "review and study of the MEV-Boost protocol and documentation," also without specifying which documentation,

testimony, as discussed further in Sections II(B) and II(C) below, these opinions should be precluded for the simple reason that the professors "fail[] to explain how [they] came to these conclusions," and "simply putting forth [the professors'] 'experience and research' as a basis for [their] conclusion[s] provides no meaningful information." *Menendez*, 2025 WL 547794, at *5.

Similarly, significant portions of the professors' proposed testimony would also be dedicated to an improper attempt to provide a post-hoc narration of the defendants' Exploit, *see* Ex. B at 17-25; Ex. C at 8-10, but "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise, nor is such a narration traceable to a reliable methodology," and for that reason, "[m]ere narration … fails to fulfill *Daubert*'s most basic requirements." *Kaufman*, 2021 WL 4084523, at *21 n.226 (quoting *Tourre*, 950 F. Supp. 2d at 675); *see Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469. Testimony and evidence regarding the Exploit "is properly presented through percipient witnesses and documentary evidence," not the narration of an expert. *Rezulin Prods.*, 309 F. Supp. 2d at 551; *see also Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events.").

Indeed, the impropriety of the two professors' proposed testimony—and their lack of reliable bases, reasons, or methodology in reaching their conclusions—is underscored by the sources they do cite, which surely lack the requisite "level of intellectual rigor that characterizes

---

Ex. F at 6. This fails to disclose the proposed experts' bases and reasons as Rule 16 requires. Notably, the defendants cannot even cite Professor Falk's study of the "MEV-Boost protocol," because Professor Falk has no prior familiarity with MEV-Boost. Indeed, Professor Weinberg is the *only* one of the defendants' four proposed experts whom the defendants—in response to the Government's direct question about the experts' prior education and experience related to MEV-Boost—could even say "has become familiar with . . . Flashbots programs and protocols (including MEV-Boost)." Ex. F at 5; *see id.* at 2, 4, 7 (describing expertise of Madura, Falk, and Eisfeldt and omitting reference to Flashbots or MEV-Boost).

the practice of an expert in the relevant field." *Nimely*, 414 F.3d at 396 (quoting *Kumho Tire*, 526 U.S. at 152). Each professor relied upon a series of legal filings from this case, including the transcript of the June 17, 2025 oral argument regarding, and in Professor Weinberg's case, the full briefing on at least three different motions filed by the defendants. Ex. C at 11; Ex. B at PDF p.40. Given their apparent reliance on legal sources, it is entirely unsurprising that, as discussed in detail below, Professors Falk and Weinberg seek to offer testimony that would, from start to finish, usurp the role of the Court and the jury by offering legal conclusions: Having digested the defendants' legal briefing, the professors now seek to regurgitate the defendants' legal arguments to the jury. But such testimony will "unfairly provide the [defendants] with an additional summation by having the expert interpret evidence" and "usurp[] the jury's function." *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003); *see United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008) ("[I]t is a little too convenient that [a party] has found an individual who is expert on precisely those facts that the [party] must prove to secure [their desired] verdict.").

Further, aside from legal filings, Professor Weinberg relies solely on a handful of "[p]ublicly [a]vailable [m]aterials," including two articles from a website called "mev.wiki" and a Github post about an unrelated 2021 attack on sandwich traders. Ex. C at 11-12.[11] Professor Falk similarly relies primarily on "[w]ebsites and [b]logs" and non-academic articles (mostly criticizing sandwich traders). Ex. B at PDF pp. 40-44. It is unclear how purported expert testimony based on a combination of these materials and legal filings could possibly be "grounded on sufficient

---

[11] Professor Weinberg also cites the published statement of the Flashbots Representative, a percipient witness who is expected to testify at trial, about the defendants' Exploit, Ex. C at 12, raising several additional concerns. *See, e.g.*, *supra* at 6-7 (expert cannot testify to credibility of witnesses); *infra* at 32-33 (expert not helpful where percipient witnesses can testify to same issues). Permitting an expert to comment on or opine based on a prior statement of another witness in the case would similarly be wholly improper, and fails to form a basis for expert testimony.

facts or data" and be "the product of reliable principles and methods" that have applied "reliably to the facts of the case," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), or match the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Nimely*, 414 F.3d at 396 (quoting *Kumho Tire*, 526 U.S. at 152).

