# Exhibit D

**<u>Disclosure as to Expert Witness Kevin E. Madura</u>**

1.  We may elicit at trial, under Federal Rule of Evidence 702, opinion testimony from Mr. Kevin E. Madura.  His curriculum vitae, attached to the email by which we transmit this letter, sets forth his qualifications.

2.  Mr. Madura is an expert on blockchain technology and computer programming.  A description of his research interests and publications, can be found on his curriculum vitae.

3.  Mr. Madura's opinions will be based on his education, training, and experience as set forth in his curriculum vitae, and on the materials listed in Appendix A.

4.  Based on all of the above sources, Mr. Madura may offer some or all of the following opinions in this case, for the reasons explained below.

## BACKGROUND AND QUALIFICATIONS

5.  Mr. Madura is a Director at AlixPartners, LLP and specializes in cryptocurrency technology, software development processes and computer programming. He holds a Bachelor of Science in Computer Science from the University of Maryland and a Master's in Technology Management from Georgetown University.

6.  As detailed in Mr. Madura's curriculum vitae, Mr. Madura has previously testified during a jury trial as an expert witness in the United States District Court for the Southern District of Florida regarding Bitcoin, blockchain technology, and computer programming. He has also provided written testimony in the Southern District of New York regarding the forensic examination of blockchain transaction activity on the Ethereum network. Most recently, he served as an expert witness for a defendant in a matter before the Singapore International Arbitration Centre, testifying about blockchain concepts and computer source code functionality.

7.  At AlixPartners, Mr. Madura regularly assists clients with technical investigations, regulatory matters pertaining to technology products, forensic analyses, and other issues that require expertise in cryptocurrencies and relevant technology, such as computer algorithms and code.

8.  His work regularly includes writing and reading source code in many different programming languages, including for matters on behalf of, or in response to, government regulators. Mr. Madura also regularly forensically examines transaction activity on both the Ethereum and Binance Smart Chain blockchains, among others.

9.  Mr. Madura regularly speaks to law firms and other professional organizations to educate them regarding cryptocurrencies, computer security, and computer systems. He has spoken about cryptocurrency technology to the Federal Bureau of Investigation, American Bankruptcy Association, Securities Enforcement Forum, Bahamas Financial Services Board, Center for Professional Education, and Armed Forces Communications and Electronics Association, among others.

10. Prior to AlixPartners, Mr. Madura was employed at International Business Machines ("IBM") in the Federal Consulting practice. While at IBM, he was a subject matter expert in the areas of cybersecurity and applied cryptography working with both civilian and military agencies, including the Department of Defense. He also developed computer programs using blockchain technology for various government agencies in their efforts to explore potential uses of the technology.

11. Mr. Madura has been retained as an expert in this matter and has been asked to provide a descriptive overview of a computer program ("the Program") developed by the Defendants, including how it interacted with the Ethereum blockchain network and other computer programs.

## SUMMARY OF OPINIONS

12. The following is a summary of the opinions Mr. Madura may provide regarding his interpretation of a collection of computer code developed by the Defendants ("the Program") and related blockchain concepts:

   a.  The Program's source code and how it would have operated when executed;

   b.  How the Program constructed and cryptographically signed certain packages of information, including valid Ethereum transactions;

   c.  How the Trigger Transactions were valid, signed transactions which, if ultimately broadcast to the network, could be included as valid transactions in an Ethereum block and accepted by the network;

d.   The Program's interaction with other programs, including MEV-Boost relays, and how the Program constructed information to be sent to these relays; and

e.   The position of MEV-Boost as an optional component of the Ethereum ecosystem

## INTRODUCTION AND BACKGROUND

### I.    Relevant Definitions

13. The term *blockchain* refers to a type of distributed ledger system that publicly records transactions between participants within the system in such a way that transactions are verifiable and immutable. Transactions are verifiable such that anyone can download a copy of the blockchain ledger and confirm the accuracy and validity of each and every transaction that has been recorded. Transactions are immutable in the sense that once they are written to the blockchain, they are cryptographically ensured to be unalterable; this property also makes transactions irreversible.

14. An *address* on the blockchain can be thought of as partially analogous to a bank account, in the sense that an individual or entity is able to send and receive funds through the address. A key difference, however, is that *only* those with access to the private key have access to the funds. This is known as "self-custody." When funds are transferred, effected through an update to the blockchain ledger, the receiving address is credited while the sending address is debited the amount being transferred. Funds are "locked" to an address and subsequently controlled through the use of cryptographic keys. While access to the private key is required to move or otherwise control (i.e., send) funds to a different address on the network, anybody can view the transaction history of a particular address given the verifiable, open, and immutable nature of the blockchain.

