# Exhibit F

LAW OFFICES
# WILLIAMS & CONNOLLY LLP

KATHERINE A. TREFZ
(202) 434-5038
ktrefz@wc.com

680 MAINE AVENUE SW
WASHINGTON, DC 20024
(202) 434-5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

September 4, 2025

VIA E-MAIL

Danielle Kudla, Esq.
Jerry Fang, Esq.
Benjamin L. Levander, Esq.
United States Attorney's Office
Southern District of New York
26 Federal Plaza, 37th Floor
New York, NY 10278

Re: *United States v. Anton Peraire-Bueno, et al.*, 24 Cr. 293 (JGLC); Re: Defense Expert Disclosures

Dear Counsel:

We write in response to your letter dated August 29, 2025, concerning the defense's designated experts. Your letter asserts that the expert disclosures that Defendants provided on August 13, 2025, were insufficient under Rule 16(b). You have also asked for certain supplemental disclosures relating to Defendants' four expert witnesses. All four of Defendants' expert disclosures more than comply with Rule 16(b), and we disagree with the government's contentions that the disclosures do not adequately disclose the bases and reasons for the experts' opinions. We nevertheless provide additional information regarding each expert disclosure.

The August 13, 2025 disclosures identify the documents on which the experts' disclosed opinions are based. None of the experts spoke with either of the Peraire-Buenos or each other, and none reviewed the disclosures approved by other experts in advance of those disclosures being provided to the government.

To date, the government has chosen to provide limited information as to the technical arguments it will make in this highly technical case and the government has made the strategic decisions (1) not to rely on expert testimony at all and (2) not to make substantive witness disclosures until September 16, 2025. Additionally, the government is still producing documents, including technical documents. Because any case-in-chief presented by either or both defendants necessarily depends on the case-in-chief presented by the government, the Peraire-Buenos reserve the right to disclose supplemental opinions and their bases and reasons, and to provide the experts with supplemental documents.

WILLIAMS & CONNOLLY LLP
Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 2

**Mr. Kevin Madura:**

Your letter first requests that we "identify the portions of Mr. Madura's 'education, training, and experience' that inform each proffered opinion." The answer to this question can be found in Mr. Madura's expert disclosure and curriculum vitae, which we provided to you on August 13. As noted therein, Mr. Madura "is a technology expert with a specialization in cryptocurrency and cyber security." Mr. Madura holds a Masters degree in Technology Management and a Bachelor of Science in Computer Science. Mr. Madura currently works as a Director at AlixPartners, LLP, where he specializes in cryptocurrency technology. His work "regularly includes writing and reading source code in many different programming languages," and Mr. Madura "regularly forensically examines transaction activity on both the Ethereum and Binance Smart Chain blockchains, among others." Through this work, Mr. Madura has studied the Ethereum protocol and the behavior of MEV-seeking entities. For example, his work has required him to examine liquidity pool trades at the code level, and how they operate; MEV is inevitably part of that work. As noted in his disclosure, Mr. Madura also has experience working in the areas of cybersecurity and applied cryptography. These are the portions of Mr. Madura's "education, training, and experience" that inform the opinions he may offer at trial, which concern cryptography, the functionality of computer code, and blockchain technology.

Your letter next requests that we identify any "other documents" that Mr. Madura relied upon to form his opinions beyond those identified in his expert disclosure. You also request that we disclose whether Mr. Madura interviewed James Peraire-Bueno, Anton Peraire-Bueno, or any other individual and whether he relied upon any of the "defendants' statements, documents, or other information containing the defendants' statements" (i.e., the "Defendants' Source Material"). All of the documents that Mr. Madura relied upon to form his opinions are listed in the August 13 expert disclosure. Mr. Madura did not interview the Defendants or anyone else in connection with his work. Mr. Madura did not rely upon any material you define as Defendants' Source Material, other than as listed in the disclosure.

Finally, you seek additional information about particular sentences or phrases in the expert disclosure. We address each of your questions below, in the same order listed in your letter:

- Mr. Madura's opinion that the Omakase code's "use of various programs . . . is very similar to other MEV-seeking entities," such as sandwich traders, is based on his experience with cryptocurrency technologies and trading on the Ethereum blockchain. As noted in the expert disclosure, Mr. Madura's role regularly requires him to study and examine transaction activity on the blockchain, which has led him to become familiar with how MEV-seeking entities operate. The use of software programs to trade cryptocurrency on Ethereum is a well-known, well-studied aspect of the Ethereum ecosystem.[1]

---

[1] The fact that traders often use computer programs to trade cryptocurrency in the relevant environment should be undisputed and is implied by the allegations in the Indictment.

