# Exhibit J

**ADR-106**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Erin E. Meyer #274244; Christopher Sun #308945<br>Keker, Van Nest & Peters LLP<br>633 Battery Street<br>San Francisco, CA 94111<br>TELEPHONE NO.: 415-391-5400     FAX NO. *(Optional):* 415-397-7188<br>E-MAIL ADDRESS *(Optional):* emeyer@keker.com; csun@keker.com<br>ATTORNEY FOR *(Name):* Coinbase, Inc. | **FOR COURT USE ONLY** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, California 92701
BRANCH NAME: Central Justice Center

PETITIONER: Coinbase, Inc.

RESPONDENT: Johnathan Vu

| **PETITION TO**   ☒ **CONFIRM**   ☐ **CORRECT**   ☐ **VACATE**<br>**CONTRACTUAL ARBITRATION AWARD** | CASE NUMBER: |
|---|---|

**Jurisdiction** *(check all that apply):*

☐ **Action is a limited civil case**
    Amount demanded    ☐ does not exceed $10,000
                     ☐ exceeds $10,000, but does not exceed $25,000
☒ **Action is an unlimited civil case** (exceeds $25,000)

CASE NUMBER:
30-2022-01293015-CU-PA-CJC

**NOTICE: You may use this form to request that the court confirm, correct, or vacate an award in an arbitration conducted pursuant to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq. and that does not involve an attorney-client fee dispute. If you are requesting court action after an attorney-client fee arbitration award, please read Alternative Dispute Resolution form ADR-105,** *Information Regarding Rights After Attorney-Client Fee Arbitration.*

1. **Petitioner and respondent.** Petitioner *(name each):*
    Coinbase, Inc.

    alleges and requests relief against respondent *(name each):*
    Johnathan Vu

2. **Contractual arbitration.** This petition requests the court to confirm, correct, or vacate an award in an arbitration conducted according to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq.

3. **Pending or new action.**
   a. ☐   A court case is already pending, and this is a petition filed in that action. *(If so, proceed to item 4.)*
   b. ☒   This petition commences a new action. *(If so, complete items 3b(1) through 3b(4).)*
       (1) **Petitioner's capacity.** Each petitioner named in item 1 is an individual,
           ☒   except petitioner *(state name and complete one or more of the following):* Coinbase, Inc.
         (a) ☒   is a corporation qualified to do business in California.
         (b) ☐   is an unincorporated entity *(specify):*
         (c) ☐   is a representative *(specify):*
         (d) ☐   is *(specify other capacity):*

       (2) **Respondent's capacity.** Each respondent named in item 1 is an individual,
           ☐   except respondent *(state name and complete one or more of the following):*
         (a) ☐   is a business organization, form unknown.
         (b) ☐   is a corporation.
         (c) ☐   is an unincorporated entity *(specify):*
         (d) ☐   is a representative *(specify):*
         (e) ☐   is *(specify other capacity):*

Form Approved for Optional Use
Judicial Council of California
ADR-106 [New January 1, 2004]

**PETITION TO CONFIRM, CORRECT, OR VACATE**
**CONTRACTUAL ARBITRATION AWARD**
**(Alternative Dispute Resolution)**

Code of Civil Procedure, § 1285 et seq.

| PETITIONER: Coinbase, Inc. | CASE NUMBER: |
|---|---|
| RESPONDENT: Johnathan Vu | |

3. b.    (3)  **Amount or property in dispute.** This petition involves a dispute over *(check and complete all that apply)*:

        (a) ☒ the following amount of money *(specify amount)*: $ 1,100,000.00

        (b) ☐ property *(if the dispute involves property, complete both of the following)*:

               (i) consisting of *(identify property in dispute)*:

               (ii) having a value of *(specify value of property in dispute)*: $

    (4) ☒  **Venue.** This court is the proper court because *(check (a) or (b))*:

        (a) ☐ this is the court in the county in which the arbitration was held.

        (b) ☒ the arbitration was not held exclusively in any county of California, or was held outside of California, **and** *(check one or more of the following)*:

               (i) ☐ this is the court in the county where the agreement was made.

               (ii) ☐ this is the court in the county where the agreement is to be performed.

               (iii) ☒ the agreement does not specify a county where it is to be performed and was not made in any county in California, and the following party resides or has a place of business in this county *(name of party)*: Johnathan Vu

               (iv) ☐ the agreement does not specify a county where it is to be performed and was not made in any county in California, and no party to this action resides or has a place of business in California.

4.  **Agreement to arbitrate.**

    a.  **Date.** Petitioner and respondent entered into a written agreement on or about *(date)*: December 4, 2017

    b.  ☒  **Attachment.** A copy of the agreement is submitted as Attachment 4(b) and incorporated herein by this reference.

    c.  **Arbitration provision.** Paragraph <u>7.2</u> of the agreement provides for arbitration of disputes arising out of the agreement as follows *(either copy the arbitration provision in full or summarize the provision)*:
"If you have a dispute with Coinbase . . . you and we agree that any dispute arising under this Agreement shall be finally settled in binding arbitration, on an individual basis, in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes . . . ."

5.  **Dispute subject to arbitration.** A dispute arose between petitioner and respondent concerning the following matter covered by the agreement to arbitrate *(summarize the dispute)*:
Respondent Johnathan Vu transferred cryptocurrency that is not supported by Coinbase to a cryptocurrency wallet address associated with his Coinbase account. Respondent claimed that Coinbase was liable for his loss of the transferred cryptocurrency under a variety of different causes of action. Coinbase, however, warned Respondent not to transfer unsupported cryptocurrency to its platform had no obligation to support the transferred cryptocurrency, and was not liable for the loss. The arbitrator agreed with Coinbase.

6.  **Arbitrator.** The following person was duly selected or appointed as arbitrator *(name of each arbitrator)*:
Rebecca Callahan

7.  **Arbitration hearing.** The arbitration hearing was conducted as follows *(complete both of the following)*:

    a.  **Date** *(each date of arbitration)*: April 25-27, 2022 and May 18, 2022

    b.  **Location** *(city and state where arbitration was conducted)*: Virtual proceedings.

8.  **Arbitration award.**

    a.  **Date of award.** The arbitration award was made on *(date)*: June 30, 2022

    b.  **Terms of award.** The arbitration award *(check one or more of the following)*:

        (1) ☐ requires ☐ petitioner ☐ respondent   to pay the other party this amount: $

        (2) ☒ requires neither party to pay the other anything.

        (3) ☐ is different as to different petitioners and respondents.

        (4) ☒ provides *(specify other terms or check item 8(c) and attach a copy of the award)*:
Claimant's claims are denied in their entirety and Claimant is denied all relief requested. See Award at 19-20.

**PETITION TO CONFIRM, CORRECT, OR VACATE
CONTRACTUAL ARBITRATION AWARD
(Alternative Dispute Resolution)**

c. ☒ **Attachment of Award.** A copy of the award is submitted as Attachment 8(c).

9. **Service of award.**

    a. The signed award or an accompanying document indicates that the award was served on petitioner on *(date):* June 30, 2022

    b. ☐ Petitioner alleges that a signed copy of the award was actually served on *(date):*

**PETITION TO CONFIRM, CORRECT, OR VACATE**
**CONTRACTUAL ARBITRATION AWARD**
**(Alternative Dispute Resolution)**

| PETITIONER: Coinbase, Inc. | CASE NUMBER: |
|---|---|
| RESPONDENT: Johnathan Vu | |

10. **Petitioner requests that the court** *(check all that apply):*

a. ☒ **Confirm the award, and enter judgment according to it.**

b. ☐ **Correct the award and enter judgment according to the corrected award, as follows:**

(1) The award should be corrected because *(check all that apply):*

    (a) ☐ the amount of the award was not calculated correctly, or a person, thing, or property was not described correctly.

    (b) ☐ the arbitrator exceeded his or her authority.

    (c) ☐ the award is imperfect as a matter of form.

