

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 23, 2025

**BY ECF**
Honorable Jessica G. L. Clarke
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re:    *United States v. Peraire-Bueno*, S1 24 Cr. 293 (JGLC)

Dear Judge Clarke:

      The Government respectfully writes to seek a ruling to preclude the defendants from cross-examining David Yakira, the victim of the defendants' Exploit, regarding certain topics that are unrelated to his credibility, unfairly prejudicial, and risk misleading the jury.  In particular, the Government seeks to preclude questioning regarding:  (i) Mr. Yakira's understanding that Israeli law enforcement closed their investigation of the defendants; (ii) the victim's November 2023 proffer agreement; (iii) impeachment material of persons other than the testifying witness, including other victims; (iv) a baseless allegation that one of the victim's bots might have engaged in money laundering; and (v) certain prior sandwich trades made by Savannah Technologies.[1]

### I.      Mr. Yakira's Understanding that the Israeli Police Closed Its Investigation

      The Government first seeks a ruling precluding cross-examination regarding Mr. Yakira's understanding that Israeli law enforcement closed its investigation of the defendants before the Indictment in this case.  *See* 3509-008.  The defendants first learned that the Israeli investigation had been closed more than a year after their indictment.  In other words, at all relevant times, this information was unknown to the defendants and thus could not have had any impact on their actions or states of mind.  The Court should preclude the defendants from cross-examining Mr. Yakira on this issue—and from otherwise presenting any evidence or argument on this issue to the jury.

      As the Court recognized in its September 24, 2025 Opinion and Order, evidence that Tether froze the defendants' cryptocurrency wallet at the request of Israeli law enforcement will be "admitted solely to show Defendants' awareness of foreign law enforcement activity and does not bear on whether Defendants' conduct violated the wire fraud statute."  Dkt. 163 (Sept. 24, 2025 Op.) at 19.  The Court, at the request of the parties, will also instruct the jury as to the same, including the specific instruction that "the involvement of a foreign law enforcement agency does

---

[1] The Government met and conferred with the defendants on October 23, 2025.  The parties have not yet reached agreement on any of the issues addressed in this letter.

not bear on whether the defendants' preceding conduct itself constituted a violation of the wire fraud statute under United States law, and you should not consider it for that purpose," Dkt. 175, and that it also does not "mean that the Peraire-Buenos violated any Israeli law," Oct. 9 Tr. at 35.

While evidence of the defendants' awareness of foreign law enforcement activity is plainly relevant to their state of mind in subsequently laundering the Exploit proceeds, evidence of the outcome of that same foreign law enforcement activity—unknown to the defendants until long after their arrest—has no bearing whatsoever on any issue properly before the jury. Indeed, its only purpose would be to improperly and inaccurately suggest to the jury that Israeli law enforcement believed the investigation had no merit. Decisions by law enforcement or prosecutors as to how, or why, to pursue investigations or charges are entirely irrelevant to whether the defendants committed fraud or money laundering here. That is particularly true here, where the defendants were unaware of the decision by Israeli law enforcement and therefore the decision could not have had any impact on their states of mind or subsequent actions. Moreover, this evidence would be unfairly prejudicial, risk misleading the jury, and create a significant potential for a mini-trial involving complex issues of Israeli law and the myriad reasons the Israeli police may have closed an investigation into two foreign defendants. Indeed, Mr. Yakira told Israeli law enforcement *before* they closed their investigation not only that he had reported the Exploit to U.S. law enforcement but also that U.S. law enforcement was interested in pursuing the case. Pursuant to Rule 403, the Court should preclude any cross-examination, evidence, or argument relating to this issue, particularly in light of the limiting instruction the Court intends to provide in connection with any evidence of foreign law enforcement involvement in the Tether freeze.

