## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ANTON PERAIRE-BUENO, and JAMES
PERAIRE-BUENO,

       Defendants.

Case No.:  1:24-cr-00293-JGLC

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF JOINT MOTION FOR JUDGMENT OF ACQUITTAL OR,
## ALTERNATIVELY, TO DISMISS THE SUPERSEDING INDICTMENT

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................3

ARGUMENT ....................................................................................................................6

I.     LEGAL STANDARD...............................................................................................6

II.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNTS 1 AND 2.................................................................................................................7

     A.     The Government Failed to Prove Any Material Misrepresentation........................8

          1.     The Lure Transactions did not convey any materially false or fraudulent meaning or generate any material misimpression ......................9

          2.     The False Signature conveyed no implicit promise and made no fraudulent claim regarding the validity of the block.................................18

          3.     The government's "MEV-Boost validator" theory is legally invalid, factually unsupported, and was not alleged in the indictment...................27

     B.     The Government Failed to Prove that a Qualifying Property Right Was the Object of the Alleged Scheme. ..............................................................39

     C.     The Government Failed to Prove an Intent to Defraud.........................................42

III.   THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNT 3.................................................................................................................44

IV.   IN THE ALTERNATIVE, THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT.......................................................................49

     A.     Background ..........................................................................................................49

     B.     The Government's Novel Theories Are Unconstitutional. ...................................50

CONCLUSION................................................................................................................54

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Ciminelli v. United States*, 598 U.S. 306 (2023)..........................................................................39

*Kousisis v. United States*, 605 U.S. 114 (2025)...........................................................................40

*Loughrin v. United States*, 573 U.S. 351 (2014)..........................................................................27

*Neder v. United States*, 527 U.S. 1 (1999)....................................................................................8

*United States v. Adler*, 186 F.3d 574 (4th Cir. 1999) ..................................................................39

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ................................................................12

*United States v. Bases*, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022)....................................14, 15

*United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) .............................................................26, 27

*United States v. Blumhagen*, 2005 WL 3059395 (W.D.N.Y. Nov. 15, 2005).............................44

*United States v. Bonds*, 784 F.3d 582 (9th Cir. 2015) .............................................................25, 26

*United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992) ......................................................39

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989) .................................................................8

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) ...........................................................8, 23

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .................................................................44

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) .......................................................8, 14, 51

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022)..................................................................8

*United States v. Denkberg*, 139 F.4th 147 (2d Cir. 2025) ...........................................................17

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008)........................................................ *passim*

*United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009) .................................................................48

*United States v. Gentile*, 2025 WL 777090 (E.D.N.Y. Mar. 11, 2025).......................................12

*United States v. Hinton*, 127 F. Supp. 2d 548 (D.N.J. 2000).........................................................8

*United States v. Jackson*, 368 F.3d 59 (2d Cir. 2004) ...................................................................7

*United States v. Johnson*, 19 F.4th 248 (3d Cir. 2021)................................................23, 24, 25, 26

*United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019) ........................................................25

*United States v. Jordan*, 2023 WL 12130999 (N.D. Ill. Sept. 14, 2023)......................................14

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) .....................................................23

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ........................................................44

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) .........................................................7

*United States v. Pierce*, 224 F.3d 158 (2d Cir. 2000) ........................................................44

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ..................................................23, 24

*United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998) ......................................................22

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004) ........................................................7

*United States v. Runner*, 143 F.4th 146 (2d Cir. 2025) ....................................................8, 42

*United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006).........................................................12

*United States v. Stein*, 37 F.3d 1407 (9th Cir. 1994) .....................................................44

*United States v. Taylor*, 464 F.2d 240 (2d Cir. 1972) ..........................................................7

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015)............................................................7

*United States v. Vorley*, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021)............................14, 15, 16

*Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016) ............................................12

## STATUTES AND RULES

18 U.S.C. § 1343.......................................................................................................27, 50

18 U.S.C. § 1503.............................................................................................................25

Fed. R. Crim. P. 12 ..........................................................................................................49

Fed. R. Crim. P. 29 ...................................................................................................... *passim*

## INTRODUCTION

The government identified what the Indictment later called "very first of its kind" conduct occurring on the decentralized, trustless Ethereum blockchain and set out to make it a federal crime. It landed on wire fraud as the appropriate charge, and it boasted publicly that this alleged scheme was "novel and has never before been charged." But that very novelty would defy the government's attempt to shoehorn this case into the fraud framework. Over the course of a three-plus-week trial, the government's novel fraud theories unraveled. The government failed to prove a single material misrepresentation when its serious misunderstandings of the at-issue technology were exposed. Its cooperating witness denied an intent to defraud. It declined to engage the defense experts on the substance of their testimony in its cross examinations. The jury hung after three days of deliberations. The resulting record does not permit a retrial.

The evidentiary and legal failures in the government's case were foreseeable. The Peraire-Buenos identified many of them in their motions to dismiss the initial indictment. One obvious failure in the making concerned the material falsehood element. From the beginning, the Peraire-Buenos flagged that the government had a falsity problem with respect to the only two alleged misrepresentations it had identified—the Lure Transactions and False Signature. Both were atypical "representations," and the Indictment was mum on their supposedly misleading content.

In resisting dismissal, the government argued that the evidence would show the material falsity of the two alleged misrepresentations. As late as the motion *in limine* stage, the government declined to identify any other misrepresentations, ECF 146 at 5-6, while reiterating that its "fraud theory" was "based on the defendants' own misrepresentations—namely, the defendants' 'bait' transactions and the False Signature, which were misrepresentations that are actionable under the wire fraud statute." *Id.* at 11.

1

The falsity problems that the Peraire-Buenos had identified were borne out at trial. The evidence showed that that the Lure Transactions were valid, signed Ethereum transactions—proposed swaps of one type of cryptocurrency for another—that were incapable of conveying a materially false meaning. The government's "half-truth" theory that the Lure Transactions conveyed an implicit promise to be the victim of a sandwich attack was shown to be preposterous given the nature of sandwich attacks and adversarial trading on Ethereum. The False Signature, meanwhile, turned out to be neither false (the government's witnesses confirmed it was valid and correctly identified the Peraire-Buenos' validator) nor material (the government's witnesses confirmed the Ultrasound relay was not even checking for the supposedly false information). And the government's witnesses rejected the government's attempt to transform the technical term "commitment" into a promise that was broken here.

Starting shortly before trial, the government began articulating—only cryptically at first—a fallback "MEV-Boost validator" theory. This theory posited that Ethereum validators, who can always sign more than one block per slot, give up that right when they become (or "pretend" to be) a "MEV-Boost validator." This theory purported to relieve the government from having to pinpoint a single discrete deceptive act (of which there were none) in favor of painting the entire asserted "scheme" as a fraud. But this theory had no basis in the record. The government's witnesses could not agree on what a "MEV-Boost validator" even is, acknowledged that neither the Peraire-Buenos nor the alleged victims even used MEV-Boost,[1] and did not identify any "MEV-Boost" rules that bind "MEV-Boost validators." The government also did not prove any

---

[1] This may have surprised the government, which before trial had incorrectly represented to the Court that the alleged victims and the Peraire-Buenos "were using MEV-Boost," 6/17/25 Hr'g Tr.31, and used with Miller a demonstrative that incorrectly suggested the same. GX5002.

"pretending" act by the Peraire-Buenos' validator that was observed by the alleged victims in real time and thus capable of deception.

The failure of proof on the material misrepresentation element in Count Two is just one of many that require acquittal on all the counts. The Court should evaluate the record and, drawing all reasonable inferences in the government's favor, find that the evidence was insufficient to prove the charged crimes beyond a reasonable doubt.

Alternatively, the Court should dismiss the Indictment for lack of constitutionally required notice that the conduct could be considered criminal. Before trial, the government defended the Indictment as a traditional misrepresentation prosecution involving two discrete lies with comparators in the spoofing cases. But the trial records show that the comparison to the spoofing cases fails in myriad ways. The undisputed facts in the record about Ethereum, its adversarial trading environment, and the nature of the transactions at issue further demonstrate why this unprecedented prosecution was entirely unexpected.

## BACKGROUND

Although this was a complex and technical case, the core facts are not in dispute. The Peraire-Buenos address the record in detail when explaining why the evidence was insufficient on every count. Several undisputed facts bear emphasis.

*Ethereum & validators*. Ethereum is a decentralized, trustless blockchain with no terms of use. Tr.348, 3027. Under the Ethereum protocol, only a validator can propose a block, and it has complete discretion to order transactions in a block. Tr.513, 3024-25. A validator can propose any block it wants, no block, or even an invalid block. Tr.3094-95. A validator does not agree to behave a certain way as a condition of becoming a validator. Tr.3027. The Ethereum protocol uses economic incentives and disincentives to guide validator behavior. Tr.354-55. Those include

that a validator will be penalized—or slashed—when it signs more than one block per slot, an action called equivocation.  Tr.359-60.

*Trading Environment*.  Trading on Ethereum occurs in a highly adversarial environment. Tr.388.  Pre-programmed "MEV-Bots" compete to extract value through various trading strategies, including arbitrage and sandwich attacks.  Tr.391-92.  The assumption is that all users will rationally maximize their own profits, and it applies especially to validators, who are not trusted entities.  Tr.969, 1609.

*MEV-Boost & relays*.  "MEV-Boost" is third-party software published by Flashbots that validators can download and use.  Tr.163.  It is not part of the Ethereum protocol but runs alongside it.  Tr.371.  This software differs from the MEV-Boost relay code, which is open-source, modifiable code published by Flashbots that other users can download to run a "relay."  Tr.341. The relay in this case was run by Ultrasound, which had modified the Flashbots code.  Tr.268.  For example, the Ultrasound relay was modified to perform "optimistically," meaning it did not always check whether the block it was preparing for a validator was valid—*i.e.*, that it could be published to the chain—before processing the validator's unblinding request.  Tr.430-31, 977-78.  Optimistic relays have proposed invalid blocks in instances other than this one.  Tr.430.  Before April 2, 2023, when "unblinding" a block to the validator, the Ultrasound relay was programmed to check only whether the validator's signature was valid—*i.e.*, that it correctly identified the validator as the one for the slot—but not certain other fields on the signed block, including the "parent" and "state" root fields.  Tr.180, 976.

Like Ethereum itself, "MEV-Boost" has no terms of use.  A validator who runs the MEV-Boost software does not agree to any terms.  Tr.962.  The MEV-Boost software license permits its users to modify the software without restriction.  DX1024 at 2.  A validator (whether running the

MEV-Boost software or not) is also not required to agree to any terms when interacting with relays running the MEV-Boost relay code or some variation of it.  Tr.963.

_Sandwich attacks_.  This MEV strategy involves placing frontrun and backrun trades around "victim" trades pending in the Ethereum mempool that other users have submitted.  Tr.383-85.  In the frontrun transaction, a "MEV-Bot" trades with the liquidity pool to intentionally vary the prices of the assets in the pool.  Tr.384-85, 500.  The middle trade in the "sandwich" executes at a disadvantageous price, further altering the balance in the pool.  Tr. 922-23.  The MEV-Bot's backrun seeks to sell back the currency the bot purchased through the frontrun but at a higher price.  Tr. 592.  There was no evidence at trial that the MEV-Bot retains any right to the currency that it had sold to the pool through the frontrun trade or that it has any right to buy back that same currency at a favorable price.

_Bundles_.  Sandwich bots pursue their attacks using "bundles."  Tr.383-84.  The concept of a bundle is foreign to the Ethereum protocol.  Tr.395, 3077-78.  Searchers (a category that includes sandwichers) have no guarantee that their bundle will land on chain.  Tr.396-97.  A searcher can convey its preference for transaction ordering to a builder, who is not bound to honor it.  _Id._ Searchers and builders do not contract.  Tr.1782.  The searcher's transaction preferences are never conveyed to the relay or the validator.  Tr.483.  Searchers and validators do not interact.  Tr.203-04, 206-07, 1575.  Searchers do not use the MEV-Boost software (only some validators do), Tr.379, and they do not interact with relays, Tr.395-97.  In the case of a sandwich attack, the searcher never takes possession of its "victim" trade, which remains in the mempool even after it is selected for a potential bundle and stays there unless and until a validator later includes it in a block that is successfully added to the chain.  Tr.1573, 1776-77.

*Omakase*.  Omakase, the Peraire-Buenos' trading strategy, was executed through computer code that did not include the MEV-Boost software.  Tr.343.  The Omakase validator's signature correctly identified it in all circumstances, which allowed it to be slashed for equivocating.  Tr.435. The Ultrasound relay did not check the parent or state root fields in the block per its code, Tr.977-78; attesting validators rejected the block as invalid when they later voted on it, Tr.670.

