

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 19, 2026

**BY ECF**
The Honorable Jessica G. L. Clarke
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601-4150

      Re: *United States v. Anton Peraire-Bueno, et al.*, S1 24 Cr. 293 (JGLC)

Dear Judge Clarke:

      In advance of trial in this case, the Government respectfully requests that the Court permit the deposition of a witness located abroad pursuant to Federal Rule of Criminal Procedure 15. As set forth below, the testimony of the witness, Justin Drake, is material and Mr. Drake has otherwise refused to testify in person at trial. Because of that refusal, the Government has sought to compel Mr. Drake's testimony in the United Kingdom. The Court should permit a deposition in order to preserve Mr. Drake's testimony for trial because, as set forth below, the Government has established that there are "exceptional circumstances" justifying a pre-trial deposition.

      Defense counsel has not provided consent to the Government's application at this time.

**I.  Background**

      Mr. Drake was a leading member of a team that operated an Ultrasound relay that used a version of the MEV-Boost relay open-source code that was exploited by the defendants on April 2, 2023, as part of a fraudulent scheme to steal $25 million worth of cryptocurrency from particular Ethereum traders (the "Exploit"). Upon learning of the Exploit, Mr. Drake was involved in the Ethereum community effort to patch the vulnerability. Moreover, in the weeks that followed the Exploit, Mr. Drake was in direct communication with the defendants, who sought to extort him in messages sent through the defendants' anonymous Proton mail e-mail account. In exchange for Mr. Drake and two others recanting their characterization of the Exploit as an "exploit"—a term the defendants knew was associated with illicit activity—the defendants proposed a *quid pro quo*, offering to reveal additional software vulnerabilities that, if they were exploited, might result in similar thefts. In the weeks that followed, Mr. Drake was involved in efforts to persuade the defendants to return the stolen money. As part of those efforts, Mr. Drake urged them to "return the tens of millions acquired from the equivocation" rather than "spend years laundering millions." Ultimately, the defendants refused Mr. Drake's request to return the proceeds.

## II. The Court Should Permit A Rule 15 Deposition

### A. Applicable Law

Rule 15 authorizes a party to "move that a prospective witness be deposed in order to preserve testimony for trial" in "exceptional circumstances and in the interest of justice."[1] Fed. R. Crim. P. 15(a)(1). In this Circuit, it is "well-settled" that "the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984). To demonstrate that exceptional circumstances exist, the movant must show that "(1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Menendez*, No. 23 Cr. 490 (SHS), 2024 WL 2214906, at *1 (S.D.N.Y. May 16, 2024); *see also United States v. Cohen*, 260 F.3d 68, 72 (2d Cir. 2001); *United States v. Conyers*, No. 23 Cr. 457 (JGLC), slip op. at 1–2 (S.D.N.Y. Jan. 14, 2026). The burden of satisfying this test is on the party seeking the deposition. *See United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962).

A witness's "[u]navailability is defined by reference to Rule 804(a) of the Federal Rules of Evidence." *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999). Thus, a witness is unavailable for trial if, among other reasons, they are "absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance." Fed. R. Evid. 804(a)(5)(A)–(B). "Unavailability is to be determined according to the practical standard of whether under the circumstances the government has made a good-faith effort to produce the person to testify at trial." *Johnpoll*, 739 F.2d at 709. "The prototypical . . . circumstance in which a witness is unavailable is when he or she is not amenable to service of process." *United States v. Colon*, No. 24 Cr. 367 (LJL), slip op. at 5 (S.D.N.Y. Oct. 22, 2024).

A witness's "testimony is material if it is highly relevant to a central issue in the case." *United States v. Vilar*, 568 F. Supp. 2d 429, 440 (S.D.N.Y. 2008). Although the analysis considers whether the testimony would be "admissible and non-cumulative of other evidence," materiality is "primarily a question of relevance, not necessity." *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2022 WL 9843495, at *4 (S.D.N.Y. Oct. 17, 2022). "Evidentiary relevance under Federal Rule of Evidence 401 is not affected by the availability of alternative proofs." *Id.* (citing *Old Chief v. United States*, 519 U.S. 172, 179 (1997)). Materiality may be satisfied both in establishing the elements of a crime as well as in rebutting a potential defense. *See, e.g.*, *United States v. Grossman*, No. 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y Mar. 2, 2005) (testimony material to "knowledge and participation in the alleged fraudulent schemes" and "false representations allegedly made"); *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993) (testimony of defendant's superiors that they had not authorized the allegedly fraudulent transaction was material because it rebutted an expected defense); *Johnpoll*, 739 F.2d at 709 (in trial related to transport of stolen securities, testimony of Swiss witnesses involved in arranging

