LAW OFFICES
## WILLIAMS & CONNOLLY LLP®

KATHERINE TREFZ
PATRICK LOOBY

680 MAINE AVENUE SW
WASHINGTON, DC 20024
202.434.5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 5, 2026

<u>Via ECF</u>

The Honorable Jessica G. L. Clarke
United States District Judge
United States District Court for the Southern District of New York
300 Quarropas St.
White Plains, NY 10601

      Re:    *United States v. Peraire-Bueno*, 24 Cr. 293 (JGLC) – Defendants' Joint Opposition to Motion for Rule 15 Deposition of Justin Drake

Dear Judge Clarke:

      The government's motion for an out-of-country Rule 15 deposition of Justin Drake comes at an odd time. With Rule 29 pending, the government claims both that it was missing material testimony from an individual it had known about for more than two years prior to the October 2025 trial and that it already presented enough evidence to convict the Peraire-Buenos. It seeks an expensive, out-of-country legal process that would exclude the Peraire-Buenos from being present for the testimony of an individual the government now claims was an uncharged "victim" but who declines to appear voluntarily.

      The Peraire-Buenos oppose the motion. The Court should defer consideration of the motion until after it has decided the Peraire-Buenos' Rule 29 motion. On the merits, the motion falls short because, as discussed below, it provides no basis to understand how Mr. Drake will testify on the topics the government has identified, which primarily relate to aspects of the technology about which there was no serious dispute at trial. Additionally, the interest of justice is not served by a deposition in light of the expense, the burden to the Peraire-Buenos' Sixth Amendment rights, and the limited relevance of the identified topics.

      If the Court grants the motion, it should order (1) that the Peraire-Buenos be present if permissible under the United Kingdom's procedures; (2) the videorecording of the deposition; (3) the government's immediate production of any material subject to production under 18 U.S.C. § 3500, *Brady*, or *Giglio*; (4) Mr. Drake's production of documents identified below, *see* § III, *infra*; and (5) the government to pay expenses associated with the deposition pursuant to Rule 15(d).

WILLIAMS & CONNOLLY LLP®

March 5, 2026
Page 2

I. **The Court Should Defer Consideration of This Motion Until After It Addresses the Peraire-Buenos' Pending Rule 29 Motion.**

As an initial matter, the Peraire-Buenos request that the Court defer any ruling on this motion until after the Court has ruled on their pending Rule 29 motion. If the Court grants the Rule 29 motion, there will be no further trial, *see Evans v. Michigan*, 568 U.S. 313, 318 (2013), and the Rule 15 motion will be moot. The Peraire-Buenos should not be required to expend their limited resources preparing for an out-of-country deposition that may not be necessary.

II. **The Government Has Not Met the Standard for a Rule 15 Deposition.**

"Depositions should not be used lightly in criminal trials." *United States v. Colon*, No. 1:24-cr-00367-LJL, ECF 36, at 2 (S.D.N.Y. Oct. 22, 2024). To justify its Rule 15 deposition, the government must show that "exceptional circumstances" exist and the deposition is "in the interest of justice." Fed. R. Crim. P. 15(a)(1). "Exceptional circumstances" exist where the movant shows (1) the unavailability of the witness; (2) the testimony is material, that is, "highly relevant to a central issue in the case," *United States v. Vilar*, 568 F. Supp. 2d 429, 437, 440 (S.D.N.Y. 2008) (citation omitted); and (3) "the testimony is necessary to prevent a failure of justice," *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001). Where, as here, the potential deposition will burden the defendants' Sixth Amendment right to be present for cross-examination, the Rule "authorizes a deposition . . . only in very limited circumstances," with the moving party "shoulder[ing] the burden" to satisfy the Rule 15(c)(3) requirements "by a preponderance of the evidence." Fed. R. Crim. P. 15, adv. comm. note to 2011 amendment. In these circumstances, the court must "make[] casespecific findings" that "the witness's testimony could provide substantial proof of a material fact in a felony prosecution," among others. Fed. R. Crim. P. 15(c)(3)(A).

Although the Peraire-Buenos agree that Mr. Drake is "unavailable" as contemplated by Rule 15 and Rule 15(c)(3)(B), they submit that the government has not met the materiality standard and the deposition would not serve the interest of justice given the financial and constitutional burdens it would impose.