Accordingly, because Professor Falk is not qualified to opine on the MEV-Boost system, sandwich trading, and the defendants' Exploit; Professor Weinberg's purported qualifications on these topics are not adequately disclosed; and because both Professor Falk and Professor Weinberg's proffered opinions are entirely unreliable given their lack of methodology, bases and reasons, the Court should preclude their testimony.

### B. The Testimony of Professors Falk and Weinberg Impermissibly Usurps the Role of the Court and Jury

As set forth above, expert testimony regarding issues of law, the application of law to fact, or state of mind is inadmissible. *See supra*, Section I(B). Much of the proposed testimony of Professors Falk and Weinberg violates these prohibitions and should be precluded.

For example, Professors Falk and Weinberg would opine that: slashing "is not a moral judgment or reflective of . . . the legality of the behavior that led to the slashing," Ex. C at 4-5; Ex. B at 5; sandwich trading is form of market manipulation, Ex. C at 6; Ex. B at 11-12; that the defendants' bait transactions and False Signature—*i.e.*, their alleged fraudulent scheme—were not false, Ex. C at 9; Ex. B at 22-23; and that, in sum and substance, the defendants had the right to unblind the block received from the relay, unbundle transactions, and construct their own block, *see* Ex. C at 6-7; Ex. B at 18. These are unfettered attempts to instruct the jury on the law and usurp their role, and they are plainly inadmissible.

Much of the rest of the professors' testimony consists of legal conclusions thinly veiled as testimony relating to industry practices or other standards of conduct, but no less impermissible.

For example, the professors propose to testify that:  Ethereum "does not rely on the honesty or virtue of its users" (*i.e.*, fraudulent behavior like the defendants' is expected in the wild west of Ethereum), Ex. C at 3; *see* Ex. B at 2-4; the defendants' Exploit was consistent with their economic incentives as validators (*i.e.*, fraud is justified because it was "economically" incentivized), Ex. B at 4-5, 21; Ex. C at 3-5, 8-9; the MEV-Boost code is publicly available and "it would be understood in the community of Ethereum users" (*i.e.*, the purported state of mind of a collective of diffuse third-parties) that other users would try to take advantage of the code (*i.e.*, that "code is law" and both the defendants and their victims knew that was the case), Ex. B at 18, 25; Ex. C at 7-8; and that public discussion of the unrelated 2021 "Salmonella" attack on sandwich traders "demonstrates [the] expectation" that other users "would attempt to thwart" sandwich trading (*i.e.*, that the defendants and their victims would have thought the Exploit was fair game due to the existence of a prior attack on sandwich traders), Ex. C at 6; *see* Ex. B at 16.  Further, Professor Falk would testify that the "the actions taken by the Defendants in this matter to move funds are not necessarily atypical" of Ethereum users (*i.e.*, that the defendants' knowing concealment of the Exploit proceeds was innocent and normal), Ex. B at 5-6, 9, and that "[t]he Defendants' trading strategy is best understood as a clash between two highly sophisticated adversarial entities" (and not fraud), Ex. B at 24.  All of this testimony is inadmissible, and no less so due to the thin veneer of "customs," "standards," and what would be "understood" by the vast body of Ethereum users applied by the defendants' experts.  *See supra* at 14-16 (collecting cases).  The decision of how the defendants' actions should be "best understood" belongs to the jury.

Moreover, the professors' proffered testimony about what would be "atypical," "understood," or an "expectation" of Ethereum users—which they attempt to apply to the explicit facts of this case—is obviously a vehicle to argue that the defendants lacked the requisite state of

mind to commit fraud and money laundering.  But use of expert testimony as a substitute for a defendant's own testimony about his knowledge or intent is improper and precluded by Rule 704. Specifically, Rule 704(b) of the Federal Rules of Evidence prohibits expert witnesses from "stat[ing] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged," as "[s]uch ultimate issues are matters for the trier of fact alone." Fed. R. Evid. 704(b).