15. Ethereum is one popular blockchain. Ethereum operates in a global, decentralized, adversarial environment where participants do not know or necessarily trust one another. The network is fundamentally open; anyone, anywhere in the world, can join or build on it. The trustless and highly competitive nature of the network incentivizes participants to maximize their own benefit as much as possible, by racing to include profitable transactions or running custom programs to calculate profit opportunities quicker than others. Because of this, Ethereum's design contemplates security across a variety of potential vectors and is engineered to be robust against faults, errors, manipulation, attacks, or collusion.

16. Ethereum's *consensus mechanism* is the protocol by which all participating computers in the network – known as *nodes* – agree on the current state of the blockchain. Initially, this occurred through a Proof of Work ("PoW") system wherein cryptocurrency *miners* would expend computing power to solve computational puzzles in a competition to validate and confirm transactions to the network, earning Ethereum's native token, ETH. Since its upgrade to Ethereum 2.0, on or around September 15, 2022, the network uses a concept called Proof of Stake ("PoS") for achieving consensus. In PoS, *validators* take the place of *miners* used in Proof of Work systems. With Proof of Stake, validators escrow a financial interest - their "stake" - which can be reduced (i.e., *slashed*) pursuant to the protocol specification.

17. Rather than competing through computational puzzles, PoS validators are pseudo-randomly chosen. This PoS model significantly reduces the energy requirements of the network and introduces economic incentives for productive participation, even by participants who may not know or trust each other. Every twelve seconds, the Ethereum network gives one validator a turn (known as a *slot*) where they have the option to create and publish a new block. Not every slot will always have a block: for instance, the assigned validator may be offline or may otherwise miss their turn.

18. Validators may propose a new block during their slot, and attest to blocks proposed by other validators when it is not their turn. When validators register with the network, they deposit 32 ETH into a network-wide "escrow" account. This 32 ETH is the validator's *stake* in the network; a portion of this stake may be decreased or *slashed* by others in the network if they detect certain activity, such as signing two different blocks for the same slot. This serves as an economic incentive to coordinate consensus among participants. Some participants will run multiple validators to increase their chance of selection.

19. A *smart contract* is a package of computer code that is stored on a blockchain ledger and is deployed by a special type of transaction. Unlike the Bitcoin blockchain which primarily supports transfers of bitcoin, the Ethereum network natively supports more complicated features like smart contracts. Digital assets can be created by deploying a smart contract to the blockchain that defines the characteristics of the new digital asset (often referred to as "tokens" or "coins"). An address for a smart contract is created when it is deployed to the blockchain.

20. *Liquidity pools* and associated *decentralized exchanges* are core components of the cryptocurrency ecosystem. These are the primary mechanisms by which one can obtain or swap cryptocurrency tokens without using a centralized intermediary. By using decentralized exchanges, all activity remains visible on the blockchain, that is, *on-chain*.

21. A liquidity pool can be created by a special-purpose smart contract. Put simply, a liquidity pool is a smart contract that holds a pair of cryptocurrency tokens and may facilitate the exchange of these tokens. An asset exchange occurs on-chain by executing a transaction which affects the balance of each address involved in the exchange. A liquidity pool often operates by dynamically changing the price of the assets it holds based on changes in the composition of those assets in the pool. This dynamic pricing mechanism incentivizes market participants to keep the pool "in balance" in part by identifying and executing on arbitrage opportunities which may be informed by other liquidity pools of similar assets.

22. A *decentralized exchange* is a way to exchange cryptocurrency assets without custodying assets with a third-party intermediary or centralized exchange. Decentralized exchanges operate as "automated market makers" because they aggregate various liquidity pools to facilitate trading between different types of tokens. One example of a decentralized exchange is Uniswap. The use of decentralized exchanges is common in the cryptocurrency industry.

23. *Blocks* are the discrete, ordered packages of information including transactions and other metadata that comprise the Ethereum blockchain. Each valid block that is accepted by the Ethereum network is cryptographically linked to its predecessor, forming an immutable chain of blocks: the "blockchain." Transaction ordering refers to the sequence in which transactions are included within a block on the blockchain. In Ethereum, the transaction ordering was previously decided by miners (when Proof of Work was the consensus mechanism) and now validators (in today's use of Proof of Stake).