WILLIAMS & CONNOLLY LLP
Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 3

- Mr. Madura's opinion that digital signatures "do[] not extend guarantees about other actions, communications, or exchanges of information outside of that particular signature," is based on his experience with applied cryptography and cryptocurrency technologies. Paragraph 31 of the expert disclosure also cites a publication from the National Institute of Standards and Technology, which states that a "digital signature" is a "cryptographic technique" used to determine "authenticity (i.e., users can verify that the message was signed with a private key corresponding to the specified public key), non-repudiation (a user cannot deny having sent a message) and integrity (that the message was not altered during transmission)."

- Mr. Madura's opinion that Defendants' Omakase code "follows the same methodology as all MEV-seeking entities do: collect and order transactions in a certain way to optimize profit for the validator," is based on his experience with cryptocurrency technologies and trading on the Ethereum blockchain. As noted in the expert disclosure, Mr. Madura's role regularly requires him to study and examine transaction activity on the blockchain, include at the code level, which has led him to become familiar with how MEV-seeking entities operate.

- Mr. Madura's opinion that Defendants' block was constructed "the same way that other miners and validators have constructed blocks to their benefit hundreds of thousands of times before," is based on his experience with cryptocurrency technologies and trading on the Ethereum blockchain, including the Ethereum protocol and documentation. As with the above bullet, Mr. Madura's point is simply that validators (and before them, miners) look to extract MEV through the blocks they build and order transactions to do that. As noted in the expert disclosure, Mr. Madura's role regularly requires him to study and examine transaction activity on the blockchain, which has led him to become familiar with the Ethereum protocol and how blocks are added to the blockchain.

- Mr. Madura's opinion that "[w]hen constructing a block, validators are free to order transactions in blocks in any way they wish, as long as the transactions included in the block are valid," is based on Mr. Madura's knowledge and study of the Ethereum protocol.

**Professor Brett Falk:**

You also make requests relating to Dr. Falk and his expert disclosure. First, the portions of Dr. Falk's "academic work and experience" that inform his opinions include his education and his academic work in the areas of blockchain and cryptocurrency technologies, including work done as a Research Assistant Professor in the Department of Computer and Information Science at the University of Pennsylvania. Dr. Falk teaches a course on blockchains. As noted in the expert disclosure, Dr. Falk's research "focuses on blockchain and cryptocurrencies, and he has published several peer-reviewed articles concerning the economics and incentives

WILLIAMS & CONNOLLY LLP
Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 4

created by blockchain systems, as well as articles on cryptocurrency regulation." This research has involved scraping data from publicly available defi contracts and stablecoins and analyzing that data, including through use of Ethereum nodes running in his office.[2] In the course of this work and his research, Dr. Falk has become familiar with the Ethereum protocol and the concept of MEV, as well as the behavior of MEV-seeking entities, including sandwich attacks. Dr. Falk has also researched cryptography, as identified on his CV. These are the portions of Dr. Falk's academic work and experience that inform the opinions he may provide at trial. Additionally, we note that in real time in April 2023, Dr. Falk followed the relevant equivocation strategy, including public reporting and analysis about it.

Second, all of the documents that Dr. Falk relied upon to form his opinions are listed in the expert disclosure we provided. Dr. Falk did not interview the Peraire-Buenos or anyone else in coming to the disclosed opinions. Dr. Falk did not rely upon any Defendants' Source Material, except to the extent identified in his expert disclosure.

Finally, you seek more information about several sentences or phrases in Dr. Falk's disclosure, which we address below in the same order listed in your letter:

- Dr. Falk's opinion that "[s]lashing is not a moral judgement on the validator" is based on the Ethereum protocol and documentation, his experience with, study of, and familiarity with the Ethereum blockchain, and his research on the economics and incentives created by blockchain systems. As explained in his disclosure, this conclusion follows from the principle that validators are assumed to be economically-rational actors and slashing is a mechanism for providing economic incentives. *See* B. Falk Disclosure ¶¶ 11-13.

- Dr. Falk's reference to "Norms and Pseudonymity" is an organizational subheader for paragraphs 14 and 15, which contain the opinions and bases thereof. The subheader does not represent additional opinions. The opinions that follow the subheader refer to the practice of many Ethereum users to employ privacy and security measures to shield balances and wallets. Dr. Falk's understanding of the norms surrounding privacy among Ethereum users is based on the material cited and his experience and research regarding cryptocurrency technologies, including the number of privacy-preserving products in the market.

- Dr. Falk's opinion that "according to the Ethereum protocol, the Defendants had the exclusive right to propose in that particular slot because they were the chosen

---

[2] An example of such research using publicly available defi contract data is a publicly-available working paper (not yet peer reviewed) titled "A Structural Model of Automated Market Making," with co-authors David Cao, Leonid Kogan, and Gerry Tsoukalas, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4591447.