(2) The facts supporting the grounds for correcting the award alleged in item 10b(1) are as follows *(if additional space is required, check here* ☐ *and submit facts on an attachment labeled 10b(2)):*

(3) The award should be corrected as follows *(if additional space is required, check here* ☐ *and describe requested correction on an attachment labeled 10b(3)):*

c. ☐ **Vacate (cancel) the award.**

(1) The award should be vacated because *(check all that apply):*

    (a) ☐ the award was obtained by corruption, fraud, or other unfair means.

    (b) ☐ an arbitrator was corrupt.

    (c) ☐ the misconduct of a neutral arbitrator substantially prejudiced petitioner's rights.

    (d) ☐ the arbitrator exceeded his or her authority, and the award cannot be fairly corrected.

    (e) ☐ the arbitrator unfairly refused to postpone the hearing or to hear evidence useful to settle the dispute.

    (f) ☐ an arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.

    (g) ☐ an arbitrator should have disqualified himself or herself after petitioner made a demand to do so.

(2) The facts supporting the grounds for vacating the award alleged in item 10c(1) are as follows *(if additional space is required, check here* ☐ *and submit facts on an attachment labeled 10c(2)):*

(3) Petitioner ☐ does ☐ does not request a new arbitration hearing.

d. ☐ **Award petitioner interest** from *(date):*

    (1) ☐ at the statutory rate.

    (2) ☐ at rate of _____ % per year.

e. ☐ **Award petitioner costs of suit:**

    (1) ☐ in the amount of: $

    (2) ☐ according to proof.

f. ☐ **Award petitioner attorney fees incurred in this action** *(check only if attorney fees are recoverable in this action according to statute or the parties' agreement):*

    (1) ☐ in the amount of: $

    (2) ☐ according to proof.

g. ☐ **Award petitioner the following other relief** *(describe relief requested; if additional space is required, check here* ☐ *and describe relief on an attachment labeled 10g):*

11. **Pages and attachments.** Number of pages attached: 55

Date: November 17, 2022

Erin E. Meyer          ▶          *Eif*

_____              _____

(TYPE OR PRINT NAME)                  (SIGNATURE OF PETITIONER OR ATTORNEY)

**PETITION TO CONFIRM, CORRECT, OR VACATE**
**CONTRACTUAL ARBITRATION AWARD**
**(Alternative Dispute Resolution)**



Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

June 30, 2022

David C. Silver, Esq.
Silver Miller
4450 North West 126th Avenue
Suite 101
Coral Springs, FL 33065-7604
Via Email to: dsilver@silvermillerlaw.com

Erin E. Meyer, Esq.
Keker Van Nest & Peters, LLP
633 Battery Street
San Francisco, CA 94111-1809
Via Email to: emeyer@keker.com

Case Number: 01-21-0002-6541

Johnathan Vu
-vs-
Coinbase, Inc.

Dear Parties:

By direction of Arbitrator Rebecca Callahan, we herewith transmit to you the duly executed Award in the above matter.

There is to be no direct communication with the Arbitrator, even if such was allowed previously on this case. All communication shall be directed to the American Arbitration Association (AAA).

Additionally, on June 30, 2022, the AAA reviewed and finalized the billing for this matter and closed this case as settled.

The business will receive a refund that will be mailed from our New York office in approximately one week.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after today's closing date.

We thank Arbitrator Callahan for serving on this matter and we appreciate your selection of the AAA as your alternative dispute resolution provider.

Sincerely,
/s/
Terri Martinez
Manager of ADR Services
Direct Dial: (559)490-1871
Email: TerriMartinez@adr.org
Fax: (855)433-3046

Supervisor Information: Donna Martinez; martinezd@adr.org; (559) 490-4881

Enclosure

bcc:    Rebecca Callahan, Esq.

cc:     Steven Ragland
        Michael Cianfrani
        Matthew W. Turetzky, Esq.
        Eric F. Rosenberg, Esq.
        Raina Abaya, Esq.
        Jason S. Miller, Esq.
        Mimi Derle, Esq.
        Christopher S. Sun
        Justin Lyn, Esq.

## AMERICAN ARBITRATION ASSOCIATION
### Consumer Arbitration Rules

In the Matter of the Arbitration between:

Johnathan Vu, an individual,

*Claimant*

- vs -

Coinbase, Inc., a Delaware limited liability company,

*Respondent*

AAA Case No. 01-21-0002-6541

### FINAL AWARD

The undersigned Arbitrator (the "***Arbitrator***"), having been designated in accordance with the User Agreement, dated August 23, 2017,[1] having been duly sworn, and having examined and considered the submissions, proofs, allegations, evidence, and arguments of the parties, hereby finds, concludes and issues this final award (***"Award"***) as follows:

### 1.    Introductory

A duly noticed evidentiary hearing (***"Hearing"***) was convened via video conference on April 25, 26, and 27, 2022, and May 18, 2022, before Rebecca Callahan, Arbitrator ("Arbitrator"). Participating in the Hearing were Eric Rosenberg and Mimi Derle, of Silver Miller, appearing on behalf of Claimant Johnathan Vu (***"Claimant"*** or ***"Dr. Vu"***), and Erin Meyer and Christopher Sun, of Keker Van Nest & Peters LLP, appearing on behalf of Respondent Coinbase, Inc. (***"Respondent"*** or ***"Coinbase"***). Also participating in the hearing was Grace Zhong, in-house litigation counsel for Respondent. Other appearances were as noted in the court reporter's transcript, which is part of the record in this arbitration.

---

[1]  *Exhibit 2004.* There is a later version of the Coinbase User Agreement that was in place at the time of the January 30, 2021, transfer transactions – *Exhibit 2040, pp. 24-65*  - but Coinbase produced no evidence that Dr. Vu ever clicked and accepted that version. As such, the 2017 version of the Agreement – *Exhibit 2004* - controls in this case.

All witnesses were duly sworn and documentary evidence was received as described in Order No. 7 - Hearing Report and Order, dated April 27, 2022, and Order No. 8 – Hearing Report and Order, dated May 18, 2022. All oral testimony and all exhibits offered during the evidentiary hearing were received into evidence. At the conclusion of the evidentiary hearing, the parties and counsel represented to the Arbitrator that they had no further evidence to offer with respect to their respective claims and positions in this matter. In addition to the evidence and argument presented at the evidentiary hearing, the parties submitted opening and closing briefs and statements, all of which have been reviewed and considered by the Arbitrator. The record was closed as of June 15, 2022.

The Arbitrator carefully considered all evidence and argument before making this award. This award is based upon those facts found by the Arbitrator to be true and necessary to the determination of the clams and issues presented. To the extent that this award may differ from any party's argument or position, that is the result of determinations made by the Arbitrator with respect to witness credibility, burden of proof considerations, the weight to be given to the evidence submitted, and the inferences to be drawn from the evidence submitted as further discussed below.[2]

2.      **Arbitral Jurisdiction**

In December 2017, Dr. Vu opened an account at Coinbase. To open his account, Dr. Vu was required to agree to Coinbase's User Agreement (***"Agreement"***), which includes a section providing for binding arbitration of disputes that might thereafter arise between the parties. Paragraph 7.2 of the Agreement provides, in pertinent part, as follows:

> If you have a dispute with Coinbase, we will attempt to resolve any such disputes through our support team. If we cannot resolve the dispute through our support team, you and we agree that any dispute arising under this Agreement shall be finally settled in binding arbitration, on an individual basis, in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes … and you and Coinbase hereby expressly waive trial by jury and right to participate in a class action lawsuit or class-wide arbitration. The arbitration will be conducted by a single arbitrator and shall take place in the county or parish in which you reside, or another mutually agreeable location, in the English language. The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law, and the arbitral decision may be enforced in any court. At your request, hearings may

---

[2]     Where the Arbitrator thought appropriate, she has included references to portions of the evidentiary record. The Arbitrator could not – and is not required to – make reference to any or every aspect of the evidentiary record as part of making an award. The lack of a record citation does not mean that there is no evidence in the record to support the Arbitrator's findings or the inferences drawn from the evidence.

be conducted in person or by telephone and the arbitrator may provide for submitting and determining motions on briefs, without oral hearings. The prevailing party in any action or proceeding to enforce this agreement shall be entitled to costs and attorneys' fees….