## II. The Victim's Proffer Agreement

The defendants have indicated their intent to cross-examine Mr. Yakira regarding a proffer agreement that Mr. Yakira signed in connection with his first meeting, on November 9, 2023, with attorneys from the Government. *See* 3509-002 (proffer agreement). The proffer agreement did not apply to any of Mr. Yakira's numerous subsequent meetings with the Government, and Mr. Yakira will not be testifying pursuant to the proffer agreement. The Court should preclude cross-examination regarding the proffer agreement and communications regarding the proffer agreement because (i) the only relevance of such questioning would be the impermissible purpose of suggesting that sandwich trading may be illegal (a topic the Court has already precluded as improper); (ii) the fact that Mr. Yakira repeatedly met with the Government *without* a proffer agreement thereafter—and will not be testifying pursuant to *any* agreement with the Government—renders the proffer agreement of limited probative value; and (iii) testifying about why or why not Mr. Yakira signed a proffer agreement would risk a mini-trial regarding the purpose of a proffer agreement and encroach upon Mr. Yakira's privileged communications with his counsel.

As the Court has ruled, the defense is "not permitted to argue about the legality of sandwich trading." Oct. 9 Tr. at 6; *see* Dkt. 163 (Sept. 29 Op. & Order) at 9 (explaining that "Defendants have confirmed that they will not argue that (i) Nonparty-1's trading strategy was unlawful"). The proffer agreement provides certain protections against the use of a witness's statements made in a meeting covered by the proffer agreement against that witness in a criminal prosecution, with limited exceptions. *See* 3509-002 ¶¶ 1-3. The only possible relevance of questioning about the

proffer agreement itself—as opposed to substantive statements of the witness made during the proffer—would be to impermissibly (and incorrectly) suggest that sandwich trading is illegal (or that Mr. Yakira was concerned it might be). The Court should preclude cross-examination regarding the proffer agreement for this reason alone.

Further, the use of a proffer agreement for Mr. Yakira's first meeting with the Government has limited probative value given that Mr. Yakira has met with Government attorneys more than a dozen times since then without a proffer agreement (and has repeated the same information in those subsequent meetings). Put differently, there is no information that Mr. Yakira disclosed in that first November 2023 meeting that remains subject to the proffer agreement's protections. Further, Mr. Yakira will not be testifying pursuant to the proffer agreement, or any agreement, with the Government. Under these circumstances, the November 2023 proffer agreement has little or no probative value, which is greatly outweighed by the unfair prejudice and risk of misleading the jury that would result from cross-examination regarding the proffer agreement for the reasons explained above. *See* Fed. R. Evid. 403.

Moreover, if asked about the proffer agreement, Mr. Yakira may be put in the untenable position of having to choose between either revealing privileged communications with counsel in order to provide complete and truthful testimony explaining his understanding of the proffer agreement or providing only limited testimony in order to protect his attorney-client privilege.

Finally, cross-examination regarding Mr. Yakira's proffer agreement risks a mini-trial on the purposes of a proffer agreement. As to the former, the Government may need to seek an instruction from the Court explaining what a proffer agreement is—a specialized legal topic which relates to a specific contract that prosecutors use to gather information in an investigation—and rebutting any suggestion that the use of a proffer agreement is in any way untoward (or otherwise suggests that the witness lacks credibility or has engaged in illegal activity). Indeed, there is nothing unusual about asking for a proffer agreement—and many witnesses without any criminal exposure request a proffer agreement. The Court would likely have to craft a substantial and lengthy instruction explaining all of these facts to the jury. Given the *de minimis* relevance of this topic, and the seemingly improper purpose for which the defendants seek its introduction, this questioning clearly runs afoul of Rule 403.[2]

Accordingly, while the defendants may use the notes from the November 2023 proffer to impeach Mr. Yakira if his testimony is inconsistent with his prior statements made in that meeting, the Court should preclude cross-examination relating to the proffer agreement itself.

---

[2] These concerns are heightened here, where the defendants have already introduced the proffer agreement of Travis Chen, who testified that he believed he faced criminal exposure, continued to meet with the Government pursuant to a proffer agreement through his entering into a non-prosecution agreement, and whose statements to the Government and testimony at trial were covered by at least one of those agreements. None of those circumstances is true of Mr. Yakira, rendering his proffer agreement of little-to-no probative value and creating a significant risk that the jury will unfairly and incorrectly draw a connection between Mr. Chen and Mr. Yakira's reasons for entering into proffer agreements with the Government.