The so-called Lure Transactions were valid, signed Ethereum transactions that proposed trades of various cryptocurrencies.  Tr.938, 941.  They were successfully added to the chain seconds after Omakase's conclusion.  Tr.941.  The alleged victim MEV-Bots simulated the Lure Transactions according to pre-coded parameters and assumptions that the Peraire-Buenos had no role in setting and did not (and could not) change.  Tr.948-50, 1803-04.

The alleged victims' frontruns traded with Uniswap liquidity pools (not with the Peraire-Buenos) as coded.  Tr.1598.  The alleged victims' backrun trades reverted per their own code. Tr.1152.  Omakase did not involve modifying these or any other transactions.  GX5012-AA; Tr.987.  Through Omakase, the Peraire-Buenos' validator signed and proposed a block that included the alleged victims' frontrun and backrun trades but replaced the so-called Lure Transactions (which the Peraire-Buenos had placed) with other transactions also placed by the Peraire-Buenos.  Tr.986-87.

## ARGUMENT

## I.    LEGAL STANDARD.

Under Rule 29(a), "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Having reserved decision on the Peraire-Buenos' Rule 29(a) motion at the close of the government's case, Tr.1430, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  Separately, because the Peraire-Buenos

renewed their motion after a mistrial was declared, Tr.3660, the Court must independently decide the motion based on the full trial record if it finds that the evidence in the government's case sufficed.  Fed. R. Crim. P. 29(c).

The inquiry under Rule 29 is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (citation omitted).  "The evidence … must be of such persuasive quality that a jury could reasonably find the essential elements [of the charged offenses] *beyond a reasonable doubt* on the basis of that evidence."  *United States v. Jackson*, 368 F.3d 59, 63 (2d Cir. 2004).  "If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal[.]"  *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

The court views the evidence "in the light most favorable to the prosecution" and draws reasonable inferences in the government's favor.  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (citation omitted).  But "specious inferences are not indulged."  *Id.*  Regarding each element of the charged offenses, "it is not enough that the inferences in the government's favor are permissible," rather they must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt."  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

## II.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNTS 1 AND 2.

The evidence was insufficient to prove wire fraud or conspiracy to commit wire fraud (Counts 1 and 2).[2]  For the following reasons and those articulated on the record during argument

---

[2] The Peraire-Buenos make their Rule 29 arguments based on the all admitted evidence without waiver of their objections and arguments that certain evidence, including undisclosed expert testimony and internet search histories, was erroneously admitted.  The Peraire-Buenos further

on the mid-trial Rule 29(a) motion which the Peraire-Buenos incorporate herein, the government failed to establish at least the following elements beyond a reasonable doubt: (1) a scheme to defraud (in particular, any material falsehood); (2) money or property in which the alleged victims had qualifying property interests; and (3) an intent to defraud. These failures doom both the substantive and conspiracy counts because the government did not establish that the underlying conduct was a crime. *See, e.g.*, *United States v. Connolly*, 24 F.4th 821, 843 (2d Cir. 2022).

### A.    The Government Failed to Prove Any Material Misrepresentation.

A scheme to defraud requires proof of a material misrepresentation. *See Neder v. United States*, 527 U.S. 1, 22 (1999); *United States v. Runner*, 143 F.4th 146, 154 (2d Cir. 2025); *see also* ECF 154 at 27 n.27 (collecting additional cases). In the Second Circuit, fraudulent representations can be false statements or misleading "half-truths." *Connolly*, 24 F.4th at 833-34.[3] Other courts have held that conduct can qualify as a fraudulent representation where it conveys a materially false meaning. *See, e.g.*, *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022).[4] Falsity and materiality are separate elements. *See Neder*, 527 U.S. at 25; *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019).

---

maintain that the government failed to prove venue but do not raise the issue here only because the remedy for that failure (vacatur of convictions) is unnecessary given the mistrial.

[3] The government disclaimed any omission theory. *See, e.g.*, ECF 154 at 35 n.36.

[4] In its opposition to the defense motions *in limine*, the government began referring to its allegations as a "unified" scheme. ECF 146 at 8. The term arises most often in cases concerning a specific unanimity instruction, *see, e.g.*, *United States v. Bryan*, 868 F.2d 1032, 1039 (9th Cir. 1989), or arguments that fraud counts are duplicitous, *see, e.g.*, *United States v. Hinton*, 127 F. Supp. 2d 548, 555-56 (D.N.J. 2000). It is irrelevant to the sufficiency analysis. The government has never disputed that it needed to prove at least one material misrepresentation (to include half-truths, implied misrepresentations, or deceptive conduct) to satisfy the scheme-to-defraud element.

The Peraire-Buenos address the only two alleged misrepresentations in the Indictment—the "Lure Transactions" and "False Signature"—before turning to the "MEV-Boost validator" theory.

### 1. The Lure Transactions did not convey any materially false or fraudulent meaning or generate any material misimpression

The Lure Transactions were not material misrepresentations because they did not convey any materially false meaning. The government barely attempted to show anything supposedly misleading about the content of the transactions themselves. Its focus on the features that made the transactions attractive targets for the sandwich bots misses the mark because those intrinsic features were not false or misleading. Its "half-truth" theory posited that the transactions were misleading because their placement in the mempool effectively guaranteed their later victimization by the sandwich bots. But this theory is irrational given the undisputed facts about how trading on Ethereum works.

### a. Falsity

The government did not prove the Lure Transactions conveyed any explicit falsehood. The Lure Transactions were just code that executed trades. Tr.723, 941-42, 950 (Chen); *accord* Tr.2599-2600, 2604-06 (Madura). When submitted to the mempool, they appeared as their "raw bytecode data." Tr.948 (Chen). That data "is the same for every mempool viewer, including searchers." *Id.* It is "constant" and cannot change. Tr.949 (Chen). The transactions were valid, signed, and were successfully added to the chain seconds after Omakase's conclusion. Tr.938, 941 (Chen).

The only thing the government said about *the content* of the Lure Transactions was that they included in their code the addresses of certain sandwich bots. *See* Tr.3298 (arguing the

addresses were "hard-coded"); *see also id.* ("Each bait transaction was tailored to its target."). But this "hard-coding" made no false representation.

The government also focused on the fact that the Omakase code used XOR logic to purportedly conceal the "hard-coding." *See* Tr.3319. This argument concedes the "hard-coding" of the addresses was not a material misrepresentation because it frames the addresses as a "truth" to be concealed. In the government's framing, the XOR logic presumably would function like an act of concealment. But this theory was unavailable to the government because its own cooperating witness rejected it. On direct, Chen explained that the XOR logic did "not conceal the address that was being queried because that is just a blockchain instruction." Tr.725. On cross, he confirmed that "XOR logic is a formula that was encoded into the trigger transaction's smart contract," that the formula is "public because the smart contract bytecode is public," and that "any simulation of the trigger transaction would follow the logic on the trigger transaction's smart contract," and this would "reverse[] the XOR logic." Tr.1080-81. The sandwich bots simulated transactions. Tr.1804. Consequently, the XOR logic was literally incapable of concealing the "hard-coding" of the addresses.

Rather than identify any explicit falsehood, the government argued that the Lure Transactions appeared as lucrative victims for Savannah's bots. Tr.3298-99. That argument sidesteps the question of falsity. And it ignores evidence that shows that nothing about the Lure Transactions influenced the assumptions the bots made about their sandwich attack strategies.

In practice, the transactions are only encountered and interpreted by automated bots running complex simulations. These simulations assess how a transaction might fit into a MEV strategy like a sandwich attack or arbitrage. Tr.949 (Chen). There is "no limit on how many times [a] bot can simulate a particular transaction." Tr.950 (Chen); *accord* Tr.1803 (Yakira). Running

simulations allows bots to "see almost any effect it could have in conjunction with other transactions." Tr.954 (Chen).

Savannah's bots simulated the Lure Transactions as they would any other, "automatically according to some rules and parameters." Tr.1568 (Yakira). These pre-programmed parameters are what "determine[] whether and how [the] bots make a trade." Tr.1569 (Yakira); *see also* Tr.904 (Chen) (explaining that MEV-Bots are "coded to respond to data" and that "[d]ata will either satisfy what the bot is looking for or it doesn't"). The sandwich bots apparently *assumed* in their simulations that an attack on any transaction (including the Lure Transactions) would always be successful. *See* Tr.721 (Chen); Tr.1803-04 (Yakira); GX4010. That assumption is flawed: Flashbots documentation disclosed that a validator could always propose its own block after seeing the transactions in the relay's potential block. *See* DX309; DX321-A at 6.[5] In any event, the *Lure Transactions* did not contribute to the MEV Bots' faulty assumptions.[6] That is beyond dispute because the code for those simulations was pre-programmed *before* the bots encountered them. Tr.948-50 (Chen); Tr.1775, 1803-04 (Yakira).[7]

---

[5] Yakira described bundles as "atomic," but this idiosyncratic belief rested on the role of *the builder* to maintain transaction ordering: "builders maintain bundle atomicity, from the word atomic, so that they maintain bundle atomicity as they build their blocks." Tr.1648; *see* GX3221 (builder documentation describing the format of communications *from the searcher to the builder*); *see also* Tr.1649-55 (Yakira discussing GX3221). As Dr. Falk explained, the only way to ensure atomicity on Ethereum is to place trades within a single transaction. Tr.3076-78, 3083, 3085; *accord* Tr.894 (Chen).

[6] The government also argued that the transactions would not have appeared like a profitable sandwich attack opportunity when simulated *by other traders*. Tr.3298. The relevance of this claim is unclear. Falsity focuses on the information the Lure Transactions supposedly misrepresented to *the allegedly deceived parties*, and materiality turns on the capacity to affect their decisions. *See infra* pp.22-23. Whether a trade would appear profitable is the result of the bot's choice of simulation conditions because every bot uses the same immutable raw bytecode data to run its simulations. Tr.948-950 (Chen).

[7] There also was nothing extraordinary about the size of the frontrun trades that Savannah's bots proposed to attack the Lure Transactions, at least for its bots. Savannah's bots, following their

The government sometimes framed this falsity theory as a "half-truth."  Tr.3300-01.  This argument begs the question of what partial truth the transactions conveyed.  A communication is a fraudulent half-truth where it is true "only so far as it goes, while omitting critical qualifying information."  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016).  Not all omitted information that the audience might consider material is subject to disclosure on a half-truth theory.  *See, e.g.*, *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) ("broker's failure to reveal that he is receiving added compensation for promoting a particular investment" was not a misleading half-truth solely based on his comments on investment).  Rather, the withheld information must provide information necessary to make that representation not misleading.  *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (defendant "vouched for the validity of [certain] forecasts without mentioning the variances in the actual numbers").  And the jury's evaluation of whether a statement is fraudulent "necessarily requires the jury to ascertain the meaning of each statement and find it to be false [or misleading]."  *United States v. Gentile*, 2025 WL 777090, at *17 (E.D.N.Y. Mar. 11, 2025).

It was incumbent on the government, then, to prove the allegedly fraudulent content of the Lure Transactions on a half-truth theory.  It failed to do so.  The implication from its jury arguments that the Lure Transactions were a "trick" because the Peraire-Buenos "had no intention of ever keeping the bait trades in the victim's proposed bundles," Tr.3300, is that the Lure Transactions conveyed an implicit promise that they were "sandwichable" and/or that the Peraire-Buenos would

---

pre-programmed logic, had placed frontrun trades valued at over a million dollars on several occasions, including a trade of $12 million for currency worth just $40,000.  Tr.1859-63 (Yakira); DX1181.

not take any steps to thwart a sandwich attack targeting them. That purported implicit message is preposterous based on the undisputed facts regarding Ethereum and MEV-Boost.[8]

This is true for several reasons. First, a mempool transaction cannot possibly make implicit claims about its future placement by a validator on a yet-to-be-constructed block. Transactions are not added to the blockchain upon submission to the mempool, which is a "waiting room"; only a validator in its allotted slot can add blocks of transactions to the blockchain. Tr.158-62, 349-50 (Miller); Tr.597-98 (Chen). When a trader places a transaction on Ethereum, the trader cannot know if, when, or how the trade will land on chain and, thus, cannot possibly promise anything about its suitability for a sandwich attack beyond what is in the bytecode. And a searcher viewing that transaction cannot expect to have any window into whether the trade was placed by a validator or the intent of the transactions. Tr.945-947 (Chen). Yakira himself rejected the idea that it made sense to attempt to divine intent from an Ethereum transaction. Tr.1816-17 (Yakira). Second, no rational Ethereum user would agree to be a victim of a sandwich attack, which the evidence established leaves its victims worse off. Tr.385 (Miller); Tr.592, 922-23 (Chen). There was a history of public counterstrategies to sandwich attacks. Tr.928 (Chen). These undisputed facts make the government's implicit-promise-to-be-sandwiched falsity theory insufficient to sustain any criminal conviction.