---

[1] Permitting a Rule 15 deposition to be conducted does not determine the admissibility of the testimony as evidence. Fed. R. Crim. P. 15(f) ("An order authorizing a deposition to be taken under this rule does not determine its admissibility.").

the transport was material); *but see Cohen*, 260 F.3d at 78 (holding the proposed testimony was not material because it was not relevant to the question of the defendant's guilt or innocence).

"In general, testimony is necessary to prevent a failure of justice when the witness is unavailable, his testimony is material, and there are no substantial countervailing factors militating against the taking of the deposition." *Grossman*, 2005 WL 486735 at *2. "[W]hen a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, justice generally requires preservation of that testimony." *Vilar*, 568 F. Supp. 2d at 442–43; *Grossman*, 2005 WL 486735, at *4; *United States v. Khan*, No. 06 Cr. 255, 2008 WL 2323375, at *4 (E.D.N.Y. June 2, 2008) ("The final factor—the necessity of the testimony to prevent a failure of justice—is likely satisfied when the first two factors are met."). Accordingly, "precluding the taking of depositions under [such] circumstances is likely to frustrate, not expedite, the administration of criminal justice." *Drogoul*, 1 F.3d at 1556. "The nonmovant bears the burden of identifying countervailing factors." *Alexandre*, 2022 WL 9843495, at *3.

### B. Discussion

Because Mr. Drake is unavailable to testify at trial, his testimony would be material, and there are no significant countervailing factors weighing against the taking of his deposition, the Court should permit a Rule 15 deposition.

1. <u>Mr. Drake Is Unavailable to Testify at Trial, and the Government Has Made a Good Faith Effort to Secure His Presence</u>

*First*, because Mr. Drake, a United Kingdom citizen and resident, is located outside the United States, the Government lacks the authority to subpoena his testimony at trial. *See* Fed. R. Evid. 804(a)(5). Nonetheless, the Government has taken repeated steps to obtain Mr. Drake's trial testimony voluntarily—both at the October 14, 2025 trial and at the upcoming retrial. Among them, United Kingdom law enforcement authorities acting at the Government's request visited Mr. Drake's residence on at least one occasion in or about early September 2025 to request his voluntary testimony at the October 14, 2025 trial.[2] On or about December 3, 2025, the Government submitted a Mutual Legal Assistance Treaty ("MLAT") request (the "MLAT Request") to the United Kingdom authorities seeking compelled document production and deposition testimony in the United Kingdom absent voluntary participation. On January 15, 2026, British authorities served Mr. Drake with a letter, directing him to notify the Government by February 6, 2026, if he agreed to participate voluntarily. Since January 29, 2026, the Government has been in communication with Mr. Drake's United States legal counsel concerning the voluntary request and the pending MLAT Request. According to representations by his counsel, Mr. Drake will not testify voluntarily at trial in the United States, even if all costs associated with such testimony are borne by the Government. Accordingly, pursuant to the MLAT Request, the Government has sought to compel Mr. Drake's testimony in the United Kingdom should he

---

[2] Although Mr. Drake did not then speak with law enforcement, a person at his residence who did indicated that Mr. Drake was aware of the U.S. prosecution.