A. Materiality

1. **The government has not proffered the content of Mr. Drake's potential testimony.**

Although the government has identified topics about which Mr. Drake may have relevant knowledge, it has not demonstrated that he will testify to these topics or how. While an affidavit from the potential deponent is not required, the moving party needs "at least some credible, reliable basis to believe that the witness would testify as forecasted before a Rule 15 deposition can be authorized." *United States v. Jefferson*, 594 F. Supp. 2d 655, 669 (E.D. Va. 2009). When "the government is the moving party," it must show that the testimony "inculpates[] the defendant." *United States v. Abu Ghayth*, 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014). This burden is typically met by proffering *the content* of the testimony—usually based on prior interviews or

WILLIAMS & CONNOLLY LLP®

March 5, 2026
Page 3

interactions with the witness—not simply by identifying potential topics. For example, in *United States v. Vilar*, the government described the content of the anticipated testimony based on prior interviews. 568 F. Supp. 2d 429, 433 (S.D.N.Y. 2008); *see also, e.g.*, *United States v. Kostin*, 2025 WL 1002254, at *4 (S.D.N.Y. Apr. 3, 2025) (government provided attorney declaration that "proffer[ed] facts about the witnesses and their expected testimony based on prior interviews and recent phone calls"); *United States v. Fargesen*, 2022 WL 4110303, at *1 (S.D.N.Y. Sept. 8, 2022) (witness declaration summarizing potential testimony); *United States v. Khan*, 2008 WL 2323375, at *2 (E.D.N.Y. June 2, 2008) (defense counsel declaration); *United States v. Grossman*, 2005 WL 486735, at *1 (S.D.N.Y. March 2, 2005) (defense counsel represented potential testimony based on prior meetings with witness). Where a party fails to make that showing or draws speculative conclusions, courts have denied Rule 15 depositions. *E.g.*, *United States v. Menendez*, 2024 WL 2214906, at *2 (S.D.N.Y. May 16, 2024) (denying defense depositions on this basis).

The government's proffer is inadequate. There is no indication in the motion or in the discovery provided to the Peraire-Buenos that the government has spoken to Mr. Drake about the substance of his potential testimony. The motion suggests the contrary. ECF 239 at 3 (describing failed attempts to contact him). While the motion identifies potential topics Mr. Drake "may" testify to, *see* ECF 239 at 5, it appears that this description is based on the government's argumentative view of the facts rather than Mr. Drake's. The government also lists several defense arguments about the Ultrasound Relay, *see* ECF 239 at 5-6, but does not say that Mr. Drake is expected to rebut those points.

### 2. The government's proposed topics would not provide "substantial proof of a material fact."

Testimony on the topics the government has identified would not provide "substantial proof of a material fact" in the case. The government's list of ways that Mr. Drake's name arose at trial and the potential topics on which he might have information fall into two buckets: (1) potential evidence related to how the Ultrasound Relay and the Omakase strategy functioned and (2) potential evidence related to the period after the Omakase strategy.

#### a. Evidence regarding how the technology functioned

The government has not shown that Mr. Drake's testimony on the functionality of the Ultrasound Relay or Omakase would assist its case. The facts on these topics established at trial in the government's case-in-chief are fatal to the government's theory that the Ultrasound Relay was "tricked" by any material misrepresentation.

With respect to how the Ultrasound Relay functioned, the government's witnesses confirmed that the Ultrasound Relay was not checking for the supposedly false information when it reviewed a validator's cryptographic signature. As the Peraire-Buenos explained in their Rule 29 briefing, that fact defeats any argument that the signature was materially false. *See* ECF 226 at 22-26. There is no further testimony Mr. Drake could give on this topic that would provide "substantial proof of a material fact" in the government's favor—and the government's Rule 15

WILLIAMS & CONNOLLY LLP

March 5, 2026
Page 4

motion does not describe any. On other aspects of the government's "false signature" theory, the government provides no basis to conclude that Mr. Drake would disagree with Mr. Miller, Mr. Chen, and Dr. Falk that a cryptographic signature is at most a cryptographic commitment to be slashed in accordance with the Ethereum Protocol if the validator signs another block. *See* ECF 226 at 19-21; ECF 237 at 15.[1]

The government also suggests that Mr. Drake may have relevant knowledge regarding the mechanics of Omakase. *See* ECF 239 at 5 (identifying that "Mr. Drake may directly explain key aspects of how the defendants' scheme was carried out"). But it is hard to imagine *Mr. Drake's* testimony would be sufficiently material on that topic to justify the deposition. Other witnesses, including Mr. Chen, testified about how the Omakase strategy was carried out, and there was little or no dispute on the mechanics of how the various computer programs were coded or performed.