The rule prevents an expert from stating an "inference as to a defendant's actual mental state at the time of a crime" because "expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993). In *DiDomenico*, the defendant was charged with wire fraud and interstate transportation of stolen property, and sought to call an expert witness who would "assist the jury to determine [the defendant's] state of mind" by testifying about how the defendant suffered from a dependent personality disorder, which is why she assisted her boyfriend in selling goods that were stolen. *Id.* at 1161.  The district court excluded that testimony and the Second Circuit affirmed, concluding that while the defendant proclaimed that the expert was not going "to testify as to the ultimate issue of whether [the defendant] knew the computer equipment was stolen," it was "semantic camouflage" and a violation of Rule 704(b).  *Id.* at 1165; *see, e.g.*, *United States v. Haynes*, 729 F.3d 178, 196 (2d Cir. 2013) (holding that it was plain error under Rule 704 to admit expert testimony that amounted to whether the defendant "realized" there were drugs in a rental car).  The same is true here.  The professors' planned testimony about what would be "understood" about taking advantage of vulnerabilities in the MEV-Boost code, attacking sandwich traders, and/or the concealment of the Exploit proceeds is simply camouflage for the suggestion that the

30

*defendants* did not have an intent to defraud their victims or conceal or disguise their proceeds. Such testimony is impermissible under Rule 704(b), unsupported, and should be precluded.

Ultimately, the proffered testimony of Professors Falk and Weinberg "functions as little more than a legal brief that parrots [the defendants'] arguments," *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021), previewed in the defendants' motion to dismiss and repeated throughout this litigation:  code is law; crypto is unregulated; the victims are the villains; and the bait transactions and False Signature were not false.  Such "[e]xpert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded."  *Id.*

### C. The Testimony of Professors Falk and Weinberg Is Irrelevant Under Rule 402 and Should Be Precluded Under Rule 403

The testimony of Professors Falk and Weinberg also should be precluded because much of it is irrelevant to the issues actually before the jury at trial, the rest is squarely the domain of percipient witnesses, and all of it is likely to confuse the issues, mislead the jury, and be unfairly prejudicial.

To begin, much of Professor Falk and Professor Weinberg's proposed testimony goes to inappropriate topics—specifically, as described above, that code is law, the victims are the real bad guys, and cryptocurrency is unregulated—that should be precluded in their entirety.  *See* Gov't MILs at 43-54.  Other proposed testimony—such as each professor's proposed testimony regarding the unrelated 2021 "Salmonella" attack—focuses "on whether others may have committed uncharged crimes" which is a "waste of time and thus is totally irrelevant."  *United States v. White*, No. 02 Cr. 1111 (KTD), 2003 WL 721567, at *7 (S.D.N.Y. Feb. 28, 2003); *cf., e.g.*, *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far

31

beyond the scope of legitimate issues in a criminal trial"). As explained above, the need to preclude such testimony regarding inappropriate and irrelevant topics, as well as the power of the Court to do so, is heightened in the expert context, "given the unique weight such evidence may have in a jury's deliberation." *Nimely*, 414 F.3d at 397; *see Daubert*, 509 U.S. at 595. Because the proposed testimony of Professor Falk and Professor Weinberg would confuse the issues—including by suggesting that the relevant standard is whether the defendants' conduct was within the technological limits of "publicly available" computer code or that there were no standards applicable to the defendants' conduct at all—it should be excluded under Rule 403. *See, e.g.*, *DiBella*, 403 F.3d at 121; *Rezulin Prods.*, 309 F. Supp. 2d at 545; *Lyon*, 2009 WL 6325519, at *1.

The professors' proposed testimony regarding the MEV-Boost system, sandwich trading, and the defendants' Exploit is also not helpful to the jury, because the percipient witnesses will testify about the actual facts of this case. At trial the Government will call, among other witnesses: a cooperating witness who helped the defendants prepare for and carry out the Exploit, including by spending months learning how to bait the victims' MEV bots into trading and by helping the defendants write the computer code used for the Exploit; a Flashbots Representative who *oversaw* the MEV-Boost system and was involved in responding to the defendants' Exploit; and a sandwich trader who used the MEV-Boost system and was victimized by the defendants' Exploit. These are lay witnesses who are competent to testify about the Exploit, MEV-Boost, and sandwich trading, and relevant and admissible questions the defendants have about these topics may be put to these witnesses during cross-examination. The defendants, should they choose to testify, have percipient knowledge of these topics as well. There is no need for a separate "expert" witness—much less *two* purported experts who have disclosed *no* firsthand experience with any of these topics—to testify on such matters, especially in light of the fact that such testimony would simply retread the

testimony of fact witnesses. *See Newkirk*, 684 F. App'x at 97 ("In these circumstances, the district court acted well within its discretion in concluding that other witnesses with financial backgrounds were competent to explain the transactions and related terminology presented by the case."); *Mendlowitz*, 2019 WL 6977120, at *7 ("Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice."). Accordingly, the proposed experts' testimony should be precluded as cumulative of lay witness testimony, confusing, misleading, and unfairly prejudicial.