24. *Maximal Extractable Value* ("MEV") refers to the maximum amount of value that a validator may extract from a block by varying the order, inclusion, or exclusion of transactions within a block. The ability for a validator to increase their rewards by specifying the number and order of transactions in a block is a direct consequence of Ethereum's competitive and inherently adversarial environment. MEV is simultaneously one of the most common and controversial parts of the broader Ethereum ecosystem as we know it today.

25. In this adversarial system, many entities constantly compete for MEV, so much so that specialized strategies and purpose-built software have emerged to identify and capture MEV.

26. *MEV-Boost* is open-source, third-party "middleware" and software developed by an organization called Flashbots[1]. MEV-Boost is: (i) not part of the core Ethereum protocol, (ii) not developed by the Ethereum Foundation, (iii) not required to run a validator and (iv) not required to achieve consensus on the Ethereum network. Validators have the option to install MEV-Boost software separately or use the MEV-Boost network at their choosing.

---

[1] https://www.flashbots.net/

27. Validators may use MEV-Boost to ultimately obtain blocks from third-party entities called *builders*. These builders search for profitable ways to order transactions within a block and specialize in creating sets of transactions for this purpose, sometimes aided by *searchers*. To facilitate a marketplace, MEV-Boost introduces *relays*, which act as intermediaries between builders and validators. Relays, as independent actors, collect candidate blocks from builders and present them to validators.

28. *Proposer-Builder Separation* ("PBS") is an architectural concept in blockchain system design that aims to separate the roles of proposing blocks from those building them. The full PBS specification was not enshrined as part of the core Ethereum protocol as of June 2025[2] and remains an active area of community research. In Ethereum, validators *have the option to obtain blocks* from other actors, in addition to creating their own.

29. In PBS, the *proposer* (i.e., the validator) is responsible for adding the next block to the chain and may obtain blocks built by specialized third parties – i.e., builders. Block builders compete to assemble transactions into blocks, maximizing rewards through transaction fees and potential MEV.

---

[2] https://ethereum.org/en/roadmap/pbs/

30. The memory pool, commonly known as the *mempool*, is a temporary staging area on computers comprising the Ethereum network where pending transactions wait before being added to a block. Pending transactions may remain in the mempool for minutes, hours, or even days before being included in a block. When a user submits a transaction, it is broadcast to the network and stored temporarily in the mempool of participating nodes. In crafting a block of valid transactions, validators may select transactions from the mempool; validators have the option to submit their own transactions and/or prioritize other transactions by transaction fees or MEV. The mempool is a crucial part of network operation, providing transparency on pending activity, but it also opens up users to MEV extraction by observers who monitor these unconfirmed transactions and submit their own in response. These actors extract MEV by deploying wide array of techniques such as front-running, back-running, "sandwich attacks," among others.

31. A *digital signature* is a cryptographic technique that provides certain mathematical guarantees regarding digital information. According to the National Institute of Standards and Technology ("NIST")[3], digital signatures are used to "verify that [a] message was signed with a private key corresponding to the specified public key" and to ensure "that the message was not altered during transmission." A digital signature algorithm relies on the use of a private key, which must be kept secret, and an associated public key which can be used to verify the signature. A signatory uses a private key to sign data such as messages, files, Ethereum blocks, or cryptocurrency transactions. The signature can then be verified using the corresponding public key.

---

[3] https://nvlpubs.nist.gov/nistpubs/ir/2018/NIST.IR.8202.pdf page 51

32. In Ethereum, digital signatures are used to sign transactions and blocks, among other uses. When a user signs a transaction with their private key, others can verify its validity and origin using the associated public key. This process proves control over the private key (known as *authentication*), can be used to authorize actions, and ensures that only the key holder can transfer assets or execute smart contracts. Importantly, digital signatures provide two other guarantees: (i) that the controller of the private key originated the information (also referred to as *non-repudiation*), and (ii) that the contents have not been modified since signing[4]. Digital signatures provide no further guarantees regarding the contents of the information itself.

33. Digital signatures are used throughout the Ethereum ecosystem, including MEV-Boost. MEV-Boost also allows actors to bypass the public mempool entirely by submitting signed transactions directly to builders using MEV-Boost. Because submitted transactions have already been signed and now benefit from the characteristics of a digital signature, they can be provided directly for inclusion into a block with no further involvement from the originator. Once signed, valid transactions can be freely mixed with other transactions in a block in arbitrary order because of the cryptographic guarantees offered by digital signatures. More specifically, transactions remain valid regardless of their position in a block and cannot be individually modified (otherwise the block itself would be rejected by the network due to containing an invalid transaction signature).