**WILLIAMS & CONNOLLY**LLP
Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 5

> proposer in that slot," is based on his study of the Ethereum protocol and documentation.
>
> - Dr. Falk's opinion that "[a]ll transactions included in the block that the Defendants built . . . were valid" is based on his review of the Etherscan pages for the block and the 24 transactions that make up the ultimately-validated block, which are formatted like Ethereum transactions with valid signatures associated with operable wallets.
>
> - Dr. Falk's opinion that "within the Ethereum protocol it is impossible to guarantee that a transaction in a block will not execute if a subsequent transaction fails to execute" is based on the Ethereum protocol and documentation, the design of Ethereum, and the blockchain technology at issue.
>
> - Dr. Falk's opinion that "Defendants' trading strategy is best understood as a clash between two highly sophisticated adversarial entities," is based on his knowledge of and experience analyzing defi activity on Ethereum and his analysis of the transactions at issue here as described in the disclosure. The opinion that the sandwich attackers were sophisticated is based on the fact the alleged victims used computer programs (the MEV-Bots) to effectuate their trades, as well as his understanding of sandwich attack strategies (and defenses to attacks on sandwich bots like Salmonella) from his experience analyzing activity on Ethereum. The opinion that the trades were adversarial is based on his experience analyzing defi activity on Ethereum, and his analysis of the transactions at issue here.

**Professor S. Matthew Weinberg**

You make similar requests relating to Dr. Weinberg and his expert disclosure. First, the portions of Dr. Weinberg's "education and training" that informed the opinions listed in his expert disclosure include his work as an associate professor of computer science at Princeton University, where he also serves as the co-director of Princeton University's Center on the Decentralization of Power through Blockchain Technology (DeCenter), and he previously served as General Chair and co- Program Committee Chair for Advances in Financial Technologies. As noted in his expert disclosure, Dr. Weinberg has expertise in the "field of . . . Algorithmic Mechanism Design, which is the study of algorithms (such as blockchain protocols) that involve economic incentives (such as those of validators, users, searchers, etc.)." Through that study, Dr. Weinberg has become familiar with the Ethereum protocol, Flashbots programs and protocols (including MEV-Boost), and sandwich attacks, including as an advisor to research on these topics and through conferences at which these topics have been presented on and discussed. Dr. Weinberg has also taught a course called "Algorithmic Mechanism Design for Cryptocurrencies and DeFi" and has published numerous papers "specifically on incentives in blockchain ecosystems and regularly presents this work at both academic and practitioner venues." Dr. Weinberg also earned his Ph.D. in Computer Science at the Massachusetts Institute of Technology

WILLIAMS & CONNOLLY LLP
Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 6

and a Bachelor of Science in Mathematics at Cornell University. These are the portions of Dr. Weinberg's education and training that inform the opinions he may provide at trial.

Second, all of the documents that Dr. Weinberg relied upon to form his opinions are listed in the August 13 expert disclosure. Dr. Weinberg did not interview the Peraire-Buenos or anyone else in connection with his work. Additionally, Dr. Weinberg did not rely upon any Defendants' Source Material, except to the extent identified in the expert disclosure.

Your footnote 1 points out that the disclosures for Drs. Falk and Weinberg both state that "slashing is not a moral judgment," and you specifically ask "whether Professor Falk and Professor Weinberg communicated with each other." Drs. Falk and Weinberg did not communicate with each other or review each other's disclosures. These disclosures were reviewed and approved by Drs. Falk and Weinberg independently.

Finally, you seek further information about the bases for various sentences and phrases in Dr. Weinberg's disclosure, which we address below in the same order listed in your letter:

- Dr. Weinberg's opinion that "[s]lashing is not a moral judgment or reflective of the Ethereum user community's views on the legality of the behavior that led to the slashing," is based on his study of the Ethereum protocol and related documents identified in his disclosure, as well as his knowledge and study of the Ethereum blockchain. *See also* M. Weinberg Disclosure at 2-4 (discussing trust-minimization and economic incentives).

- Dr. Weinberg's opinion that "[n]othing in the MEV-Boost protocol prevents a validator from submitting an authentic signature to obtain the relay's block and subsequently equivocating by signing and proposing a block of its own construction," is based on his review and study of the MEV-Boost protocol and documentation. We also note that the technological feasibility is self-evident from the fact that it happened in alleged Exploit.