*Exhibit 2004.*

This matter concerns disputes between Dr. Vu and Coinbase regarding three deposit transactions whereby by Dr. Vu attempted to make deposits to his Coinbase account on January 30, 2021. Dr. Vu voluntarily submitted to arbitration his claims and disputes with Coinbase by filing a demand for arbitration with the American Arbitration Association (***"the AAA"***) on or about April 9, 2021. Thereafter, on or about May 24, 2021, Coinbase voluntarily appeared in this arbitration by filing an answering statement in which it denied all of Dr. Vu's claims and asserted several affirmative defenses.

Based upon the foregoing, as well as the appearances and submissions made by the parties during the course of the Hearing, the proceedings leading up to the Hearing, and the matters submitted to the Arbitrator during the course of this arbitration, all without objection to the Arbitrator's jurisdiction, it is the Arbitrator's determination that the parties' respective claims, defenses and requests for relief, are subject to and were submitted voluntarily to binding arbitration before the undersigned Arbitrator.

### 3.    *Statement of Decision*

### A.    *Overview*

Through the January 30, 2021, transactions described in Section 3(B)(3), below, Dr. Vu lost 2,954 aAAVE tokens. The ultimate question to be determined is: who is responsible for that loss? Dr. Vu or Coinbase?

Dr. Vu has admitted from the outset that he "made a mistake" when he attempted to transfer unsupported cryptocurrency from his non-custodial wallet at MetaMask to his custodial wallet at Coinbase on January 30, 2021. *RT Day 1, p. 10.* Some might say that Dr. Vu's admission should be the beginning and end of the inquiry.

It is undisputed that Dr. Vu's transfer of 2,964 aAAVE tokens never appeared in Dr. Vu's custodial wallet at Coinbase. In this arbitration, Dr. Vu's blames Coinbase for his loss, complaining that (a) his mistake was the result of misrepresentations or misleading statements on Coinbase's website, (b) Coinbase has possession and is wrongfully withholding return of his aAAVE tokens, and (c) Coinbase has a duty to develop a software system to communicate with the Aave blockchain so as to achieve a return of Dr. Vu's aAAVE tokens to his self-custody MetaMask wallet or, failing that, Coinbase has an obligation to pay Dr. Vu the alleged U.S. dollar value the aAAVE tokens had on January 30, 2021 (allegedly $1,100,000.00). *Exhibit 2040, p. 7,. ¶ 32.*

Coinbase has denied all of Dr. Vu's claims, allegations and requests for relief. In its defense, Coinbase says that just because Dr. Vu's transfer transactions are reflected on the Aave blockchain does not mean that Coinbase has access to the blockchain or has the ability to move Dr. Vu's aAAVE tokens. Coinbase claims that it is not holding or housing Dr. Vu's aAAVE tokens, and that it cannot do so because the cryptocurrency in question is not supported by the Platform (defined in Section 3(B)(3)). Similarly, Coinbase claims that it cannot communicate with the Aave blockchain concerning Dr. Vu's aAAVE tokens because Coinbase does not support that cryptocurrency and, as such, does not have systems in place to interact with the Aave blockchain concerning Dr. Vu's aAAVE tokens. In this regard, Coinbase says that in order to communicate with the Aave blockchain concerning Dr. Vu's aAAVE tokens, it would have to put in jeopardy the security of its other account holders' assets that actually are housed in the Platform because there is not one private key assigned specifically to Dr. Vu's custodial wallet that can be activated to help Dr. Vu reverse his mistake. The architecture for the Platform, in particular Coinbase's security features, is more complicated than that, as discussed in Section 3(B)(3).

For the reasons discussed below, Dr. Vu's claims fail because he did not carry his burden of proof. Dr. Vu failed to demonstrate that Coinbase made any false statements that caused him to believe that he could transfer aAAVE tokens to his Coinbase wallet. The evidence shows that Coinbase does not have possession and is not exercising dominion and control over Dr. Vu's aAAVE tokens. Dr. Vu did not establish that Coinbase has an affirmative duty to do something to reverse Dr. Vu's mistake.

### B.    Facts Pertinent to the Decision on the Merits

#### (1)    Cryptocurrency

Cryptocurrency is an unusual type of property. Cryptocurrency is not a physical object with height, width, depth or weight. While it is commonly described as "digital money," unlike traditional currencies, cryptocurrency does not exist in a physical form. *RT Day 2, p. 184.*

There are *thousands* of different cryptocurrencies, with new currencies being introduced on an almost daily basis. *Exhibit 2038, p. 4.* The different cryptocurrencies are based on their respective software protocols, which are stored in databases, referred to as "blockchains." These blockchains are publicly viewable and are controlled by the participants' computers that are on the network implementing the same rule sets. *RT Day 2, pp. 184-187.* Ownership of units of a particular cryptocurrency is recorded on the blockchain associated with the cryptocurrency, which operates as a public ledger of transactions stored and maintained across a network of computers. *RT Day 2, pp. 184-186.* A key feature of blockchains is that recorded transactions are immutable, and that immutability is one of the "core goals" of the blockchain. *RT Day 2, pp. 125-126; Exhibit 2038, p. 4.* "Once data is recorded on a blockchain it cannot be altered." *Exhibit 2038, p. 4.*

The most well-known application of blockchains is digital tokens, also known as cryptocurrencies. As explained by Coinbase's expert – Stephen McNew (*"McNew"*):

> "Cryptocurrency … is a digital or virtual currency which is designed to work as a medium of exchange. It uses blockchain technology, a decentralized network, with strong integrated cryptography to manage transactions. It is not governed by any central bank, public institution, or monetary authority. Bitcoin was the first cryptocurrency to use blockchain technology and as a result is the most well-known cryptocurrency. As of February 9, 2022, there are over [17,000] different cryptocurrencies based on CoinMarketCap listings."

*Exhibit 2038, p. 4, and Appendix B – Exhibit A.*

### (2)    Management of Cryptocurrency Holdings

Cryptocurrency holders store or house their cryptocurrencies in software programs called "wallets," which help automate some of the processes associated with sending and receiving cryptocurrencies. As explained by Mark Nesbitt (*"Nesbitt"*), a blockchain security architect at Coinbase,

> "A wallet is software that manages keys and addresses and allows users to create addresses, allows users to observe the receipt of cryptocurrency at those addresses and allows users to sign transactions to send from those addresses…. [T]here are many different wallet implementations. Given that it's software that interacts with the blockchain, anyone can write a wallet implementation to interact with a blockchain."

*RT Day 2, pp. 192-193.*

Wallets come in two forms: self-custody wallets and custodial wallets. Self-custody wallets put control of a wallet's private keys[3] in the hands of the user and thus makes the user solely responsible for all aspects of initiating transactions with a blockchain, keeping the keys secure, and maintaining the overall protection of the assets in the wallet. In contrast, a custodial wallet is managed by a third party that controls the wallet's private keys and executes transactions on the user's behalf. The user holds the public keys for purposes of initiating transactions with the cryptocurrency in the user's wallet, but it is the custodian who actually

---

[3]   The term "private key" is used to describe part of the digital signature scheme used by many cryptocurrencies. The private key operates much like a signature on a check. It serves to verify the legitimacy of the cryptocurrency transaction to which it is attached. As Falk explained: "[T]he private key is what's needed to create digital signatures…. [T]he way the Ethereum blockchain works, like almost all blockchains, is that in order to send a message asking tokens to be moved, you sign what's called a transaction." *RT Day 2, p. 34.*

executes the transaction with a blockchain on the user's behalf using the user's private keys. The custodian is also responsible for maintaining the security of the private keys on behalf of the user, and providing the overall protection and security for the assets held in the custodial wallet. *RT Day 2, pp. 193-194; Exhibit 2018, pp. 4-5.*

Dr. Vu's expert – Dr. Brett Falk (***"Falk"***) – testified that private keys are "very dangerous" and, thus, it is "very important and very challenging" to keep them secure. *RT Day 2, pp. 122-123.* Whoever has the public and private key information has the ability to transfer <u>all</u> of the cryptocurrency assets out of that wallet, and that transfer transaction is *irreversible* because a defining feature or characteristic of the blockchain is that transactions are irreversible. *Id.* Dr. Vu acknowledged that he experienced such a loss with regard to management of one of his self-custody wallets, and stopped using several of his other self-custody wallets because he has lost or was unable to secure the private keys for those wallet accounts. As discussed in Section 3(B)(3), below, Coinbase's security features is one of the reasons that makes it a popular exchange platform.