### III.  Impeachment Material of Persons Other than the Witness

The defendants have marked as defense exhibits (i) a 257-page Discord chat (DX 227) between Mr. Yakira's business partner and the other two victims of the defendants' Exploit spanning from April 2, 2023 through October 26, 2023; and (ii) Etherscan pages that appear to relate to transactions by other victims (not Mr. Yakira) involving another victim's apparent use of Tornado Cash (DX 103) and specific sandwich trades made by other victims in April 2022 and January 2023 (DX 104-109).  The Court should preclude the use of the victim Discord chat (DX 227) in its entirety for any purpose at trial, and the Court should preclude the defense from cross-examining or otherwise impeaching Mr. Yakira with transactions made by other victims.

#### a.  The Victim Discord Chat (DX 227)

Defense Exhibit 227 is a 257-page Discord chat between Mr. Yakira's business partner and the two other victims of the Exploit spanning from April 2, 2023 through October 26, 2023.  The entire document consists of inadmissible hearsay with no possible exception that would permit its admission.  Mr. Yakira himself was not a part of the chat, did not write any of the messages, and has never even seen most of its contents.  It is therefore also improper and irrelevant to ask Mr. Yakira to speculate about, or comment on, views or statements made by others.  The Court should preclude DX 227 in its entirety.[3]

The document consists entirely of hearsay without exception.  As noted above, Mr. Yakira is not a participant in the chat.  Even if he were, his own statements would still be hearsay.  Here, the defense is even further afield from admissibility.  While Mr. Yakira's business partner showed Mr. Yakira a subset of the messages and discussed some of those messages with Mr. Yakira, any knowledge Mr. Yakira has of the messages or his business partner's views are themselves hearsay.  It would be highly prejudicial to allow the defendants to admit statements of victims who are not testifying and, essentially, attempt to impeach those victims without having them ever take the stand.  *See United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997) (affirming the district court's preclusion of impeachment evidence for non-testifying witnesses on Rule 403 grounds).

Nor can Mr. Yakira be impeached using statements made by others.  It is black letter law that for a statement to be a prior inconsistent statement, the proponent must first establish that the statement was in fact made or adopted by the witness.  *See United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).  Accordingly, as this Court ruled during the cross-examination of Robert Miller, a witness cannot be impeached with prior statements made by others.  Trial Tr. at 476-77.  Because none of the messages in DX 227 are statements of Mr. Yakira, and Mr. Yakira has never adopted those messages as his own statements, the admission of DX 227 should be precluded.[4]

---

[3] The chat is also largely irrelevant to the issues properly before the jury at trial.  If the defendants identify even a single message in the entire chat that they claim is not barred by Rule 802 (the Government has found none), the Government requests an opportunity to be heard on additional grounds for exclusion of the identified message.

[4] Additionally, much of the chat consists of messages that are inadmissible because they go to collateral issues, *see, e.g.*, *United States v. Blackwood*, 456 F.2d 526, 531 (2d Cir. 1972) ("A witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters

### b. Conduct of Other Victims (DX 103-109)

The Court similarly should preclude the defense from attempting to impeach Mr. Yakira by cross-examining him regarding the transactions and conduct of other victims. In particular, the defendants have marked as defense exhibits Etherscan pages that appear to relate to the use of Tornado Cash by another victim of the defendants' Exploit (DX 103) and specific sandwich trades made by other victims in April 2022 (DX 104-106) and January 2023 (DX 107-109). Mr. Yakira and his company have never used a mixer like Tornado Cash or Aztec. *See* 3509-014 at 7. Accordingly, the defendants would have no good faith basis to ask Mr. Yakira about his own use of cryptocurrency mixers, and such questioning therefore would serve only to improperly and inaccurately suggest to the jury that Mr. Yakira was involved in something illegal or illicit.

Moreover, while a court "may, on cross-examination, allow [specific instances of conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about," Fed. R. Evid 608(b), neither the other victim's use of Tornado Cash nor the prior sandwich trades made by other victims bear on *Mr. Yakira's* character for truthfulness, and Mr. Yakira will not testify about the character of any of the other victims.

To be clear, the Government is not arguing that all references to the another victim's use of Tornado Cash must be entirely precluded from this case. Indeed, the Government expects to introduce in its case-in-chief an August 2023 Slack thread (GX 3495) in which Anton Peraire-Bueno notes that one of that victim's bots "was funded by tornado."[5] But it would be entirely inappropriate to cross-examine *Mr. Yakira* regarding another victim's use of Tornado Cash (or another victim's trades not involving Mr. Yakira's company), and the Court should preclude the defendants from doing so.