Moreover, it would be strange for transactions pending in the Ethereum mempool to be interpreted as making implicit promises about sandwich attack bundles because bundles are not even a concept in the Ethereum protocol. Tr.3077-78 (Falk). No users, including validators, make

---

[8] The government repeatedly talked around this absurd position in closing rather than state it plainly. For example, the government argued that the Peraire-Buenos "create[ed] a false impression about key facts, like … that this was a legitimate trade." Tr.3314. But the Lure Transactions *were* valid transactions. Tr.941 (Chen). By "legitimate," the government apparently meant willing and able to be victimized by a sandwich bot.

promises about bundles.  While a searcher can express a preference for transaction ordering when communicating with the builder, the searcher has no guarantee to a bundle.  *See* Tr.396-97 (Miller) (builders can always decline to honor searchers' preferences); Tr.3081 (Falk); *accord* Tr.1782 (Yakira).  A searcher's ordering preference is never conveyed to the relay or the validator.  Tr.482-83 (Miller).  Validators do not contract with searchers (or any other users), and do not communicate with searchers.  Tr.203-04, 206-07 (Miller); Tr.1782 (Yakira); Tr.3079, 3082 (Falk).[9]

A comparison to the spoofing cases underscores the government's failure to prove the falsity of the Lure Transactions.  In spoofing cases, placing trades on a regulated commodities market with the intent to cancel them has been interpreted as conveying "false and misleading information regarding supply or demand."  *Chanu*, 40 F.4th at 533; *see also id.* at 541 (framing this as a "half-truth").  But, in these cases, the government introduced substantial evidence that the trades in fact conveyed a specific implied meaning and that it was objectively reasonable for other traders to rely on that meaning.  The evidence included testimony by experts regarding market expectations and the economic theories underpinning them; by representatives of the exchanges about binding rules that prohibited spoofing; by employers of the defendant-traders who explained their own rules against spoofing; and by co-conspirators and victims articulating the precise meaning the government claimed the trades conveyed.  *See, e.g.*, *id.* at 532-34; *United States v. Jordan*, 2023 WL 12130999, at *2-5 (N.D. Ill. Sept. 14, 2023), *aff'd sub nom. United States v. Smith*, 150 F.4th 832 (7th Cir. 2025); *United States v. Bases*, 2022 WL 3586142, at *4 (N.D. Ill. Aug. 22, 2022), *aff'd sub nom. United States v. Pacilio*, 85 F.4th 450 (7th Cir. 2023); *United States*

---

[9] Perhaps because it is nonsensical to locate this supposed promise in the Lure Transactions, the government argued that the False Signature in effect conveyed a promise to honor the searcher's ordering preferences.  The government also failed to prove this False Signature theory for the reasons discussed below, *infra* pp.18-27, but the mere existence of this argument is a concession that the Lure Transactions themselves did not implicitly convey that same supposed promise.

*v. Vorley*, 2021 WL 1057903, at *5 (N.D. Ill. Mar. 18, 2021), *aff'd sub nom. United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022).

Each of the district courts, in denying the defendants' acquittal motions, placed primary emphasis on the binding anti-spoofing rules as providing an objective basis for the implicit representations. *See, e.g.*, *Bases*, 2022 WL 3586142, at *3. Also important to the courts was expert testimony establishing the objective meaning that the trades conveyed. *See, e.g.*, *Vorley*, 2021 WL 1057903, at *7.

The record here defies comparison to the spoofing cases. In a spoofing case, the meaning that the spoofing trade supposedly conveys concerns the trader's own intent with respect to that same trade. Here, as noted above, the supposed implicit meaning an Ethereum transaction conveys (*i.e.*, to be sandwichable) under the government's theory is a promise about future events over which a trader has no control. In a spoofing case, the implicit meaning a spoofing trade conveys (*i.e.*, that the price reflects genuine demand) is supplied by simple maxims of supply and demand that are well understood by market participants. Here, the government did not establish the objective meaning of an Ethereum transaction. And the supposed meaning the transaction conveys under the government's theory does not derive from economics but instead rests on a convoluted theory about the inviolability of sandwich attack bundles.

Importantly, in a spoofing case, binding rules (both at the exchange and employer level) prohibiting spoofing provided the basis on which other traders could place reasonable reliance on the implicit meaning a trade conveys. Here, there are no similar rules that could play that role. The evidence did not establish any rules that guarantee sandwich attacks in a manner akin to the rules on the commodities exchanges that guarantee accurate information about supply and demand. The Ethereum protocol is agnostic to the order of transactions; only the validator decides. Tr. 172-

73, 513 (Miller), 3024-27 (Falk). The concept of a bundle is foreign to the Ethereum protocol. Tr.3078 (Falk). The Ethereum protocol's slashing penalty discouraged but did not prohibit equivocation. *See infra* pp.19-21. Moreover, nobody testified that MEV-Boost operated like rules. MEV-Boost is third-party software that the Peraire-Buenos did not use and, even if they had, does not have terms of use or any independent mechanism outside the Ethereum slashing penalty to facilitate sandwich attack bundles. Tr.963 (Chen); Tr.3027 (Falk).

This is not the first cryptocurrency case where the government's analogy to the spoofing cases failed on the falsity element. In *United States v. Eisenberg*, the government argued that placing a "borrow" transaction on Mango Markets based on collateral whose value had been inflated due to the defendant's manipulation "created the false impression that his collateral was valuable" or carried the implicit certification that the collateral "had not been manipulated." 784 F. Supp. 3d 579, 616-17 (S.D.N.Y. 2025). This theory failed because there was "there was no evidence at trial that Mango Markets had any rules, instructions, or guidance addressing manipulation or requiring users to maintain sufficient collateral in their accounts." *Id.* at 617. The court contrasted that lack of proof with the "substantial evidence" canvassed in the *Vorley* opinion about the commodities market rules. *Id.* at 616. It rejected the government's reliance on testimony from "Mango Markets users that not maintaining collateral and manipulating asset values would have 'mattered' to them." *Id.* at 617. As the court explained when granting acquittal, notwithstanding those users' subjective "expectations and beliefs," the lack of rules prohibiting the conduct was dispositive. *See id.* (citing *Connolly*, 24 F.4th 821).

The same result should follow here. A sandwich attacker, like the traders on Mango Markets, may have certain expectations, but unless those expectations are grounded in actual rules, the implicit representation theory fails for the same reasons as in *Eisenberg*.

16

### b.    *Materiality*

The government's failure to prove the falsity of the Lure Transactions led to its related failure to prove the separate materiality element.

The government's failed attempts to elicit testimony regarding the materiality for the Lure Transactions underscore the problems with this theory.  To be material, a fraudulent statement must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it [is] addressed."  *United States v. Denkberg*, 139 F.4th 147, 158 n.36 (2d Cir. 2025) (cleaned up) (quoting *Neder*, 527 U.S. at 16).  The government's questions at trial did not inform that inquiry because they did not isolate the effect of any supposed falsity as opposed to the effect of the Lure Transactions themselves.  Nor were they even posed to the correct decisionmaker.

For example, the government asked Yakira if he would have traded "$2.3 million of USDC for $8.25 of SHIB" if he "thought there was a chance [he] wouldn't be able to sell back the [SHIB] as part of the same bundle."  Tr.1593.  But, as noted above, the Lure Transactions did not contain any misrepresentation of the Peraire-Buenos' intent regarding the sandwich attack bundles.  And, in any event, Savannah's bots (not Yakira) placed that trade based on their pre-programmed code, which Yakira did not write and which mistakenly assumed the "atomicity" of sandwich attack bundles, just as they had in other attacks.  *See supra* p.11.  That the bots were programmed with these assumptions *in every case* disproves the materiality of *the Lure Transactions* and any supposed misleading message they allegedly conveyed about the "atomicity" of the bundles.

The government also got the timing wrong.  Its "materiality" questions really asked whether, in retrospect, Yakira wished Savannah had programmed its bots differently *before they encountered the Lure Transactions*, *see, e.g.*, Tr.1609, when it should have asked whether any false message in the transactions themselves affected the bots' behavior.  The line of questioning

the government pursued does not illuminate whether the *Lure Transactions* made any materially false impression that could have altered the bots' pre-determined decisions.

The government's arguments in closing betrayed these errors. The government claimed the reason "why" Yakira "was willing to process these multimillion dollar trades" was "because the market had provided predictability of expectations that Mr. Yakira thought that the validators would not see these private transaction data." Tr.3313. That concedes the Lure Transactions were immaterial even to Yakira (as if that mattered) because Yakira's expectations were based on an incorrect understanding of *MEV-Boost's* functionality. No evidence established that the Peraire-Buenos set Yakira's inaccurate expectations. Yakira's testimony about other instances of unbundling illustrates a similar error. Because unbundling was a known risk, he tried to distinguish these prior instances on the basis that, only here, did MEV-Boost "not operate as it is supposed to operate." Tr.1657-58. But that pivot presupposes a different alleged falsehood than the government pursued—*i.e.*, not an implicit promise to not unbundle, but an implicit promise not to do so through making MEV-Boost "not operate" a certain way. This theory too fails because the Peraire-Buenos made no representations about the functionality of MEV-Boost and did not contribute to Yakira's mistaken belief regarding the atomicity of his bundles.[10]

### 2. The False Signature conveyed no implicit promise and made no fraudulent claim regarding the validity of the block

Regarding the False Signature, the government ultimately landed on two theories, neither of which withstands scrutiny. First, that a validator's signature on a blinded beacon block conveys an implied promise not to sign and propose a different block. Tr.3308. Second, that a validator is

---

[10] To the extent Yakira was misled by his interpretation of Flashbots documentation, that is irrelevant here because only a misrepresentation by the Peraire-Buenos can satisfy this element. *See* ECF 130.

under some obligation to publish a valid block and that populating certain fields—the parent and state roots—in a manner that caused the block to be invalid was deceptive.  Tr.3309.  Both fail.

### a. Falsity—promise theory

There was nothing false about the Omakase validator's signature because it did not convey any promise.  The government's witnesses agreed an Ethereum validator signature's role is to identify the validator.  Any signature that correctly identifies the signer is "valid."  *See* Tr.180 (Miller) ("The relay validated the signature that the validator provided – so it's validated as correct – so it checked that the correct validator had … signed the block header, and that's what validate signature here means."); *see also* Tr.976 (Chen).  All Ethereum transactions and commands are digitally signed in the same manner.  *See* Tr.3068 (Falk).  There is no evidence that signatures used in connection with MEV-Boost relays have unique features that changed this limited function.  It is undisputed there are no terms of use that govern MEV-Boost or interactions with relays, including any terms regarding signatures imbuing them with special meaning.  *See* Tr.3049 (Falk). And it is undisputed that the Omakase validator's signature correctly identified it, which is what made slashing possible.  Tr.435 (Miller).

Notwithstanding these undisputed facts, the government claims a signature in this context conveys an implicit promise that constrains the validator's otherwise limitless discretion to sign more than one block per slot.  Tr.3309.  But the record refutes that argument.  Even Flashbots' documentation acknowledged that this was not how the signature could reasonably be viewed. *See, e.g.*, DX321-A at 6; *see also* Tr.461 (Miller) ("Q. So [DX321-A], it revealed that the validator could decide to propose a different block, even after receiving and signing the block from the relay, correct?  A. I agree that's implicit in this document, yep.").  As Dr. Falk explained, cryptographic signatures do not constrain a validator's future actions; rather, a signature only freezes a message a validator signs.  *See* Tr.3066-67 ("[I]n cryptography, you can never commit to … do something

19

in the future."); *id.* ("And you can always sign something else.  That's sort of the nature of digital signatures.").

Contrary to the government's arguments in closing, the *testimony* in the government's case is consistent with Dr. Falk's views and Flashbots' documentation.  The government's witnesses agreed that a signature does not actually bind the validator to not sign another block but rather makes slashing possible if the validator does so.  Chen repeatedly confirmed this understanding. When first asked, "What does the signature do," Chen responded, "it means one of two things; either that block that they signed is going to be the next block on the blockchain, or if it's not, then it can be used as grounds for slashing."  Tr.608.  When asked, "why did the relay require a signature before unblinding the block transactions," Chen explained, "it was designed to incentivize one of two things – either the block that we signed gets accepted as the next block or, if not, then it can incur a slashing fee."  Tr.667-68; *see also* Tr.610.  He elaborated that the signature only "increased the probability that the block would be the one that gets propagated" but did not guarantee that future event.  Tr.711.