3

continue to refuse to voluntarily testify.[3]  Mr. Drake's refusal to testify, combined with the Government's diligent and good faith efforts to obtain his testimony, establishes his unavailability. *See, e.g.*, *Johnpoll*, 739 F.2d at 709 (four Swiss nationals were all unavailable pursuant to Rule 15); *United States v. Sindona*, 636 F.2d 792, 803 (2d Cir. 1980) ("prospective witnesses had specifically refused to come to the United States"); *Kostin*, 2025 WL 1002254, at *4 (witnesses in the United Kingdom who refused to travel to the United States were unavailable); *United States v. Mashinsky*, No. 23 Cr. 347 (JGK), 2024 WL 4728499, at *5 (S.D.N.Y. Nov. 8, 2024) (witnesses "outside the subpoena power of the Court" and "unwilling to come to the United States to testify at trial" unavailable); *United States v. Htut*, No. 22 Cr. 671 (NSR), 2023 WL 3222484, at *2 (S.D.N.Y. May 3, 2023) (citing witnesses' "status as foreign nationals outside of the subpoena power of the court"); *Alexandre*, 2022 WL 9843495, at *3 (witnesses abroad "would not be amenable to service of United States process"); *United States v. Fargesen*, 2022 WL 4110303, at *3 (S.D.N.Y. Sept. 8, 2022) (witnesses residing in Dubai were "outside the Court's subpoena power"); *United States v. Little*, No. 12 Cr. 647 (ALC), 2014 WL 1744824, at *2 (S.D.N.Y. Apr. 23, 2014) (United Kingdom resident unavailable); *Vilar*, 568 F. Supp. 2d at 439 (unavailability where the government requested several times that witnesses in the United Kingdom travel at the government's expense to the United States, and the witnesses declined); *Grossman*, 2005 WL 486735 at *3 (witness "a resident of Canada and thus beyond the subpoena power of the court").

   2. Mr. Drake's Testimony is Material

*Second*, the witness's testimony satisfies the materiality requirement because (1) Mr. Drake is a percipient witness to, and victim of, the defendants' crimes; and (2) Mr. Drake's testimony is necessary to rebut a particular defense the defendants have advanced, *i.e.* that, although they shared the same MEV-Boost Relay open-source coding vulnerability, the particular MEV-Boost Relay that was tricked by the defendants' Exploit had been operated by Ultrasound rather than directly by Flashbots itself.

As the Court knows, Mr. Drake's role as a witness to, and victim of, the defendants' conduct was relevant throughout the first trial in this case.  Witnesses testified, for example, that (i) Mr. Drake worked at the Ethereum Foundation and was affiliated with an Ultrasound relay at the time of the Exploit (Tr. 286, 526); (ii) the Ultrasound relay Mr. Drake operated was "exploited and [] prematurely released bundle information" by virtue of the defendants' scheme, (Tr. 1667); (iii) Mr. Drake was among a group of "security experts [and] Ethereum researchers" who sought

---

[3] For purposes of the Government's Rule 15 motion, Mr. Drake's unavailability at trial in the United States does not depend on a United Kingdom's court approval of the MLAT Request, nor does the Government's motion turn on whether or not Mr. Drake's deposition is ultimately conducted in the United Kingdom on a voluntary basis or after being compelled by a United Kingdom court.  *See Vilar*, 568 F. Supp. 2d at 439 ("Neither the text of Rule 15 nor binding case law concerning the Rule provide any basis to conclude that, in resolving a Rule 15 motion, courts must consider the witness's willingness to voluntarily appear at a deposition in a foreign country."); *see also United States v. Kostin*, No. 24 Cr. 91 (GHW), 2025 WL 1002254, at *4 (S.D.N.Y. Apr. 3, 2025) (voluntary deposition of witnesses in the United Kingdom).

to respond to the Exploit by identifying the culprits and patching the MEV-Boost code, (Tr. 1666–67); (iv) Mr. Drake received e-mails from the defendants' anonymous "Low Carb Crusader" Proton account linking the defendants' identities to the Exploit, (Tr. 286, 292–93, 297 (defendants admitting "they were responsible for the incident on April 2nd"), 544; GX-708 (defendants stipulating to use and control of the Proton account)); (v) the defendants sought to conceal their identities in communications with Mr. Drake and others by seeking to anonymize their patterns of speech using large language models and by communicating over VPNs, (Tr. 823–24, GX-3478); (vi) Mr. Drake was extorted by the defendants, who threatened future hacks unless they were referred to "in a neutral way . . . instead of a negative way, like a relay exploiter," (Tr. 297–98, 292 (defendants threatening to "pull off something similar"), 818–19, 826–827 (Travis Chen explaining that public references to the Exploit mattered because they could cause "Coinbase to use it as a reason not to off-ramp us"); GX-3478 (James Peraire Bueno explaining, "the condition can just be that they recant calling it an exploit")); and (vii) Mr. Drake unsuccessfully sought to persuade the defendants to return, rather than launder, the proceeds of the Exploit (Tr. 826, 1907; GX-507, 3713 (Mr. Drake asking the defendants, "What's your next step?  I hope it's to build something amazing, not to spend years laundering millions.")).[4]  The Government expects Mr. Drake's testimony will be material to each of these topics, all of which will be plainly relevant at trial: Mr. Drake may directly explain key aspects of how the defendants' scheme was carried out, including how it was used to exploit the Ultrasound relay on April 2, 2023; whether Mr. Drake had other communications with the defendants; and why Mr. Drake—described by defense counsel as a "fairly prominent member[] of this community in the Ethereum world," (Tr. 526)—apparently understood the defendants' conduct as sufficiently disconcerting that it could require years of "launder[ing]" the proceeds to pull off.