Testimony on other issues falling under this topic is likely inadmissible. To the extent the government suggests Mr. Drake could testify about the "intended" design of the Ultrasound Relay, about whether Omakase "mattered" to Mr. Drake, or about whether Mr. Drake would have done things differently in hindsight if he had anticipated the equivocation strategy, such testimony would have no bearing on any element of the alleged fraud which required a material misrepresentation *by the Peraire-Buenos* capable of influencing *the relay*. *See* ECF 226 at 22-23 (discussing the correct materiality inquiry), 32-38 (discussing *Finnerty*); *see also* ECF 237 at 11-14, 17-18, 22.

Finally, the government notes that the Peraire-Buenos raised the absence of any Ultrasound witness in jury argument and post-trial briefing. But that argument was not a suggestion that Mr. Drake's testimony would solve the government's fundamental problems in the case. Rather, given how the government framed its case, Ultrasound's absence at trial was relevant. The government was permitted to elicit testimony from Mr. Miller about his intentions for MEV-Boost and to frame *Flashbots* as a victim. In light of those government arguments, it was proper for the defense to argue that the testimony was of little value given Flashbots' attenuated connection to the case. The Peraire-Buenos maintain that testimony of this sort is irrelevant and unfairly prejudicial whether it comes from Mr. Miller or from Mr. Drake. The trial record demonstrates that the government would not be able to satisfy its burden by calling Mr. Drake any more than it could by calling Mr. Miller, because there is no evidence the Peraire-Buenos ever agreed to conform to Mr. Miller's conception of "intended use" of the relay technology—or Mr. Drake's conception of such "intended use," if he has similar thoughts.[2]

---

[1] The Peraire-Buenos maintain that the evidence adduced at the trial on these and other topics require the Court grant judgment of acquittal.

[2] It is notable that the government did not have an Ultrasound witness given its present attempt to frame the relay as an uncharged "victim" of the alleged fraud. The fact that yet another "victim" has not agreed to appear voluntarily speaks volumes about the government's case. Even the founder of the Ethereum blockchain—the very "integrity" of which the indictment claims Omakase "exploited," SI ¶ 1—has expressed concern about the government's arguments. *See*

WILLIAMS & CONNOLLY LLP

March 5, 2026
Page 5

### b. Evidence regarding post-Omakase communications

The government also argues that Mr. Drake could provide testimony regarding his post-Omakase interactions with the Peraire-Buenos. The motion does not establish that this testimony would be relevant or likely admissible, let alone material.

As an initial matter, the Peraire-Buenos disagree with the inflammatory characterization of the events as described in the government's brief: Mr. Drake is not a "victim" of the alleged fraud; the Peraire-Buenos never outright refused to return the cryptocurrency to the anonymous sandwich attackers, but they did ask for more information on the sandwichers' identities; the Peraire-Buenos did not believe the Omakase trading strategy was an "exploit" and made efforts with a half-dozen entities to explain why; the Peraire-Buenos did not believe that they had committed a felony; and they made no attempt to "extort"—a loaded, legal term that should not be uttered at trial—anyone.

For the purposes of this motion, it suffices that the government has not shown that Mr. Drake's testimony would advance these misguided characterizations. For example, the government's continued emphasis on the Peraire-Buenos' use of VPNs, *see* ECF 239 at 5, as a sign of fraudulent intent has not been embraced by any of its witnesses. There is no indication that Mr. Drake felt "extorted" by emails from Low Carb Crusader offering to provide information on another way of executing the Omakase strategy in exchange for referring to it in a more neutral way. And an objective reading of the email to Mr. Drake reveals that the email did not "threaten[] future hacks," as the government suggests. ECF 239 at 5; *see*.¹ Meanwhile, there is no indication that Mr. Drake would adopt the government's framing of GX-3713 (his email exchange with Low Carb Crusader) as probative of the Peraire-Buenos' intent to engage in money laundering; indeed, the email indicates that, while Mr. Drake encouraged Low Carb Crusader to return the cryptocurrency and used the term "laundering," he hoped to work together in the future.