**III.    The Court Should Exclude the Proposed Testimony of Kevin Madura**

The defendants intend to call Mr. Kevin E. Madura, a director at AlixPartners, LLP, as an expert to offer opinions on a variety of topics relating to, among other things:

(i)     General definitions concerning the MEV-Boost system, the Ethereum network, and digital signatures; Ex. D ¶¶ 13-34;

(ii)    The validity of digitally signed cryptocurrency transactions, opining that "[o]nce signed, valid transactions can be freely mixed with other transactions in a block in arbitrary order because of the cryptographic guarantees offered by digital signatures," Ex. D ¶ 33;

(iii)   The "Program's source code" (*i.e.*, the Exploit computer code) and "how it would have operated when executed," Ex. D ¶¶ 12, 35-79;

(iv)    The discretion of validators operating MEV-Boost software, opining that "validators are free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid," Ex. D ¶ 56;

(v)     The validity of the Program's Trigger Transactions (referred to as the "Bait Transactions" in the Indictment), as "valid, signed transactions," Ex. D ¶¶ 12, 48-49, 51, 72, and 74;

(vi)    The validity of the Program's Presigned Transactions (referred to as the "Tampered Transactions" in the Indictment), as valid, "cryptographically signed" transactions "stored for later use," Ex. D ¶¶ 52-53, 72, 74;

(vii)   The validity of the Program's construction of the blockheader message— the message sent from the validator operating the MEV-Boost software to the MEV-Boost relay (*i.e.*, the "False Signature" in the Indictment)—

33

opining that "when constructing this package of information, the Program did not change the default values used for certain fields, including the parent root and state root," but rather used the "default value . . . as specified by the author of the open-source programming library used by the Program (and not the Program itself)," Ex. D. ¶¶ 63-65;

(viii)    A "digital signature" within the context of the MEV-Boost relay and validator exchange "ensure[s] nothing at all regarding the contents of the internal data the signature is applied to," Ex. D ¶ 67;

(ix)    The validity of the Program's construction of the published block after receipt of the MEV-Boost relay transaction data, opining that it "follows the same methodology as all MEV-seeking entities do: collect and order transactions in a certain way to optimize profit for the validator," "much like would be done in any other scenario when building your own blocks with your own transactions"—"that is, selecting ones most advantageous to the validator," Ex. D ¶ 72;

(x)    The validity of the Program's replacement of the Trigger Transactions with the Presigned Transactions, opining that this conduct occurred in "the same way that other miners and validators have constructed blocks to their benefit hundreds of thousands of times before," Ex. D ¶ 74; and

(xi)    The conclusion that the "Program uses established block-building techniques and a novel MEV optimization strategy to derive profit from the competitive landscape of Ethereum transactions," Ex. D ¶ 78.

Mr. Madura's testimony should be precluded in its entirety on several grounds. First, he lacks sufficient experience or expertise in the MEV-Boost system to opine as an expert on these topics, and in the absence of these qualifications, fails to adequately explain the bases and reasons for his opinions or his methodology. Second, Mr. Madura's proposed testimony impermissibly attempts to usurp the role of the Court and the jury or to argue that the defendants lacked the requisite intent to commit the charged crimes. Third, many of Mr. Madura's opinions, which pertain to generic descriptions of the MEV-Boost system, the Ethereum network, and an explanation of the Exploit code, are not the proper subjects of expert opinion under Rule 702 where his testimony merely mirrors the testimony offered by fact witnesses and should be precluded under Rule 403 because it is likely to confuse the issues and mislead the jury, among other issues.