---

[4] A common technical term for this property is known as *data integrity*.

34. *Finality* refers to the point at which a block and the transactions within it are considered irreversible and permanently part of the blockchain. In Ethereum's PoS system, finality is achieved after a proposed block has been attested to by other validators and ultimately becomes economically impractical for any adversary to reorganize the confirmed chain. Settlement, in this context, is the assurance that transactions are not only recorded but cannot be reversed, which is critical for the usefulness of Ethereum. This entire process occurs through the execution of code and computer programs exchanging messages.

## **THE PROGRAM**

35. At a high level, the Program was designed to coordinate activity between validators the Defendants controlled, on-chain transaction activity, and a set of common open-source programs designed to interact with the Ethereum network.

36. First, the Program relies on a list of validators which had been previously registered with the Ethereum network, along with each validator's private key. Each validator's key is loaded into program memory to allow for it to be used to sign a block ultimately broadcast to the network[5]. The validator that ultimately propagated the block relevant for this case was registered on March 16, 2023[6].

37. Second, the Program relies on a list of tokens and smart contracts which are used to detect and coordinate certain blockchain activity.

---

[5] omakase_rs/src/bin/omakase rs lines 282 - 310
[6] https://beaconcha.in/validator/552061/stats

38. Third, the Program loads a list of cryptocurrency addresses which is documented in its code[7] as "known sandwichers," i.e., addresses observed to be exploiting user transactions for their benefit by executing sandwich attacks (the *sandwich bots*)[8].

### I.     <u>Order of Events</u>

39. In order to obtain data from the Ethereum network, interact with relays, and calculate the potential profit of a particular trade, the Program utilizes three programs or *clients*[9]: one execution client for simulation purposes, a consensus client to obtain live data from the blockchain and broadcast information, and a separate execution client which provides low-level functionality for building blocks.

40. The use of various programs in this manner is very similar to other MEV-seeking entities. For example, many sandwich bots can only be effective by (i) understanding the current state of the blockchain (using consensus and execution clients), (ii) identifying targets by simulating transaction outcomes (using an execution client, often designed for high performance) and (iii) constructing a set of transactions or a bundle to profit off of the identified opportunity. MEV-seeking entities, such as sandwich bots, use similar infrastructure setups to indiscriminately identify public transactions susceptible to certain profitable techniques, such as *sandwiching*.

---

[7] omakase_rs/src/lib rs line 435
[8] omakase_rs/src/bin/omakase rs line 42
[9] omakase_rs/src/bin/omakase rs lines 177-181

41. With the three client programs operating, the Program loads the requisite configuration, a list of target tokens, and a list of smart contracts. This configuration step also allows for testing and development before executing the full suite of functionality.

42. The Program then connects to the Ethereum network and waits continuously until the various clients are in sync.

43. The Ethereum blockchain operates in 12-second *slots*, which are grouped into *epochs* (one *epoch* is comprised of 32 slots). In advance of an epoch, the protocol deterministically but pseudo-randomly assigns exactly one validator to be the proposer for each upcoming slot. The Program therefore monitors the schedule to identify when any of its validators is listed as the proposer for an approaching slot.

44. Once the Program detects that the protocol has selected one of their validators to build an upcoming block, the main logic executes[10].

## A. <u>The Program Pre-Computes a Set of Transactions and Sends Them to the Network</u>

45. Once the Program detects it is next in line to propose a block, the Program loads the private key for the selected validator.

46. Because the Program is connected to the Ethereum network, it can query the live balance of any address, and simulate the effect(s) of certain transactions using the *execution client*, among other actions.

---

[10] omakase_rs/src/bin/omakase.rs lines 339 - 350

47. The Program queries the network to understand the balance of each of the sandwich bots provided as input to the Program. The Program queries information about the sandwich bots for specific tokens and token pools to better understand potential profit opportunities.

48. For each token pool identified as "in-scope" (per the list loaded during startup), the Program determines[11] the optimal token purchase amount to maximize profit, taking into account the pool's current liquidity. It then constructs[12] a set of customized transactions (the "Trigger Transactions") that are designed to interact with the token pools in ways that are likely to provoke activity from the sandwich bots, and if so, create a profit opportunity. The process of constructing these transactions reflects a very similar approach to how sandwich bots, and other trading bots in the competitive Ethereum ecosystem, monitor and simulate transactions to trigger profit opportunities.