- Dr. Weinberg's opinion that the "alleged Exploit was consistent with the Ethereum and MEV-Boost protocols," is based on the material listed in his disclosure, including the Flashbots post-mortem on the alleged Exploit, the Ethereum protocol, and the MEV-Boost protocol. This opinion is also based on Dr. Weinberg's experience with and study of blockchain ecosystems.

- Dr. Weinberg's opinions that the "alleged Lure Transactions did not and could not have conveyed any meaning to the searchers or any other Ethereum user because the Lure Transactions were simply transactions pending in the mempool" and that the "alleged False Signature was not false, because digital signatures in MEV-Boost program [sic] convey no meaning other than identifying the particular validator," are based on Dr. Weinberg's study of the Ethereum protocol, the MEV-Boost protocol, and experience with blockchain systems. The reasons for these opinions

WILLIAMS & CONNOLLY LLP
Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 7

> are described in Dr. Weinberg's disclosure, *see, e.g.*, M. Weinberg Disclosure at 2-4, 8, 9, and include the Ethereum protocol, the MEV-Boost protocol, the design of Ethereum, the use of computer programs and protocols, and Dr. Weinberg's experience with blockchain technologies, digital signatures, and cryptography.

**Professor Andrea Eisfeldt**

You also make similar requests relating to Dr. Eisfeldt and her expert disclosure. First, the portions of Dr. Eisfeldt's "experience, expertise, academic teaching, [and] academic research" that informed the opinions listed in her expert disclosure include her current work as the Laurence and Lori Fink Endowed Chair in Finance and Professor of Finance at the Anderson School of Management at the University of California, Los Angeles. Dr. Eisfeldt earned her Ph.D. in Economics at the University of Chicago. Dr. Eisfeldt also works as a Research Associate at the National Bureau of Economic Research in the Asset Pricing, Corporate Finance, Economic Fluctuations and Growth, and Conference on Research in Income and Wealth working groups, and she serves as an editor for multiple finance and economics-focused journals. Dr. Eisfeldt also teaches courses regarding "blockchain technology, cryptocurrency protocols and trading, crypto market dynamics and liquidity, and applications of cryptofinance, such as stablecoins, to payment systems." Prior to her engagement in this case, Dr. Eisfeldt's graduate-level fintech class at UCLA covered MEV and transaction-ordering, including sandwich trading. Moreover, Dr. Eisfeldt has personal experience with asset management, as she has served as a consultant, board member, and/or chief economist for a number of asset management firms. These are the portions of Dr. Eisfeldt's experience, expertise, academic teaching, and academic research that inform the opinions she may provide at trial.

Second, all of the case documents that Dr. Eisfeldt relied upon to form her opinions are listed in the August 13 expert disclosure. Dr. Eisfeldt did not interview the Peraire-Buenos or anyone else in connection with her work. Additionally, Dr. Eisfeldt did not rely upon any of what you have described as Defendants' Source Material, except to the extent identified in the disclosure.

Finally, we address your questions about certain phrases from her disclosure below, in the same order listed in your letter:

- Dr. Eisfeldt's opinion that "a [trading] strategy that consistently results in substantial profits generally requires extensive preparation" is based on upon her academic work and her experience as a finance professor and as a consultant to various asset management firms. We note that the concept that complex trading strategies have higher alpha and more sophisticated parties is well-documented in financial literature, including Dr. Eisfeldt's own academic work. *E.g.*, A. Eisfeldt Disclosure at 23 (citing "Complex Asset Markets").

- Dr. Eisfeldt will not be asked to testify that sandwich trading is "market manipulation." She may testify as to the economic incentives of sandwich trading

**WILLIAMS & CONNOLLY**LLP

Danielle Kudla, Esq., Jerry Fang, Esq.; and Benjamin L. Levander, Esq.
September 4, 2025
Page 8

- and how it works, as disclosed in her disclosure. The quotation of the Coinbase reference simply provides additional support for the undisputed way in which sandwich attacks work.

- Dr. Eisfeldt's opinion that the "ex-post examination of disruptions [of systems like Ethereum] . . . is a valuable and necessary process" for their development is based on her professional and academic experience studying finance and financial systems. For example, the concept of continuous creative destruction is well-established in economic theory, going back all the way to Joseph Schumpeter. Modern day examples include the evolution of the high yield bond market and market for internet stocks.[3]

Please let us know if you have any further questions.

Sincerely,

*/s/ Katie Trefz*
Katie Trefz
Williams & Connolly LLP

*Attorney for James Peraire-Bueno*

*/s/ Daniel Marx*
Daniel Marx
Fick & Marx LLP

*Attorney for Anton Peraire-Bueno*

---

[3] Note that Dr. Eisfeldt is not expected to testify in detail regarding creative destruction; these points are provided here in response to the government's request for further information regarding the basis for the statement about the development of markets.