### (3)    Coinbase

Coinbase is a cryptocurrency exchange that offers users a platform where users / account holders can purchase, sell, and transfer cryptocurrencies that are supported by the Platform. *RT Day 2, p. 190.* Coinbase's "flagship" product is a custodial wallet, which is commonly referred to as the Coinbase Retail Platform (***"the Platform"***). *RT Day 2, p. 194.*

The Platform manages and secures users' cryptocurrency assets and executes transactions on the blockchain on their behalf. *RT Day 2, pp. 194-195*. Although the Platform interacts with certain blockchains on behalf of its users / account holders, Coinbase does not exercise any control over those blockchains or its users' activities outside of the Platform. *Id.* As discussed above, control of a blockchain is typically decentralized and spread among the blockchain's various users and stakeholders.

Coinbase is responsible for securing the billions of dollars of digital assets stored on its Platform. *Exhibit 2033.* It does so in a variety of ways, including by safeguarding the private keys to its custodial wallets. *RT Day 2, p. 218.* According to Nesbitt, Coinbase goes to "extreme lengths" to ensure that its private keys remain secure. *Id.* Nesbitt explained that Coinbase stores its private keys in systems protected by several layers of security that prevent any human being from being able to access or export those private keys; that the use of private keys at Coinbase to execute transactions is done programmatically by Coinbase software systems; and that there is no one private key designated or attached to a particular user's account. *RT Day 2, pp. 218-221.*

### (4)    Aave Protocol Tokens

This dispute concerns two tokens issued by the Aave protocol—one Coinbase supports (AAVE) and one Coinbase does not support (aAAVE).

The Aave protocol is an example of decentralized finance, commonly referred to as "DeFi." DeFi is a term used to describe peer-to-peer financial services that are provided via the blockchain (using cryptocurrency) instead of traditional financial institutions (using dollars). *RT Day 4, p. 16, Exhibit 2038, p. 4.* The Aave protocol allows users to lend and borrow cryptocurrencies and other digital assets.[4] *RT Day 2, p. 205; RT Day 4, p. 17.* Loans on the Aave protocol are facilitated using "smart contracts" that run on the Aave blockchain and automate the steps involved in consummating the lending and borrowing of cryptocurrencies. *RT Day 4, pp. 16-18.* Cryptocurrency owners who wish to lend their cryptocurrency can deposit their cryptocurrency into an Aave protocol lending pool and earn interest on their deposit. Aave users that wish to borrow can withdraw cryptocurrency out of a lending pool. *RT Day 2, pp. 205-206; RT Day 4, p. 17.*

The Aave protocol issues two types of cryptocurrencies. *RT Day 2, pp. 205-206; RT Day 4, p. 18.* The first is the AAVE governance or native token, which is a widely traded cryptocurrency whose primary distinguishing feature is that is allows owners of the token to influence how the protocol is run. *RT Day 2, p. 205; RT Day 5, pp. 18-19.* The ticker symbol for the AAVE governance token is "AAVE."

The second category of cryptocurrency issued by the Aave protocol are aTokens, which are provided to owners who lend their cryptocurrency to one of the Aave lending pools on the Aave protocol. *RT Day 4, p. 19.* An aToken serves as a record of the deposit, and allows the owner of the contributed cryptocurrency to collect / receive interest. *Id.; RT Day 2, pp. 206-207.* When the cryptocurrency owner is ready to withdraw his cryptocurrency from the lending pool, he does so using the Aave protocol to exchange / redeem his aTokens for the deposited cryptocurrency. *RT Day 2, p. 108; RT Day 4, p. 19.* aTokens are an example of a "supplemental" or "advanced" protocol because they supplement or otherwise interact with another cryptocurrency, while being distinct from the underlying digital asset. *RT Day 2, p. 211; RT Day 4, pp. 39-41.*

The type of aToken that a user receives depends on the particular cryptocurrency he deposits into a lending pool. *RT Day 4, pp. 19-20.* Generally, the convention is to refer to an aToken received in exchange for a particular cryptocurrency by appending an "a" to the front of the cryptocurrency's ticker symbol name. *Id.; RT Day 2, p. 206.* For example, if a user deposits ETH (which is the ticker symbol for the Ethereum cryptocurrency), he would receive an aETH

---

[4]    R. Vu testified that he was trading in the Aave protocol specifically because he "wanted to earn passive income and borrow against the token." *RT Day 1, p. 89.*

token. *RT Day 2, pp. 206-207.* If the user deposits LINK (which is the ticker symbol for Chainlink) he would receive an aLINK token. If the user deposits AAVE (which is the ticker symbol for the AAVE cryptocurrency), he would receive an aAAVE token. aTokens are an entirely distinct type of cryptocurrency, and have different ticker symbols than the cryptocurrency for which they are exchanged in the Aave lending pool. *RT Day 4, p. 20.*

Dr. Vu complained that the similarity between the ticker symbol for AAVE and the ticker symbol for aAAVE was confusing. As discussed above, the evidence showed that it is a common naming protocol to simply add an "a" to the front of the ticker symbol for the cryptocurrency's governance token – e.g., aETH and aLINK. *RT Day 1, pp. 240-241.* This naming protocol is beyond Coinbase's control. Moreover, given this common naming practice for DeFi tokens, the similarity in ticker symbols is entirely attributable to the way in which DeFi works and is not unique with respect to the aAAVE tokens. Accordingly, the difference between the governance token and the interest-bearing token, including their respective ticker symbols, is something that a cryptocurrency owner / investor would reasonably be expected to know on his own.

### (4)    Dr. Vu

While Dr. Vu is a licensed dentist with a community-based practice, he testified that he has been an active trader / investor in cryptocurrency for approximately 5 years; that he spends four or five hours a day researching and trading cryptocurrency; that he purchases, sells, invests, and trades using both self-custodial wallets and custodial wallets; and that he has traded on the Kraken, Binance and Gemini exchanges in addition to the Coinbase exchange. *RT Day 1, pp. 46, 124-125, 211-212 and 225.* The inference drawn from this evidence is that before initiating the January 30, 2021, transfer transactions, Dr. Vu was a sophisticated and experienced purchaser / investor / account holder who was involved in several dimensions of cryptocurrency ownership, including cryptocurrency related to DeFi. With regard to DeFi tokens, Dr. Vu testified that he has been trading in various types of DeFi cryptocurrency since mid-2019, starting with Chainlink, which he bought and sold "a lot." *RT Day 1, pp. 199-200.*

Dr. Vu testified that over the years, he has used several different cryptocurrency exchanges because the different exchanges support different types of cryptocurrency. *RT Day 1, p. 212.* As a general practice, Dr. Vu testified that he researched what coins an exchange supported before making the decision to use an exchange for his intended transactions. *RT Day 1, p. 216.* The inference drawn from this evidence is that Dr. Vu followed this practice when he opened his account at Coinbase and before he began using the Platform to transact trades of any kind, including but not limited to those involving AAVE.