### IV. Unfounded Allegations of Unlawful Conduct

The defendants, in correspondence with the Government, have alleged that sandwich trading has been used to illegally launder funds, citing a March 17, 2025 article on a website called "DLNews."[6] The article speculates that "[c]rypto money launderers are [sandwich] attacking their own trades" and that "[d]oing so helps them make illicit funds look clean." The article lists as an example a sandwich trade involving one of Mr. Yakira's bots. However, the article also contains a post-publication update that Reid Yager, the head of policy at Flashbots, had subsequently explained to "DLNews" that the identified sandwich trade was really "a well-known trading bot"

---

which are not collateral, *i.e.*, as to those matters which are relevant to the issues in the case and could be independently proven."); *United States v. Rivera*, 273 Fed. App'x 55, 58 (2d Cir. 2008) (same), and/or raise serious Rule 403 concerns that counsel against their admission.

[5] The other victim's use of Tornado Cash may be relevant to the extent the defendants knew about it and that knowledge bears on their *mens rea* in subsequently laundering the proceeds of the Exploit.

[6] https://www.dlnews.com/articles/defi/lazarus-sandwich-attacks-its-own-trades-to-launder-crypto/

that had sandwiched a bad trade, and that "[i]f it was money laundering . . . the launderer's bot would not have been able to guarantee they would win the opportunity to attack the vulnerable trade."  In other words, self-sandwich attacking is an unlikely form of money laundering because the launderer risks losing the bulk of their illicit proceeds.

The Government showed this article to Mr. Yakira and asked if the allegation was true. Mr. Yakira explained that his bot's trade referenced in the article was not money laundering, but rather a run-of-the-mill sandwich trade with a third-party user's trade in the middle. *See* 3509-014 at 7.  Mr. Yakira has never engaged in money laundering, has never heard of the mixers referred to in the article, and has never used a mixer or similar privacy service to fund his trading bots. *See id.*  In light of the post-publication update included in the article and Mr. Yakira's denial of the speculative claim, defense counsel does not have the requisite "good faith basis for questioning that alleges adverse facts," *United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) to ask questions relating to the March 2025 "DLNews" article or the allegations therein. *See, e.g.*, *United States v. Morales*, 474 F. App'x 30, 33-34 (2d Cir. 2012) (no good faith basis for "speculative inquiry" into whether witness previously had lied about involvement in domestic abuse where there was no evidence supporting accusation and "the government asserted that it had no reason to believe" the allegation was true).

Even if the defendants could articulate a good faith basis, the Court should preclude questioning on this topic pursuant to Rules 608 and 403.

District courts have "broad discretion in controlling the scope of cross-examination." *United States v. Caracappa*, 614 F.3d 30, 42 (2d Cir. 2010) (quotation marks omitted); *see also* Fed. R. Evid. 611(a) (noting that courts "shall exercise reasonable control" over cross-examination to "avoid needless consumption of time" and to "protect witnesses from harassment or undue embarrassment") and 611(b) (limiting scope of cross-examination of witnesses to subject matter of direct examination and matters affecting credibility of witnesses).

Rule 608 limits the circumstances under which specific acts of a witness may be introduced at trial, whether through extrinsic evidence or mere questioning of the witness.  Pursuant to Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," except for a criminal conviction that falls within the parameters of Rule 609.  While the admissibility of extrinsic evidence is thus cabined, the Court "may, on cross-examination, allow [specific instances of a witness's conduct] to be inquired into," but only if the instances "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1).  Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's conduct may be inquired into on cross-examination only if their probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403; *accord Devery*, 935 F. Supp. at 407-08 ("Such [prior] acts are only admissible insofar as they bear on a witness's propensity for truthfulness or untruthfulness, and, even if the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403.").

Mr. Yakira has never been convicted of any crime, much less the extraordinarily speculative claim of money laundering alleged the "DLNews" article, and therefore extrinsic evidence of this issue—including the article itself—plainly are not admissible here. *See* Fed. R. Evid. 608(b). The Court should further exercise its discretion to preclude questioning of the witness on this topic.