Miller likewise testified that the signature is a form of "commitment," but not in the way the government urged at closing.  He explained that the term has a special meaning "within the cryptocurrency industry": "the reason why we use that [term] is because, by providing a signature for this block, there is now a financial penalty for the validator in the Ethereum network if they provide another signature, if they propose another block, within that slot."  Tr.179.  Miller explained that, when he says a validator is "bound to the block," he means the same thing: "What it means is that the proposer, by providing their signature, is making a commitment to that block that is enforceable with financial penalties if they sign another block in that slot.  That's why we say the proposer is bound to the block, because there's kind of an enforceable guarantee backed

by financial incentives."  Tr.214; *see also* Tr.551 ("[W]e call that a commitment because it is backed by economic incentives.").  On cross, Miller agreed that the signature and the slashing penalty it enables work to "discourage[]" signing a second block (*i.e.*, "equivocating") but does not eliminate that possibility.  *See* Tr.466 ("I think it's always the case that they're 'discouraged,' being the operative word here, but the proposer may not be discouraged enough.").  The government never asked Miller whether this technical "commitment" was a promise not to sign another block, and his careful testimony did not suggest as much.  He agreed that the Flashbots documentation conveyed to MEV-Boost users a message at odds with the government's promise theory but consistent with his and Chen's testimony.  *See* DX321-A; DX 304; DX309; Tr.459-66.

In sum, Miller, Chen, and Falk testified similarly that a validator's signature on the relay's block "ensure[s] that if they were to publish another block, they would get slashed."  Tr.3067 (Falk).[11]  When assessed against this testimony, the False Signature was not false.  The Omakase validator signed two blocks with a valid signature that correctly identified it.  Even if the "commitment" functioned like a "promise" that could support a fraud charge, it would be at most a promise to do one of two things: to not sign another block after submitting a signed block to the relay, or to accept a slashing if signing another block.  *E.g.*, Tr.608 (Chen).  If so, any such implicit promise was not false.  If someone promises to do one of two things—A or B—and then does one of the two (B), that is not a broken promise.  *See Eisenberg*, 784 F. Supp. 3d at 615 ("borrow" function entailed that user would "keep the collateral value positive" or "get liquidated"; it was not a promise to do the former).

---

[11] Hoffmeister likened slashing to "rules" but was not asked to opine on the function of the signature and thus did not testify inconsistently with these witnesses.

### b.      *Falsity—incorrect data theory*

The government's other falsity theory, which focuses on the supposedly "incorrect" data in the parent and state root fields, suffers from two related problems.  First, the government did not prove that a validator is obliged to populate these fields in a way that ensures the block can be added to the blockchain.  Dr. Falk confirmed that no such obligation exists.  *See* Tr.3094 ("Q. Does the Ethereum protocol say anything about what a validator must put in the parent and state root fields on the signed blinded beacon block?  A. No, not at all.").  Second, no government witness testified the signature conveyed a certification that the fields would be "correctly" populated.  Chen rejected the idea.  *See* Tr.976.  Their purported incorrectness was visible to anybody who saw them (including the Ultrasound relay), *see* Tr.977-78 (Chen); GX5006-P (showing slashing penalty), and the data made no validity claim about the block that was fraudulent.  Rather, the zeros showed the truth that the block was invalid.  By signing a clearly invalid block—something a validator has the indisputable right to do—the validator makes no false or misleading statement.

### c.      *Materiality*

The government failed to prove materiality for either False Signature theory.  It is unclear what it even means to deceive a bot like the relay; its automated nature defies the materiality test.  *See* Tr.2661-62.  But assuming the relay can be deceived, there are two independent bases on which the evidence of materiality was insufficient.

First, it is undisputed that the Ultrasound relay was not checking the parent and state root fields.  Tr.688 (Chen); Tr.151 (Miller).  As a result, the relay would have returned the unblinded block to the validator whatever those fields contained.  Tr.982 (Chen).

Under Second Circuit law, this undisputed fact defeats materiality, which requires "evidence … that the misrepresentation could have, or did influence [the recipient's] decision." *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998).  "In the context of an objective

decisionmaking process," like the relay's, "whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ, and the degree to which a misrepresentation would be capable of influencing the decision of the decisionmaking body." *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (cleaned up).  Where the decisionmaker's discretion is "limited," the materiality inquiry considers only the factors that the decisionmaker is permitted to consider and their ability to impact its available decisions.  *See id.*  The more "circumscri[bed]" that discretion, the higher "the difficulty the government face[s] in adducing evidence sufficient to identify a decision capable of being influenced."  *United States v. Litvak*, 808 F.3d 160, 174 (2d Cir. 2015).

In *Rigas*, contracts determined a borrower's interest rate based on their reported "leverage ratios."  Because the interest-rate decision was set by a contractual formula, a misrepresentation of a leverage ratio could be "material only if" it would have "resulted in the co-borrowers being in a different interest category than they would have been had the accurate leverage ratio been reported."  490 F.3d at 235; *see Calderon*, 944 F.3d at 85-88 (applying *Rigas* in a wire fraud case).

Other circuits agree with this principle, which is core to the meaning of materiality across multiple statutes.  In *United States v. Johnson*, 19 F.4th 248 (3d Cir. 2021), relying in part on *Rigas* and *Litvak*, the court vacated a false statement conviction based on a similar failure of proof as here.  The defendant in *Johnson* had "developed an unusual fascination" with the Bill Cosby criminal case.  *Id.* at 252.  The government charged him under § 1001 for filing an unsolicited pleading in the Cosby case using a fake name.  *Id.*  On appeal, the government argued that the fake name was material to the court's decision to docket the pleading, and that materiality was shown by the judge's order striking the pleading when the court discovered the filer's identity.  *See id.* at 260-61.  But the evidence showed "that almost anything with a proper case number would be

scanned and uploaded to the civil docket, regardless of the identity of the signatory." *Id.* at 262. The court thus held that, "[f]ar from proving that masquerading as [another] enabled the false [pleading] to be filed, the record reveals that Johnson's identity was immaterial, and that Johnson could have filed the same documents under his, or any other, name." *Id.*

Here, the relay's "decision" was predetermined by its code and in no way hinged on the content of the parent and state root fields. Just as contracts limited what factors the bank in *Rigas* could consider in setting rates and how to weigh those factors, the relay's code limited what it could consider (and how) when unblinding the block to only the validity of the signature.[12] And just like the court in *Johnson*'s practice of docketing any pleading it received, the relay's practice was to behave the same regardless of the alleged falsity. If the signature was valid (and there is no dispute that it was here), the relay would "unblind" the block. The content of the other fields was *per se* immaterial.

Second, the alleged falsehood was immaterial even if the fields had been considered as part of the unblinding decision because the alleged falsehood was incapable of deceiving the relay. In the government's view, the parent and state root fields had "correct" answers, and the zeros were obviously wrong. *See* Tr.3310 ("You know that it is not 0X000000. That's just not it."). This argument, although flawed in several respects, correctly identified that the data was not something that could possibly deceive. The relay operates through its code and would have identified mathematically that the parent and state root fields were incorrect if it had been programmed to check those fields. *See* Tr.978 (Chen). Indeed, the only bots that did check those fields—the attesting validators—automatically identified that the block was invalid and could not be added to

---

[12] As Dr. Falk explained, this makes sense given the relay's role in the block-assembly process as the mechanism by which Ethereum's slashing penalty can be applied in connection with blocks processed through the relay. *See* Tr.3056-57.

the chain.  *See* Tr.656, 670 (Chen).  As Dr. Falk explained, the "incorrect data" was so obviously incorrect that it was functionally the "equivalent [of] just not producing a block at all."  Tr.3094.

To be clear, the Peraire-Buenos do not contend the relay was negligent or foolish, which is not a defense to fraud.  Rather, based on the evidence, the relay could not have been deceived by their alleged misrepresentation.   The objective materiality standard requires that the misrepresentation be "capable 'of influencing the intended victim,'" *United States v. Johnson*, 945 F.3d 606, 614 (2d Cir. 2019) (quoting *Neder*, 527 U.S at 24), which was not proven here.

Courts have granted or affirmed acquittal where there was no proof that the falsehood could influence the relevant decision.  The Third Circuit's opinion in *Johnson* is again instructive.  The government's trial theory and primary appellate argument was that the "fake" pleading was material to the presiding Judge's decisions, but it "did not present evidence connecting Johnson's filing to a specific decision by the Judge that might have been affected by Johnson's false statement." *Id.* at 260.  The frivolous pleading was instantly recognized as such, and the trial court struck it from the record.  *See id.*  A portion of the *en banc* Ninth Circuit made a similar observation when reversing Barry Bonds' obstruction conviction under 18 U.S.C. § 1503.  *See United States v. Bonds*, 784 F.3d 582, 585-86 (9th Cir. 2015) (en banc) (Kozinski, J., concurring).  The statement at issue was an answer to a prosecutor's question that was so wholly off topic that all the judges on the *en banc* court but one agreed it was *per se* immaterial.  In his concurrence, Judge Kozinski explained that a single, obviously irrelevant answer could never be material, "whether it's true or false."  *Id.* at 586.  He and the concurring judges reasoned: "if a witness is asked, 'Do you own a gun?' it makes no difference whether he answers 'The sky is blue' or 'The sky is green.'  That the second statement is false makes it no more likely to impede the investigation than the first."  *Id.*

Here, the string of zeros resembled the frivolous pleading in *Johnson* or the irrelevant answer in *Bonds* because it was objectively incapable of deceiving the Ultrasound relay regardless of whether it is framed as "incorrect" or even "false." The zeros may make the block invalid but only in an obvious way that conceals or misrepresents nothing about the block.[13]

The government had no answer to these points. Instead, it deflected by suggesting that the signature step "was critical to Mr. Yakira." Tr.3313. But Yakira was not the recipient of the alleged False Signature. Alternatively, the government aimed its materiality arguments at the "scheme" rather than any of its component parts, vaguely asserting that "it mattered" to Flashbots. Tr.3314-15. But, like Yakira, neither Flashbots nor its relay was the recipient of the False Signature (Ultrasound's relay was). The government also argued that the Peraire-Buenos "exploit[ed] a flaw in the trading system." Tr.3297. But that is only fraud if, among other things, it is done through material deception. With nothing else to say, the government asserted (over and over) that the False Signature "trick[ed]" the relay without ever explaining how. *E.g.*, Tr.3460; Tr.3488-89. Repeating that something is a trick is no substitute for evidence on the essential material falsehood element.

### d.    Causation

The wire fraud statute "requires that the defendant's fraud be 'the mechanism naturally inducing [the victim or the victim's custodian] to part with money.'" *United States v. Berroa*, 856 F.3d 141, 149 (1st Cir. 2017) (quoting *Loughrin v. United States*, 573 U.S. 351, 365 (2014)). This causation requirement is an additional, implicit element of the offense that derives from the text of

---

[13] That the relay's code was changed after Omakase only demonstrates the immateriality. Now, the Ultrasound relay does not unblind the block until its local node has confirmed that the block is valid (but still does not check the fields itself). Tr.284 (Miller). But that wasn't true at the relevant time, and it was never the relay's role to make sure that the block submitted by the proposer was valid. *See* Tr.428-31 (Miller) (discussing "optimistic" relaying feature).

the wire fraud statute, which requires that money or property be obtained "by means of" a fraudulent statement. *Id.*; *see Loughrin*, 573 U.S. at 362-66; 18 U.S.C. § 1343.

The evidence did not establish that the False Signature caused the sandwich bots to part with money or property. Yakira confirmed the validator's signature occurred *after* his pre-programmed trades were sent by his bot to the builder. *See* Tr.1821-22. This concession precludes a causation finding. It does not matter that the relay possessed the data underlying the proposed transactions because this was not the property allegedly lost (*i.e.*, cryptocurrency). When the information underlying the proposed bundle was at the relay, the MEV-Bots had already agreed to part with their cryptocurrency by placing the frontrun trade. Tr.1821-22 (Yakira).