The defendants, for their part, have made much of Mr. Drake's absence from the first trial, arguing, among other things, that (i) the Government could not prove a material misrepresentation without testimony or documents directly from Ultrasound, rather than Flashbots, (Tr. 45–46, 224–26, 339–43, 2672, 3360, 3388; Def. Mot. for Acquittal ("Def. Rule 29 Br.") (Dkt. 226) at 2); (ii) an Ultrasound relay may have never checked the validity of blockheader signatures anyway, if hypothetically a builder had relied upon Optimistic relaying, (Tr. 431, 3456; Def. Rule 29 Br. at 22–24); (iii) there existed a theoretical chance the Ultrasound relay may not have even been involved in "actually [] publishing a block" at all, (Tr. 3388); (iv) the Ultrasound relay might not have had "terms that a validator must agree to abide," (Tr. 963, 2687; Def. Rule 29 Br. at 36); and (v) the Ultrasound relay could not have been tricked because the defendants' deception was publicly available "for anyone to see," (Tr. 3386; Def. Rule 29 Br. at 26).  Repeatedly insisting that the "Government doesn't have an Ultrasound witness [and] they've never gotten documents from Ultrasound," (Tr. 45–46), and there was "no testimony in this case about how the Ultrasound Relay was coded or implemented," (Tr. 3388), the defendants portrayed this claimed lack of

---

[4] That other evidence relating to Mr. Drake was admitted at the first trial does not make his direct testimony "cumulative" so as to not be material.  "Materiality is primarily a question of relevance, not necessity," *Alexandre*, 2022 WL 9843495 at *4 (citing *United States v. Salim*, 855 F.2d 944, 952 (2d Cir. 1988) ("Rule 15 concentrates first on preservation of testimony and only thereafter focuses on admissibility.")); *see also Colon*, slip op. at 4 (testimony is cumulative where it is "unnecessarily repetitive," not where it "it increases the weight of the evidence" against the defendant).

evidence about Ultrasound as a "glaring gap in the Government's case" stemming from the fact that there were "no Ultrasound Relay documents produced in this case," "no Ultrasound Relay witness called," and no "Ultrasound Relay[] code . . . produced." (Tr. 2672; *see, e.g.*, Def. Rule 29 Br. 36 ("there was no Ultrasound witness")).

Although the Government's evidence was sufficient to convict the defendants without an Ultrasound witness at trial, and a rational jury was entitled to reject the defendants' conjectures,[5] there can be little doubt that responding to such arguments with the testimony and documents from Ultrasound—which the defendants have purported to long seek—would be material at trial. Mr. Drake's testimony may rebut each of the defendants' various theories by explaining, among other things, the design and code of the Ultrasound relay the defendants exploited; the degree to which its code did, or did not, differ from Flashbots's open-source MEV-Boost Relay code which Ultrasound adapted; the capacity for the defendants' Exploit to affect, or not, the actions of the Ultrasound relay; and the extent to which Ultrasound's protocols established rules according to which it normally operated. Indeed, because the defendants in closing arguments expressly invoked the absence of direct Ultrasound evidence as a reason why the jury should find reasonable doubt, (*see, e.g.*, Tr. 3456), they cannot possibly now argue that such evidence would not be material at trial.