Some of the government's potential topics also raise Rule 403 concerns. For example, the government's desire to inquire as to Mr. Drake's views about "why" Omakase would require "laundering" implicates Rule 403. That line of inquiry is minimally relevant at best because Mr. Drake's intent or opinion is not at issue. And that testimony would be unfairly prejudicial and likely to confuse the jury because (1) the Peraire-Buenos are charged with money laundering and (2) there is no indication that Mr. Drake, who is neither a lawyer nor an American, was using the legal definition under United States law, or even knew that the Peraire-Buenos were subject to United States law. All that was conveyed to the Peraire-Buenos about Mr. Drake's position is set forth in the email itself.

### B. The Interest of Justice

The Court should not find that the proposed deposition is necessary to prevent a failure of justice, or that the deposition is in the interest of justice, for at least four reasons.

---

¹ https://x.com/vitalikbuterin/status/1985666615564710018?s=46, *responding to*: https://x.com/valkenburgh/status/1985374963201626603.

WILLIAMS & CONNOLLY LLP

March 5, 2026
Page 6

First, taking a deposition in London would be an expensive endeavor for the Peraire-Buenos, requiring the expenditure of travel costs and (even if the Court orders the payment of costs) incurring attorneys' fees for the preparation, travel, and taking of the deposition. These serious expenses weigh against ordering a deposition. *See, e.g.*, *United States v. Alexandre*, 2022 WL 9843495, at *3 (S.D.N.Y. Oct. 17, 2022).

Second, the government has taken the position that it does not need Mr. Drake to prove its case beyond a reasonable doubt, which undercuts its position as to the materiality of his testimony.

Third, the Court should weigh the procedural limitations—namely, that, according to the government, the Peraire-Buenos will not be permitted to attend, and it is not even clear whether videoconference participation will be permitted, *see* ECF 239 at 7—against ordering the deposition. Deposition testimony is disfavored as compared to live testimony. The value of live testimony should not be understated: it gives the defendant "an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Barber v. Page*, 390 U.S. 719, 721 (1968). Moreover, this is a complex case in which the Peraire-Buenos' assistance in their own defense is critically important to providing effective assistance of counsel. The Peraire-Buenos object to testimony being introduced against them for which they were not allowed to be physically present. Participation through a live feed or, worse, by teleconference, even if it may satisfy the technical requirements of Rule 15(c)(3)(E), no doubt burdens their Sixth Amendment rights. The government's motion presents uncertainty as to the procedural protections that would be in place, which should be a further weight against the deposition.

Fourth, although an order authorizing a Rule 15 deposition "does not determine its admissibility," Fed. R. Crim. P. 15(f), the Peraire-Buenos submit that potential evidentiary hurdles such as those identified above should bear on the Court's consideration of the motion, and weigh against finding that a deposition would serve the interest of justice.

### III. If the Court Grants the Motion, It Should Make Additional Orders Pursuant to Rule 15(a), (d), and (e).

If the Court grants the motion, the Peraire-Buenos request that the Court order (1) the Peraire-Buenos be present if it is possible pursuant to United Kingdom procedures or, if not, that the Peraire-Buenos be permitted to participate via videoconference and (2) the deposition be video-recorded and not merely transcribed. The Peraire-Buenos also respectfully request that the Court make certain additional orders under Rule 15.

First, the Court should order the government to provide, upon the entry of an order granting the deposition, any 3500 material for Mr. Drake, as well as any *Giglio* and *Brady* material the government has not yet disclosed with respect to Mr. Drake. Fed. R. Crim. P. 15(e)(3). As noted above, the Peraire-Buenos have no indication that the government has spoken with Mr. Drake:

WILLIAMS & CONNOLLY LLP®

March 5, 2026
Page 7

other than the government's motion, they have received no witness disclosures regarding Mr. Drake—no *Brady*, no documents, no 3500 material. In the event the government has had substantive conversations with Mr. Drake or his counsel, the government should be ordered to produce appropriate material within 48 hours of an order granting the deposition. (If the government has *Brady* material with respect to Mr. Drake, it should have already made corresponding disclosures.)