### A.  Mr. Madura Is Not Qualified to Offer His Proposed Opinions, Which are Unsupported by Bases, Reasons, or Reliable Methodology

Much of Mr. Madura's testimony should be excluded because he is not qualified to opine as an expert about the MEV-Boost system and the block-building process within that system.  Nor does Mr. Madura provide sufficient bases, reasons, or any reliable methodology to support his proffered opinions in the absence of this necessary expertise.

While Mr. Madura has experience relating to blockchain technology and computer software, he does not appear to have any specific experience or research involving the MEV-Boost system.  As a result, he is unqualified to render his core opinions that (i) validators *operating* MEV-Boost software remain "free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid," (ii) a "digital signature" within the context of the MEV-Boost relay and validator exchange "ensure[s] nothing at all regarding the contents of the internal data the signature is applied to," and (iii) the Exploit computer code, which "utilizes [MEV-Boost] to source valid, signed transactions for consideration when constructing a final block," used "established block-building techniques and a novel MEV optimization strategy to derive profit from the competitive landscape of Ethereum transactions."  *See Ellis v. YMCA Camp Mohawk, Inc.,* 615 F. App'x 697, 699 (2d Cir. 2015) (affirming district court's disqualification of an expert whose resume had "generalized familiarity with camp education," but lacked specialized "knowledge or experience" on the more narrow topic at issue of "horsemanship"); *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) ("Rule 702 mandates that experts 'stay within the reasonable confines of [their] subject area . . . .  In other words, 'an expert qualified in one subject matter does not thereby become an expert for all purposes.'").

Notably, Mr. Madura's curriculum vitae makes no reference to MEV-Boost or even the more general topic of Ethereum network block-building procedures.  *See* Ex. D at PDF pp. 27-30.

And while Mr. Madura's CV lists a number of court cases for which he has provided an expert report—almost none of which are publicly available—the description of each report is so generic that it is impossible to evaluate what, if any, experience he has related to the MEV-Boost system or related topics.[12]  For example, the topics of his expert reports are listed as follows: "blockchain software functionality," "blockchain and cryptocurrency functionality," "blockchain transactional analysis," "Ethereum smart contracts," "forensic analysis of Ethereum transactions," "Bitcoin," and "computer programming."  In the limited instance for which Mr. Madura's expert report is publicly available, there is nothing in the report to indicate that he has any expertise in the Ethereum network block-building process, much less how that process operates in conjunction with the MEV-Boost system.  *See SingularDTV GmbH v. John Doe*, 21-cv-6000 (VEC), (S.D.N.Y. Dec. 31, 2021), Dkt. 26, attached hereto as Ex. K.  Specifically, the report focuses primarily on cryptocurrency *tracing* for transactions that occurred on the Ethereum blockchain—not, as relevant here, the block-building and cryptocurrency validation process.  *See* Ex. K; *see also Kleiman v. Wright*, 2020 WL 6729362, at *10 (S.D. Fla. Nov. 16, 2020) (qualifying Mr. Madura as an expert to opine on a topic irrelevant to issues in dispute in this matter—namely, whether the plaintiff had had the "skills and experience to have written the original Bitcoin core software application released in 2009").

---

[12] As noted above, *see supra* at 4, the Government requested supplemental disclosures, including, among other things, Mr. Madura's education, experience, or training, if any, related to the MEV-Boost system prior to his engagement in this matter.  *See* Ex. E.  The defendants' supplemental expert disclosure states that Mr. Madura "has studied the Ethereum protocol and the behavior of MEV-seeking entities," providing as an example "work [that] has required him to examine liquidity pool trades at the code level, and how they operate."  Ex. F at 2.  The supplemental disclosure is notably silent as to actual education, experience, or training related to the *MEV-Boost system* on which Mr. Madura seeks to opine.

Mr. Madura's list of speaking engagements and publications fare no better. His speaking engagements are replete with generic references to "cryptocurrency," but lack any reference to the topics for which he wishes to opine, such as, "Ethereum block-building," "MEV," "validators," "Flashbots," or "MEV-Boost." There is no basis to understand how his participation in panels concerning, among other broad topics, "cryptocurrency management strategies in bankruptcy," "cryptocurrency: valuation issues and market volatility," or most recently, "[t]he role of GenAI and cryptocurrency in Fraud Schemes," qualify him to opine on the block-building discretion of validators operating the MEV-Boost software or his conclusion that the Exploit source code (which relies on the MEV-Boost software) "uses established block-building techniques and novel MEV optimization strategy to derive profit from the competitive landscape of Ethereum transactions." *See supra* at 11 (citing *Lek Sec. Corp.*, 370 F. Supp. 3d at 407-13; *Tourre*, 950 F. Supp. 2d at 677-78; *Menendez*, 2025 WL 547794, at *5; *Nimely*, 414 F.3d at 399 n.13; *Querub*, 649 F. App'x at 56-57).