49. At this point, the Trigger Transactions are valid, signed transactions which, if ultimately broadcast to the network, could be included as valid transactions in an Ethereum block and accepted by the network.

50. The Trigger Transactions were then propagated to the Ethereum network[13]. Because the transactions were sent to the network, they would be added to nodes' *mempool* and visible to other participants monitoring the Ethereum network, including sandwich bots.

---

[11] omakase_rs/src/contract/execution.rs lines 629 - 647
[12] omakase_rs/src/omakase rs lines 42 - 49
[13] omakase_rs/src/lib.rs lines 461 - 492

51. Because the Trigger Transactions were broadcast to the network, they were eventually selected from the available transactions in the mempool by validators and included in subsequent blocks[14] [15].

52. The Program then generates another[16] set of transactions ("Presigned Transactions"). These Presigned Transactions would interact with the respective token pool and result in profit if a particular sandwich bot took advantage of the specific Trigger Transaction(s) for that pool. These liquidity pools were already in existence as of the time of execution.

53. The Presigned Transactions, like the Trigger Transactions, are cryptographically signed[17] and stored for later use[18].

54. Once the Program detects that a validator in its list of pre-registered validators has been selected as the next block proposer, it enters a second phase of execution.

---

[14] https://etherscan.io/tx/0xd534c46ba5a444e886feedeb4dbe698b68be74a65356b5cc46c49f2dd07f7edf

[15] https://etherscan.io/tx/0xd7bb6353f03a7ee1bf20d553e2df77a2cef44717dbe4afc38737540189d0c305

[16] omakase_rs/src/contract/sign_and_submit rs line 114

[17] omakase_rs/src/contract/generate.rs line 173

[18] omakase_rs/src/bin/omakase.rs:67

## B.  The Program Collects Information From Relays

55. When an Ethereum validator is chosen to construct a block, it generally has two options: generate a list of transactions it has observed in the mempool itself, or obtain transactions from others. MEV-Boost was created in an attempt to create a market to support the latter option, but is not part of the "core" Ethereum software.

56. When constructing a block, validators are free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid. Validators can source these transactions from anywhere including their own mempool. A block will only be accepted by the rest of the network if it is comprised of valid and cryptographically sound content, including transactions, and if the block signature from the validator is also correct and verifiable.

57. Like some other validators do, the Program utilizes MEV-Boost to source valid, signed transactions for consideration when constructing a final block.

58. MEV-Boost *relays* can be thought of as purpose-built programs that aggregate blocks from builders, to eventually pass to validators, who themselves have the option to propagate a signed block. Because MEV-Boost and its related relay software is a third-party "middleware" solution, it is not required for the Ethereum consensus mechanism to function.

59. In order to ensure compatibility and consistency, MEV-Boost programs rely on information to be constructed in a particular format and use those message constructs throughout the execution of steps in the process of exchanging information. This process typically involves the validator exchanging information including a sort of snippet – the *relay parameters* – to each relay they have registered with, in effect telling them: "this is my public key; please provide information regarding a proposed next block, which is based on this prior block."

60. The Program does exactly this: it iterates through a list of specified relays[19], identifying itself and sending the relay parameters[20], to query for information.

61. The relay then provides a *response*, which is a special packet of information comprised of a *blinded header* and associated metadata that contains summary information about a set of transactions (but without the transactions themselves). At this point, the transactions associated with that response are ready to be included inside an Ethereum block. The underlying transactions aren't immediately revealed in the response back to the validator, meaning at this step the detailed transaction information remains with the relay and not the validator.

62. From all of the responses it has collected, the Program chooses the response[21] with the highest potential for financial return based on the information calculated from each.

---

[19] omakase_rs/src/lib.rs line 244
[20] omakase_rs/src/lib.rs lines 496 - 528
[21] omakase_rs/src/lib.rs lines 565 - 580

C.  **The Program Uses the Collected Data to Construct New Information Requests**

63. Using the information in the chosen response, the Program then constructs another package of information to send[22] to the relay (the BlindedBeaconBlockBody, which is part of a BlindedBeaconBlock). All validators using MEV Boost follow this step.

64. In constructing this package of information, the Program starts with the standard template that specifies which fields are required according to the default format. This template specifies the name of the fields, the data types, and their default values. Normally, two fields are populated with specific information based on the current state of the network: the *parent root* and *state root*. These two fields are among a variety of fields that provide important data to the relay so that it can provide the right information in the next step in the protocol.