Dr. Vu opened his Coinbase account in December 2017. *RT Day 1, p. 46.* When Dr. Vu signed up for his account, he both read and agreed to the Agreement. *RT Day 1, p. 46, and RT Day 3, pp.* 23-25. The Agreement warned Dr. Vu not to transfer unsupported cryptocurrencies to the Platform and advised him that he – not Coinbase – would be responsible for loses associated with transfers of unsupported cryptocurrencies to the Platform. *Exhibit 2004, p. 3.*

Prior to the January 30, 2021, transfer transactions, Dr. Vu was engaged in buying AAVE and other cryptocurrencies and then investing then in the lending pool on the Aave protocol because he wanted to earn interest on his cryptocurrency investments. *RT Day 1, p. 89.* In this regard, Dr. Vu testified that he also deposited Ethereum and Chainlink cryptocurrencies into the Aave lending pool hundreds of times, and never once attempted to send an aToken of Ethereum or Chainlink to his custodial account at Coinbase. *RT Day 1, pp. 240-241.* The inference drawn from this evidence is that Dr. Vu understood that he needed to redeem his aTokens from the Aave lending pool before executing cross-wallet transactions between his self-custody wallet at MetaMask and his custodial wallet at Coinbase.

Dr. Vu testified that in dealing with AAVE cryptocurrency and the Aave lending pool, he had to negotiate a number of steps. Dr. Vu acknowledged that between January 25 and 30, 2021, he was doing "a lot" of Aave lending pool transactions, and that those transactions involved sending to and from his MetaMask wallet and interacting with the Aave protocol. *RT Day 1, pp. 222-223.* Dr. Vu acknowledged that between January 25 and 30, 2021, he made deposits of AAVE into the Aave lending pool, that he withdrew those deposits, and that he successfully transferred funds across the Aave protocol, his MetaMask wallet and his custodial wallet at Coinbase multiple times. *RT Day 1, p. 224.*

Dr. Vue acknowledged that between January 25 and January 30, 2021, he deposited various cryptocurrencies into the Aave protocol lending pools and withdrew them "multiple times." *RT Day 1, p. 224.* During this same period, Dr. Vu testified that he made as many as 54 deposits into the Aave protocol lending pools and was "transferring funds quite frequently across the Aave protocol, [his] MetaMask wallet and the Coinbase platform." *RT Day 1, p. 224.* Dr. Vu also traded AAVE governance tokens on the Platform on numerous occasions. *RT Day 1, p. 63.* Dr. Vu testified that he understood that by depositing cryptocurrency (including AAVE governance tokens) into the Aave lending pool, he would not be able to use / spend / trade the cryptocurrency he had lent out. *RT Day 1, pp. 116-117.*

Based on this evidence, plus Dr. Vu's testimony that he read the AAVE white paper and researched what cryptocurrencies the Platform supported before he started investing in AAVE cryptocurrency – all of which was before the January 30, 2021[5] - Dr. Vu's testimony that he relied on *anything* posted on the Coinbase website in making the decision to initiate the January 30, 2021, deposit transactions is not credible. That testimony is inconsistent with Dr. Vu's testimony about his extensive cross-wallet transactions involving AAVE and aAAVE using both his MetaMask and Coinbase wallets. The inference drawn from this evidence is that Dr. Vu understood the difference between an AAVE governance token and an aAAVE interest-bearing

---

[5]    Dr. Vu testified that before buying AAVE or transacting in the Aave protocol lending pool, he reviewed Aave's white paper, which describes the protocol's features – *Exhibit 2013* – and Aave's website, which includes a page that specifically discusses aTokens – *Exhibit 2038, p. 32. RT Day 1, pp. 81, 117-118, 122-123*. Dr. Vu testified that he did this research because he wanted to understand how the Aave protocol worked. *RT Day 1 pp. 119-122.*

token before the January 30, 2021, transfer transactions based upon his independent research and his extensive DeFi investment and trading history.

### (6)    January 30, 2021 Transfer Transactions

On January 30, 2021, over the course of just four minutes, Dr. Vu executed three separate transactions from his self-custody wallet at MetaMask that resulted in transferring a total of 2,964 aAAVE tokens out of his wallet. *RT Day 1, pp. 55 and 230.* Dr. Vu executed all three transactions without conducting a test deposit, as recommended by Coinbase.[6] *RT Day 1, p. 231.* According to the account statement for Dr. Vu's self-custody wallet at MetaMask, the three aAAVE transfer transactions which are the subject of this arbitration were part of a 75-transaction trading session, during which Dr. Vu acknowledged that he was "moving pretty quickly." *RT Day 1, p. 231; Exhibit 2001, pp. 31-34.* There is no dispute that Dr. Vu's MetaMask wallet listed Dr. Vu's aAAVE interest-bearing tokens using the "aAAVE" ticker symbol, and not the "AAVE" ticker symbol. *RT Day 2, pp. 236-237; Exhibits 2049 and 2050.*

Dr. Vu testified that he did not understand the distinction between the AAVE governance token and aAAVE interest-bearing token until *after* he completed the January 30, 2021, transfer transactions. That testimony was not credible because Dr. Vu testified that he read the Aave white paper before investing in AAVE. The white paper makes clear the difference and distinction between AAVE (native) and aAAVE (derivative).

> "The LendingPool contract uses the LendingPoolCore and LendingPoolDataProvider to interact with the reserves …. One of the advanced features implemented in the LendingPool contract is the **tokenization** of the lending position. When a user deposits in a specific reserve, he receives a corresponding amount of **aTokens**, tokens that map the liquidity deposited and accrue the interests of the deposited underlying assets. Atokens are minted upon deposit, their value increases until they are burned on redeem or liquidated….

*Exhibit 2-13. §§ 2 and 2.3, pp. 7-8 (bold in original).*

The Coinbase website has a dedicated page (Asset Directory) that lists the cryptocurrencies it supports. *Exhibit 2038, Appendix B – Exhibit D, pp. 34-37.* Only AAVE is listed as a cryptocurrency Coinbase supported at the time Dr. Vu executed the January 30, 2021, transfer transactions. Based upon Dr. Vu's extensive trading history with AAVE and aAAVE – as well as the other cryptocurrencies Dr. Vu put into the Aave lending pool – the inference drawn from this evidence is that Dr. Vu understood exactly what he was doing when he traded in

---

[6] *RT Day 2, pp. 215-216; Exhibit 2040, p. 35.* Even after losing his 2,964 aAAVE interest-bearing tokens, Dr. Vu testified that he still does not use "test sends" when transferring cryptocurrency assets to Coinbase, although he admitted that he "probably should." *RT Day 1, pp. 242-244.*

AAVE, and that he understood that the interest-bearing aToken (aAAVE) was not the same as the native cryptocurrency (AAVE). To the extent Dr. Vu truly believed that the AAVE ticker symbol referred to both AAVE and aAAVE, that mistake is on him. As the owner of the cryptocurrency in question, it was incumbent on Dr. Vu to understand what it was that he owned, and what it was that he was trading. No evidence was presented that would support a finding that Coinbase was in any way responsible for counseling Dr. Vu regarding the properties or characteristics of his cryptocurrency holdings.

Coinbase's responsibility concerning its operation of the Platform was to tell is users / account holders what cryptocurrency it supported. The evidence showed that Coinbase did exactly that. *Exhibit 2038, Appendix B – Exhibit D, pp. 34-37.* The evidence also showed that Coinbase took the extra step of reminding users / account holders with a warning screen they were required to read and accept before making trade on the Platform. The Platform has a warning screen that the user / account holder must review and accept before transacting on the Platform. That warning screen states in bold, "**Be sure to select the right cryptocurrency.**" *Exhibit 2038, Appendix A, p. 13.* The evidence showed that Dr. Vu selected AAVE, but then sent aAAVE to the Coinbase deposit link. If Dr. Vu truly was intending to deposit aAAVE in his custodial wallet at Coinbase, the fact that aAAVE was <u>not an option</u> should have alerted Dr. Vu not to try to send aAAVE from his MetaMask wallet to his Coinbase wallet. However, based upon the evidence discussed above concerning Dr. Vu's extensive cross-wallet trading history with DeFi cryptocurrency of various types, the stronger inference is that, before executing the January 30, 2021, transfer transactions, Dr. Vu simply forgot to redeem his aAAVE tokens for the AAVE tokens he had deposited into the Aave lending pool. The point here is that the execution of the January 31, 2021, transfer transactions was done *outside* the Platform, and was completely under Dr. Vu's control. Dr. Vu owns the mistake and its unfortunate consequences.