For the same reasons that the defendants arguably lack a good-faith basis for such questioning—namely, the DLNews article's own post-publication update, Mr. Yakira's denial, and the sheer unlikelihood and impracticality of sandwiching one's own trade to engage in money laundering—such questioning has little or no probative value and a significant and unfair prejudicial effect. *See, e.g.*, *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 170 (2d Cir. 2017) (mere "accusations have little, if any, probative value because the innocent and guilty alike can be accused of wrongdoing." (citing *Michelson v. United States*, 335 U.S. 469, 482 (1948)). By contrast, there is substantial risk of unfair prejudice, confusing the issues, and misleading the jury, if the defendants are allowed to cross-examine Mr. Yakira on this topic; even if Mr. Yakira denies the allegation, defense counsel's questioning may leave the jury with the false impression that Mr. Yakira has some connection to money laundering. *See, e.g.*, *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002); *Morales*, 474 F. App'x at 34; *United States v. Khalil*, 2005 WL 3117195, at *2 (2d Cir. 2005). That unfair prejudice would be especially acute here, as it would provide the defendants with a backdoor to putting before the jury the type of allegations of victim misconduct that they claimed they would not put at issue (and that the Court has ruled are not an appropriate subject of argument or evidence in this case). *See* Oct. 9 Tr. at 6; Sept. 29 Op. & Order at 9.

Accordingly, the Court should preclude extrinsic evidence of, and questioning regarding, the speculative allegation that certain sandwich trades—including one involving one of Mr. Yakira's bots—were in any way connected to money laundering.

### V. Specific Prior Sandwich Transactions Involving Savannah Technologies

The defendants have marked for identification six Etherscan pages that relate to a total of four sandwich trades executed by Savannah Technologies' trading bots between October 2021 and the day before the Exploit. *See* DX 100-102, DX 110-112. Five of these six exhibits reflect cherry-picked transactions that have limited relevance to the issues at trial and raise significant concerns under Rule 403.[7] Specifically, DX 100 through DX 102 are the three trades from an October 5, 2021 sandwich, which predate the Ethereum merge and the existence of MEV Boost, and therefore have limited probative value to the sandwich trading conducted by Savannah Technologies as of April 2023. Further, DX 110 and DX 112 appear to be the front "buy" trade by Savannah Technologies for two different unusually large sandwich trades made by the company in March or April 2023. DX 110 and DX 112 do not on their face appear to relate to the Exploit

---

[7] The sixth, DX 111, appears to be the sell trade by Savannah Technologies as part of a sandwich of one of the defendants' test bait transactions one day before the Exploit. Given this apparent relevance, the Government does not object to the use of DX 111 on cross-examination of Mr. Yakira.

or this case, and their selection appears calculated to provide a misleading impression about the typical size of one of the company's sandwich trade investments.

The mechanics of sandwich trading—and its effect on the middle trade belonging to a third party—are undisputed in this case and evidence about how sandwich trading works has already been adduced. Trial Tr. at 385 (Robert Miller testimony); Trial Tr. at 652, 758-59 (Travis Chen testimony). The Government expects Mr. Yakira will testify to the same. Detailed questioning about specific sandwich trades that have little or no bearing the charges against the defendants in this case, Mr. Yakira's direct testimony, or Mr. Yakira's credibility is gratuitous and cumulative, given the Court's appropriate limitations on the introduction of evidence on this topic. Should the defendants get into the details of these trades, the Government may need to put on evidence of some of the countless other trades Savannah Technologies engaged in during the same period involving significantly less price impact (and/or significantly less investment) to dispel any misimpression created by the defendants' selected pre-Exploit trades.

Savannah Technologies is not on trial. The Court should exclude this evidence of limited probative value on an undisputed issue to avoid unfair prejudice, confusing the issues, and wasting the jury's time. *See* Fed. R. Evid. 403.

    Respectfully submitted,

    JAY CLAYTON
    United States Attorney
    Southern District of New York

by: _____/s/_____
    Danielle Kudla / Jerry Fang /
    Benjamin Levander / Ryan Nees
    Assistant United States Attorneys

Cc: Counsel of Record (by ECF)