### 3. The government's "MEV-Boost validator" theory is legally invalid, factually unsupported, and was not alleged in the indictment

The government belatedly pivoted to an implied misrepresentation theory that the Peraire-Buenos "pretended to be a MEV-Boost validator" by supposedly making "it appear that they were ready to take valuable and private transaction data and publish that to the blockchain sight unseen, but they knew they actually had no intention of doing that." Tr.3287. The government also called this pretending to be a "true validator," Tr.3303, or "legitimate MEV-Boost validator," Tr.3302. Many legal and factual problems with this theory preclude it from independently sustaining a fraud conviction. First, the theory is indistinguishable from the one the Second Circuit rejected in *Finnerty*. Second, it is factually unsupported: the very concept of a "MEV-Boost validator" is incoherent; there are no "MEV-Boost" rules that one could implicitly agree to abide; and there is no evidence of the supposedly deceptive "pretending" that could have created any misimpression. Third, the theory is not alleged in the Indictment.[14]

---

[14] A conviction on this basis would also violate due process. *See infra* pp.50-53.

### a.    Procedural history

During pretrial litigation, the government identified only two alleged misrepresentations—the Lure Transactions and the False Signature.  ECF 61 at 15-18.  Shortly before trial, the Court invited the parties to respond to its proposed instruction on the scheme-to-defraud element which named the Lure Transactions and the False Signature as the two alleged "false or fraudulent representations and statements" in the case.  The government proposed deleting that sentence entirely, contending that the "jury should be instructed on the government's implied misrepresentation theory," ECF 169 at 2, without explaining what that implied misrepresentation theory was or how it was different than the Lure Transactions or False Signature theories.

At a hearing on the instruction, the Court stated that it was inclined to include a list of the alleged misrepresentations (or half-truths or deceptive conduct) at issue and asked the government "what other conduct are we talking about beyond the lure transactions and the false signature?" 10/8/25 Hr'g Tr.17-18.  The Court ordered the government to provide a list of allegedly deceptive conduct by October 16.  10/9/25 Hr'g Tr.34.

The government's (open-ended) list included 7 items, 6 of which appeared to track alleged steps in the Omakase strategy.  ECF 182.  Several were flawed, but one item was not like the others: "1. Posing as an honest MEV-Boost validator."  *Id.*  The term "honest validator" had become an apparent focus of the government's case in the first days of the trial; by October 16, it had been defined as "doing the things that [a validator] should according to the [Ethereum protocol] specification," which, in this context, supposedly meant "propos[ing] one block … within the time window that it's allocated."  Tr.282 (Miller).  In other words, the government now claimed that a validator signing two blocks and getting slashed as a result constituted fraudulent conduct sufficient to prove a scheme to defraud.

The Peraire-Buenos noted their surprise and concern at the mid-trial emergence of this theory. Tr.567. The Peraire-Buenos objected to the filing, explaining the legal and factual problems with this theory. *See* ECF 185 at 3.

The government's response confirmed it viewed the act of "posing as an honest validator" as an independent false representation, pretense, or action, and claimed that this alleged misrepresentation had been disclosed across 12 Indictment paragraphs. *See* ECF 188 at 2.[15] The government doubled down on this theory on the morning of October 29 in its motion to exclude Dr. Falk's testimony. *See* ECF 198 at 9 n.4 (listing "posing as an honest MEV-Boost validator" among the "multiple misrepresentations (including implied misrepresentations)" it intended to argue to the jury).

But later that morning, while opposing leave for the participation of *amicus curae* on the issue, the government suggested that the issue was a big misunderstanding. The Court explained its view that the inclusion of the "posing as an honest validator" theory on the list suggested that the government might argue that the "per se violation of a rule" "alone could be the basis for a misrepresentation that could give rise to a wire fraud charge." Tr.2200. The government responded that its October 16 list (which was intended be included *in the jury instructions*) was just "an illustrative list to provide some concept" and was "more given as an aid of possible items that may come up during the trial for the jury to hear" and not "necessarily" something that it needed to "proceed on." Tr.2201. As for the "posing as an honest validator" theory, the government now claimed that it was not arguing such conduct was a false representation or

---

[15] This claim makes no sense considering the Indictment's specific allegations. If the Omakase strategy was *per se* fraudulent conduct because it involved signing two blocks and getting slashed, then the Indictment would not have named just two subsidiary steps in the trading strategy as the only alleged misrepresentations in the "to wit" clauses.

pretense but rather was only evidence limited to the jury's evaluation of "*mens rea* of a defendant within the context of everything else." Tr.2201-02.

Defense counsel noted that the government's statements did not accurately reflect the purpose of the October 16 filing. Tr.2203. And the defense reiterated that, notwithstanding the government's shifting position, the new theory could only be interpreted one way: "that by participating in Ethereum, you are implicitly representing that you are going to follow the technical specifications of the protocol, because that's how 'honesty' has been defined by the government's own witnesses." Tr.2204.

The Court then stated: "I think, to provide some clarity here, it sounds like the government agrees that there's going to be no argument that posing as an honest validator alone constitutes a misrepresentation or a false impression that is sufficient to give rise to a wire fraud charge. Correct?" Tr.2205. The government and the Court then engaged in a colloquy where, notwithstanding its contrary representations minutes earlier, the government stated that it *would* argue that acting "dishonestly"—that is, operating a validator, signing a block containing the relay's header, and then signing and proposing a different block—was sufficient to prove wire fraud. *See* Tr.2206. When asked why this was different than arguing that fraud occurs whenever the protocol is supposedly violated—*i.e.*, that "anybody who's been slashed at any time could then be prosecuted for wire fraud," *id.*—the government suggested removing the theory from the jury instructions and cited an inapposite case where professional rule violations were argued as relevant to intent. *See* Tr.2208. The colloquy ended with the Court reiterating its "concern" with the new

theory "being alone a basis for a misrepresentation" and granting leave for an *amicus* submission on the issue.  Tr.2208-09.[16]

The next day, October 30, the defense orally presented its Rule 29 arguments, including with respect to the "honest validator" theory.  *See* Tr.2684-90.  On October 31, during the charge conference, the Court reiterated it still had "concerns, to the extent the government is relying on the honest MEV-Boost validator as a standalone basis for deceitful conduct."  Tr.2926.

Before closings, the Peraire-Buenos moved to preclude the government from arguing the "honest validator" theory.  ECF 213 at 4.  The Court inquired again whether the government would pursue this theory, and the government responded, "to the extent it comes up at all, it would be adhered very closely to Mr. Miller and Mr. Chen's percipient witness [testimony] of what that term means as a term of art."  Tr.3222-23.  The Court further explained: "To be clear, because I know we had a back-and-forth on this issue, I think it's perfectly proper to make arguments with respect to this as relevant to *mens rea*.  But my concern was [with] posing as an honest validator, that theory as a misrepresentation."  Tr.3223.  The government stated: "Correct, your Honor.  There's not going to be any argument for the technical term as 'honest validator,' as defined in this unique manner, as a misrepresentation."  *Id.*

That answer was not true, or at least not fully accurate.  Later that morning, government counsel pursued the honest validator theory in its closing:

> Now, the MEV-Boost validator was supposed to be an actor in the MEV-Boost system that proposed blocks got from the relay.  But to the defendants, the MEV-Boost validator was a means to an end.  It was just a vehicle to commit the fraud.  It was a ruse.  They needed to step into the shoes of a validator in order to exploit

---

[16] Later that day, in connection with argument on the *Daubert* motion to Dr. Falk's testimony, government counsel suggested it was "happy to strip out" the word "honest" and swap in the word "legitimate."  Tr.2422.  The defense noted that that semantic maneuver changed nothing and that it "continue[d] to be disappointed with the difficulty that we're having in determining what the government's theories are here and what the alleged misrepresentations are."  Tr.2424.

the MEV-Boost relay software vulnerability and to take money. That was the whole point of this. … ***Pretending to be a true validator was deceptive, and it was misleading. That's another false pretense, and it's meant to be.*** That is fraud.

Tr.3303 (emphasis added). The government repeatedly returned to this theory. *See* Tr.3336 ("They were pretending to be validators"); Tr.3307 ("They never intended to be a legitimate MEV-Boost validator. It was a false pretense[.]"); *see also* Tr.3299 ("It's because they're the validator. They're pretending to be the validator for that block."). Although the government swapped the word "honest" for "true" or "legitimate," the point remained the same—*i.e.*, that the act of being a validator conveys an implicit promise not to equivocate and sign a second block in a given slot.[17]

The theory's eleventh-hour appearance confirms the government's fundamental failure to prove the material falsity of the Lure Transactions or False Signature as discussed above. Faced with the potential of its case collapsing, the government reached for a vague "implied misrepresentation" theory that it had disavowed during pretrial litigation (when casting this as a traditional misrepresentation case suited it), *see* ECF 61 at 2, 15-19; 6/17/25 Hr'g Tr.31-35; ECF 146 at 11. This evasion would not have been necessary if the government's evidence of the only two alleged misrepresentations had been adequate.

### b.     *Invalid legal theory*

The "MEV-Boost validator" theory is foreclosed by Second Circuit precedent. In *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008), the court affirmed a grant of judgment of acquittal for a NYSE specialist convicted of securities fraud for the act of "interpositioning." *Id.* at 145. The evidence was insufficient because the government "identified no way in which Finnerty

---

[17] In denying the defense's request for a limiting instruction in the moment, the Court noted the issue was "close" but it viewed the government's argument as proper. Tr.3348. For the reasons explained herein, the Peraire-Buenos respectfully submit that this theory was invalid and insufficiently substantiated to support a conviction.

communicated anything to his customers, let alone anything false." *Id.* at 148-49. Critically, the court rejected the argument that the conduct was deceptive because (a) Finnerty was a specialist at the NYSE, which had rules against interpositioning; and (b) as a result, his clients (also NYSE members who were aware of its rules) expected that he would not engage in the practice. *See id.* at 149. The government claimed that engaging clients as an NYSE member was implicitly "holding [oneself] out as a specialist obligated to follow NYSE rules." *Id.* The Second Circuit saw this argument for what it was—one that "seeks to impose criminal liability based on a background assumption of compliance with NYSE rules." *Id.* The court rejected that assumed-compliance theory, holding that even if "the [NYSE] rules amount to an assurance (by somebody) that interpositioning will not occur," the customers' upset expectations were not "based on any statement or conduct by Finnerty" and thus could not prove securities fraud. *See id.* at 150; *see also* ECF 130 at 6-8 (discussing *Finnerty* and its progeny).

In this case, the government pursued a materially identical theory on an even weaker record. In both cases, there is no conduct or statement by a defendant that created any misimpression. In *Finnerty*, moreover, rules prohibited the allegedly deceptive conduct. Here, however, the government's theory is based on expectations of "MEV-Boost validator" behavior (*i.e.*, what such validators are "supposed" to do, Tr.3303) that derive from the design or "intended use" of open-source, modifiable software programs that had no terms of use. *E.g.*, Tr.164, 170-71, 177, 196 (Miller); Tr.3027, 3049 (Falk); DX1024 at 2 (granting "[p]ermission" to, among other things, "modify" software downloaded from boost.flashbots.net). In *Finnerty*, the defendant and his clients were all NYSE members and bound by its rules. Here, neither the alleged victims nor the Peraire-Buenos used the MEV-Boost software. Tr.343, 349 (Miller); Tr.956-57 (Chen); Tr.1577 (Yakira); Tr.2607 (Madura). In *Finnerty*, the defendant and the alleged victims had an

advisor-client relationship within a highly regulated market.  Here, the Peraire-Buenos and the alleged victims never met or interacted (prior to the trades at issue) on the decentralized blockchain, and they had no trust relationship.

Nor does the assumed-compliance theory work considering the Ethereum protocol and its economic incentives.  Trading and MEV strategies on Ethereum occur in a highly adversarial environment.  Tr.388 (Miller); Tr.920 (Chen).  MEV-Boost was designed on the assumption "that self-motivated users in an adversarial environment like Ethereum will act rationally and not honestly."  Tr.453 (Miller); *accord* Tr.969 (Chen) (agreeing that the "assumption in the Ethereum protocol is that validators will act rationally," not honestly); Tr.1609 (Yakira) ("Validators are not trusted in the MEV-Boost ecosystem.").  On Ethereum, it is *assumed* that validators will equivocate where that is profitable.  *See* Tr.368 (Miller) ("[T]here are too many validators for users to assume that validators will not unbundle transactions."); Tr.453 (Miller) (confirming that "when designing [MEV-Boost], you would assume that people will try to capture the MEV if they can").  MEV-Boost did not change these baseline assumptions.  *See* Tr.458 (Miller); *see also* DX321A; DX309.[18]  If the assumed-compliance theory failed in *Finnerty*, it cannot survive here.

### c.     *Lack of record support*

Because the concept of a "MEV-Boost validator" is intolerably vague, and because no "MEV-Boost" rules govern the use of MEV-Boost (or interactions with the "MEV-Boost ecosystem") by any validator, a rational jury could not convict on this novel theory.