3. <u>There Exist No Substantial Countervailing Factors Against the Taking of the Deposition</u>

*Third*, there exist no countervailing factors here that weigh against the taking of Mr. Drake's deposition. "In general, whether a Rule 15 deposition is necessary to prevent a failure of justice depends on the first two factors," *Colon*, slip op. at 8, but some courts have denied a

---

[5] As the Government explained in its opposition to the defendants' motion for acquittal, (Govt. Mot. for Acquittal Opp. ("Govt. Rule 29 Br.") (Dkt. 236) at 40–44, 48–53) the jury was entitled to reject these arguments. As the defendants themselves acknowledge, the Ultrasound relay contained the same MEV-Boost coding vulnerability that "did not check the parent or state root fields," such that "attesting validators rejected the block as invalid when they later voted on it." (Def. Rule 29 Br. at 6). Although the Government was unable (because of Mr. Drake's unavailability) to introduce the Ultrasound code itself into evidence, Robert Miller testified that the Ultrasound relay was just "another MEV-Boost Relay," (Tr. 259, 268), because Ultrasound "had taken the open source version of MEV-Boost Relay that . . . Flashbots made, and modified it." (Tr. 268, 340 ("they took the MEV-Boost Relay software, made modifications to it, and they were running that")). There was no evidence adduced in the defense case that Ultrasound's MEV-Boost Relay happened to fail for some reason *other than* by falling victim to the defendants' carefully plotted scheme—which, as the trial testimony and Omakase code itself established, targeted numerous relays all built upon the same open-source MEV-Boost code, including those operated by Ultrasound, Flashbots, and others, (Tr. 208, 955, 2609, 2720; GX-604 (Omakase code expressly identifying Flashbots, Ultrasound, and other MEV-Boost Relays), GX-608 at 13 (same), 606 at 9–10 (same))—and a rational jury could have credited that evidence. In any event, the Government's case was not premised narrowly on the material misrepresentations made to the MEV-Boost Relay alone, but rather upon a wide-ranging scheme to defraud which spanned deceptive conduct in multiple, coordinated spheres.

6

deposition where the defendants' right to cross-examination could not be meaningfully honored or because the Government delayed in seeking the deposition. *See Drogoul*, 1 F.3d at 1554 (cross-examination); *Vilar*, 568 F. Supp. 2d at 442 (explaining that it is "clear" denying a Rule 15 motion because of delay must be the product of a "serious lack of due diligence" by the moving party); *Grossman*, 2005 WL 486735, at *3 (same). Here, however, the depositions contemplated by the Government would entail in-person cross-examination by defense counsel. And because a trial date has not yet been set in this case and the Government has engaged in diligent efforts since early December 2025 to obtain Mr. Drake's deposition testimony, there can be no basis to find delay by the Government resulting in any possible injustice.

### III. The Deposition May Be Taken Without the Defendants' Presence

Should the Court grant the Government's application, the Government intends to continue to consult with the United Kingdom authorities, Mr. Drake's counsel, and defense counsel on mutually agreeable dates for Mr. Drake's deposition. The Government understands from diplomatic consultation, however, that the defendants would not be permitted to gain entry into the United Kingdom to attend the requested deposition in person. Accordingly, the Government expects to make arrangements to enable the defendants to participate in the proceedings by video- or teleconference—a procedure that Courts in this District and the Second Circuit have repeatedly approved, applying the identical standard for a Rule 15 deposition. *See United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (live, two-way closed circuit video testimony did not implicate the Confrontation Clause); *Salim*, 855 F.2d at 949 (permitting transcribed Rule 15 deposition abroad without defendant's presence and without either recording or live transmission); *see also United States v. Mostafa*, 14 F. Supp. 3d 515, 525 (S.D.N.Y. 2014) (live CCTV testimony at trial); *United States v. Abu Ghayth*, No. S14 98 Cr. 1023, 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014) (live CCTV Rule 15 deposition). Accordingly, for substantially the same reasons described above, the Court should find that the witness's testimony could provide substantial proof of a material fact in a felony prosecution; there is a substantial likelihood that the witness's attendance at trial cannot be obtained; the witness's presence for a deposition in the United States cannot be obtained; the defendants cannot be present because the country where the witness is located will not permit the defendants to attend the deposition; and the defendants can meaningfully participate in the deposition through reasonable means, and order the deposition be taken without the defendants' presence. *See* Fed. R. Crim. P. 15(c)(3).

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: /s/ _____
Jerry Fang, Danielle Kudla,
Benjamin L. Levander, and Ryan T. Nees
Assistant United States Attorneys
(212) 637-2584 / 2304 / 2571 / 1595

Cc:     Defense Counsel (by ECF)