Second, pursuant to Rule 15(a)(1), the Court should order Mr. Drake to produce at the deposition certain documents relevant to the deposition. *See United States v. Fargesen*, 2023 WL 6289954, at *2 (S.D.N.Y. Sept. 27, 2023) (granting government's requests to produce four categories of documents where the requests included "[a]ll records of communications related to CanaFarma in any respect and [witness's] deposition or other testimony in this or any related case," because it determined those requests were "narrowly tailored and seek relevant information"). In particular, the Court should order the production of the following documents relevant to the government's arguments: (1) any contracts, code of conduct, or terms and conditions a validator agreed to when it registered with the Ultrasound Relay or that it agreed to before it interacted with the Ultrasound Relay (or confirmation that none existed); (2) the Ultrasound Relay code in effect at the time of the Omakase strategy, including the code that implemented Optimistic Relaying and the code that checked the digital signature and returned an unblinded payload; (3) documents sufficient to show the changes to the Ultrasound Relay code made in response to the Omakase strategy; (4) communications with Savannah Technologies or its representatives, including individuals communicating under pseudonymous social media handles, related to the Omakase strategy, including direct communications, contracts, offers for payment, or payments made in connection with Savannah Technologies' effort to recover the cryptocurrency it traded away; (5) communications regarding the Omakase strategy; and (6) documents sufficient to identify the timing, amount, and payor of payments received by Mr. Drake related to the Omakase strategy.

Third, the Court should order that the government pay expenses related to the deposition as permitted by Rule 15(d). Rule 15(d) provides that if "the deposition was requested by the government, the court may . . . order the government to pay . . . (1) any reasonable travel and subsistence expenses of the defendant and the defendant's attorney to attend the deposition; and (2) the costs of the deposition transcript." Here, the government requests an in-person deposition of Mr. Drake in the United Kingdom. *See* ECF 239 at 7. Given the length of witness examinations at last fall's trial, the deposition may take over a full day. A multi-day trip to the United Kingdom to depose a witness is not an expense that the Peraire-Buenos should be forced to cover at this stage. The Peraire-Buenos request that the Court exercise its discretion to require the government to pay for the "reasonable travel and subsistence expenses" that the Peraire-Buenos incur in having counsel attend the deposition and the costs for video recording and transcribing the deposition. Courts grant such requests even on behalf of non-indigent defendants. *See, e.g.*, *United States v. Manzano-Huerta*, 2014 WL 2154262, at *2 (N.D. Iowa May 22, 2014).

WILLIAMS & CONNOLLY LLP

March 5, 2026
Page 8

 Finally, the Court should direct the parties to confer as to the procedures of the deposition, including identification of case-in-chief exhibits, how to ensure the deposition will proceed "in the same manner as a deposition in a civil action," Fed. R. Crim. P. 15(e), and objections, *id.* 15(g).

*   *   *

 For the foregoing reasons, the Peraire-Buenos oppose the motion for a Rule 15 deposition. If the Court grants the motion, the Peraire-Buenos request that the Court make the additional orders identified above.

Respectfully submitted,

By: */s/ Daniel Marx*      By: */s/ Katherine Trefz*

| | |
|---|---|
| Daniel N. Marx | Katherine Trefz (*pro hac vice*) |
| William W. Fick (*pro hac vice*) | Daniel Shanahan (*pro hac vice*) |
| Fick & Marx LLP | Patrick J. Looby (*pro hac vice*) |
| 24 Federal Street, 4th Floor | Joseph Bayerl (*pro hac vice*) |
| Boston, MA 02110 | Ikenna Ugboaja (*pro hac vice*) |
| Tel: 857-321-8360 | Williams & Connolly LLP |
| dmarx@fickmarx.com | 680 Maine Avenue SW |
| wfick@fickmarx.com | Washington, DC 20024 |
| | Tel: (202) 434-5000 |
| *Counsel for Defendant* | ktrefz@wc.com |
| *Anton Peraire-Bueno* | dshanahan@wc.com |
| | plooby@wc.com |
| | jbayerl@wc.com |
| | iugboaja@wc.com |
| | |
| | Jonathan P. Bach |
| | Shapiro Arato Bach |
| | 1140 Avenue of the Americas |
| | 17th Floor |
| | New York, NY 10036 |
| | Tel: 212-257-4897 |
| | jbach@shapiroarato.com |

cc: Counsel of Record via ECF