Mr. Madura's publications are equally inapplicable. Of the two articles listed on his CV, only one includes a single-sentence reference to "MEV" over the course of a 10-page article published at some point in "2022," which appears to pre-date the launch of the MEV-Boost system. The other article, which pertains to "blockchain initiatives in healthcare"—as well as other articles Mr. Madura appears to have published or co-authored over the past two years, but which are not listed on his CV—do not appear to have any relevance to Ethereum block-building procedures, MEV, validators, or the MEV-Boost system, but rather pertain to topics such as "artificial intelligence," SEC asset class approval, and "crypto-assets and corporate bankruptcy."

Accordingly, Mr. Madura should be precluded from opining on topics related to the MEV-Boost system, the permissible conduct of Ethereum validators—particularly, such conduct

within the MEV-Boost system, and the Ethereum block-building process, including the validity of transactions, MEV-seeking "methodology," and "MEV optimization strategies."

### B. Mr. Madura's Testimony Impermissibly Usurps the Role of the Court and Jury

As set forth above, expert testimony regarding issues of law, the application of law to fact, or state of mind is inadmissible. *See supra,* Section I(B). Like Professors Eisfeldt, Falk, and Weinberg, much of the proposed testimony of Mr. Madura violates these prohibitions and should be precluded. In particular, Mr. Madura seeks to offer nine main sets of opinions that are at issue with respect to these prohibitions:

(i)   The validity of digitally signed cryptocurrency transactions, opining that "[o]nce signed, valid transactions can be freely mixed with other transactions in a block in arbitrary order because of the cryptographic guarantees offered by digital signatures," Ex. D ¶ 33;

(ii)   The unfettered discretion of validators operating MEV-Boost software, opining that "validators are free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid," Ex. D ¶ 56;

(iii)   The validity of the Program's Trigger Transactions (referred to as the "Bait Transactions" in the Indictment), Ex. D ¶¶ 12, 48-49, 51, 72, and 74;

(iv)   The validity of the Program's Presigned Transactions (referred to as the "Tampered Transactions" in the Indictment), as valid, "cryptographically signed" transactions "stored for later use," Ex. D ¶¶ 52-53, 72, 74;

(v)   The validity of the Program's construction of the blockheader message— the message sent from the validator operating the MEV-Boost software to the MEV-Boost relay (referred to as the "False Signature" in the Indictment)—opining that "when constructing this package of information, the Program did not change the default values used for certain fields, including the parent root and state root," but rather used the "default value," "as specified by the author of the open-source programming library used by the Program (and not the Program itself)," Ex. D ¶¶ 63-65;

(vi)   A "digital signature" within the context of the MEV-Boost relay and validator exchange "ensure[s] nothing at all regarding the contents of the internal data the signature is applied to," Ex. D ¶ 67;

(vii)   The validity of the Program's construction of the published block after receipt of the MEV-Boost relay transaction data, opining that it "follows the same methodology as all MEV-seeking entities do:  collect and order

38

transactions in a certain way to optimize profit for the validator," "much like would be done in any other scenario when building your own blocks with your own transactions"—"that is, selecting ones most advantageous to the validator," Ex. D ¶ 72;

(viii)    The validity of the Program's replacement of the Trigger Transactions with the Presigned Transactions, opining that this conduct occurred in "the same way that other miners and validators have constructed blocks to their benefit hundreds of thousands of times before," Ex. D ¶ 74; and

(ix)    The conclusion that the "Program uses established block-building techniques and novel MEV optimization strategy to derive profit from the competitive landscape of Ethereum transactions," Ex. D ¶ 78.