65. In this case, when constructing this package of information, the Program did not change the default values[23] used for certain fields, including the *parent root* and *state root*. The default value for both of these fields is the number zero, as specified by the author of the open-source programming library used by the Program[24] (and not the Program itself).

---

[22] omakase_rs/src/lib.rs line 1108
[23] omakase_rs/src/unblinding/mod rs lines 30 - 54
[24] https://github.com/ralexstokes/ethereum-consensus/blob/main/ethereum-consensus/src/bellatrix/blinded_beacon_block.rs#L56-L57

66. The final package of information which has all the fields populated - in this case some with fields derived from the relay's response and others with default values - is called the BlindedBeaconBlock. This package is then cryptographically signed using the validator's private key to "seal" the data inside that packet of information.[25] That way, the relay can validate the contents originated from the validator and that the contents have not been modified in transit. The signed final package is called the <u>Signed</u>BlindedBeaconBlock.

67. As noted previously, digital signatures only provide guarantees regarding the signing key and that the data has not been modified since signed; they ensure nothing at all regarding the contents of the internal data the signature is applied to. Signatures are self-contained, meaning they ensure the previously described characteristics for a specific piece of information: nothing more and nothing less. In other words, it does not extend guarantees about other actions, communications, or exchanges of information outside of that particular signature.

68. The SignedBlindedBeaconBlock is then sent to the relay[26]. Upon receipt, the relay software performs a variety of checks on the incoming information, including whether it adheres to the expected template, whether the signature is valid, and whether the signature matches the validator public key[27].

---

[25] omakase_rs/src/unblinding/mod rs line 74
[26] omakase_rs/src/lib.rs line 668
[27] https://github.com/flashbots/mev-boost-relay/pull/330/files

**D.  The Relay Reveals the Transaction Information**

69. This is a decision point for the relay: depending on the contents it can reject the incoming SignedBlindedBeaconBlock as invalid and return an error code; or, it can proceed with revealing the underlying transactions to the Program.

70. Recall that these transactions are valid signed transactions put forward by the original signatory to be included in an Ethereum block, including the sandwich bot(s). Because all transactions are signed using digital signatures, their integrity is guaranteed. Said differently, it would be impossible to change the amount, recipient, or otherwise modify any the contents of the individual transactions without invalidating the digital signature – meaning the transactions would not be accepted as part of a block.

71. The Program then processes the relay's response, and if it detects a list of transactions have been provided, then stores them for later use ("Relay Transactions")[28]. Now the relay and Program both have the same information: the list of Relay Transactions, which can be packaged into a block. However, because the *parent root* and *state root* fields remain as their default values, if the relay chooses to process and broadcast this block to other nodes, the block would not be accepted as valid by the Ethereum network.

---

[28] omakase_rs/src/lib.rs lines 667 - 677

### E.  **The Program Constructs a Block**

72. The Program then follows the same methodology as all MEV-seeking entities do: collect and order transactions in a certain way to optimize profit for the validator. It does so by iterating through the list of valid transactions provided by the relay, much like would be done in any other scenario when building your own blocks with your own transactions (or those from the mempool), that is, selecting ones that are most advantageous to the validator. The Program now has a larger set of transactions to choose from: the Trigger Transactions, Presigned Transactions, and the Relay Transactions.

73. At this point, *all* transactions contemplated at this step have been, and still are, entirely immutable; they cannot be modified to change the amount, or recipient, or any other field for that matter. These transactions are ready to be finalized as "settled," but only will be when included in a valid block accepted by the network.

74. The Program then selects from the Relay Transactions and Presigned Transactions and attempts to optimize for MEV by replacing the Trigger Transactions with Presigned Transactions[29], the same way that other miners and validators have constructed blocks to their benefit hundreds of thousands of times before.

75. The Program then follows the rest of the block building process[30].

---

[29] omakase_rs/src/lib.rs lines 1138 - 1165
[30] omakase_rs/src/bin/omakase.rs lines 83 - 92

### F. **The Program Broadcasts the New Block to the Ethereum Network**

76. Once this block is constructed, the validator's same private key is used to sign the final package[31], resulting in a SignedBeaconBlock. This SignedBeaconBlock has a valid digital signature and contains a series of valid, signed transactions, which is then broadcast to the Ethereum network. The block is evaluated by other validators and participants in the network, and is ultimately accepted. It now is ossified in the Ethereum network as block number[32] 16964664 which was made part of the Ethereum network on April 2, 2023.

77. By submitting the finalized, signed block to the network, the Program solidifies its chosen transaction ordering, as it will be executed and included by other Ethereum validators as it is a valid block comprised of valid transactions.