### C.    *Decision on the Merits*

#### (1)    *Claim 1 - Unjust Enrichment Claim*

In his first claim for relief, Dr. Vu alleged that Coinbase had received a direct benefit from the January 30, 2021, transfers of his aAAVE tokens from his self-custody wallet at MetaMask to his custodial wallet at Coinbase. Dr. Vu further alleged that Coinbase accepted and retained that benefit by directing Dr. Vu's aAAVE tokens "into its own cryptocurrency wallet." Dr. Vu's claim for unjust enrichment and his request that Coinbase return the benefits allegedly conferred upon it fail because Dr. Vu failed to carry his burden of proof that any benefit was conferred, accepted, received or retained by Coinbase.

Manish Gupta (***"Gupta"***), the Executive Vice President of Engineering for Coinbase, testified that Dr. Vu's tokens are on the Aave blockchain where Dr. Vu transferred them. *RT 163-165.* Gupta further explained that just because Dr. Vu's aAAVE tokens are reflected on the blockchain scan as being in a Coinbase custodial wallet does not mean that Coinbase is holding or housing Dr. Vu's aTokens. Coinbase had no control over Dr. Vu's send transaction, and has no control over the Aave blockchain. Just because Dr. Vu's send instructions directed the unsupported aAAVE tokens to his custodial wallet at Coinbase does not mean that Coinbase is housing or has access to that cryptocurrency. *RT Day 1, p. 165.* Falk agreed and testified that per his review of the Etherscan of the Aave protocol blockchain, Coinbase has <u>not</u> interacted in any way with Dr. Vu's aAAVE tokens. *RT Day 2, pp. 107-108.* Under these facts, it cannot be said that Coinbase received or has retained any sort of benefit related to Dr. Vu's aAAVE tokens. Accordingly, Dr. Vu's claim for unjust enrichment fails and is denied.

### *(2)      Claim 2 - Conversion*

In his second claim for relief, Dr. Vu alleged that he transferred "funds and assets" to his custodial account at Coinbase and that Coinbase has "taken for itself" and "kept as its own" a portion of Dr. Vu's funds and assets after Dr. Vu requested their return.

The elements of a claim for conversion are (1) the plaintiff's ownership or right to possession of the subject property, (2) the defendant's wrongful act or disposition of the property that interferes with the plaintiff's possession of the subject property, and (3) damages. *Archer v. Coinbase, Inc.*, 53 Cal. App. 5th 266, 276 (2020), citing *Los Angeles Federal Credit Union v. Madalyan*, 209 Cal. App. 4th 1383, 1387 (2012) and *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1491 (2006).

Conversion requires the defendant to take some affirmative action to exercise dominion or control over or to deprive a plaintiff of his or her property. *Archer v. Coinbase, supra,* citing *Spates v. Dameron Hospital Assn.*, 114 Cal. App. 4th 208, 222 (2003) and *Simonian v. Patterson*, 27 Cal. App. 4th 773, 781 (1994).

The evidence showed that Coinbase had no involvement in or control over what Dr. Vu did with respect to executing transfers into or out of his self-custody wallet at MetaMask. The evidence showed that Dr. Vu had complete control over his self-custody wallet at MetaMask and, without any prompting or involvement by Coinbase, executed the transfer of 2,964 aAAVE tokens from his MetaMask wallet. The evidence showed that the deposit transaction failed because the Platform does not support aAAVE. Dr. Vu failed to establish that Coinbase has possession of his aAAVE tokens or has taken any action with regard to his aAAVE tokens. The evidence shows that Dr. Vu's aAAVE tokens are on the Aave blockchain where he put them.

Coinbase submitted evidence showing that it has not taken – and does not have the technical ability to take – any action with regard to Dr. Vu's aAAVE tokens because the Platform (where Dr. Vu maintains an account / custodial wallet) does not support aAAVE tokens. Gupta, the Executive Vice President of Engineering for Coinbase, testified that Dr. Vu's tokens are on the blockchain where Dr. Vu transferred them. *RT 163-165.* Gupta further explained that just because Dr. Vu's aAAVE tokens are reflected on the blockchain scan as being in a Coinbase custodial wallet does not mean that Coinbase has control over Dr. Vu's send transaction or that the aTokens reflected on the blockchain are actually being housed by Coinbase. Gupta testified that Coinbase does not have access to Dr. Vu's aAAVE tokens on the Aave blockchain because it does not support aAAVE. *RT Day 1, p. 165.* Falk agreed with Gupta's testimony, and conceded that per the Etherscan he reviewed, Coinbase has <u>not</u> interacted in any way with Dr. Vu's aAAVE tokens on the blockchain. *RT Day 2, pp. 107-108.* This is consistent with Gupta's testimony that in order for Coinbase to be able to move / interact with Dr. Vu's aAAVE tokens on the Aave blockchain, Coinbase would have to actually support that cryptocurrency within its systems, which it does not. *RT 168.* Accordingly, Dr. Vu's claim for conversion fails and is denied.

Dr. Vu has argued that Coinbase's lack of action – its failure to take action to develop a software system to communicate with the Aave blockchain for the purpose of moving Dr. Vu's aAAVE tokens back to his self-custody wallet at MetaMask – is tantamount to refusing to return Dr. Vu's aAAVE tokens. This argument is similar to the one made in *BDI Capital, LLC v. Bulbul Investments, LLC*, 446 F.Supp. 3d 1127, 1140 (N.D.Ga. 2020), involving a case where the exchange did not support forked currency and thus could not grant the bitcoin owner access to the forked currency deposited to his wallet. The undersigned Arbitrator agrees with the court in *BDI Capital* that to require an exchange to take affirmative action "would be imposing a major new duty" that would effectively require the exchange to honor unsupported cryptocurrencies. To the extent that this is the relief that Dr. Vu is seeking in this arbitration, this request for relief fails because Dr. Vu has not established the existence of such a legal duty on the part of Coinbase.

Dr. Vu provided no legal support for the proposition that Coinbase has a legal duty to take affirmative action to help reverse a mistake that is of Dr. Vu's own making. The only duties that existed between Dr. Vu and Coinbase were those created by the relationship of user / customer and service provider. That relationship is largely governed by the Agreement, which makes clear that Coinbase accepts no responsibility for a user's attempt to use the Platform for digital currencies that Coinbase does not support. *Exhibit 2004, ¶ **3.1, p. 2.* Dr. Vu provided no authority to support the proposition that Coinbase has a duty to take affirmative action on behalf of an account holder who makes a mistake while transaction business outside the Platform.

### (3)    Claim 3 - Negligence

In his third claim for relief, Dr. Vu has alleged that Coinbase was negligent in its design of the architecture of the Platform because that design does not prevent an account holder from trying to deposit unsupported cryptocurrency into his/her custodial wallet. He also argued in his post-hearing brief that Coinbase was negligent because it failed to design the Platform in a way that would allow it to perform its alleged duty to return unsupported cryptocurrency from the blockchain (the aAAVE interest-bearing tokens) to Dr. Vu.

The elements of a claim for negligence are (1) the existence of a legal duty on the part of the defendant owed to the plaintiff, (2) breach of that duty, and (3) damages proximately caused by the defendant's breach. *Archer v Coinbase, Inc., supra,* 53 Cal. App. 5th at 278. citing *Beacon Residential Community Assn. v. Skidmore Owings & Merrill LLP*, 59 Cal. 4th 568, 573 (2014) "Absent a legal duty, any injury is an injury without actionable wrong." *Romero v. Superior Court*, 89 Cal. App. 4th 1068, 1078 (2001).