It is unclear what the term "MEV-Boost validator" even means.  There is only one type of Ethereum validator, and all agree that it can source transactions for a block from multiple places,

---

[18] *Amicus curiae* Coin Center reinforces the testimony of Miller, Chen, and Falk regarding the role of the Ethereum protocol's economic incentives, the expectations of participants, and the role of "honest" behavior.  *See* ECF 203-01 at 5-6, 9-11.

including relays running the MEV-Boost relay code or some variation. Tr.512-17 (Miller); Tr.956-57 (Chen); Tr.3029-30 (Falk). Flashbots documentation does not refer to a "MEV-Boost validator," *e.g.*, GX3005-A, GX3202, GX3232, and Chen confirmed that it is not actually "a term that's defined in the Ethereum protocol" and likely not a "term of art." Tr.958. The government appears to have lifted the term from Chen's notes of the December 2022 conference call when he first heard about the potential trading strategy and a related document. *See* Tr.3296 (discussing GX4101); *see also* GX3682.

Moreover, the government could not settle on a single, coherent definition of this term. Its first witness, Miller, defined it as "a validator that is running the MEV-Boost software," specifically one that has "taken the MEV-Boost software from the Flashbots GitHub or another place that it's hosted, and [is] running it on [its] machine." Tr.171; *see also* Tr.239 (Miller) ("Q. Remind us — what makes a validator a MEV-Boost validator? A. They run the MEV-Boost software. Q. And, again, how do they start interacting with the MEV-Boost ecosystem? A. You would download MEV-Boost."). But it was revealed during Miller's cross that the Omakase validator *did not use MEV-Boost*. Tr.343. (This was later confirmed by multiple witnesses. *See* Tr.956-57 (Chen); Tr.2607 (Madura).) On redirect, the government attempted to redefine the term, but Miller rejected the premise of categorizing the Omakase validator as either an Ethereum validator or a MEV-Boost validator: "Well, the validator was interacting with MEV-Boost relays. It's calling a bunch of standardized interfaces that you use within the MEV-Boost ecosystem, and it's also an Ethereum validator." Tr.547. Miller provided additional "nuance" that the government's binary characterization obscured: "[Y]ou could say they're a MEV-Boost validator since they're using MEV-Boost relays and standardized endpoints within the MEV-Boost ecosystem," but "[a]t the same time, it's unclear if they were using the actual MEV-Boost

35

software." Tr.548.  The government persistently embedded the term in its questions to Chen.  *E.g.*, Tr.703, 761; *see also, e.g.*, Tr.678, 679, 691, 702.  Chen used the term just once.  Tr.624.  The government then abruptly abandoned the term, and neither the prosecutors nor any witnesses used it again in front of the jury until it became the centerpiece of the government's closing.  The government did not ask Yakira, the only party supposedly deceived by the "pretending," about the term, and there was no Ultrasound witness to ask.

In any event, regardless of the definition, the government did not prove that a so-called MEV-Boost validator's behavior is governed by anything other than the economic incentives that concern all validators.  In the government's case, there was some testimony regarding the Ethereum protocol and honest validator behavior under that protocol.  *E.g.*, Tr.451-52 (Miller); Tr.783, 969 (Chen); Tr.2020 (Hoffmeister).  Although Miller stated that the Ethereum protocol "honest" validator specifications describe how an honest validator "should" act, Tr.282, there was no testimony about similar "MEV-Boost" protocols.  Instead, Miller only testified about how the MEV-Boost software was "intended" to be used.  *See, e.g.*, Tr.245-46 (Miller) ("Q. To put a finer point on it, based on the way that MEV-Boost was designed and intended to operate, is a MEV-Boost validator supposed to reorder a block that has been signed? … THE WITNESS: That's not the intended behavior, no.").  And there are no terms of use even for validators running the MEV-Boost software.  *See* Tr.962 (Chen) (no "legal agreement," "written agreement," or "anything like that" between the validator and MEV-Boost).  Nor are there any terms of use or rules for engaging with relays running variations of the MEV-Boost relay code.  *See* Tr.963 (Chen) (not aware of any "terms that a validator must agree to before sourcing blocks from [a] relay," including the Ultrasound relay).  As Miller confirmed, absent any such terms, it is unreasonable to "assume that

users will interact with a piece of technology only in the way the technology's creators intended." Tr.453.[19]

It is also unclear when the government believes an Ethereum validator becomes a "MEV-Boost validator." Unable to argue that this occurs when a validator downloads and runs the MEV-Boost software (because that did not happen here), the government suggested in closing that it occurs when a validator registers with relays. Tr.3306. The record refutes this argument. Miller testified that the registration step entails only conveying limited information "that's useful for relays and block [builders]" regarding a validator's preferences for getting paid if the validator successfully publishes a block received from the relay to the chain. Tr.239. He also confirmed that it's "possible to register with a relay and to never ask the relay for a block header" and "nothing in th[e] registration message … requires a validator to accept a block from a relay." Tr.403; *see also* Tr.519 (Miller). Chen similarly confirmed that "[w]hen you register with a relay as a validator, you don't make any promises to the relay ahead of time about which slots you'll use their block for." Tr.963. Dr. Falk drove the stake through whatever was left of this "registration" argument, *see* Tr.3050-52, and the government did not challenge this testimony (or any other substantive aspects of his testimony) on cross.

Nor is there anything about the "get header" command that could possibly transform an Ethereum validator into a so-called MEV-Boost validator bound by separate rules or expectations. Chen confirmed that, after requesting an "execution payload header from a relay, the validator

---

[19] The "builder API" cannot fill this hole in the government's case. An API is a "an application programming interface." Tr.965 (Chen). It is just a "set of calls that your code can make to do something," Tr.686 (Chen), and "a standardized way for Ethereum validators to communicate with MEV-Boost and with relays," Tr.209 (Miller). The government did not ask Miller whether an API functions like rules. Chen rejected multiple attempts by the government to frame the API as instructions. *See* Tr.686, 688. Dr. Falk explained that the API imposes no obligations on a validator. *See* Tr.3039-40.

doesn't have to respond back."  Tr.958.  The "get header" endpoint is public, meaning that "anybody" (including non-validators) "can call a relay's get header endpoint, and the relay will return a block header."  Tr.432 (Miller); *accord* Tr.3052-55 (Falk).  (This would leave the government with only the signature as the supposed moment of transformation, but that theory fails for the reasons identified above.  *See supra* pp.18-27.)

In sum, the government's implied misrepresentation theory hinged on a supposed "pretense" for an Ethereum validator to become something of uncertain definition at some unclear moment in time, and that this transformation binds the validator to rules constraining its behavior that don't exist.  This is not the foundation on which a legitimate fraud conviction may rest.

Another independent flaw fatal to this theory is that, to trick someone by "pretending" to be a MEV-Boost validator, that person *must see you acting like a MEV-Boost validator*.  The government seemed to recognize this when it argued that, "from the perspective of those victim traders, the validator was just like any other validator.  They were there to propose blocks from the relay; not the defendants lying in wait getting ready to switch out their trades."  Tr.3303.  But there was no evidence that the alleged victim traders or their bots observed in real-time any action taken by the Omakase validator to pretend to be a MEV-Boost validator or that they looked at validator identity at all.  The only evidence is that a typical user *wouldn't* know, that validators aren't trusted, and the assumption is that validators act rationally, not honestly.  Indeed, it is hard to understand what this "pretending" or "posing" theory could possibly mean in this context.

### d.    *Uncharged theory*

Finally, even if it were legally viable and factually supported, this theory cannot support a conviction because it was not alleged in the Indictment.  A conviction on this theory would either constructively amend or prejudicially vary the Indictment.  ECF 185 at 4.  The government cited 12 Indictment paragraphs supposedly capturing this concept, demonstrating that the term is merely a

vague catchall for the entire Omakase strategy.  ECF 188 at 2 (citing ¶¶ 1, 8-9, 12-14, 17-19, 22, 25-26).  But those paragraphs do not allege a "legitimate validator" theory, and the Indictment's specific allegations belie this post-hoc interpretation.  *See supra* pp.27-29.  This new theory was designed to absolve the government of its burden to pinpoint any moment of deceptive conduct in the Omakase strategy.  But the wire fraud statute requires a deceptive statement or action, *see supra* p.8, and the Constitution requires fair notice.  The Indictment's specific allegations here precluded this mid-trial pivot.  The Court should not rely upon this new theory when deciding this motion.

### B.    The Government Failed to Prove that a Qualifying Property Right Was the Object of the Alleged Scheme.

The wire fraud statute covers only schemes to deprive another of rights that have "long been recognized as property when the wire fraud statute was enacted."  *Ciminelli v. United States*, 598 U.S. 306, 314 (2023) (citation omitted).  Courts have held that a wide array of valuable interests fall outside the scope of the traditional property rights that the federal fraud statutes protect where the victim lacks an enforceable claim to the property.  *See, e.g.*, *United States v. Adler*, 186 F.3d 574, 578, 580 (4th Cir. 1999) (unsecured creditor's interest in debtor's property); *see also* ECF 49 at 26 (citing additional cases).  Similarly, courts have rejected fraud theories where the rights supposedly interfered with are too untraditional like the "[t]he right to valuable economic information needed to make discretionary economic decisions," *Ciminelli*, 598 U.S. at 316, or a company's interest in which markets its goods would later be resold, *see United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992); *see also* ECF 63 at 28 (citing additional cases).

While the government argued that the Peraire-Buenos "stole" cryptocurrency that belonged to the sandwichers, the record shows that this was not the case.  At best for the government, the evidence showed an interference with a contingent expectation of profits based on a multi-trade

strategy in which the alleged victims had no property interest, or alternatively, an interference with a novel form of property (a sandwich attack bundle). Several undisputed facts show why.

*First*, the sandwich bots' frontruns traded away their existing cryptocurrency by selling it to a liquidity pool, not the Peraire-Buenos. Tr.384 (Miller); Tr.968, 1145 (Chen); Tr.1594 (Yakira). The bots did not come out of these trades empty-handed; rather, they received the currency they agreed to purchase from the pool.[20] These trades made no economic sense on their own, Tr.894-95 (Chen); Tr.1593 (Yakira), because the plan was to take a loss on the frontrun trade only to sell the currency back and to extract a profit. *See* Tr.1593 (Yakira).

*Second*, the alleged victims had no property interest in their bundle or the Lure Transactions they attacked. As discussed above, *see supra* pp.13-14, an Ethereum searcher can only express a preference for a bundle to the builder, who may or may not honor that request. *See, e.g.*, Tr.395-97 (Miller). In the case of Savannah, it did not contract with the builder and never even received a receipt. *See* Tr.1782, 1790-92 (Yakira); GX3221. These bundles included at their center a trade that never belonged to the MEV-Bots. Tr.1144 (Chen). As a matter of mechanics, the bundle never even exists as something tangible because the victim transaction remains in the mempool even after a MEV-Bot selects it for a potential bundle. *See* Tr.1573 (Yakira); *see also* Tr.1776-77 (Yakira) ("Q. … Savannah never takes the middle sandwich of a sandwich bundle out of the mempool; isn't that right? A. That's right. It stays in the mempool."). Every second on Ethereum, legions of bots are automatically submitting competing bundles that could include this same mempool transaction.

---

[20] To be clear, the Peraire-Buenos do not contend that the bots got the "benefit of the bargain" in a manner inconsistent with *Kousisis v. United States*, 605 U.S. 114 (2025), which did not concern the money-or-property element. Furthermore, there was no "bargain" between the Peraire-Buenos and the alleged victims.

*Third*, Omakase did not alter or otherwise interfere with the alleged victims' trades. All the sandwichers' frontrun and backrun trades went through as coded. Tr.987 (Chen). The backruns reverted per their coded logic. Tr.1152 (Chen). The only thing the Peraire-Buenos are alleged to have done is to take their own trades (the Lure Transactions) and replace them with other *trades of their own* when building *their own block*. *See* Tr.3309 (arguing the Peraire-Buenos "changed out a specific thing. They changed out the bait with the dump trade[.]").

*Fourth*, the Peraire-Buenos purchased cryptocurrency from the liquidity pool at the advantageous price that the sandwich attackers' frontruns had created. *See* Tr.621 (Chen) ("Q. … [W]hat was the purpose of the dump? A. To effectively get ahead of the sandwicher sell transaction and profit at the sandwicher's expense."). This may have been at the sandwicher's "expense," but it did not involve taking any property to which the sandwicher had a legitimate claim. Indeed, Yakira said the "overall impact" of one of the dump trades was that he "lost 2.33 USDC *because we couldn't get it back anymore*. It wasn't in the liquidity pool." Tr.1605 (emphasis added). But he had no right to "get … back" what he had traded away to the liquidity pool in the hope of turning a quick profit with a separate, later transaction. And the Peraire-Buenos did not alter any of his trades; they only replaced their own transactions in their own block.