Much of Mr. Madura's testimony consists of legal conclusions thinly veiled as testimony relating to the *hypothetical* operation of the "Program code" in the context of the general Ethereum practices and customs that are irrelevant to the actual issues before the jury. For example, Mr. Madura proposes to testify, among other things, that: (1) "validators are free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid," Ex. D ¶ 56; (2) the Trigger Transactions and Presigned Transactions were "valid" (*i.e.—bona fide*) trades because they were digitally signed and could be later published to the blockchain, Ex. D ¶¶ 48-49, 51-53, 72, and 74; (3) the manner in which the defendants' gained access to the Trigger Transactions (*i.e.*—by relying on the False Signature), did nothing more than use the "default value" "as specified by the author of the open-source programming library used by the Program (and not the Program itself)," Ex. D. ¶¶ 63-65, and (4) the defendants' reconstruction of the new block simply used "established block-building techniques and novel MEV optimization strategy to derive profit from the competitive landscape of Ethereum transactions," Ex. D ¶ 78. Mr. Madura provides no explanation of what bases and reasons caused him to render these opinions in the context of a MEV-Boost validator such as the one operated by the defendants.

In sum and substance, Mr. Madura proposes to testify that (1) there were no MEV-Boost rules or protocols concerning the conduct of validators, like the defendants, who *chose to use* the

39

MEV-Boost software (*i.e.,* the defendants were free to ignore the rules and protocols of the very software they used to commit the fraud, which, contrary to Mr. Madura's opinions, are documented in, among other places, Flashbots' materials, and notably, do not appear in the list of materials Mr. Madura reviewed when forming his opinions); (2) the Trigger Transactions and the Presigned Transactions were *bona fide* trades because they could be executed on the blockchain (*i.e.*, that the defendants' intent in submitting the Trigger and Presigned Transactions to the mempool is irrelevant because the mere execution of any transaction renders it "bona fide"); (3) the Program Code did not cause the MEV-Boost relay to act in an unintended manner because the defendants used the "default values" as "specified by the author of the open-source programming library," and that the digital signature submitted to the relay, "ensure[s] nothing at all regarding the contents of the internal data the signature is applied to," (*i.e.*, that "code is law" and submitting inaccurate data is a permissible block-building technique); and (4) the defendants' Program code used "established block-building techniques and a novel MEV optimization strategy" to obtain profits in a "competitive landscape," (*i.e.*, the defendants engaged in lawful trading).

Such testimony is a transparent effort to put the weight of Mr. Madura's opinions on key *mens rea* issues in this case (that is, the defendants' state of mind when writing and executing the Exploit code), and thus "is an improper subject for expert testimony and cannot be saved by couching [his] opinion as industry custom and practice." *Highland*, 551 F. Supp. 2d at 182-83; *see supra* at 14-16 (collecting cases); *see also, e.g.*, *Rezulin Prods.*, 309 F. Supp. 2d at 541 ("[A]n expert may give an opinion to help the jury decide an issue in the case, [but] he or she may not tell the jury what result to reach[.]"). Mr. Madura's opinions about the roles of validators in the MEV-Boost system and the "validity" of the Bait and Tampered transactions, as well as the False Signature, which appear to be based on solely on Mr. Madura's *ipse dixit*, should be excluded. *See Joiner*, 522 U.S. at 146

40

(affirming court's decision to preclude "opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert"); *Menendez*, 2025 WL 547794, at *5 (excluding expert who sought to offer "her '*ipse dixit*' conclusions based on her experiences throughout her career").

Finally, Mr. Madura's baseless opinions concerning what is acceptable practice in the MEV-Boost block-building process raise serious Rule 403 concerns because his opinions conflate concepts of technical feasibility—for example, the purported "validity" of the Bait and Tampered Transactions because they *could* be executed to the blockchain—with what is truly at issue, namely, the defendants' intent when executing the Exploit code, including the submission of the Bait and Tampered Transactions.  As outlined in the Government's *omnibus* motions *in limine*, (Dkt. 125 at 50-54), that fraud was technologically feasible using the MEV-Boost software is not a defense to the charges in this case.  *See United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022) (holding that "spoofing"—where a trader manipulates prices by placing orders to buy or sell, with the intent to cancel those orders—constitutes wire fraud); *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658-59 (2d Cir. 2016) (explaining that a promise without an intent to keep the promise is fraud).