78. This end-to-end process automates both the triggering of adversarial bot activity and the defensive positioning needed to counteract it, resulting in a profit opportunity, while submitting a structurally valid block to the Ethereum network. Ultimately, the Program uses established block-building techniques and a novel MEV optimization strategy to derive profit from the competitive landscape of Ethereum transactions.

79. Because the process involved the validator signing two blocks in the same slot, the validator used in the Program was slashed on April 3, 2023[33] for 0.994392 ETH.

---

[31] omakase_rs/src/construction.rs line 184
[32] https://etherscan.io/block/16964664
[33] https://beaconcha.in/slot/6142320#proposer-slashings

## **ACKNOWLEDGMENT**

I acknowledge and approve of the above disclosure of my qualifications and opinions.

_____

                                         Kevin E. Madura

                                         Washington, D.C.

# APPENDIX A

- USAO_00023934; specifically computer code extracted from the file "18Decimal-omakase.bundle" residing in a folder named "omakase_rs" written in the Rust programming language

- Changes made to the MEV Boost Relay code at https://github.com/flashbots/mev-boost-relay/pull/330/files

- https://www.flashbots.net/

- https://ethereum.org/en/roadmap/pbs/

- https://nvlpubs.nist.gov/nistpubs/ir/2018/NIST.IR.8202.pdf page 51

- https://beaconcha.in/validator/552061/stats

- https://etherscan.io/tx/0xd534c46ba5a444e886feedeb4dbe698b68be74a65356b5cc46c49f2dd07f7edf

- https://etherscan.io/tx/0xd7bb6353f03a7ee1bf20d553e2df77a2cef44717dbe4afc38737540189d0c305

- https://github.com/ralexstokes/ethereum-consensus/blob/main/ethereum-consensus/src/bellatrix/blinded_beacon_block.rs#L56-L57

- https://etherscan.io/block/16964664

- https://beaconcha.in/slot/6142320#proposer-slashings

# CURRICULUM VITAE
## OF
### Kevin E. Madura

_____        _____

| | |
|---|---|
| **POSITION** | Director at AlixPartners, LLP; Washington, D.C. |
| **EDUCATION** | Master of Professional Studies, Technology Management |
| | *Georgetown University* |
| | Bachelor of Science, Computer Science |
| | *University of Maryland* |

**PROFESSIONAL EXPERIENCE**

Kevin is a technology expert with a specialization in cryptocurrency and cyber security who has worked with private and public sector clients on a variety of technology-related matters. He is typically engaged by counsel in cases requiring technical expertise in digital assets, where he has provided both oral and written testimony in US Federal District courts. He also works strategically with management, regulators, and counsel, applying his technical knowledge in the areas of software development and application architecture design. His recent focus has been developing blockchain solutions, smart contracts, and custom tooling to assist clients on a variety of cryptocurrency matters. He has spoken to the FBI, SEC, AICPA, American Bankruptcy Institute, and many others on the topics of cryptocurrency and digital assets.

Prior to AlixPartners, Kevin worked as a cybersecurity principal for IBM where he supported the US Department of Defense and Homeland Security in designing, implementing, and operating cyber systems.

**RANGE OF EXPERIENCE**

Mr. Madura has extensive experience aiding clients in matters pertaining to cryptocurrency and complex digital technology. Examples include:

- Testified as expert witness in the US Southern District of Florida during jury trial of a multibillion-dollar civil lawsuit over rights to crypto assets, opining on functionality of Bitcoin and computer programming
- Provided written expert testimony in S.D.N.Y on behalf of a crypto-native company during investigation of alleged misappropriation of crypto assets.
- Selected by a major financial regulator to review a leading crypto company; led a technical evaluation of infrastructure used interface with 15+ blockchains, trading systems, and BSA/AML/OFAC controls
- Engaged by the Board Special Committee of a cryptocurrency mining company to validate company's on-chain activity across multiple blockchains to defend against an investor suit.
- Investigated claims on behalf of a crypto-native DeFi company that was the victim of a hack; reviewed cross-chain activity for a dispute before the Singapore International Arbitration Centre.

Kevin E. Madura
PAGE 2

---

**EXPERT WITNESS TESTIMONY**

*Paul v. Findeisen*
<u>Venue:</u> United States District Court, Western District of Texas
<u>Type:</u> Expert Report
<u>Date:</u> April 2025
<u>Topics:</u> Blockchain software functionality; Ethereum smart contracts

*Ho v. Baek*
<u>Venue:</u> Superior Court of the State of Washington for King County
<u>Type:</u> Expert Declaration
<u>Date:</u> May 2024
<u>Topics:</u> Blockchain software functionality; Bitcoin.