Dr. Vu's theory of negligence is that Coinbase had "a duty to reasonably design deposit protocols that would prevent an account holder from depositing onto the COINBASE platform cryptocurrency assets that are not supported" by Coinbase. *Dr. Vu Opening Brief, p. 11.* As discussed in Section 3(B), above, that whole foundation of cryptocurrency is that it is an <u>unregulated</u> financial environment There are no rules other than the ones set by the particular set of rules governing the particular software application or platform. In this context, no legal duty can be imposed on an actor operating in this environment for purposes of imposing negligence liability. Buying, selling, investing, trading, lending, exchanging, etc. in digital assets is a bold, new frontier where there is no legal precedent defining a standard of conduct concerning the programing of platform architectures by exchanges offering custodial wallets and other services to users / investors such as Dr. Vu. Coinbase has no duty to support or provide services related to any particular cryptocurrency created by a third party. Indeed, the uncontroverted evidence established that Coinbase does not have the ability to design "deposit protocols" that prevent the deposit of unsupported currency. *RT Day 2, pp. 200-201 and 259-260.*

### (4)    Claim 4 – Negligent Misrepresentation

In his fourth claim for relief, Dr. Vu has alleged that Coinbase made "false statements of material facts about the services [he] would received from COINBASE upon opening an maintaining a COINBASE account." Specifically, Dr. Vu alleged that Coinbase made the following misrepresentations:

"(a)    COINBASE would act as a sound and reliable depository of customer assets;

(b)    COINBASE would provide adequate security to protect its customers' assets; and

(c)    COINBASE – as of December 15, 2020 – supported the AAVE token, without limitations or qualifications to its support of the token."

*Statement of Claim, ¶¶ 49 and 50.*

In order to prevail on a negligent misrepresentation claim, a plaintiff must show that the defendant made a factually false statement. *See SI 59 LLC v. Variel Warner Ventures, LLC,* 29 Cal. App. 5th 146, 154 (2018). Dr. Vu's negligent misrepresentation claim fails because he failed to carry his burden of proving that Coinbase made a misrepresentation of material fact. In this regard, during the Hearing, Dr. Vu pointed to the December 15, 2020, announcement regarding AAVE being a supported cryptocurrency on the Platform, and claimed that he was confused by the language / phrasing in the announcement. However, Falk – Dr. Vu's expert – confirmed that there was not "anything specifically that's factually incorrect." *RT Day 2, p. 153.*

At best, Dr. Vu's evidence of negligent misrepresentation was that the language used in the December 15, 2020, announcement was confusing *to him* or potentially subject to more than one interpretation. That is not enough to prevail on a negligent misrepresentation claim. "Parties cannot read something into a neutral statement in order to justify a claim for negligent misrepresentation. The tort requires a positive assertion." *Diediker v Peelle Fin. Corp.*, 60 Cal. App. 4th 288, 297-298 (1997). Dr. Vu failed to present evidence of any factually untrue statement by Coinbase.

Assuming for sake of argument that Dr. Vu had established that Coinbase misrepresented a material fact through its website statements about the Aave protocol and its support of the AAVE token or that Dr. Vu was confused by the language / phrasing of the December 15, 2020, announcement or any of the other articles or blog postings on the Coinbase website, another element a plaintiff must establish for a negligent misrepresentation claim is that plaintiff relied on the representation. *California Jury Instructions CACI 1903; see also Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 475-476 (2003); *West v. JPMorgan Chase Bank, N.A.,* 214 Cal. App. 4th 780, 794 (2013). As applied to this case that means that Dr. Vu needed to establish that he relied on those statements or representations in making the decision to execute the January 30, 2021, transfer transactions.

Dr. Vu's "reliance" testimony was not credible when viewed against the undisputed facts concerning (a) Dr. Vu's extensive trading history and experience with cross-wallet transactions involving DeFi tokens prior to January 30, 2021, (b) Dr. Vu's specific trading experience with cross-wallet transactions involving AAVE and aAAVE, (c) the frenzy and pace at which Dr. Vu was trading on January 30, 2021, and (d) the fact that subject transfer transactions were but three of 75 transactions Dr. Vu executed on January 30, 2021, without a "test send" and while he was "moving pretty quickly. *RT Day 1, p. 231; Exhibit 2001, pp. 31-34.*

### (5)    Claims 5 and 6 – False Advertising in Violation of Cal. Bus & Prof. Code §§ 17500, et seq., and Unfair Competition in Violation of Cal. Bus & Prof. Code §§ 17200, et seq.

California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, et seq.) (***"FAL"***) prohibits any advertising that is false and advertising that "although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.) (***"UCL"***) prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Dr. Vu's FAL and UCL claims for the reasons discussed below.

<u>Reason One</u>

Dr. Vu failed to establish that a reasonable consumer would have been misled by the statements made in the December 15, 2020, announcement or any other postings on Coinbase's website. Dr. Vu's FAL and UCL claims are centered on a single statement that is found in several Coinbase articles. The statement says:

> "Aave (AAVE) is an Ethereum token that powers Aave, a decentralized non-custodial money market protocol where users can participate as depositors or borrowers. Depositors provide liquidity to the market to earn a passive income, while borrowers are able to borrow cryptocurrencies in exchange for paying a variable interest rate."

*Exhibits 1029, 1030, 1032, 1033 and 1041.* In order to prevail on his FAL and UCL claims, it was Dr. Vu's burden to prove that the above statement would "likely deceive a 'reasonable consumer.'" *Eidmann v. Walgreen Co.*, 522 F.Supp. 3d 634, 643 (N.D. Cal. 2021). Dr. Vu failed to carry that burden of proof.

The evidence showed that the above statement is factually accurate. Falk - Dr. Vu's expert - affirmed its accuracy. *RT Day 2, p. 153* ("I don't see anything specifically that's factually incorrect."). Dr. Vu's claims instead rest on the tenuous premise that the statement, while true, is confusing. However, to prove a claim under the FAL or UCL, Dr. Vu was required to show that Coinbase's statement was so confusing that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021). "This is not a negligible burden." *Id.*

"To meet this standard, [a plaintiff] must demonstrate more than a mere possibility that [the representation] might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Id.* (alterations adopted) (internal quotation marks omitted). "[U]nreasonable mistakes or confusion [a]re simply not enough." *Thomas v. Costco Wholesale Corp.*, No. 20-cv-718, 2021 WL 948801, at \*6–7 (S.D. Cal., Mar. 12, 2021), *aff'd*, No. 21-55335, 2022 WL 636637 (9th Cir. Mar. 4, 2022). Falk's testimony about what he thought might be confusing to a consumer was not persuasive and, moreover, lacked foundation with regard to Falk's (a) credentials to render such opinion testimony, and (b) what basis he had for reaching the opinion conclusions he offered.

"[A]necdotal evidence alone is insufficient to prove that the public is likely to be misled." *Haskell v. Time, Inc.*, 965 F. Supp. 1398, 1407 (N.D. Cal. 1997). "To state a cognizable claim, a plaintiff must demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged [representation]." *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260–61 (C.D. Cal. 2003) (internal quotation marks omitted). Where a defendant's allegedly misleading statement is not false on its face, as here, a claimant "must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers." *Haskell v. Time, Inc., supra,* 965 F. Supp. at 1408. Falk provided no such evidence. By his own admission, he did not "do any surveys regarding how anyone interprets [Coinbase's] representations." *RT Day 2, p. 133.* Absent such evidence, Dr. Vu has failed to satisfy his burden of proof.

California courts have consistently held that unreasonable interpretations of facially true statements cannot support an FAL claim. "California's consumer protection laws do not require [companies] to anticipate and affirmatively dispel . . . shoppers' idiosyncratic assumptions or wholly incorrect interpretations of its [representations]." *Thomas v. Costco Wholesale Corp.*, *supra,* 2022 WL 636637, at \*2. "Perhaps a few misguided souls believe, for example, that all 'Danish pastry' is made in Denmark. Is it, therefore, an actionable deception to advertise 'Danish pastry' when it is made in this country? Of course not." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 507 (2003).