The government's closing arguments ignored or misstated these facts to make the alleged scheme sound more in traditional property rights. These arguments, however, still principally identified the property interest as the bundle—not cryptocurrency. *See* Tr.3297. The government argued that the Peraire-Buenos "took possession of those trades," *id.*, when the validator always takes possession of trades. It claimed that the Peraire-Buenos were not "supposed to modify the transactions, the private valuable transactions, that the block builder submits to the relay," Tr.3304, when they did not, in fact, "modify" any transactions—let alone any belonging to the alleged

victim traders. The Peraire-Buenos merely included some when building their own block. Tr.791-92 (Chen); Tr.2628-29 (Madura). At bottom, Yakira's complaint (and the government's theory, shorn of its mistaken assumptions) was that his contingent market manipulation play was thwarted because the relative order of the transactions in the bundles was different than he anticipated, and that someone else benefited from the imbalance the sandwich bots intentionally created in the liquidity pool. That theory is light years away from an enforceable, traditional property right cognizable under the wire fraud statute.

### C.    The Government Failed to Prove an Intent to Defraud.

The evidence was insufficient to prove an intent to defraud for many of the same reasons discussed above. This element is most often established by evidence of the knowing use of material falsehoods. *See, e.g.*, *Runner*, 143 F.4th at 157. Because the government failed to prove any material misrepresentations, it necessarily failed to prove fraudulent intent.

Additional facts preclude a rational jury from finding this element beyond a reasonable doubt. This is a unique case where there is no evidence that any of the alleged co-conspirators believed before Omakase that there was anything even *wrong* about the strategy—much less fraudulent, dishonest, or illegal. In fact, Chen testified that, at the time he participated in planning Omakase, "nothing gave [him] the impression that it was wrong." Tr.801; *see also* Tr.1036 ("I did not, at the time, think that we had done something problematic."). The government would need strong evidence to overcome such statements from a cooperating witness. There was no such compelling evidence here. No testimony—from Chen or any other witness—disputed Chen's statements. No documentary evidence (Slack messages or otherwise) prior to April 3, 2023, use the words "exploit," "hack," "trick," or "deceive."

The unique context of Ethereum corroborates Chen's denial of fraudulent intent. The Omakase strategy was designed and executed in the context of Ethereum's highly adversarial MEV

ecosystem.  Tr.388, 453 (Miller); Tr.920, 1006-07 (Chen); GX3460 at 14.  The alleged victims of Omakase were themselves executing an adversarial strategy, sandwich attacking, that profited at the expense of others.    Tr.922-23 (Chen); Tr.385 (Miller); GX4010.    Yakira's testimony highlighted the adversarial approach taken by participants in this environment: Savannah itself declined to return funds to a user who had lost 10 Bitcoin as a victim of one of Savannah's sandwich attacks.  Tr.1818-19.  Other publicly known operations against sandwich attackers— such as Salmonella—were an inspiration for Omakase.  Tr.927-28 (Chen).  In this adversarial environment, Omakase was executed by a validator, an untrusted user.  Tr.1609 (Yakira); *see* Tr.930-931 (Chen contrasting with role of the relay or blockbuilder).  And the Omakase team researched the strategy using publicly available information and other normal methods of developing trading strategies.  Tr.905-07, 933-34 (Chen); Tr.1775, 1941 (Yakira).  Against that backdrop, it is no surprise that Chen thought Omakase "fit[] into that adversarial environment" as a "sharp, but fair game practice."  Tr.922.

No other admitted evidence could overcome reasonable doubt on this element.  The evidence undermined any attempt by the government to rely on the desire for anonymity: the evidence was overwhelming and undisputed that using pseudonyms and seeking to remain anonymous was normal and reasonable.  Tr.542 (Miller); *see also* Tr.3088-89 (Falk).  Same with the efforts to keep the trading strategy secret before it was executed, Tr.1922-24 (Yakira); Tr.890, 912-13 (Chen), the use of VPNs, Tr.912 (Chen), and the use of a privacy protocol or mixer, Tr.916 (Chen); Tr.3088-89 (Falk); *see also* Tr.2292 (Hoffmeister) ("wouldn't want to speculate" "whether using … a privacy protocol like Aztec is a normal part of trading activity or something that's more suspicious").  In any event, to the extent the government focuses on steps that the Peraire-Buenos supposedly took to make their identities harder to identify before Omakase, that type of

"consciousness-of-guilt" evidence has little probative value in the typical case and none here.  *See*

*United States v. Lorenzo*, 534 F.3d 153, 161 (2d Cir. 2008); *see also Finnerty*, 533 F.3d at 151

(defendant's efforts to conceal were equivocal evidence of intent to defraud and thus insufficient

where he had professional and personal reasons to want to conceal); *United States v. Cassese*, 428

F.3d 92, 100 (2d Cir. 2005) (rejecting government's reliance on cherry-picked evidence of

concealment that was undercut by other evidence of disclosure and which was "entirely consistent

with innocence").

## III.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNT 3.

Count Three required proof that the Peraire-Buenos agreed to conduct a financial

transaction (a) that involved the "proceeds of a specified unlawful activity (Element Two); (b)

knowing that the "transaction involved the proceeds of some form of unlawful activity" that is a

felony (Element Three); (c) knowing the "transaction was designed, in whole or in part, to conceal

or disguise the nature, location, source, ownership or control of the proceeds of the unlawful

activity" (Element Four).  Tr.3273-74.  The evidence was insufficient on each of these elements.

*Element Two*.  Because the specified unlawful activity in this case is the wire fraud alleged

in Count Two, Indict. ¶ 39, the government's failure to prove Count Two for all of the reasons

stated above dooms this Count as well.  *See* Tr.3276.[21]

*Element Three*.  This element requires not mere knowledge of the *acts* alleged to constitute

unlawful activity, but knowledge that those acts *violate the law*, *i.e.*, constitute a felony.  *United*

---

[21] That the Peraire-Buenos are charged with conspiracy and not money laundering itself is of no
moment.  *See, e.g.*, *United States v. Pierce*, 224 F.3d 158, 168 (2d Cir. 2000) (failure to prove
predicate offense of wire fraud means acquittal on money laundering conspiracy "was
mandatory"); *United States v. Blumhagen*, 2005 WL 3059395 (W.D.N.Y. Nov. 15, 2005) (similar).

*States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994). The evidence was insufficient for any rational jury to find beyond a reasonable doubt that the Peraire-Buenos knew Omakase was unlawful.

Chen was the only witness who could possibly opine on the Peraire-Buenos' knowledge and motivations during the alleged money laundering conspiracy. But he repeatedly made clear that neither he nor they believed Omakase was illegal or even wrongful. *E.g.*, Tr.1036. He testified that he "did not believe that it was a hack" at the time, Tr.1026, that the "group consensus" was that they "neither access[ed] information without authorization, nor exceeded authorized access," Tr.1051, and that it never crossed his mind that Omakase might be regarded as a theft. Tr.1005. The indictment of the Peraire-Buenos in May 2024 was a surprise to him. Tr.1123.

The government suggested that because the Peraire-Buenos were aware that some third parties, including Etherscan, news articles, and social media users, referred to Omakase as an "exploit," they knew it was illegal. That is a non sequitur. No statute prohibits anything called "exploits." In any event, the record is clear that the Peraire-Buenos sincerely disagreed with that view. Chen testified that those who had labeled Omakase an "exploit" were under a misimpression, which the group sought to correct by contacting various entities, including Flashbots, Etherscan, TRM, and Coinbase. Tr.1034-37; *see also* Tr.1051, 1098; GX3478 at 1. No evidence indicates that the Peraire-Buenos agreed there was an exploit; Slack messages and other internal communications state the opposite. *E.g.*, GX3478; GX3306. And the commentary of others in the community, including prominent security researchers, reinforced these views. DX1041 at 49; DX1041-Q; Tr.1011-12, 1014-15 (Chen).

The government has also cited Tether's decision to blacklist the Peraire-Buenos' cryptocurrency address. But in its first interaction with the Peraire-Buenos in April 2023, then-anonymous Savannah claimed responsibility for freezing the USDT, and the Omakase team

believed the freezing was done in deference to Savannah's power and influence.  *See* Tr.1020, 1091, 1095-96, 1100 (Chen); GX4005; DX202; DX1058.

The government has also pointed to the fact that the Peraire-Buenos learned from Tether in September 2023 that their Tether had been blacklisted due to an Israeli investigation.  Tr.3331 (citing GX3801).  But, as this Court properly instructed the jury, that information did not "mean that the defendants violated any Israeli law," Tr.833, and the government did not dispute that it failed to introduce evidence sufficient for a jury to find knowledge on this basis.  *See* Tr.3222.

Finally, the government introduced post-Omakase internet searches purportedly for the purpose of showing that the Peraire-Buenos' searches for statutes, concepts related to criminal justice, and famous criminal defendants showed their knowledge that their own novel trading strategy was a felony.  The Peraire-Buenos reiterate their objections to this evidence, *e.g.*, ECF 132; ECF 145 at 7-11, and submit the trial showed their concerns to be well-taken.  There was no basis for the government or the jury to conclude that the most inflammatory of those searches and other electronic evidence had anything to do with the trading strategy at issue.  *E.g.*, *Compare* GX3800 at 3 *with* ECF 132 at 6 *and* Tr.2568; *compare* GX6419-A-M *with* DX1166.  And those that might have some potential connection to the case do not bear the illogical inferences the government draws from them.  For example, the government's argument that James' search for "money laundering" in October 2023, GX3800, means he intended to launder is unreasonable given record evidence showing that this was neither his nor Anton's intent.  *See, e.g.*, DX1185 at 4 (James: "idk need to look at laws and make sure its not money laundering"); DX1058 at 4 (James: "we're U.S. citizens/will comply with court orders"); DX4005-A (Anton: "I would have come wherever [law enforcement] asked me.").  The search-history evidence, even if it were properly admitted, could not meet the government's burden.

*Element Four*.    There was no evidence that the purpose of the post-Omakase cryptocurrency transactions was to disguise anything about the cryptocurrency.

The Peraire-Buenos first moved the tokens from hot wallets to the Gnosis vault solely because it provided more security.  Tr.1017 (Chen).  Far from concealing where the tokens came from, this consolidated them in an account that anyone could monitor.  Trades executed in the spring and summer of 2023, meanwhile, were made for "capital loss realization purposes, that is to say, tax purposes," Tr.1018 (Chen), and for investment purposes, including to generate yield.  Tr.2331-32 (Hoffmeister); *see also* GX3495 at 18-19 (holding staked ETH and DAI for "diversification" and "realizations for tax reasons").  The government cited evidence that certain transactions were executed, in part, to avoid tokens (USDC in particular) being frozen.  But a purpose to avoid freezing in no way constitutes a purpose to conceal the funds' origin—especially where the evidence makes clear that the desire was to avoid freezing due to improper influence, *not* to avoid government scrutiny or identification.  *E.g.*, DX1058.  These transactions were recorded on the public blockchain and readily traceable to the Peraire-Buenos' Low Carb Crusader wallet address, Tr.1032 (Chen), as the government's own tracing expert acknowledged, Tr.2284, 2295-96 (Hoffmeister).  It is undisputed that *no* mixer or privacy protocol was used for any post-Omakase transaction.  Tr.2293 (Hoffmeister).  If, according to the government, the use of these tools pre-Omakase is supposed to signal an intent to conceal, then *not* using such tools must rationally indicate the opposite.

There is, furthermore, no evidence that any transaction in the off-ramping process itself, around October 2023, was designed to conceal their connection to Omakase.  The central, animating purpose of off-ramping was to ensure that team members had funds to pay taxes on the Omakase trades.  Tr.1043.  There is no evidence to the contrary.  First, to their surprise, the Peraire-

Buenos learned in June 2023 that they would imminently owe taxes on their trades.  Tr.1040-42 (Chen); DX231; *see also* GX3510; GX3513.[22]  The team was concerned that they lacked sufficient cash to make those payments.  *See* Tr.1043, 1085-86 (Chen); GX 3495 at 16; DX1051, 1058.  The Peraire-Buenos allocated most of the proceeds to James, DX6731, who then paid roughly $6.8 million of taxes to the IRS, before any indictment.  *See* DX405, 406, 411, 412, 7003.  Chen paid over $1 million in taxes on the trading strategy.  Tr.885; GX108-B.