Because jurors are likely to give additional import to testimony designated as "expert testimony," the risk of misleading the jury weighs even more heavily in this Rule 403 balancing test.  Given the minimal, if any, probative value of Madura's proposed testimony on the Exploit code, which as outlined below in Section III(C), will be explained by percipient witnesses, and the substantial risk of misleading the jury as to the issue before it, this testimony should be precluded pursuant to Rule 403. *See Newkirk*, 684 F. App'x at 97 (affirming district court's exclusion of expert testimony concerning industry practice as irrelevant to "attorney obligations not to convey information they actually know, or consciously avoid knowing, is false"); *Sanders*, 2013 WL

1421487, at *2 (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses").

### C. Mr. Madura's Proffered Testimony Is Not Properly the Subject of Expert Opinion

Given that Mr. Madura is unqualified to opine on the MEV-Boost System and his opinions related to this subject improperly invade the province of the Court and jury, all that is left is his testimony regarding his own understanding about the "operation" of the Exploit code.

Here, much of this proposed expert testimony, which operates as a line-by-line recitation of the Exploit code, is unnecessary and not helpful to the jury. *See* Ex. D ¶¶ 35-79. Mr. Madura proposes to opine on the Exploit source code and his view of "how it *would have operated* when executed." *See* Ex. D ¶ 12(a) (emphasis added). But there is no need for an expert to opine about how it "would have operated," when the Government will call CC-1, who was involved in writing the Exploit code, and will testify to how it, *in fact*, operated when executed, and the defendants will be free to cross-examine CC-1 or call their own fact witnesses. CC-1 is a lay witness who is competent to testify about the code, and relevant and admissible questions the defendants have about the code may be put to this witness during cross-examination. The defendants, should they choose to testify, also have percipient knowledge of the source code. There is no need for a separate "expert" witness to testify on such matters, which are at best cumulative of the testimony of the fact witnesses.[13] *See supra* at 32-33 (citing *Newkirk*, 684 F. App'x at 97; *Mendlowitz*, 2019 WL 6977120, at *7).

---

[13] The Government further notes that neither Mr. Madura's CV nor his firm's biographical page list his coding expertise in Rust, the Exploit code's predominant coding language.

The same is true for Mr. Madura's opinions concerning general descriptions of the MEV-Boost system.  *See* Ex. D ¶¶ 12(e), 26-27, 33, and 55-71.  As outlined above, Mr. Madura is not qualified to opine on the MEV-Boost system and the block-building process within that system, including the role of validators and relays.  Moreover, there is no need for Mr. Madura's proposed testimony on these topics.  At trial the Government will call a Flashbots Representative who, as noted previously, oversaw the MEV-Boost system.  This lay witness is competent to testify about MEV-Boost system and the role of the various participants in this system, including validators and relays.  There is no need to call a separate "expert" witness to testify, particularly where the purported "expert" lacks any specialized qualifications, skills, or experience to opine on these topics.

## IV.    In the Alternative, the Court Should Conduct a Daubert Hearing

The defendants' proposed experts should be precluded without any need for a hearing.  However, if the Court does not grant the Government's motion to preclude the defendants' proposed expert testimony on the papers, the Government respectfully requests that the Court conduct a *Daubert* hearing to evaluate the prospective expert's qualifications, her/his methodology, the bases and reasons for their opinions, and the relevance and reliability of the proposed expert testimony to ensure compliance with Rule 702.  As outlined above, each expert's qualifications on the narrow issues actually before the jury are questionable and their opinions are replete with cursory and vague conclusions that raise significant questions regarding the relevance and reliability of the proposed testimony, as well as the reliability of their methods.  Their sweeping and unsupported conclusions present a grave risk of confusing and misleading the jury, including regarding the ultimate issues in this case.  A *Daubert* hearing would therefore be appropriate for the Court to exercise its gatekeeping function before any of this confusing and prejudicial evidence is presented to the jury, especially in areas where courts have recognized that the potential for prejudice is particularly high.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the court should exclude the testimony of Andrea Eisfeldt, Brett Falk, S. Matthew Weinberg, and Kevin Madura.

Dated: New York, New York
          September 10, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney


                          By:      _____/s/_____
                                        Jerry Fang
                                        Danielle Kudla
                                        Benjamin Levander
                                        Ryan Nees
                                        Assistant United States Attorneys
                                        Tel: (212) 637-2304 / -2584 / (914) 993-1930