*SAIC Arbitration No. 165 of 2022 (ARB 165/22)*
<u>Venue:</u> Singapore International Arbitration Centre
<u>Type:</u> Expert Report
<u>Date:</u> December 2023
<u>Topics:</u> Computer programming; Blockchain transaction analysis

*SingularDTV GmbH v. Zachary LeBeau*
<u>Venue:</u> United States District Court, Southern District of NY
<u>Type:</u> Expert Declaration
<u>Date:</u> December 2021
<u>Topics:</u> Blockchain and cryptocurrency functionality; Ethereum smart contracts; forensic analysis of Ethereum transactions

*SingularDTV GmbH v. John Doe*
<u>Venue:</u> United States District Court, Southern District of NY
<u>Type:</u> Expert Declaration
<u>Date:</u> December 2021
<u>Topics:</u> Blockchain and cryptocurrency functionality; Ethereum smart contracts; forensic analysis of Ethereum transactions

*Kleiman v. Wright*
<u>Venue:</u> United States District Court, Southern District of Florida
<u>Type:</u> Trial Testimony, Deposition, Written Reports
<u>Date:</u> November 2021
<u>Topics:</u> Blockchain and cryptocurrency functionality; Bitcoin; computer programming

## SPEAKING ENGAGEMENTS

**American College of Bankruptcy**
- *Cryptocurrency Management Strategies in Bankruptcy* (2022)

**American Bar Association**
- *Protecting, Perfecting, and Preserving Rights in Alternative Capital* (2023)

**American Bankruptcy Institute**
- *Cryptocurrency Management Strategies in Bankruptcy* (2022)
- *Cryptocurrency: Valuation Issues and Market Volatility* (2021)

**American Institute of CPAs**
- *Crypto and Investigations* (2022)

**Asia Crypto Asset Summit**
- *Crypto Adoption in the American Market* (2022)

**Armed Forces Communications and Electronics Association**
- *Cybersecurity in the World of Blockchain and Cryptocurrency* (2018)

**Bahamas Financial Services Board**
- Moderator – *Evolution of Digital Assets* (2023)
- Moderator – *Digital Assets Market Update* (2024)
- Moderator – *The role of GenAI and cryptocurrency in Fraud Schemes* (2025)

**California Bankruptcy Forum**
- *House of Cards? A look at the cryptocurrency industry* (2023)

**Center for Professional Education**
- *Cryptocurrencies & Blockchain Technology* (2019)
- *Managing Cyber Risk* (2018)

**ComplianceWeek**
- *Cyber perspective – investigation to remediation, and the impact is on strategy and business* (2021)

**Federal Bar Association**
- *Cryptocurrency Considerations for Counselors at Law* (2022)

**Federal Bureau of Investigation**
- *Moving on-chain: What you need to know about crypto* (2022)

**FBI InfraGard**
- *Cryptocurrency, Ransomware, and National Security* (2022)

**Global Arbitration Review**
- *The implications of web3 on international disputes* (2022)

**Mid-South Commercial Law Institute**
- *Cryptocurrency in Bankruptcy* (2023)

**Multiple Law Firms**
- *Understanding the cryptic nature of cryptocurrency* (2022 – current)

**SEC Securities Enforcement Forum**
- *Insider Trading 360: Enforcement Trends, Key Cases, and Prosecutions (and Crypto!)* (2023)

**Tri-County Financial Fraud Coalition**
- *Fraud & ransomware in the cryptocurrency ecosystem* (2023)

**Turnaround Management Association**
- *Crypto Collapse – Current State of Crypto* (2023)

**Kevin E. Madura**
**PAGE 4**

| | |
|---|---|
| **PUBLICATIONS** | **Association of Insolvency and Restructuring Advisors;** VOL 35: NO 3 |

- *Cryptocurrency in 2022: Critical Concepts, Risk, Regulation, and the Road Ahead*

**FinTech Times** (2022)

- *Popular Blockchain Initiatives in Healthcare With Bento Bio, AlixPartners and More*

| | |
|---|---|
| **CURRENT AND PRIOR PROFESSIONAL AFFILIATIONS** | American Bankruptcy Institute |

Control System Cyber Security Association International

Information Systems Audit and Control Association

International Association of Privacy Professionals

FBI InfraGard

Chainalysis - Reactor Certification