In final analysis, it is unreasonable to interpret Coinbase's statement about the Aave protocol as a representation by Coinbase that it supports the aAAVE interest-bearing token. As discussed above, given the complexities of trading in DeFi cryptocurrency and executing cross-wallet transactions between a self-custody wallet and a custodial wallet at Coinbase, coupled with the very clear Asset Directory posted on Coinbase's website identifying by ticker symbol what cryptocurrencies it supports, it is the determination in this arbitration that a reasonable consumer (including Dr. Vu) would understand that (a) AAVE and aAAVE are different cryptocurrencies, (b) AAVE and aAAVE have different ticker symbols, and (c) Coinbase only supports AAVE on the Platform. No evidence was presented of any fact or circumstance that would countermand the foregoing facts and circumstances, which must be considered.

<u>Reason Two</u>:

A claimant "has standing to sue under the Unfair Competition Law [or] the false advertising law . . . only if she actually relied on whatever defect in a [representation] allegedly makes it actionable when making her decision" to utilize a service. *Watkins v. MGA Entertainment, Inc.*, 550 F.Supp. 3d 815, 834 (N.D. Cal. 2021). To satisfy that requirement, a claimant must show that she "would not have [used] the [service] but for the allegedly actionable misrepresentation or omission." *Id*.

Dr. Vu failed to establish his standing to bring claims under the FAL and/or UCL. The testimony Dr. Vu provided on the question of reliance at the evidentiary hearing lacked credibility, as discussed in Section 3(C)(4), above. Dr. Vu was a sophisticated cryptocurrency investor who had traded in DeFi cryptocurrencies for many years before executing the January 30, 2021, transfer. The evidence showed that Dr. Vu had an extensive history of executing cross-wallet transactions from his self-custody wallet at MetaMask to his custodial wallet at Coinbase of other cryptocurrencies he had invested in the Aave protocol (e.g., Ethereum and Chainlink), and never once attempted to send aETH or aLINK to his Coinbase wallet. Finally, Dr. Vu testified that he read the Aave white paper for he started investing in AAVE and before he started contribution cryptocurrency to the Aave lending pools, and that he traded in AAVE numerous times before the January 30, 2021 transfer transactions. *RT Day 1, pp. 81, 117-118, 122-123, 223-224.* Given the frenzy in which Dr. Vu was trading on January 30, 2021, where the aAAVE trades were just three of 75 transactions Dr. Vu executed that day during a short window of time, this circumstance is at odds with the suggestion that Dr. Vu was doing any type of research that day before executing aAAVE transactions from his MetaMask wallet.

<u>Reason Three</u>:

Dr. Vu must establish standing under the UCL by showing that he lost money or property as a result of Coinbase's purportedly unlawful or unfair conduct. *See Watkins v. MGA Entertainment, Inc.*, *supra,* 550 F. Supp. 3d at 834. As discussed above, it is been determined that Dr. Vu was responsible for executing the January 31, 2021, transfers of aAAVE tokens from his MetaMask wallet. Those transfer transactions were controlled entirely by Dr. Vu through his control over his self-custody wallet at MetaMask. Coinbase had nothing to do with Dr. Vu's aAAVE send transactions. More importantly, Coinbase warned Dr. Vu not to attempt to transfer unsupported cryptocurrency to the Platform. *See, e.g.*, *Exhibits 2004, p. 3, 2015, p. 1, 2016, p. 1, and 2038 p. 13.*

Dr. Vu's UCL claim also fails because Dr. Vu has not identified any other law that Coinbase allegedly violated outside of the UCL and FAL. "To assert a claim under the UCL's 'unlawful' prong, [a] plaintiff must allege a violation of another law." *Local Ventures & Invs., LLC v. Open Found.*, No. 18-CV-05581-EDL, 2019 WL 7877938, at *6 (N.D. Cal. Feb. 26, 2019).

>>> **(7)    *Claim 7 – Declaratory Relief Regarding the Unenforceability of the Agreement as Unconscionable and Contrary to Public Policy***

In his seventh claim for relief, Dr. Vu seeks declaratory relief that the exculpatory provisions, damage waivers and indemnification provisions of the December 2020 Coinbase User Agreement are unconscionable and thus unenforceable. As mentioned in footnote 1, the 2017 version of the Coinbase User Agreement (defined herein as "the Agreement") controls in this case because there was no evidence that Dr. Vu ever clicked or accepted the December 2020 version which is the subject of Dr. Vu's seventh claim for relief. This clam is thus denied as moot.

Even if the Agreement contains exculpatory provisions, damage waivers and indemnification provisions similar to those contained in the December 2020 User Agreement, those contractual provisions are not the basis for any of the rulings rendered in this Award. As discussed, above, Dr. Vu's claims all fail for lack of evidence and/or lack of legal authority, not because of the application of any provision in the Agreement.

>>> ***4.    Award***

Based on the foregoing, IT IS HEREBY AWARDED AS FOLLOWS:

1.    Claimant's claims against Coinbase for alleged unjust enrichment are denied in their entirety, and Dr. Vu is denied all relief requested.

2.    Claimant's claims against Coinbase for alleged conversion are denied in their entirety, and Dr. Vu is denied all relief requested.

3.    Claimant's claims against Coinbase for alleged negligence are denied in their entirety, and Dr. Vu is denied all relief requested.

4.    Claimant's claims against Coinbase for alleged negligent misrepresentation are denied in their entirety, and Dr. Vu is denied all relief requested.

5.    Claimant's claims against Coinbase for alleged false advertising in violation of the FAL (California Business and Professions Code §§ 17500, et seq.) are denied in their entirety, and Dr. Vu is denied all relief requested.

6.    Claimant's claims against Coinbase for alleged violation of the UCL (California Business and Professions Code §§ 17200, et seq.) are denied in their entirety, and Dr. Vu is denied all relief requested.

7.      Claimant's request for a declaratory relief is denied in its entirety, and Dr. Vu is denied all relief requested.

8.      The AAA administrative fees totaling $2,900.00 and the Arbitrator fees totaling $11,718.75 shall be borne as incurred.

9.      All issues, arguments, submissions, exhibits and testimony presented by Claimant and Respondent have been considered by the Arbitrator regardless of whether they are expressly addressed in this Final Award. Pursuant to California Code of Civil Procedure section 1283.4, this Final Award includes a determination of all questions submitted by the parties to the Arbitrator in this arbitration, the decision of which is necessary in order to determine the controversy. All claims and defenses not expressly granted herein are hereby DENIED.

Dated:  30 June 2022

Rebecca Callahan, Arbitrator

I, the undersigned Arbitrator, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Dated:  30 June 2022.

Rebecca Callahan, Arbitrator

**PROOF OF SERVICE**

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made.  I am over the age of eighteen years and not a party to the within action.  My business address is Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111-1809.

On November 17, 2022, I served the following document(s):

- **CIVIL CASE COVER SHEET**

- **PETITION TO CONFIRM OR VACATE CONTRACTUAL ARBITRATION AWARD (ALTERNATIVE DISPUTE RESOLUTION) {ADR-106}**

☑ by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format.  The transmission was reported as complete and without error.

| | |
|---|---|
| Rebecca Callahan, Arbitrator | terrimartinez@adr.org |
| 5120 Campus Drive | |
| Newport Beach, CA 92660 | |
| | |
| David C. Silver | dsilver@silvermillerlaw.com |
| Jason S. Miller | jmiller@silvermillerlaw.com |
| Eric Rosenberg | erosenberg@silvermillerlaw.com |
| Mimi Derle | mderle@silvermillerlaw.com |
| Silver Miller | |
| 4450 NW 126th Avenue - Suite 101 | |
| Coral Springs, FL 33065-7604 | |

Executed on **November 17, 2022**, at San Francisco, California.  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____
Susan Hope

1773441