The government argued in closing that the Peraire-Buenos delayed off-ramping to avoid scrutiny by prosecutors.  Tr.3286, 3330.  The evidence undermined this argument.  *E.g.*, Tr.1043-46 (Chen); DX1058.  But even if it had not, that is not proof that the purpose of the *off-ramping itself* was to conceal a connection with Omakase.  The Court recognized that distinction in its instruction to the jury that "[t]he fact that a transaction was effected covertly in an effort to avoid the transaction being detected by third parties does not, on its own, mean that the purpose of the transaction was to conceal anything about the proceeds."  ECF 215-17 at 61; *accord, e.g.*, *United States v. Garcia*, 587 F.3d 509, 517-19 (2d Cir. 2009).  Indeed, the manner of the off-ramping makes such a conclusion irrational.

Finally, the Peraire-Buenos chose to deposit the Omakase proceeds in a single Coinbase account—a company that is known to be highly regulated and to cooperate with law enforcement.  Tr.1175-77 (Dean); Tr.2131 (Hoffmeister).  Beforehand, they tried to reach out to Coinbase to ask questions about off-ramping but received no response.  Tr.1100-01 (Chen); Tr. 1269 (Dean).  They also withdrew ETH from the slashed Omakase validator to Coinbase—which they knew would "create[] a clear link between the Omakase strategy and the withdrawal address or deposit address

---

[22] The efforts to understand the tax implications of Omakase in June 2023 are also inconsistent with any view that it constituted a felony.

on Coinbase." Tr.1102 (Chen).  All the while, Coinbase knew their real identities.  Tr.1244-46 (Dean).  These undisputed facts are wildly inconsistent with the claim that off-ramping was conducted for the purpose of concealing the connection between the money and Omakase.  At a minimum, it would be irrational for a jury to find Count Three was proven beyond a reasonable doubt.

## IV.    IN THE ALTERNATIVE, THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT.

Even if the Court determines that the record suffices to establish wire fraud under Rule 29, the Court should revisit the due process arguments raised in the Peraire-Buenos' Rule 12 motion (which the Peraire-Buenos reincorporate in full here), *see* ECF 49, with the benefit of the trial record.  The trial substantiated the arguments made there.  On this record, the traditional sources of notice—the text and cases construing it—could not supply fair notice that the Omakase trading strategy constituted wire fraud.  To the contrary, the many unique features of Ethereum, the adversarial trading environment, and the particulars of the strategy at issue undermine any purported notice of the government's novel fraud theories.

### A.    Background

The Peraire-Buenos moved pretrial to dismiss the Indictment for lack of fair warning that the alleged conduct could be considered criminal.  ECF 49.  The Peraire-Buenos explained that no court has ever applied the wire fraud statute to similar transactions, and the Indictment marks an unusual intervention in the Ethereum Network that effectively seeks to identify, and enforce, new duties for Ethereum validators for the first time through a criminal prosecution.  *See id.* at 12.  The Peraire-Buenos identified many aspects that made this case unexpected, including the very structure of the Ethereum Network, which is decentralized, trustless, and utilizes economic incentives to encourage behavior among profit-seeking users; that the alleged conduct was

permitted by transparent code; that the role of validator was just six months old at the time of the alleged conduct; and that the alleged victims were sandwich attackers whose predatory practices had prompted counterstrategies that were publicly discussed but never prosecuted.

The government defended the Indictment by characterizing this as a traditional misrepresentation case and arguing that the Indictment sufficiently alleged misrepresentations. *See* ECF 61 at 2, 15-19. The only misrepresentations it identified were the Lure Transactions and the False Signature. *Id.* at 15-19. With specific reference to the Lure Transactions, the government identified the spoofing cases as comparators while acknowledging that the cases were not "precisely on fours." 6/17/25 Hr'g Tr.34.

In its Order denying the Peraire-Buenos' motions to dismiss, the Court ruled that the motion was premature without a trial record. ECF 112 at 12. The Court also found that the language of the wire fraud statute, the Indictment's allegations, and the analogy to the spoofing cases pointed away from a due process violation at that "juncture." *Id.* at 15-16 (denying motion without prejudice to renewal after trial). The trial substantiated the Peraire-Buenos' arguments, and the case is ripe for dismissal on due process grounds.

### B. The Government's Novel Theories Are Unconstitutional.

*First*, the record illustrates how the government's theories defied the text of the wire fraud statute, which criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," without defining those terms. 18 U.S.C. § 1343. Neither of the two alleged misrepresentations in the Indictment were "pretenses, representations, or promises" in the normal sense. One was a cryptocurrency transaction. The other was a valid cryptographic signature on a "blinded beacon block" for a potential block to be added to the Ethereum blockchain. Whatever the scope of terms like "pretenses, representations, or promises," it cannot be said that a common-sense reading of the

text would put an Ethereum trader on notice that these two on-chain actions could qualify.  The government's fallback "MEV-Boost validator" theory was likewise unexpected because it is materially indistinguishable from a theory that the Second Circuit has rejected, and even a three-plus-week trial left the theory's contours unclear.  *See supra* pp.34-38.

*Second*, the analogy to the spoofing cases—which only ever purported to cover the Lure Transactions—fell apart at trial.  As discussed above, *see supra* pp.14-16, the records in the spoofing cases were replete with evidence sufficient for a jury to conclude beyond a reasonable doubt that a trade that was not a representation in a normal sense functioned like one in that particular instance.  And as it relates to the due process issue, the spoofing comparison requires applicable market rules that prohibited the conduct.  *See* ECF 112 at 16 (stating that "whether [the Peraire-Buenos] were subject to any rules or protocols analogous to those in *Chanu*," was "a question of fact for trial").

The record defies this analogy.  Commodities market rules are definite things that market participants can look up, refer to, and collectively understand; Ethereum has no code of conduct that purports to be "rules."  It doesn't even have terms of use.  Commodities market rules are promulgated by a central authority; Ethereum is decentralized.  Commodities market rules carry professional sanction; Ethereum users are anonymous and even "slashed" validators can stake more ETH and become new anonymous validators.

With respect to Ethereum, there was limited testimony likening features of the protocol such as the slashing penalty to "rules," but this mostly came through the government's tracing expert who was not qualified to contradict or supplement testimony from Miller, Chen, and Falk. *E.g.*, Tr.2020, 2025, 2109.  The supposed "rules" themselves were not introduced or clearly articulated.  Nobody from Ethereum testified.

The complete record shows that these protocol features are not "rules" or even stand-ins for rules; rather, they are protocol design features that allow Ethereum as a decentralized, trustless blockchain to operate without rules. Analogizing them to rules (and premising a criminal prosecution on that analogy) gets things precisely backwards: the features are anti-rules. The assumption on Ethereum is that validators will ignore them when doing so is economically rational. Tr.3043-44. Miller's team designed MEV-Boost on the assumption that validators will unbundle if they can. Tr.368-69. Dr. Falk explained how the economic incentives (and disincentives) work to guide behavior in the absence of rules. Tr.3044-45.[23] The absurd result of this protocol-design-as-rules analogy is that the Peraire-Buenos are being prosecuted for conduct that met the baseline assumptions about typical and expected validator behavior. If so, the analogy obviously flouts the Fifth Amendment's fair notice requirement.

With respect to MEV-Boost, the record is even more limited and similarly confounds comparison to the spoofing cases. MEV-Boost itself has no rules, or even a slashing mechanism like Ethereum. The government's witnesses testified only to the software's typical functionality and supposed "intended use." *Supra* pp.33, 36. The government may seek to extrapolate from the design of "MEV-Boost" (and/or its "ecosystem" of users) an implicit set of rules based on what users may have understood about its purpose and intended function. (Indeed, that was the unspoken premise of its "MEV-Boost validator" theory.) But it has never identified a case that sustained a fraud conviction based on such a vague source of obligations.

---

[23] The reaction in the Ethereum community to Omakase highlights the unexpected nature of a prosecution based on this kind of validator behavior, as Coin Center noted. *See* ECF 203-01 at 11. None of the mixed reactions to the strategy introduced into evidence (other than the accusations by the then-anonymous Savannah) indicate otherwise.

Even if "MEV-Boost" could be a source of implicit rules, it is far from clear what those rules are. The Flashbots documentation is ambiguous at best. The same documents that would show how the system was "supposed" to work revealed that the conduct here—a validator signing another block after the relay "unblinds" the transactions in a potential block—was a possible and even expected outcome. *See supra* pp.11, 19-21. Given these disclosures, it would not be obvious to an objective observer that the MEV-Boost "system" was even "intended" to prevent something like Omakase when that strategy merely accomplished what the disclosures said could happen. It would be surprising that there was a supposed "rule" against it.

In sum, the differences between the rules in the spoofing cases and what the government may point to as stand-ins for rules in this case are too many and too meaningful for the spoofing cases to supply constitutional fair notice.

*Third*, all the facts that the Peraire-Buenos identified pretrial that make this case unexpected are now proven. Ethereum is a decentralized blockchain that is trustless by design. Tr.348, 3027. The role of validator was created in September 2022, mere months before the Omakase strategy was developed. Tr.361-62. Validators do not need to agree to behave in a certain way, sign no terms of use, and are not trusted players. Tr.3027; *see also* Tr.1609. Validators do not interact with searchers (including sandwich attackers) and make them no promises. Tr.1782-83, 3081-82.

Omakase was a trading strategy that relied on publicly available data and transparent code. Tr.432, 910, 933-34. The supposed vulnerability in the relay code was as visible and available to the alleged victims to see as to the Peraire-Buenos. Tr.993. Miller testified that Omakase or something like it was inevitable given these facts and the economic incentives at play. Tr.528.

The alleged victims were sandwich attack bots who manipulate prices in liquidity pools to victimize retail traders.  Tr.383-84.  Those bots automatically traded based on pre-programmed code that the Peraire-Buenos did not "hack" or alter in any way.  Sandwich attacks are controversial on Ethereum.  As promised, the Peraire-Buenos did not argue to the jury that sandwich attacks are illegal.  That's the point: the fact that this form of adversarial trading with obvious analogies to illegal market manipulation in other markets has not been prosecuted would impact any expectation about permissible trading on Ethereum.  Additionally, sandwich attacks have inspired counterstrategies conducted in the open, one of which was an inspiration for Omakase.  Tr.923, 3086-87.  Those counterstrategies have been out in the open for years and indisputably (and regardless of the government's shifting arguments about whether this prosecution team might consider them illegal) have never been prosecuted.

This constellation of undisputed facts makes this case unlike any other fraud case this Court or any court has ever seen.  The government's case was revealed to be a handful of novel theories in search of a statutory basis.  But these theories did not fit the wire fraud mold.  The Peraire-Buenos had no notice that Omakase could be considered fraud.  After a three-plus-week trial, a jury of their peers assessing mostly undisputed facts was unable to find that it was after asking several thoughtful questions about how the unique facts and law interacted.  In the event the Court does not grant judgment of acquittal, the Court should dismiss the Indictment.

## CONCLUSION

For all of the reasons discussed above and in the Peraire-Buenos' initial Motions to Dismiss the Indictment (ECF 49) incorporated herein, the Court should grant judgment of acquittal on all Counts in the Indictment or, in the alternative, dismiss the Indictment.

Date: December 12, 2025

Respectfully submitted,

By: */s/ Patrick J. Looby*

Katherine Trefz (*pro hac vice*)
Daniel Shanahan (*pro hac vice*)
Patrick J. Looby (*pro hac vice*)
Joseph Bayerl (*pro hac vice*)
Ikenna Ugboaja (*pro hac vice*)
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
ktrefz@wc.com
dshanahan@wc.com
plooby@wc.com
jbayerl@wc.com
iugboaja@wc.com

Jonathan P. Bach
Shapiro Arato Bach
1140 Avenue of the Americas
17th Floor
New York, NY 10036
Tel: 212-257-4897
jbach@shapiroarato.com

*Counsel for Defendant*
*James Peraire-Bueno*

By: */s/ Daniel N. Marx*

Daniel N. Marx
William W. Fick (*pro hac vice*)
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Tel: 857-321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

*Counsel for Defendant*
*Anton Peraire-Bueno*

55

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.

*/s/ Patrick J. Looby*
Patrick J. Looby

**CERTIFICATE OF WORD-COUNT**

I hereby certify that the foregoing document contains 17,393 words calculated consistent with Federal Rule of Appellate Procedure 32(f).

*/s/ Patrick J. Looby*
Patrick J. Looby